UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

THE EUROPEAN COMMUNITY,
acting on its own behalf and on behalf of the
MEMBER STATES it has power to represent,
and the Republic of Austria, Kingdom of Belgium,
Republic of Bulgaria, Republic of Cyprus,
Czech Republic, Kingdom of Denmark,
Republic of Estonia, Republic of Finland,
French Republic, Federal Republic of Germany,
Hellenic Republic, Republic of Hungary,
Republic of Ireland, Italian Republic, Republic of Latvia,
Republic of Lithuania, Grand Duchy of Luxembourg,
Republic of Malta, Kingdom of the Netherlands,
Republic of Poland, Portuguese Republic,
Romania, Slovak Republic, Republic of Slovenia,
Kingdom of Spain, and Kingdom of Sweden, individually,

       Plaintiffs,

- against -

RJR NABISCO, INC.,
R.J. REYNOLDS TOBACCO COMPANY,
(a New Jersey corporation),
RJR ACQUISITION CORP., f/k/a
NABISCO GROUP HOLDINGS CORP.,
RJR NABISCO HOLDINGS CORP.,
R.J. REYNOLDS TOBACCO HOLDINGS, INC.,
R.J. REYNOLDS GLOBAL PRODUCTS, INC.,
REYNOLDS AMERICAN INC., and
R.J. REYNOLDS TOBACCO COMPANY,
(a North Carolina corporation),

       Defendants.

_____

SECOND
AMENDED COMPLAINT

Case No:  CV 02-5771-Garaufis

      Plaintiffs, THE EUROPEAN COMMUNITY, acting on its own behalf and on

behalf of the MEMBER STATES it has power to represent, and the Republic of Austria,

Kingdom of Belgium, Republic of Bulgaria, Republic of Cyprus, Czech Republic, Kingdom of

Denmark, Republic of Estonia, Republic of Finland, French Republic, Federal Republic of

Germany, Hellenic Republic, Republic of Hungary, Republic of Ireland, Italian Republic,

Republic of Latvia, Republic of Lithuania, Grand Duchy of Luxembourg, Republic of Malta,

Kingdom of the Netherlands, Republic of Poland, Portuguese Republic, Romania, Slovak

Republic, Republic of Slovenia, Kingdom of Spain, and Kingdom of Sweden, individually,

(hereinafter referred to as the "MEMBER STATES" and together with THE EUROPEAN

COMMUNITY, as "PLAINTIFFS"), by and through their undersigned attorneys, for their

complaint against Defendants, RJR NABISCO, INC., R.J. REYNOLDS TOBACCO

COMPANY (a New Jersey corporation), RJR ACQUISITION CORP., f/k/a NABISCO GROUP

HOLDINGS CORP., RJR NABISCO HOLDINGS CORP., and R.J. REYNOLDS TOBACCO

HOLDINGS, INC. (hereinafter referred to as the "ORIGINAL RJR DEFENDANTS"), and

REYNOLDS AMERICAN INC. (RAI), R.J. REYNOLDS GLOBAL PRODUCTS, INC., and

R.J. REYNOLDS TOBACCO COMPANY (a North Carolina corporation) (RJRT) (hereinafter

referred to as the "RJR SUCCESSOR CORPORATIONS" or collectively with all the RJR

entities, as the "REYNOLDS AMERICAN DEFENDANTS" or "RJR DEFENDANTS") and

herein allege:

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................ 1

II. PARTIES ......................................................................................................... 3

III. JURISDICTION .............................................................................................. 15

IV. VENUE .......................................................................................................... 15

V. SCOPE ........................................................................................................... 16

VI. THE LINK BETWEEN THE RJR DEFENDANTS' CIGARETTE SALES, MONEY

    LAUNDERING, AND ORGANIZED CRIME ............................................... 17

    *Money-Laundering Links Between Europe, The United States, Russia, and Colombia* ... 17

    *Background on the Convergence of Narcotics Trafficking and Money Laundering* ........ 18

    *Background on Black-Market Money Exchanges* ............................................... 20

    *Background on Money Laundering: The Cut-Out Strategy* ............................... 22

VII. THE DEVELOPMENT OF THE MONEY-LAUNDERING ENTERPRISES.................. 24

VIII. THE RJR DEFENDANTS' DIRECT INVOLVEMENT IN MONEY LAUNDERING... 28

    *RJR's Relationships with Money Launderers* .................................................. 29

    *The RJR Defendants' Direction and Control of the Money-Laundering Scheme* ............ 31

    *Cigarette Sales to Launder Narcotics Proceeds* .............................................. 32

    *Money Laundering Through Central America and the Caribbean* ................................. 33

    *Money Laundering through Panama* ............................................................. 34

    *Distinctions between Sales to Legitimate Customers and Sales to Criminal Customers* . 35

    *Money-Laundering Mechanisms / Laundering of Cash* ...................................... 37

    *Money Laundering through Brady Bonds* ....................................................... 39

i

*Illegal Sales into Iraq through the European Community* ................................................. 40

*The RJR Defendants and Terrorist Organizations* ........................................................ 41

*Travel and Entertainment by RJR Employees* ............................................................. 44

*RJR's Efforts to Deceive the Plaintiffs* ...................................................................... 45

*RJR's Responsibility for its Agents, Employees, and Coconspirators* ............................ 47

*RJR's Use of Wires and Mails* ................................................................................. 48

IX.  THE REYNOLDS AMERICAN DEFENDANTS' ACQUISITION OF BROWN &

WILLIAMSON TOBACCO CORPORATION'S BUSINESS ....................................... 50

*Money Laundering Through Panama* ........................................................................ 52

*Money Laundering Through Cigarette Manufacturing and Sales in the European*

*Community* ........................................................................................................... 54

*Illegal Sales in the European Community* .................................................................. 55

*Reynolds American Inc.'s Exploitation of Port Facilities, Banks, Wires, Mails, and Other*

*Institutions in the European Community* .................................................................... 56

*Travel and Entertainment by Reynolds American Inc. Employees* ................................ 57

*Reynolds American Inc.'s Efforts to Deceive the Plaintiffs* ......................................... 57

*Reynolds American, Inc.'s Responsibility for its Agents, Employees, and Coconspirators*

.............................................................................................................................. 58

*Reynolds American Inc.'s Use of Wires and Mails* ..................................................... 59

X.  INTEREST OF THE UNITED STATES, THE EUROPEAN COMMUNITY, AND THE

MEMBER STATES IN THE RJR DEFENDANTS' SCHEMES ................................. 62

*The Palermo Convention* ....................................................................................... 66

*The USA PATRIOT Act* ......................................................................................... 68

XI.  CONTINUING DAMAGE TO THE PLAINTIFFS AND COMPELLING NEED FOR

INJUNCTIVE AND EQUITABLE RELIEF ................................................................. 69

*Compensatory Damages* ...................................................................................... 70

*Restitution* ........................................................................................................... 87

*Punitive Damages* ............................................................................................... 87

*Declaratory Relief* ............................................................................................... 88

*Injunctive and Other Equitable Relief* ............................................................... 88

COUNT I:  MEMBER STATES (RICO, 18 U.S.C. § 1962(a)) ................................... 95

COUNT II:  MEMBER STATES (RICO, 18 U.S.C. § 1962(b)) ............................... 109

COUNT III:  MEMBER STATES (RICO, 18 U.S.C. § 1962(c)) .............................. 110

COUNT IV:  MEMBER STATES (RICO, 18 U.S.C. § 1962(d)) .............................. 112

COUNT V:  MEMBER STATES (RICO, 18 U.S.C. §§ 1964(a), 1964(c), 28 U.S.C. § 1651(a))

............................................................................................................................... 114

COUNT VI:  EC AND MEMBER STATES (COMMON-LAW FRAUD) .............................. 116

COUNT VII:  EC AND MEMBER STATES (PUBLIC NUISANCE – DAMAGES) ............. 119

COUNT VIII:  EC AND MEMBER STATES (PUBLIC NUISANCE – INUNCTIVE RELIEF)

............................................................................................................................... 124

COUNT IX:  EC AND MEMBER STATES (UNJUST ENRICHMENT) .............................. 127

COUNT X:  MEMBER STATES (UNJUST ENRICHMENT) .................................... 129

COUNT XI:  EC AND MEMBER STATES (NEGLIGENCE) ................................... 130

COUNT XII:  EC AND MEMBER STATES (NEGLIGENT MISREPRESENTATION) ....... 134

COUNT XIII:  MEMBER STATES (COMMON-LAW CONVERSION) ............................. 136

COUNT XIV:  MEMBER STATES (MONEY HAD AND RECEIVED) ............................. 138

DEMAND FOR JUDGMENT ................................................................................................ 139

## I.  INTRODUCTION

1. For more than a decade, the RJR DEFENDANTS have directed, managed, and controlled money-laundering operations that extended within and/or directly damaged the Plaintiffs.  The RJR DEFENDANTS have engaged in and facilitated organized crime by laundering the proceeds of narcotics trafficking and other crimes.  As financial institutions worldwide have largely shunned the banking business of organized crime, narcotics traffickers and others, eager to conceal their crimes and use the fruits of their crimes, have turned away from traditional banks and relied upon companies, in particular the RJR DEFENDANTS herein, to launder the proceeds of unlawful activity.

2. The RJR DEFENDANTS knowingly sell their products to organized crime, arrange for secret payments from organized crime, and launder such proceeds in the United States or offshore venues known for bank secrecy.  RJR DEFENDANTS have laundered the illegal proceeds of members of Italian, Russian, and Colombian organized crime through financial institutions in New York City, including The Bank of New York, Citibank N.A., and Chase Manhattan Bank.  The RJR DEFENDANTS have done business in Iraq, in violation of U.S. sanctions, in transactions that financed both Saddam Hussein's regime and terrorist groups.

3. The RJR DEFENDANTS have, at the highest corporate level, determined that it will be a part of their operating business plan to sell cigarettes as a means of laundering criminal proceeds – that is, to sell cigarettes to and through criminal organizations and to accept criminal proceeds in payment for cigarettes by secret and surreptitious means, which under U.S. law constitutes money laundering.  The officers and directors of the RJR

1

DEFENDANTS facilitated this overarching money-laundering scheme by restructuring the corporate structure of the RJR DEFENDANTS, for example, by establishing subsidiaries in locations known for bank secrecy to direct and implement their money-laundering schemes and to avoid detection by U.S. and European law enforcement.  This overarching scheme to launder criminal proceeds by selling cigarettes to criminals was implemented through many subsidiary schemes across THE EUROPEAN COMMUNITY and the United States.

Examples of these subsidiary schemes are described in this Complaint and include:

> (a.)    Money laundering for European organized crime;
>
> (b.)    Laundering criminal proceeds in the European Community;  and
>
> (c.)    Laundering criminal proceeds through Panama.

Numerous additional subsidiary schemes exist that harm THE EUROPEAN COMMUNITY and each of the MEMBER STATES named herein.

4. This civil action is based upon violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), which was specifically intended by Congress to eradicate organized crime on all fronts (including in foreign and interstate commerce) and to deprive violators of their ill-gotten gains.  It is also based upon violations of standards of common law, including fraud, negligence, unjust enrichment, public nuisance (federal and state common law), and conspiracy to commit such torts.  Plaintiffs seek damages, equitable relief including disgorgement of profits, and injunctive relief:  (a) to enjoin the RJR DEFENDANTS from engaging in money laundering and facilitating organized crime, and (b) to compel the RJR DEFENDANTS to adopt necessary programs and procedures to prevent such conduct in the future.  Absent such relief, there will be an increased risk to national security, continued injury

to Plaintiffs' business and property, and damage to the vital interests of the United States and Plaintiffs.

## II.  PARTIES

5. THE EUROPEAN COMMUNITY is a governmental body created as a result of collaboration among the majority of the nations of Western Europe, more specifically, Austria, Belgium, Bulgaria, Cyprus, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Ireland, Italy, Latvia, Lithuania, Luxembourg, Malta, The Netherlands, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, Sweden, and the United Kingdom.  Pursuant to the Treaty establishing THE EUROPEAN COMMUNITY, as last amended by the Treaty of Nice (2001), Article 2, THE EUROPEAN COMMUNITY is vested with the responsibility "to promote throughout the Community a harmonious, balanced and sustainable development of economic activities, . . . a high level of protection and improvement of the quality of the environment, the raising of the standard of living and quality of life, and economic and social cohesion and solidarity among the Member States." THE EUROPEAN COMMUNITY has certain legal rights and responsibilities.  Pursuant to Article 281 of the Treaty establishing THE EUROPEAN COMMUNITY, THE EUROPEAN COMMUNITY is a legal person.  Under the Treaty, the EC can sue and be sued.  Pursuant to Article 282 of the Treaty establishing THE EUROPEAN COMMUNITY, THE EUROPEAN COMMUNITY possesses the most extensive legal capacity accorded to legal persons under the laws of the Member States, and it may, in particular, acquire or dispose of property and may be a party to legal proceedings.  In such instances, THE EUROPEAN COMMUNITY is

represented by the European Commission.  Pursuant to Article 280 of the Treaty establishing THE EUROPEAN COMMUNITY, THE EUROPEAN COMMUNITY has the duty to counter fraud and any other illegal activities affecting the financial interests of THE EUROPEAN COMMUNITY through measures which shall act as a deterrent and be such as to afford effective protection in the Member States.  THE EUROPEAN COMMUNITY has a duty to protect against harm to the financial institutions and infrastructure within it.  THE EUROPEAN COMMUNITY possesses additional duties and authorities that have been conferred upon it by the MEMBER STATES or that it shares with the MEMBER STATES, by virtue of treaty and/or law, including but not limited to the following:  (a)  the duty and authority to regulate foreign commerce; (b)  the duty and authority to regulate and set rules to combat money laundering; (c)  the duty and authority to prescribe regulations for the seizure of bank accounts and assets and to take other related actions to combat money laundering and other financial crimes committed against the financial interests of THE EUROPEAN COMMUNITY and the MEMBER STATES; (d)  the duty and authority to ensure and regulate the free movement of goods within THE EUROPEAN COMMUNITY; (e)  the duty and authority to regulate safety and security at sea; (f)  the duty and authority to regulate and take action to protect against breaches of THE EUROPEAN COMMUNITY Customs Territory or THE EUROPEAN COMMUNITY Customs Border; (g)  the duty and authority to regulate ports, customs territories, free-trade zones, and customs-bonded warehouses; (h)  the duty and authority to regulate transportation into THE EUROPEAN COMMUNITY or within its borders; and (i)  the duty to promote throughout THE EUROPEAN COMMUNITY a harmonious, balanced, and sustainable development of economic activities and to protect and promote the economic well being of its citizens.  THE EUROPEAN COMMUNITY has the

general duty and the authority to act to abate any harm to itself or to the general public of THE

EUROPEAN COMMUNITY within its areas of competence as set forth above.  Among the

legal rights of THE EUROPEAN COMMUNITY is the right to hold a legal or beneficial

interest in property.  THE EUROPEAN COMMUNITY is represented in the United States by

a Delegation in Washington, D.C.  The Delegation has full diplomatic privileges and

immunities, and the Head of the Delegation is accorded full ambassadorial status.

   6. Each of the MEMBER STATES named as Plaintiffs herein, Republic of

Austria, Kingdom of Belgium, Republic of Bulgaria, Republic of Cyprus, Czech Republic,

Kingdom of Denmark, Republic of Estonia, Republic of Finland, French Republic, Federal

Republic of Germany, Hellenic Republic, Republic of Hungary, Republic of Ireland, Italian

Republic, Republic of Latvia, Republic of Lithuania, Grand Duchy of Luxembourg, Republic

of Malta, Kingdom of the Netherlands, Republic of Poland, Portuguese Republic, Romania,

Slovak Republic, Republic of Slovenia, Kingdom of Spain, and Kingdom of Sweden, is a

sovereign State.  As such, each MEMBER STATE possesses the legal capacity to acquire,

own, or dispose of property and may sue and be sued.  Each MEMBER STATE is a "person"

as defined under the applicable U.S. law.  Each MEMBER STATE has the right to hold a legal

or beneficial interest in property.  Many of the MEMBER STATES act in a commercial

capacity in regard to cigarettes in that they now or have in the past manufactured, sold, and/or

been bulk purchasers of cigarettes.  As such, the illegal conduct of the RJR DEFENDANTS

has directly harmed the commercial interests of the Plaintiffs and has caused them to suffer a

loss of money and property.  Several of the MEMBER STATES within the EUROPEAN

COMMUNITY have held a constitutional monopoly on the domestic manufacture and/or sale

of cigarettes.  During the period relevant to this complaint, several MEMBER STATES have

5

operated one or more cigarette manufacturing facilities within their borders.  These MEMBER STATES, along with other MEMBER STATES, have sold and/or distributed cigarettes, both made by the MEMBER STATES or those which have been legally imported into the MEMBER STATE.  By virtue of the aforesaid activities, these MEMBER STATES have been large sellers and, in some instances, the largest sellers and producers of cigarettes within their borders.  As such, they have a very large financial stake in the tobacco business and are the most harmed by illegal competition.  As a result of the actions of the RJR DEFENDANTS as set forth more fully below, these MEMBER STATES and the EUROPEAN COMMUNITY have experienced a large reduction in their business and have lost money and property as a result.

       7. Within the subject areas of their competency and jurisdiction, THE EUROPEAN COMMUNITY and each of the named MEMBER STATES are the legal entities with the duty and responsibility for enforcing the money and banking laws within their respective jurisdictions.  If any entities, including the RJR DEFENDANTS, launder criminal proceeds or commit other illegal acts that violate the money and/or banking laws of the PLAINTIFFS, these PLAINTIFFS have the duty and competency to enjoin and obtain redress for such conduct.

       8. RJR NABISCO, INC. was a Delaware corporation and, according to public records, maintained its principal place of business at 1301 Avenue of the Americas, New York, New York 10019-6013.  Prior to August 1, 2004, RJR NABISCO, INC. was the parent corporation of R.J. REYNOLDS TOBACCO COMPANY (a New Jersey corporation) and has participated in the sale and manufacture of cigarettes and other tobacco products both individually and through its agent and instrumentality, DEFENDANT R.J. REYNOLDS

TOBACCO COMPANY (a New Jersey corporation), and related entities and ventures.  At all relevant times, RJR NABISCO, INC. assumed an active role in the tobacco business and treated the tobacco business as a department or division of RJR NABISCO, INC.  At times pertinent to this complaint, RJR NABISCO, INC., individually and through its agents, subsidiaries, divisions, or affiliated companies, or ventures, materially participated in the operation and management of the RJR DEFENDANTS' money-laundering enterprise, and materially participated, conspired, assisted, encouraged, and otherwise aided and abetted one or more of the other RJR DEFENDANTS in the unlawful and fraudulent conduct alleged herein, all of which has affected foreign and interstate commerce.  Upon information and belief, based on RJR's public filings, RJR NABISCO, INC., was renamed R.J. REYNOLDS TOBACCO HOLDINGS, INC., a Delaware corporation, and was a direct, wholly owned subsidiary of RJR ACQUISITION CORP., f/k/a NABISCO GROUP HOLDINGS CORP.  During relevant times herein, RJR NABISCO, INC., has conducted continuous and systematic business in the State of New York, maintains a substantial financial presence in the State of New York, utilizes offices of its own and of its affiliated corporations in New York, and is otherwise subject to the jurisdiction of the courts in the State of New York.  Following the merger of July 30, 2004, discussed below, RJR NABISCO, INC. is now named R.J. REYNOLDS TOBACCO HOLDINGS, INC.

       9.  R.J. REYNOLDS TOBACCO COMPANY, as it existed prior to July 30, 2004, was a New Jersey corporation whose principal place of business was located at 401 North Main Street, Winston-Salem, North Carolina 27102.  At times pertinent to this complaint, R.J. REYNOLDS TOBACCO COMPANY, individually and through its agents, subsidiaries, divisions, or affiliated companies or ventures, materially participated in the

operation and management of the RJR DEFENDANTS' money-laundering enterprise, and materially participated, conspired, assisted, encouraged, and otherwise aided and abetted one or more of the other RJR DEFENDANTS in the unlawful and fraudulent conduct alleged herein, all of which has affected foreign and interstate commerce.  During relevant times herein, R.J. REYNOLDS TOBACCO COMPANY conducted continuous and systematic business in the State of New York, maintained a substantial financial presence in the State of New York, utilized offices of its own and of its affiliated corporations in New York, and is otherwise subject to the jurisdiction of the courts in the State of New York.  The entity previously known as R.J. REYNOLDS TOBACCO COMPANY was absorbed as a part of the merger of July 30, 2004, and, on information and belief, is no longer an active corporation.

       10.  RJR NABISCO HOLDINGS CORP. was a Delaware corporation whose principal place of business was 1301 Avenue of the Americas, New York, New York 10019-6013.  Prior to August 1, 2004, RJR NABISCO HOLDINGS CORP. was the parent corporation of RJR NABISCO, INC.  On June 14, 1999, RJR NABISCO HOLDINGS CORP. changed its name to NABISCO GROUP HOLDINGS CORP.  In 2001, NABISCO GROUP HOLDINGS CORP. changed its name to RJR ACQUISITION CORP.  RJR ACQUISITION CORP., f/k/a NABISCO GROUP HOLDINGS CORP. was a Delaware corporation whose principal place of business was 7 Campus Drive, Parsippany, New Jersey 07054-0311.

       11.  On June 14, 1999, RJR NABISCO HOLDINGS CORP. distributed all of the common stock of its subsidiary, R.J. REYNOLDS TOBACCO HOLDINGS, INC., to the shareholders of RJR NABISCO HOLDINGS CORP.  Following the merger of July 30, 2004, RJR ACQUISITION CORP., f/k/a NABISCO GROUP HOLDINGS CORP., to the extent that it still exists, is ultimately a subsidiary of REYNOLDS AMERICAN INC.

12. R.J. REYNOLDS GLOBAL PRODUCTS, INC. was and is a Delaware corporation whose principal place of business is 401 North Main Street, Winston-Salem, North Carolina.  Prior to July 30, 2004, R.J. REYNOLDS GLOBAL PRODUCTS, INC. was a subsidiary of R.J. REYNOLDS TOBACCO COMPANY.  Since the merger of July 30, 2004, the Defendant, R.J. REYNOLDS GLOBAL PRODUCTS, INC., was and is a subsidiary of REYNOLDS AMERICAN INC.

13. During all relevant times, the holding corporations, identified above in paragraphs 8, 10, and 11, participated, directly and indirectly, in the sale and manufacture of cigarettes and other tobacco products through their agent and instrumentality DEFENDANT R.J. REYNOLDS TOBACCO COMPANY (a New Jersey corporation), and related entities and ventures.  These holding corporations assumed an active role in the tobacco business, and at relevant times have treated the tobacco business as a department or division.  At times pertinent to this complaint, these holding corporations, individually and through their agents, subsidiaries, divisions, or affiliated companies or ventures, materially participated in the operation and management of the RJR DEFENDANTS' money-laundering enterprise, and materially participated, conspired, assisted, encouraged, and otherwise aided and abetted one or more of the other RJR DEFENDANTS in the unlawful and fraudulent conduct alleged herein, all of which has affected foreign and interstate commerce.  During relevant times herein, the holding corporations, identified above in paragraphs 8, 10, and 11, conducted continuous and systematic business in the State of New York, maintained a substantial financial presence of their own and their affiliated corporations in New York, and are otherwise subject to the jurisdiction of the courts in the State of New York.

14. The ORIGINAL RJR DEFENDANTS are and were, during all relevant times, involved in directing, managing, and controlling money-laundering operations that extended within and/or directly damaged the PLAINTIFFS.  At all times pertinent to this complaint, the ORIGINAL RJR DEFENDANTS, individually and through their employees, agents, joint venturers, coconspirators, subsidiaries, divisions, or affiliated companies, actively directed, managed, and controlled the ORIGINAL RJR DEFENDANTS' money-laundering enterprise, and actively participated, conspired, assisted, encouraged, and otherwise aided and abetted one or more of their coconspirators in the unlawful and fraudulent conduct alleged herein, all of which has affected and continues to affect foreign and interstate commerce in the United States.

15. The foregoing RJR corporations, as well as their affiliated entities, ventures, and successors, are and were, during all relevant times, affiliated, consolidated, combined, and unitary entities for purposes of tobacco operations and related activities. Tobacco operations were departments within the RJR corporate family.  The ORIGINAL RJR DEFENDANTS maintained control of tobacco operations worldwide through a web of affiliated entities and joint ventures.  This corporate structure was an essential aspect of the ORIGINAL RJR DEFENDANTS' successful efforts to launder the proceeds of criminal activity to the detriment of the PLAINTIFFS.

16. The ORIGINAL RJR DEFENDANTS are and were, during all relevant times, responsible for the acts and omissions of their employees, for acts undertaken within the general area of their authority and for the benefit of the ORIGINAL RJR DEFENDANTS.  As alleged herein, the ORIGINAL RJR DEFENDANTS were central figures in the overall conspiracy that actively embarked on and extensively participated in the fraudulent scheme.

10

By means of corporate policies that put the ORIGINAL RJR DEFENDANTS' resources and strategy at the heart of the conspiracy, the ORIGINAL RJR DEFENDANTS were aggressor entities that acted to harm the economic interests of the Plaintiffs.

17. The ORIGINAL RJR DEFENDANTS, during relevant times, adopted a policy that purported to exercise control over the activities of their employees, as well as those of their direct and indirect subsidiaries.  Under this policy, which on information and belief is monitored and enforced by RJR's Audit Committee, the ORIGINAL RJR DEFENDANTS have undertaken responsibility for the acts of the employees of the ORIGINAL RJR DEFENDANTS, wherever taken, including acts related to money-laundering activities within Europe and elsewhere which materially injured THE EUROPEAN COMMUNITY and its MEMBER STATES.

18. On or about July 30, 2004, the ORIGINAL RJR DEFENDANTS and Brown & Williamson Tobacco Corporation, (hereinafter Brown & Williamson or B&WTC) entered into a merger which resulted in the creation of several new corporate entities.  This included the creation of corporate entities which had names identical to previously existing corporations.  The newly created corporate entities are as described below.

19. The Defendant, REYNOLDS AMERICAN INC. (hereinafter referred to as "REYNOLDS AMERICAN" or by its New York Stock Exchange designation "RAI"), is a corporation organized and existing under the laws of the State of North Carolina, which maintains its principal place of business at 401 North Main Street, Post Office Box 2990, Winston-Salem, North Carolina 27102-2990.  RAI is the parent corporation to the entity currently known as R.J. REYNOLDS TOBACCO HOLDINGS, INC. (described below and hereinafter referred to as "RJR") and acquired the assets, including the brands of Brown &

11

Williamson Tobacco Corporation.  REYNOLDS AMERICAN INC. conducts continuous and systematic business in the State of New York, maintains a substantial financial presence in the State of New York, utilizes offices of its own and of its affiliated corporations in New York, and is otherwise subject to the jurisdiction of the courts in the State of New York.

20. The Defendant, R.J. REYNOLDS TOBACCO HOLDINGS, INC. (hereinafter referred to as "RJR"), is a corporation organized and existing under the laws of the State of Delaware which maintains is principal place of business at 401 North Main Street, Post Office Box 2866, Winston-Salem, North Carolina 27102-2866.  R.J. REYNOLDS TOBACCO HOLDINGS, INC. is the parent corporation of R.J. REYNOLDS TOBACCO COMPANY (a North Carolina corporation) (described below and also known as "RJRT"), a wholly owned subsidiary of REYNOLDS AMERICAN INC.  RJR is the successor, by June 15, 1999, re-naming, of RJR NABISCO, INC.

21. The Defendant, R.J. REYNOLDS TOBACCO COMPANY (a North Carolina corporation) (hereinafter referred to as "REYNOLDS TOBACCO" or by its New York Stock Exchange designation "RJRT"), is a corporation organized and existing under the laws of the State of North Carolina, which maintains it principal place of business at 401 North Main Street, Winston-Salem, North Carolina 27102-2990.  RJRT is a wholly owned subsidiary of R.J. REYNOLDS TOBACCO HOLDINGS, INC. (RJR), which is in turn a wholly owned subsidiary of REYNOLDS AMERICAN INC. (RAI).  By virtue of the merger of July 30, 2004, RJRT is the successor in fact to the business of Brown & Williamson Tobacco Corporation and R.J. REYNOLDS TOBACCO COMPANY.

22. The functional result of the above-described merger is that the newly created entity REYNOLDS AMERICAN INC. is the parent company to the ORIGINAL RJR

12

DEFENDANTS and the entities which conducted Brown & Williamson's tobacco business. Former stockholders in the RJR entities now own 58 percent of the stock in REYNOLDS AMERICAN INC., while Brown & Williamson Holdings, Inc. owns 42 percent of the stock of REYNOLDS AMERICAN INC. Many of the money-laundering conspiracies which are more fully described in this complaint have continued subsequent to the merger of July 30, 2004. At the time of the merger on July 30, 2004, the Defendants REYNOLDS AMERICAN INC., R.J. TOBACCO HOLDINGS, INC., and R.J. REYNOLDS TOBACCO COMPANY (a North Carolina corporation), acquired the money-laundering enterprise of the ORIGINAL RJR DEFENDANTS. The REYNOLDS AMERICAN DEFENDANTS continue to direct, manage, and be responsible for the money-laundering enterprise of their subsidiaries, including the ORIGINAL RJR DEFENDANTS. In addition, there is a new money-laundering enterprise by virtue of the combined activities of the consolidated entity now known as REYNOLDS AMERICAN INC. In addition, the REYNOLDS AMERICAN DEFENDANTS make, ship, sell, and receive payments for traditional "Brown & Williamson-brand" cigarettes subsequent to July 30, 2004, and, as such, are liable for the illegal activities, including the receipt of criminal proceeds, associated with their activities in regard to those brands.

            23. The REYNOLDS AMERICAN DEFENDANTS are and were, during all relevant times, involved in directing, managing, and controlling money-laundering operations that extended within and/or directly damaged the PLAINTIFFS. At all times pertinent to this complaint, the REYNOLDS AMERICAN DEFENDANTS , individually and through their employees, agents, joint venturers, coconspirators, subsidiaries, divisions, or affiliated companies, actively directed, managed, and controlled their money-laundering enterprises, and actively participated, conspired, assisted, encouraged, and otherwise aided and abetted one or

13

more of their coconspirators in the unlawful and fraudulent conduct alleged herein, all of which has affected and continues to affect foreign and interstate commerce in the United States.

24. The foregoing DEFENDANTS, as well as their affiliated entities, ventures, and successors, are and were, during all relevant times, affiliated, consolidated, combined, and unitary entities for purposes of tobacco operations and related activities.  Tobacco operations were departments within the respective corporate families.  The REYNOLDS AMERICAN DEFENDANTS  maintained control of tobacco operations worldwide through a web of affiliated entities and joint ventures.  This corporate structure was an essential aspect of their successful efforts to launder the proceeds of criminal activity to the detriment of the PLAINTIFFS.

25. The RJR DEFENDANTS are and were, during all relevant times, responsible for the acts and omissions of their employees, for acts undertaken within the general area of their authority and for the benefit of the RJR DEFENDANTS.  As alleged herein, the RJR DEFENDANTS were central figures in the overall conspiracy that actively embarked on and extensively participated in the fraudulent scheme.  By means of corporate policies that put the RJR DEFENDANTS' resources and strategy at the heart of the conspiracy, the RJR DEFENDANTS were and are aggressor entities that acted to harm the economic interests of the Plaintiffs.

26. The RJR DEFENDANTS, during relevant times, adopted a policy that purports to exercise control of the activities of their employees, as well as those of their direct and indirect subsidiaries.  Under this policy, the RJR DEFENDANTS have undertaken responsibility for the acts of the employees of the RJR DEFENDANTS, wherever taken,

14

including acts related to money-laundering activities within Europe and elsewhere which

materially injured THE EUROPEAN COMMUNITY and its MEMBER STATES.

## III. JURISDICTION

27. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1337

because the claims of the MEMBER STATES involve allegations of illegal behavior arising

under the laws of the United States, including violations of RICO and federal common law.

Furthermore, jurisdiction in this Court is proper pursuant to RICO, 18 U.S.C. §§ 1964(a),(c)

and 28 U.S.C. § 1651(a).  The DEFENDANTS are "persons" within the meaning of 18 U.S.C.

§ 1961(3).  As to all Plaintiffs, jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332

because the matter in controversy exceeds the sum or value of $75,000 and involves parties of

diverse citizenship.  The Plaintiffs are "persons" within the meaning of 18 U.S.C. § 1961(3).

Finally, this Court may exercise jurisdiction over Plaintiffs' non-federal claims pursuant to 28

U.S.C. § 1367, as this Court possesses both federal-question and diversity jurisdiction.

## IV.  VENUE

28. Venue is proper in this Court pursuant to 18 U.S.C. § 1965(a) because

DEFENDANTS reside, are found, have an agent, or transact affairs in this district.  Venue is

also proper in this Court pursuant to 18 U.S.C. § 1965(b) because, to the extent any

DEFENDANT may reside outside of this district, the ends of justice require such

DEFENDANT or DEFENDANTS to be brought before the Court.  Venue properly lies in this

Court pursuant to 28 U.S.C. § 1391(b)(2) or, alternatively, pursuant to 28 U.S.C. § 1391(a)(2).

Further, certain of the conspiratorial acts alleged herein took place within this judicial district.

V.  SCOPE

29. For purposes of this complaint, the Plaintiffs do not seek damages or equitable relief from the Defendants that (a) would result in an obligation of indemnity under the Purchase Agreement dated as of March 9, 1999, as amended and restated as of May 11, 1999, among R.J. REYNOLDS TOBACCO COMPANY, RJR NABISCO, INC. (the "Sellers") and Japan Tobacco Inc. (the "Buyer"), being owed by the Buyer to any member of the Sellers' Group (as defined in the Purchase Agreement); or (b) were released and discharged in the Release executed by THE EUROPEAN COMMUNITY and certain MEMBER STATES dated December 14, 2007.  Without limitation, the Plaintiffs seek all available damages and equitable relief in regard to (i) any "RJR-brands" *other than* Camel, Doral, Dorchester, MacDonald, Magna, Maxim, Monte Carlo, More, Now, Passport, Quest, Salem, Select, Vantage, Winchester, Windsor, Winston, and any name variation of those brands; (ii) all "Brown & Williamson brands" sold by the REYNOLDS AMERICAN DEFENDANTS; (iii) all brands manufactured or sold as a result of any joint ventures between RJR and REYNOLDS AMERICAN, INC. and any other companies; and (iv) all cigarette brands, including those referred to above, for sales after December 14, 2007.

## VI.  THE LINK BETWEEN THE RJR DEFENDANTS' CIGARETTE SALES,
## MONEY LAUNDERING, AND ORGANIZED CRIME

*Money-Laundering Links Between Europe, The United States, Russia, and Colombia*

30. Cigarette sales, money laundering, and organized crime are linked and interact on a global basis.  According to Jimmy Gurule, former Undersecretary for Treasury Enforcement:  "Money laundering takes place on a global scale and the Black Market Peso Exchange System, though based in the Western Hemisphere, affects business around the world.  US law enforcement has detected BMPE-related transactions occurring throughout the United States, Europe, and Asia."

31. The primary source of cocaine within THE EUROPEAN COMMUNITY is Colombia.  Large volumes of cocaine are transported from Colombia into THE EUROPEAN COMMUNITY and then sold illegally within THE EUROPEAN COMMUNITY and the MEMBER STATES.  The proceeds of these illegal sales must be laundered in order to be useable by narcotics traffickers.  For many years and continuing to the present day, a primary means by which these cocaine proceeds are laundered is through the purchase and sale of cigarettes, including those manufactured by the RJR DEFENDANTS.  Cocaine sales in THE EUROPEAN COMMUNITY are facilitated through money-laundering operations in Colombia, Panama, and elsewhere, which utilize RJR DEFENDANTS' cigarettes as the money-laundering vehicle.

32. In a similar way, the primary source of heroin within THE EUROPEAN COMMUNITY is the Middle East and, in particular, Afghanistan, with the majority of said

17

heroin being sold by Russian organized crime, Middle Eastern criminal organizations, and terrorist groups based in the Middle East.  Heroin sales in THE EUROPEAN COMMUNITY and the MEMBER STATES are facilitated and expedited by the purchase and sale of the RJR DEFENDANTS' cigarettes in money-laundering operations that begin in THE EUROPEAN COMMUNITY and the MEMBER STATES, Eastern Europe, and/or Russia, but which ultimately result in the proceeds of those money-laundering activities being deposited into the coffers of the RJR DEFENDANTS in the United States.

*Background on the Convergence of Narcotics Trafficking and Money Laundering*

33. This complaint is about Trade and Commerce or, more correctly, illegal Trade and illegal Commerce, and how money laundering facilitates the financing and movement of goods internationally.  Merchants engaging in global trade often turn to the more stable global currencies for payments of goods and services purchased abroad.  In many markets, the U.S. dollar is the currency of choice and, in some cases, the U.S. dollar is the only accepted form of payment.  Merchants seeking dollars usually obtain them in a variety of ways, including the following three methods.  Traditional merchants go to a local financial institution that can underwrite credit.  Private financing is usually available for those with collateral.  A third and least desirable source of dollar financing can be found in the "black markets" of the world.  Black markets are the underground or parallel financial economies that exist in every country.  These underground economies are controlled by criminals and their organizations, which generally operate through "money brokers."  These "money brokers" often fulfill a variety of roles not the least of which is as an important intermediate step in the

laundering process, one that we will refer to throughout this complaint as the "cut out." (See paragraphs 42-45 below.)

34. The criminal activity that provides the dollars for these black-market money-laundering operations is often drug trafficking and related violent crimes. South America is the world leader in the production of cocaine, and the United States and the European Community are the world's largest cocaine markets. Likewise, Colombia and countries in the Middle East produce heroin. Cocaine and heroin are smuggled to the United States and Europe, and are sold for U.S. dollars as well as Euros and local European currencies. Russian drug smugglers obtain heroin from the Middle East and cocaine from South America and sell both drugs in large quantities in the United States and in Europe. Retail street sales of cocaine and heroin have risen dramatically over the past two decades throughout the United States and Europe. Consequently, drug traffickers routinely accumulate vast amounts of illegally obtained cash in the form of U.S. dollars in the United States and Euros in Europe. In 2002, the U.S. Customs Service estimated that illegal drug sales in the United States alone generated an estimated fifty-seven billion dollars in annual revenues, most of it in cash.

35. A drug trafficker must be able to access his profits, to pay expenses for the ongoing operation and to share in the profits; and he must be able to do this in a manner that seemingly legitimizes the origins of his wealth, so as to ward off oversight and investigation that could result in his arrest and imprisonment and the seizure of his monies. The process by which these goals are achieved is the money-laundering cycle.

36. The purpose of the money-laundering cycle is to establish total anonymity for the participants, by passing cash drug proceeds through financial markets in a way that conceals or disguises the illegal nature, source, ownership, and/or control of the money.

*Background on Black-Market Money Exchanges*

37. Within Europe, the United States, South America, and elsewhere, a community of illegal currency exchange brokers, known to law-enforcement officials as "money brokers," operates outside the established banking system and facilitates the exchange of narcotics sale proceeds for local cash or negotiable instruments. Many of these money brokers have developed methods to bypass the banking systems and thereby avoid the scrutiny of regulatory authorities. These money brokers have different names depending on where they are located, but they all operate in a similar fashion.

38. A typical "money broker" system works this way: In a sale of Colombian cocaine in THE EUROPEAN COMMUNITY, the drug cartel exports narcotics to the MEMBER STATES where they are sold for Euros. In Colombia, the cartel contacts the money broker and negotiates a contract, in which the money broker agrees to exchange pesos he controls in Colombia for Euros that the cartel controls in Europe. The money broker pays the cartel the agreed-upon sum in pesos. The cartel contacts its cell (group) in THE EUROPEAN COMMUNITY and instructs the cell to deliver the agreed-upon amount of Euros to the money broker's European agent. The money broker must now launder the Euros he has accumulated in THE EUROPEAN COMMUNITY. He may also need to convert the

20

Euros into U.S. dollars because his customers may need U.S. dollars to pay companies such as the RJR DEFENDANTS for their products.

39. The money broker uses his European contacts to place the monies he purchased from the cartel into the European banking system or into a business willing to accept these proceeds (a process described in more detail below). The money broker now has a pool of narcotics-derived funds in Europe to sell to importers and others. In many instances, the narcotics trafficker who sold the drugs in THE EUROPEAN COMMUNITY is also the importer who purchased the cigarettes. Importers buy these monies from the money brokers at a substantial discount off the "official" exchange rates and use these monies to pay for shipments of items (such as cigarettes), which the importers have ordered from U.S. companies and/or their authorized European representatives, or "cut outs." The money broker uses his European contacts to send the monies to whomever the importer has specified. Often these customers utilize such monies to purchase the RJR DEFENDANTS' cigarettes in bulk and, in many instances, the money brokers have been directed to pay the RJR DEFENDANTS directly for the cigarettes purchased. The money broker makes such payments using a variety of methods, including his accounts in European financial institutions. The purchased goods are shipped to their destinations. The importer takes possession of his goods. The money broker uses the funds derived from the importer to continue the laundering cycle.

40. In that fashion, the drug trafficker has converted his drug proceeds (which he could not previously use because they were in dollars or Euros) to local currency that he can use in his homeland as profit and to fund his operations; the European importer has obtained the necessary funds from the black-market money broker to purchase products that he might not otherwise have been able to finance (due to lack of credit, collateral, or U.S.

dollars, and/or a desire for secrecy); the company selling cigarettes to the importer has received payment on delivered product in its currency of choice, regardless of the source of the funds; and the money broker has made a profit charging both the cartel and the importer for his services.  This cycle continues until the criminals involved are arrested and a new cycle begins.  Money laundering is a series of such events, all connected and never stopping until at least one link in the chain of events is broken.

41. Many narcotics traffickers who sell drugs in THE EUROPEAN COMMUNITY now also purchase and import cigarettes.  In particular, as the trade in cigarettes becomes more profitable and carries lesser criminal penalties compared to narcotics trafficking, the "business end" of selling the cigarettes has become at least as attractive and important to the criminal as the narcotics trafficking.  Finally, it makes no difference whatsoever to the money-laundering system whether the goods are imported and distributed legally or illegally.  Regardless of whether he sells his cigarettes legally or illegally, the narcotics trafficker has achieved his goal in that he has been able to disguise the nature, location, true source, ownership, and/or control of his narcotics proceeds.  At the same time, the cigarette manufacturer has achieved its goal because it has successfully sold its product in a highly profitable way.

*Background on Money Laundering:  The "Cut-Out" Strategy*

42. There are numerous important steps in any money-laundering cycle. "Dirty" money of necessity moves in a way that is specifically designed to conceal or disguise its nature, source, ownership, and/or control.  Successful "layering" of "dirty" transactions

22

often will involve intermediaries, like money brokers, as a matter of necessity and convenience. These "money brokers" play an important role in the laundering conspiracy. They serve to isolate relevant coconspirators from the overt criminal acts, and because of that they are often referred to by law-enforcement agencies as "cut outs." The "cut out" is purposefully inserted into the transaction to create a layer of activity between the overt criminal actors and those receiving the laundered proceeds or profits of the criminal scheme. The "cut out's" role is to shield the true participants in the conspiracy from discovery.

43. In this money-laundering conspiracy, the RJR DEFENDANTS' role will often be masked by the activities of the "cut outs." Consequently, the "cut-out" strategy will be referred to often throughout this complaint. The "cut-out" strategy is also relevant to the sales and marketing end of the international cigarette export cycle. When a cigarette manufacturer intentionally sells its products into criminal distribution channels via carefully selected wholesalers, so that it can deny responsibility for "where the customer sells the product," the manufacturer is using that wholesaler as a "cut out" to insulate itself from the overt acts involved in the sale of cigarettes as a means of supporting the money-laundering cycle.

44. The cut-out strategy benefits the manufacturers looking to increase market share and those merchants looking to conceal their involvement in legal or illegal business activity. This process develops an unfair business strategy for the manufacturer, which increases its market share by creating a competitive disadvantage. By operating outside the legal framework for fair business operations, the manufacturer creates an unfair advantage for itself as against its competitors in virtually all aspects of business activity, including profit margins, financing terms, price structures, shipping, storage, advertising, regulation (e.g., in

the case of cigarettes, health warnings), reporting obligations, and other aspects of business strategy. The resulting "competitive disadvantage" is particularly onerous to domestic companies that must comply with an array of regulations ranging from the sourcing of raw materials to laws governing treatment of their employees. Consequently, domestic manufacturers in THE EUROPEAN COMMUNITY (both state owned and privately owned) are particularly harmed by the cut-out strategy.

45. As will become clear from the RJR DEFENDANTS' use of Giovannex, UETA, and many others, the "cut out" was an integral part of the RJR DEFENDANTS' direction of and participation in this international money-laundering conspiracy.

## VII.  THE DEVELOPMENT OF THE MONEY-LAUNDERING ENTERPRISES

46. The RJR DEFENDANTS have been aware of organized crime's involvement in the distribution of their products. On January 4, 1978, the Tobacco Institute's Committee of Counsel met in New York City. The Committee of Counsel was the high tribunal that set the tobacco industry's legal, political, and public relations strategy for more than three decades. The January 4, 1978, meeting was called to discuss, among other things, published reports concerning organized crime's involvement in the tobacco trade and the tobacco industry's complicity therein. The published reports detailed the role of organized crime in the tobacco trade (including the Colombo crime family in New York), and the illegal trade at the Canadian border and elsewhere. RJR's general counsel, Max Crohn, attended and participated in the meeting. The large cigarette manufacturers were present at the meeting and/or represented by counsel. The Committee of Counsel took no action to address,

24

investigate, or end the role of organized crime in the tobacco business.  Instead, the Committee

agreed to formulate a joint plan of action to protect the industry from scrutiny of the U.S.

Congress.  Notice and the agenda for the meeting, and the minutes of the meeting, were

transmitted by the use of the U.S. mails.

47. From June 1999 through August 1, 2004, and continuing to the present day,

the RJR DEFENDANTS have undertaken extensive efforts to increase their market share and

to expand the sales of their products throughout the world.  To accomplish this end, the RJR

DEFENDANTS have actively engaged in the sale of their products to criminals and/or

criminal organizations, which can purchase goods with their criminal proceeds only if the

payments for those goods are made covertly so as to avoid detection by law enforcement.  The

RJR DEFENDANTS engaged in such conduct through illegal acts, including money

laundering, wire fraud, mail fraud, and other violations of U.S. law.  The RJR DEFENDANTS

have controlled, directed, encouraged, supported, and facilitated the activities of the criminals

who purchase their products.  The RJR DEFENDANTS have collaborated with criminals,

directly and indirectly, and have sold cigarettes to persons and entities that they know or had

reason to know were laundering criminal proceeds through the purchase of cigarettes.

48. By engaging in this illegal conduct the RJR DEFENDANTS have achieved

multiple benefits for themselves, including but not limited to the following:

(a.)	The RJR DEFENDANTS have increased their cigarette sales

because they have new and additional customers, namely, the money launderers and the criminal

organizations they service.

(b.)	The RJR DEFENDANTS have increased their profit margins

because they require the criminals to pay a premium for their cigarettes and/or subject the

criminals to sales and credit terms that are more favorable to the RJR DEFENDANTS than those granted to legitimate customers.

(c.)     The RJR DEFENDANTS have increased their market share by adding to their customer base to the detriment of their competitors.

(d.)     The RJR DEFENDANTS have enhanced the market value of their tobacco operations, while decreasing the market value of their competitors' operations.

49. The RJR DEFENDANTS, jointly and as individual corporations, control, direct, encourage, support, promote, and facilitate criminal activities that harm THE EUROPEAN COMMUNITY in a variety of ways, including but not limited to the following:

(a.)     The RJR DEFENDANTS developed mechanisms and procedures, including the use of cut outs, to allow their criminal customers to pay them for cigarettes in ways that could not be detected by U.S. and European law enforcement.  In most instances, the RJR DEFENDANTS mandate that their criminal clients utilize these procedures to ensure that the RJR DEFENDANTS' role in these money-laundering activities will remain undetected.

(b.)     The RJR DEFENDANTS accept payments from persons or entities they know, or have reason to know, are criminals and money launderers, and/or from distributors that they know, or have reason to know, are selling cigarettes to criminals and money launderers.

(c.)     The RJR DEFENDANTS make arrangements by which the cigarettes they sell can be paid for in such a way that the payments are virtually untraceable.

(d.)     The RJR DEFENDANTS make arrangements for payments for their cigarettes to be made into foreign accounts in an attempt to improperly utilize the banking and privacy laws of foreign governments as a shield to protect the criminals from government investigations concerning their activities.

26

(e.)     The RJR DEFENDANTS agree to receive payment for cigarettes by way of third-party checks and other forms of payment executed by persons who have no relationship to the transaction other than that they have provided the funds.  Such persons are a common part of money-laundering schemes.  Payments for cigarettes by such third-party persons are a clear indication of money-laundering activity.

(f.)     The RJR DEFENDANTS established protocols for "layered transactions" that allowed for payment for cigarettes to be made through multiple intermediaries (cut outs) to conceal the ultimate source and nature of the illicit funds.

(g.)     The RJR DEFENDANTS invoiced distributors and intermediaries (cut outs) for cigarettes that were sold to criminal customers to conceal the fact that these sales were being made to criminals.  In fact, however, the intermediaries and distributors were never expected to pay for the invoiced cigarettes and, at most, would act as pass-through accounts by which the criminals paid the RJR DEFENDANTS for cigarettes.

(h.)     The RJR DEFENDANTS generate false or misleading invoices, bills of lading, shipping documents, and other documents that expedite the process by which the cigarettes are secretly delivered to criminals.

(i.)     The RJR DEFENDANTS approve their criminal customers on an expedited basis and do not require them to go through the formalities required of legitimate customers.

(j.)     The RJR DEFENDANTS engage in a pattern of activity by which they ship cigarettes designated for one port knowing that the cigarettes in fact will be diverted to another port to be sold illegally and/or in violation of U.S. laws and embargoes.

(k.)     The RJR DEFENDANTS have formed, financed, and directed the activities of industry groups to disseminate false and misleading information to Plaintiffs and the public to conceal their illegal activities.

(l.)     The RJR DEFENDANTS controlled, directed, encouraged, supported, and facilitated cigarette sales by and to criminals by giving instructions to distributors, shippers, shipping companies, retailers, and/or various other intermediaries so as to effectuate the sale of large amounts of cigarettes by and to criminal organizations.

50. But for the involvement and active assistance of the RJR DEFENDANTS, money launderers and criminals could not have laundered the proceeds of their criminal activities and continued such activities at such levels to the detriment of THE EUROPEAN COMMUNITY and the MEMBER STATES.  The members of this vertical group, consisting of the RJR DEFENDANTS, the distributors, the shippers, the criminal customers, currency brokers, and the RJR DEFENDANTS' agents and subsidiaries who receive payment for the cigarettes, work together for the common purpose of depriving Plaintiffs of money and property and engaging in a course of conduct to gain massive profits from the sale of cigarettes as a part of a global money-laundering enterprise while harming Plaintiffs' economic interests.  The activities of this core group constitute a conspiracy in law and in fact.


VIII.  THE RJR DEFENDANTS' DIRECT INVOLVEMENT IN MONEY LAUNDERING


51. The RJR DEFENDANTS have been actively involved in money laundering for many years, and have carried out their scheme through acts within this district and throughout the State of New York.  Examples of the methods and means by which the RJR

28

DEFENDANTS have been complicit in the money-laundering scheme, directly and through the acts of their coconspirators, are set forth below.

*RJR's Relationships with Money Launderers*

52. The RJR DEFENDANTS have solicited contacts with companies and individuals in Europe, Central America, and the Caribbean that the RJR DEFENDANTS knew, or had reason to know, were money launderers. In approximately 2002, RJR began engaging in a series of acquisitions and joint ventures which caused RJR to enter the international market. At that time, RJR engaged in money-laundering activities. Said money-laundering activities have occurred and continue to occur up to and through the date of this complaint.

53. In light of the dramatic increase of narcotics sales in THE EUROPEAN COMMUNITY in the 2000s, narcotics traffickers and money launderers in THE EUROPEAN COMMUNITY increasingly needed to launder enormous volumes of cash and/or convert their cash from one form of currency to another. The RJR DEFENDANTS wished to increase their market share in certain target markets including THE EUROPEAN COMMUNITY by obtaining additional customers for their product on whom they could rely to sell the cigarettes in the markets targeted by the RJR DEFENDANTS. In general, it was immaterial to the RJR DEFENDANTS whether the cigarettes were sold legally or illegally, so long as the cigarettes were sold in the target markets. Accordingly, the RJR DEFENDANTS reached an agreement with their coconspirators, the narcotics traffickers and money launderers, that the RJR DEFENDANTS would provide these criminals with the capability to launder the proceeds of

their criminal activities, including narcotics trafficking, by purchasing the RJR DEFENDANTS' tobacco products.  The RJR DEFENDANTS arranged for secret delivery of the cigarettes and secret means by which the coconspirators could pay for the cigarettes, an essential component of the money-laundering scheme.  In return, the narcotics traffickers and money launderers agreed to sell the products in the markets targeted by the RJR DEFENDANTS and sold the cigarettes under the instructions of the RJR DEFENDANTS.  In this way, the proceeds of enormous amounts of Colombian cocaine money and Russian heroin money derived from narcotics sales in the United States and THE EUROPEAN COMMUNITY, as well as the proceeds of other crimes, were laundered through the purchase and sale of the RJR DEFENDANTS' products.

54. The RJR DEFENDANTS had a well-established relationship with distributors in Panama, the Caribbean, Eastern Europe, and elsewhere who were well situated to develop and exploit relationships with criminal individuals and organizations.  The RJR DEFENDANTS directly and indirectly encouraged their distributors to solicit and/or expand their relationships with customers who were purchasing the cigarettes largely for the purpose of laundering criminal proceeds.  Said practice continues to the present date.

55. The RJR DEFENDANTS entered into agreements and understandings with money launderers and narcotics traffickers in Europe, Russia, and South America to meet the business needs of the RJR DEFENDANTS and their coconspirators.  Communications with or on behalf of these individuals were accomplished through a regular use of the U.S. wires and mails.

*The RJR Defendants' Direction and Control of the Money-Laundering Scheme*

56. The RJR DEFENDANTS controlled every aspect of the financial transactions involving the purchase of their cigarettes.  The RJR DEFENDANTS set either favorable or unfavorable financing terms for their customers as a means to reward, punish, and/or control the customers.  The RJR DEFENDANTS also controlled the exact methods and means by which the RJR DEFENDANTS were paid for the cigarettes.  In this way, the RJR DEFENDANTS structured their payment schemes to maximize their own security from detection by U.S. and European law enforcement.

57. In addition to establishing the rules by which the RJR DEFENDANTS would be paid by cash, Brady Bonds, secret payments to offshore accounts, or other means as described more fully below, the RJR DEFENDANTS also dictated that their criminal customers route payments to the RJR DEFENDANTS through intermediary distributors, shippers, and other cut outs.  This procedure, known in money-laundering jargon as "layering," is conducted for the sole purpose of concealing the payments' true source from THE EUROPEAN COMMUNITY and U.S. law enforcement.

58. In the 2000s, at key distribution points in the European Community, the RJR DEFENDANTS utilized certain companies to handle and sell their products.  These companies maintained lists of "direct customers of RJR" which included special handling instructions for shipments designated for RJR customers that the RJR DEFENDANTS knew were involved in criminal activities.  These special instructions, directed by the RJR DEFENDANTS, were intended to conceal the true purchaser of the cigarettes and/or the RJR DEFENDANTS' relationship with these special customers.  These "direct customer" lists

31

clearly demonstrated that the RJR DEFENDANTS knew that they were selling to criminal customers and thereby demonstrated that the RJR DEFENDANTS knew that they were receiving criminal proceeds in payment for their products.

*Cigarette Sales to Launder Narcotics Proceeds*

59. The sale of cigarettes has become one of the primary vehicles by which drug traffickers launder their illicit profits. The RJR DEFENDANTS have become a prime recipient of this business. Money brokers routinely purchase large volumes of RJR cigarettes with money that represents the proceeds of illicit drug sales. Representatives of the RJR DEFENDANTS know or should know the source of these funds and their illicit nature, yet the RJR DEFENDANTS continue to receive these funds and to sell cigarettes to these persons and entities.

60. Sales of RJR cigarettes have enabled drug lords to launder their illicit profits. Representatives of the RJR DEFENDANTS are on actual notice that the source of funds used to purchase their cigarettes is drug trafficking, yet the RJR DEFENDANTS continue to receive these funds and to sell cigarettes to these persons and their affiliates. By reason of this conduct, the RJR DEFENDANTS aid, abet, and act in concert with drug lords to launder their ill-gotten gains.

61. The RJR DEFENDANTS have long been on notice that their cigarette sales are linked to money laundering. In or about 1994, the National Coalition Against Crime and Tobacco Contraband, which was funded by RJR and other tobacco companies, retained Lindquist Avey Macdonald Baskerville Inc. ("Lindquist") to investigate and analyze illegal

32

activity involving cigarettes in the United States, among other things.  In its August 15, 1994, report, Lindquist observed that: "There are indications that some Colombian cocaine barons still handle cigarettes, but for a different purpose.  It is believed that, in some cases, they patriate cocaine profits earned in the United States through cigarette purchases.  These cigarettes are imported into Colombia and sold there, providing cocaine traffickers with a seemingly legal alibi for the source of their wealth."

62.    That the RJR DEFENDANTS should have known that their distributors were laundering drug proceeds is undeniable.  In or about the early 1990s, bank accounts in Miami, Florida, owned by various RJR cigarette distributors, were frozen by U.S. law-enforcement officials because funds credited to those accounts represented laundered drug money.  The freezing of these accounts was well known to the RJR DEFENDANTS.  By virtue of this event, the RJR DEFENDANTS were aware or should have been aware that their distributors had been involved in handling laundered narcotics proceeds.  In spite of the fact that the conduct of these individuals was known to the RJR DEFENDANTS, the RJR DEFENDANTS continued to develop these relationships actively so as to sell large volumes of cigarettes to these money launderers.

*Money Laundering through Central America and the Caribbean*

63. Agents and employees of the RJR DEFENDANTS established direct relationships with individuals in Europe, Central America, and the Caribbean who they knew, or should have known, were actively involved in laundering the proceeds of illicit narcotics sales.  Executives and employees of the RJR DEFENDANTS traveled to Europe, the

33

Caribbean, and to Central America on multiple occasions for the purpose of meeting and

negotiating business agreements with individuals who the RJR DEFENDANTS knew, or

should have known, were involved in the laundering of narcotics proceeds.  This travel was

routinely arranged through the use of the U.S. wires and mails.

   64. The development of these relationships with known money launderers was

known or should have been known by all the ORIGINAL RJR DEFENDANTS and in

particular RJR NABISCO, INC. and R.J. REYNOLDS TOBACCO COMPANY.


*Money Laundering through Panama*


   65. The RJR DEFENDANTS knowingly and intentionally shipped large

volumes of cigarettes to individuals and corporations in certain free-trade zones such as the

Colon Free Trade Zone in Panama for the purpose of expediting the money-laundering

scheme.

   66. Even as to cigarettes whose ultimate destination was nowhere near Panama,

the RJR DEFENDANTS shipped cigarettes through cut outs in Panama so that the money

launderers could use the secrecy laws of the Republic of Panama as a shield by which to

prevent law-enforcement agencies and governments from identifying the true purchasers of

the cigarettes.  This trade allowed for the movement of laundered money out of Europe

without detection.  The RJR DEFENDANTS endeavored to conceal the sale of their products

into money-laundering channels by transferring the cigarettes to several cut outs in several

destinations prior to the ultimate delivery to the final customer and by providing secret and

circuitous means by which the cigarettes were paid for.

*Distinctions between Sales to Legitimate Customers and Sales to Criminal Customers*

67. The RJR DEFENDANTS utilized different business practices depending on whether their customer was a legitimate business customer or a criminal business customer. Criminal customers were handled differently because they represented a greater risk. Specifically, the RJR DEFENDANTS faced a risk that the products intended for criminal customers might be confiscated or the customers arrested. Additionally, the RJR DEFENDANTS took steps to conceal from law-enforcement authorities their relationship with these criminal customers so as to prevent law-enforcement authorities from becoming aware that the RJR DEFENDANTS were laundering criminal proceeds.

68. Cigarette sales to a legitimate customer can be identified by the following characteristics:

(a.)     Customers placed orders directly to the RJR DEFENDANTS through the use of purchase orders. Purchase orders could be communicated by telephone or fax.

(b.)     The purchase orders were processed and serviced by warehouses contracted by the RJR DEFENDANTS.

(c.)     The wholesaler of the cigarettes was responsible for complying with all applicable laws and the payment of applicable taxes.

(d.)     Legitimate customers were usually provided with credit terms. Because credit was being extended, the approval process for a new customer could take a substantial amount of time.

35

      (e.)     Legitimate customers routinely make payments directly to the RJR DEFENDANTS via wire transfers.

      (f.)     Cigarettes purchased by legitimate customers were typically produced and shipped from a single source.

      69. In contrast, when the RJR DEFENDANTS sold cigarettes to criminal customers, the procedure often was as follows:

      (a.)     The customers could not place orders directly to the RJR DEFENDANTS; orders had to be placed with some intermediary company (a cut out).

      (b.)     If the cigarettes passed through a Free Trade Zone, the customer, not the RJR DEFENDANTS, coordinated the shipment and transportation instructions with the Free Trade Zone.

      (c.)     The customer was deemed "responsible" for compliance with applicable law regarding the sale of the cigarettes.

      (d.)     Sales were often for cash only; no credit or credit terms highly favorable to the RJR DEFENDANTS were offered.

      (e.)     The RJR DEFENDANTS approved such sales almost immediately without any attempt to "know the customer."  In fact, the RJR DEFENDANTS make it a point to not develop a knowledge of the customer so they would not have to admit that they were aware of the customer's criminal activities.  Formal applications and waiting periods for approval that were the standard in the industry were circumvented.

      (f.)     The RJR DEFENDANTS accepted payment by checks payable to intermediary companies, third-party checks, bank checks, third-party wire transfers, and other

forms of payment that were not typical in the cigarette trade.  Payments often had to be made through "cut outs" to hide or disguise the true nature of the transaction and the participants.

(g.)    On some occasions, payments were made directly to the account of an RJR subsidiary in the Caribbean.  However, in such instances, those payments were directed to be sent to a numbered account and did not name the RJR DEFENDANTS in the payment details.

(h.)    The RJR DEFENDANTS continually switched the banks where payments were to be made to the RJR DEFENDANTS in order to escape detection by U.S. law enforcement.  This process was known within the RJR DEFENDANTS as "musical banks."

(i.)    The RJR DEFENDANTS engaged in "dual sourcing," a practice in which cigarettes were sourced from multiple locations or transferred through circuitous and indirect shipping routes to conceal the true customer.

*Money-Laundering Mechanisms*

*Laundering of Cash*

70. The way in which the RJR DEFENDANTS laundered narcotics proceeds and the proceeds of other forms of criminal activity evolved.  Many of the money-laundering operations were simple and overt, involving meetings between RJR employees and known money launderers in which the RJR employees would receive large volumes of cash in payment for cigarettes, or would be present when these transactions took place.

71. For example, it was virtually a monthly routine that employees of the RJR DEFENDANTS would travel from the US to Colombia by way of Venezuela.  These

employees, traveling with authorized RJR distributors, would enter Colombia illegally, paying bribes to guards at the Colombian border so that they could enter the country without their passports being stamped.  They would then travel by car to various locations such as Maicao where they would meet face to face with money launderers and narcotics traffickers.  There the RJR employees would receive payments for cigarettes in the form of bulk cash that may be denominated in U.S. dollars or Venezuelan bolivars.  They would also receive easily transferable instruments such as third-party checks, cashier's checks, and other such instruments.  The employees of the RJR DEFENDANTS would then travel back to Venezuela, bribing border guards at the Venezuelan border to ensure that they could move the cash illegally across the border into Venezuela.  Once the employees of the RJR DEFENDANTS reached a major Venezuelan city such as Maracaibo they would, by direct or indirect means, wire transfer the funds to bank accounts of the RJR DEFENDANTS in the United States, thereby completing the money-laundering cycle.

72.    Throughout this process, the RJR DEFENDANTS and their employees were well aware that they were laundering the proceeds of criminal activities.  The great lengths that were taken to conduct these activities in a surreptitious manner demonstrate the knowledge of the RJR DEFENDANTS that these activities were illegal.  The process by which these illegal payments were made, received, transported, and laundered was established by high-level executives of the RJR DEFENDANTS.  This money-laundering operation could not have occurred without the knowledge and complicity of officers and managers of the RJR DEFENDANTS.  The above-described travel was arranged through the use of the U.S. wires and mails and the laundered narcotics proceeds were transferred to the bank accounts of the RJR DEFENDANTS through the U.S. wires and mails.

38

*Money Laundering through Brady Bonds*

73. At another time, to avoid the transportation of bulk cash and to conceal further the illegal nature of their transactions, the RJR DEFENDANTS laundered the proceeds of criminal activities through the use of Brady Bonds.  Brady Bonds, named after former United States Secretary of the Treasury Nicholas Brady, were created in association with the IMF and the World Bank as part of an effort to restructure outstanding sovereign loans into liquid debt instruments.  Brady Bonds were coupon-bearing bonds for which the principal and interest were collateralized by United States Treasury zero-coupon bonds and other high-grade instruments.  Creditor banks exchanged sovereign loans for Brady Bonds incorporating principal and interest guarantees as a means by which debtor governments could have their debts reduced.  Issued as registered and/or bearer bonds, Brady Bonds were utilized to restructure the debt in a number of countries, including Venezuela.  Brady Bonds are transferable and can be bought and sold through various exchanges.

74. As an example of how Brady Bonds were used to launder narcotics proceeds, employees and/or distributors of the RJR DEFENDANTS traveled to locations such as Maicao, Colombia, to receive payment for cigarettes by cash, check, or money order.  Often these payments were made in Venezuelan bolivars, not the preferred currency for the RJR DEFENDANTS.  To convert these bolivars into U.S. dollars, the RJR DEFENDANTS and/or their distributors would transport the cash, checks, or money orders to a major city in Venezuela.  At that point, they would use the funds in question to purchase Brady Bonds.  Once the Brady Bonds were purchased, they would be transferred to an exchange in New

York City where they would then be sold for dollars.  In this way, the RJR DEFENDANTS could launder the proceeds of criminal activities, convert the proceeds into U.S. dollars, and deliver them to their bank accounts in New York without detection from law enforcement. The purchase, movement, and sale of the Brady Bonds were expedited through the United States wires and/or mails.

### *Illegal Sales into Iraq through the European Community*

75. In 2001 and 2002, the RJR DEFENDANTS produced and sold new brands of cigarettes that apparently were designed for the Iraqi/Middle East market.  Two such brands were Easton and Barton.  These cigarette brands, although virtually unknown in the West and unidentified in the RJR DEFENDANTS' annual report, were manufactured by the RJR DEFENDANTS in North Carolina for sale into Iraq.

76. The Easton brand name is purportedly owned by a company known as GMB Inc. located at 401 North Main Street, Winston-Salem, North Carolina.  This address is also the address for the corporate offices of the RJR DEFENDANTS.  Although GMB Inc. ostensibly owns the brand-name rights to Easton cigarettes, the cigarettes themselves were manufactured by the RJR DEFENDANTS.  Easton-brand cigarettes made in the United States were labeled in part:  "Manufactured by RJ Reynolds Tobacco Co., Winston-Salem, NC USA exclusively for A.T.C. . . .Made in USA."  The Barton Light cigarettes made in the United States were labeled in part:  "Manufactured by RJ Reynolds Tobacco Co., Winston-Salem, NC USA. exclusively for A.T.C. . . .Made in USA."

40

77. The Barton- and Easton-brand cigarettes were sold through the RJR DEFENDANTS' distribution network into Iraq.  Shipments of Easton- and Barton-brand cigarettes, manufactured by the RJR DEFENDANTS, were sold illegally into Iraq as recently as April 2002.  Shipments of Barton- and Easton-brand cigarettes were accompanied by promotional materials, including hats, cigarette lighters, key rings, and matches.

78. Examples of illegal shipments of cigarettes into Iraq between January and April 2002 includes:

Barton          4,500 master cases                (10,000 cigarettes per master case)

Easton          1,560 master cases.

Shipments into Iraq on March 2, 2002, March 23, 2002, March 31, 2002, April 6, 2002, and April 11, 2002, included advertising and promotional materials for the cigarettes.

79. In many instances, the cigarettes in question, even when ostensibly in the possession of the distributor, remained titled to the RJR DEFENDANTS.  Thus, the RJR DEFENDANTS maintained control over the shipping, handling, and ultimate delivery of the cigarettes up to and including the time the cigarettes entered Iraq.  The aforesaid scheme was accomplished through a continuing use of the U.S. wires and/or mails.

*The RJR Defendants and Terrorist Organizations*

80. Substantial portions of the cigarettes sold into Iraq were sold to or for the benefit of various terrorist groups, including the PKK (Kurdistan Workers' Party).  From June 1999 and up to and including 2002, the RJR DEFENDANTS and their coconspirators sold cigarettes into Iraq by way of the northern territories of Iraq, including the towns of Dohuk

and Zokho.  This region is wholly or partially controlled by terrorist groups, including the

PKK.  The PKK and similar terrorist groups charge a fee for every container of cigarettes that

is allowed to pass through their territory.  These fees have been paid to the PKK by the RJR

DEFENDANTS' coconspirators.  Consequently, the RJR DEFENDANTS and their

coconspirators have provided direct financial benefits to the PKK and other terrorist groups.

Although the regime of Saddam Hussein was often at odds with Kurdish groups in Northern

Iraq, the illegal cigarette trade was so lucrative to Saddam Hussein and his family that they

allowed several Kurdish groups to import these cigarettes.  Saddam Hussein's son Uday

Hussein oversaw and personally profited from the illegal importation of cigarettes into Iraq.

This racketeering scheme harmed U.S. and EUROPEAN COMMUNITY interests.  On May

18, 2004, the United States Department of the Treasury took action to freeze the assets of

Uday Hussein's key financial lieutenants in the organized crime enterprise, including (i) Roodi

Slewa, who received millions of dollars from the cigarette distributors and paid Uday Hussein

approximately $1.5 million per month from the proceeds of this racketeering scheme; and (ii)

Nabil Victor Karam, who played a key role in Uday Hussein's racketeering activities in

addition to serving as the director of Trading and Transport Services and Alfa Company

Limited for International Trading and Marketing, two companies that managed many of Uday

Hussein's illegal enterprises.

        81. On October 8, 1999, Secretary of State Madeleine K. Albright designated

the PKK as a "Foreign Terrorist Organization" (FTO) pursuant to the Antiterrorism and

Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 302, 110 Stat. 1214, 1248

(1996), as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of

1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996).  As a result of this action, it became illegal

for a person in the United States or subject to the jurisdiction of the United States to provide

funds or other material support to a designated FTO.  On May 10, 2001, Secretary of State

Colin L. Powell reaffirmed the designation of the PKK as an FTO on the ground that it has

"continued to plan and prepare for possible acts of terrorism."

       82. The designation of the PKK as an FTO is consistent with its activities over

the course of the past three decades.  The PKK was established in the 1970s as a Marxist-

Leninist insurgent group primarily composed of Turkish Kurds.  In recent years, it has moved

beyond rural-based insurgent activities to include urban terrorism.  It seeks to establish an

independent Kurdish state in southeastern Turkey, where the population is predominantly

Kurdish.  The PKK's primary targets are the Turkish Government security force in Turkey,

but it has also been active in THE EUROPEAN COMMUNITY against Turkish targets.  The

PKK conducted attacks on Turkish diplomatic and commercial facilities in dozens of Western

European cities in 1993 and again in spring 1995.  In an attempt to damage Turkey's tourism

industry, the PKK has bombed tourist sites and hotels and kidnapped foreign tourists.  PKK

members in Europe have been involved in the wholesale and retail distribution of heroin and

other criminal activities to finance their operations, including the purchase of arms.  The PKK

has received aid and comfort from Syria, Iraq, and Iran.  On May 24, 2006, affiliates of the

PKK claimed responsibility for setting fire to the airport in Istanbul, Turkey, along with at

least eight other bombings in Istanbul in 2006.  Said bombings have a direct and adverse

impact on both the United States and the EUROPEAN COMMUNITY.

       83. The PKK has had a particularly adverse affect on THE EUROPEAN

COMMUNITY.  The PKK has launched numerous terrorist attacks within THE EUROPEAN

COMMUNITY.  Additionally, the PKK is known to commit an array of other criminal

offenses within THE EUROPEAN COMMUNITY, including heroin trafficking and weapons trafficking.  Accordingly, the acts of the RJR DEFENDANTS have proximately and directly injured and continue to injure THE EUROPEAN COMMUNITY because the RJR DEFENDANTS' activities enabled the PKK to engage in narcotics trafficking, weapons trafficking, and terrorist activities that occurred within and to the detriment of THE EUROPEAN COMMUNITY and the MEMBER STATES.  In April 2002, THE EUROPEAN COMMUNITY declared the PKK a terrorist group.

*Travel and Entertainment by RJR Employees*

84. To advance the money-laundering schemes set forth above, the employees, executives, and managers of the RJR DEFENDANTS often traveled extensively, both to supervise the schemes and also to entertain the RJR DEFENDANTS' criminal customers. RJR executives traveled from the United States to Europe and South America to meet with, entertain, and maintain relations with RJR's criminal customers.  RJR executives and managers who engaged in such travel and entertainment often received large travel and entertainment budgets from the RJR DEFENDANTS.  Some RJR executives received travel and entertainment budgets of up to one million dollars per year for the purpose of advancing the RJR DEFENDANTS' illicit activities in this fashion.

*RJR's Efforts to Deceive the Plaintiffs*

85. On many occasions over the past decade, government departments of the MEMBER STATES have requested that the RJR DEFENDANTS inspect seized cigarettes to determine whether they were legitimate product and the party to whom the cigarettes were sold. Almost invariably, the RJR DEFENDANTS have indicated that they are unable to determine to whom the product was sold. This was true even as to products that the RJR DEFENDANTS admitted were produced by them.

86. The representations by the RJR DEFENDANTS that they could not identify the customers to whom the products were sold were false and fraudulent. The cigarettes in question contained markings that allow the RJR DEFENDANTS to identify at a minimum the first and second purchasers of the cigarettes. The RJR DEFENDANTS deceived the Plaintiffs and refused to provide this information, which was known to them, in order to protect their valuable criminal customers and also to prevent the Plaintiffs' law-enforcement authorities from conducting investigations that could demonstrate the RJR DEFENDANTS' complicity in the money-laundering schemes.

87. When the RJR DEFENDANTS indicated that they were unable to identify to whom the products were sold, they made a false representation to the Plaintiffs regarding a matter of great importance to the Plaintiffs. The Plaintiffs reasonably relied upon the representations of the RJR DEFENDANTS because the RJR DEFENDANTS were supposed to be acting in good faith pursuant to cooperation agreements that they entered into with the Plaintiffs. The Plaintiffs have suffered great financial harm as a result of RJR DEFENDANTS' failure to identify the customers to which the seized products were sold. The

45

RJR DEFENDANTS' false statements have made it costly and/or impossible to apprehend the coconspirators who are trafficking in the cigarettes as a part of the scheme to launder criminal proceeds.

88. The RJR DEFENDANTS filed or caused the filing of false and fraudulent documents that misstated the destination and the value of cigarettes.  This was done to advance the money-laundering scheme.  In many nations, including the MEMBER STATES and Turkey, costly surety bonds are required of shippers that transport cigarettes across the country.  By grossly undervaluing the cigarettes being shipped, the RJR DEFENDANTS and their coconspirators reduced the purported value of their shipments and thereby dramatically reduced the surety bonds that must be paid on the cigarettes.  In so doing, the RJR DEFENDANTS and their coconspirators reduce their costs associated with the sale and delivery of the cigarettes.

89. With respect to cigarette sales into Iraq, the RJR DEFENDANTS and/or their coconspirators filed false and fraudulent documents with Spanish authorities to conceal that the final destination of the cigarettes was Iraq.  The value of the cigarettes in question was fraudulently understated by the RJR DEFENDANTS and/or their coconspirators to expedite the delivery of cigarettes into Iraq with the payment of minimal surety bonds.  THE EUROPEAN COMMUNITY and the MEMBER STATES reasonably relied upon such false and fraudulent documents to their detriment.

90. The RJR DEFENDANTS entered into an understanding or agreement, express or tacit, with their distributors, customers, agents, consultants, and other coconspirators, to participate in a common scheme, plan, or design to commit tortious and illegal acts, including money laundering.  In pursuance of the agreement, the RJR

DEFENDANTS and other tobacco companies formed, managed, and directed the affairs of

several groups including, without limitation: (a) International Committee on Smoking Issues

("ICOSI"); (b) EEC Task Force on Consumerism; (c) International Duty Free Confederation

("IDFC"); (d) "Confederation of European Community Cigarette Manufacturers Ltd."

("CECCM"); and (e) CECCM's "Duty Free Study Group" which was comprised entirely of

company representatives, including those of the RJR DEFENDANTS.  Acting through the

aforesaid groups, the RJR DEFENDANTS obstructed government oversight and falsely

represented to Plaintiffs and the public that the RJR DEFENDANTS were not involved in

illegal activities.


*RJR's Responsibility for its Agents, Employees, and Coconspirators*


91. The acts and omissions of the individuals employed by the RJR

DEFENDANTS are imputed to the RJR DEFENDANTS under the doctrines of vicarious

liability and *respondeat superior*.  The RJR DEFENDANTS actually benefited from the

performance of predicate acts of racketeering through increased sales, profits, name-brand

recognition, and market share.

92. The RJR DEFENDANTS and their employees were central figures and

aggressors in the fraudulent money-laundering scheme.  RJR personnel performed the

fraudulent and illegal acts described above on behalf of the RJR DEFENDANTS within the

scope and course of their employment with the RJR DEFENDANTS.  Through their officers

and directors, the RJR DEFENDANTS had knowledge of, or were willfully blind and

recklessly indifferent toward, the unlawful activity.

93. The RJR DEFENDANTS are liable under principles of agency.  Each of the RJR DEFENDANTS is responsible for the conduct of its supervisory employees, who violated the law and caused the RJR DEFENDANTS to enter into and act to further money-laundering conspiracies.

*RJR's Use of Wires and Mails*

94. During all relevant times, the RJR DEFENDANTS communicated with each other and with their coconspirators on virtually a daily basis by means of U.S. interstate and international wires as a means of obtaining orders for cigarettes, arranging for the sale and shipment of cigarettes, and arranging for and receiving payment for the cigarettes in question. Under principles of conspiracy and concert of action, the RJR DEFENDANTS are jointly and severally liable for the actions of their coconspirators in the furtherance of the money-laundering scheme.

95. The RJR DEFENDANTS and their coconspirators utilized the interstate and international mail and wires, and other means of communication, to prepare and transmit documents that intentionally misstated the purchases of the cigarettes in question so as to mislead the authorities within the United States, THE EUROPEAN COMMUNITY, and the MEMBER STATES in regard to the nature and objectives of the money-laundering scheme. THE EUROPEAN COMMUNITY and its MEMBER STATES, including the Republic of Austria, Kingdom of Belgium, Republic of Bulgaria, Republic of Cyprus, Czech Republic, Kingdom of Denmark, Republic of Estonia, Republic of Finland, French Republic, Federal Republic of Germany, Hellenic Republic, Republic of Hungary, Republic of Ireland, Italian

Republic, Republic of Latvia, Republic of Lithuania, Grand Duchy of Luxembourg, Republic of Malta, Kingdom of the Netherlands, Republic of Poland, Portuguese Republic, Romania, Slovak Republic, Republic of Slovenia, Kingdom of Spain, and Kingdom of Sweden, reasonably relied on said misrepresentations of fact, were damaged as a result, and continue to be damaged by such reliance.

96. The RJR DEFENDANTS, their subsidiary corporations, and their coconspirators have used the mail and telephonic and other wire forms of communication on a daily basis in furtherance of the money-laundering schemes described above.  Specifically, the U.S. mails and wires are used by the RJR DEFENDANTS to bill and pay for the cigarettes, to confirm billing and payment for the cigarettes, to account for the payment of the cigarettes to the RJR DEFENDANTS and their subsidiaries, and to maintain an accounting of the proceeds received by the RJR DEFENDANTS from the sale of the cigarettes, with said proceeds ultimately being returned to the RJR DEFENDANTS in the United States.

97. The RJR DEFENDANTS' coconspirators, the distributors and money launderers, utilize the mail and wire communications on a continuing basis to advance the money-laundering schemes, specifically to determine marketing strategies, to order cigarettes, to arrange for sale of the cigarettes, to arrange for distribution of cigarettes, to arrange payments for cigarettes, and to further support other aspects of the money-laundering schemes.

98. Because the money-laundering conspiracy is a multi-million-dollar per year operation and is continuing on a daily basis, it is impractical and impossible, in advance of discovery, to delineate each and every fraudulent communication in what is a pervasive and ongoing use of the mails and wires in furtherance of money-laundering activities.  By conducting some of their activities in countries known for bank secrecy, the RJR

49

DEFENDANTS have taken affirmative steps to prevent the victims of their fraud and illicit

conduct from discovering the exact details of the vast number of wire and mail

communications that furthered the money-laundering schemes, including orders for tobacco

products, and repatriation of the proceeds of the money-laundering schemes to the United

States.

99. In addition to using the mail and wire communications themselves to

advance the money-laundering schemes, the RJR DEFENDANTS caused the use of the U.S.

mails and wires in furtherance of the money-laundering schemes by acting with knowledge

that the use of the U.S. mails and/or wires would follow in the ordinary course of business

and/or could be reasonably foreseen as a result of their activities.  The mailings or use of wire

communications were for the purpose of executing the money-laundering schemes.  These

mail and wire transmissions furthered the money-laundering schemes and were essential to the

success of those schemes, since such communications were necessary for the coconspirators,

who were separated by great distances and national borders, to effectuate their common goals

within the money-laundering enterprises.


IX.  THE REYNOLDS AMERICAN DEFENDANTS' ACQUISITION OF BROWN &
WILLIAMSON TOBACCO CORPORATION'S BUSINESS


100. On or about July 30, 2004, the Defendant REYNOLDS AMERICAN INC.

came into existence by virtue of the merger more fully described in paragraphs 18-22 above.

As a result of the merger, the Defendants REYNOLDS AMERICAN INC., R.J. REYNOLDS

TOBACCO HOLDINGS, INC., and R.J. REYNOLDS TOBACCO COMPANY (a North

Carolina corporation), acquired and became the parent companies to the ORIGINAL RJR
DEFENDANTS.  Up to and including the date of the merger in question, the ORIGINAL RJR
DEFENDANTS were engaged in an active and ongoing Money-Laundering Enterprise as
described above.  The REYNOLDS AMERICAN DEFENDANTS, in acquiring the assets,
liabilities, employees, and operations of the ORIGINAL RJR DEFENDANTS, were fully
aware that they were acquiring an active and ongoing Money-Laundering Enterprise.

101. Since the date of the aforesaid acquisition, the REYNOLDS AMERICAN
DEFENDANTS, through their agencies, instrumentalities, and coconspirators, have continued
forward with the Money-Laundering Enterprise.  The REYNOLDS AMERICAN
DEFENDANTS have made, sold, and shipped both RJR and Brown & Williamson-brand
cigarettes to Panama and elsewhere, and received criminal proceeds in payment for cigarettes,
in the same way that the ORIGINAL RJR DEFENDANTS had conducted money laundering
for over a decade.  Examples of such shipments occurred in August 2004, March 2005, April
2005, May 2005, and October 2005.

102. When the REYNOLDS AMERICAN DEFENDANTS acquired the RJR
Money-Laundering Enterprise, it was with the intention that they would continue and build
upon said enterprise and further and that they would make use of their newly acquired assets,
including the domestic operations of Brown & Williamson, for the purpose of expanding upon
their illegal cigarette sales and money-laundering activities.

103. As a result of the above-described merger, the REYNOLDS AMERICAN
DEFENDANTS acquired and obtained control over Brown & Williamson as described above.
Brown & Williamson was an ongoing business as of the time it was acquired.  The
REYNOLDS AMERICAN DEFENDANTS understood the business they were acquiring at

51

the time of the acquisition.  Since August 2004, following the merger, the agents, employees,

instrumentalities, and customers of Brown & Williamson, now acting as agents,

instrumentalities, employees, and/or customers of the REYNOLDS AMERICAN

DEFENDANTS, have made cigarettes and have sold cigarettes to criminals and received

criminal proceeds in payment for said cigarettes as described below.  High-ranking officers of

Brown & Williamson were appointed and continue to serve as high-ranking officers of

REYNOLDS AMERICAN INC.

### Money Laundering Through Panama

104. Since their formation in July 2004, the REYNOLDS AMERICAN

DEFENDANTS have both continued the B&WTC business which they acquired and

developed money-laundering schemes.

105. An example of the money-laundering scheme is demonstrated by the use

of Giovannex in Panama by the REYNOLDS AMERICAN DEFENDANTS.  Since August

2004 and continuing at least through 2009, the REYNOLDS AMERICAN DEFENDANTS

have manufactured traditional Brown & Williamson-brand cigarettes in the United States and

sold them in large volumes to customers throughout the world through the use of their cut out

in Panama, Giovannex.  On many occasions, including August 2004, February 2005, March

2005, and April 2005, the REYNOLDS AMERICAN DEFENDANTS have made major

shipments of product from the United States to Giovannex in Panama.  Once the cigarettes are

delivered to Giovannex, Giovannex has sold the cigarettes to European Community

companies. Shipments of this type have occurred in September 2005, September 2006, and October 2006.

106. In an example of a newly created branch of the scheme, the REYNOLDS AMERICAN DEFENDANTS, over the last two years, have sold products through a company known as UETA and its sister companies. In a typical example of this scheme, the REYNOLDS AMERICAN DEFENDANTS manufacture either "traditional RJR brands" or "traditional Brown & Williamson brands" and sell them to UETA in Panama. Once UETA takes the cigarettes into its possession, they are delivered to companies in the European Community. Shipments of this type are occurring on a regular basis and have occurred as recently as February 2009.

107. In another variation of the scheme, the REYNOLDS AMERICAN DEFENDANTS manufacture cigarettes which they sell to certain companies in the European Community. These sales are accomplished through a company known as Maritrade Investments Ltd. which lists its corporate offices as being located in Kenilworth, New Jersey, although it actually acts on behalf of a company known as Amec-Rijeka located in Croatia. The European Community companies make payments to the REYNOLDS AMERICAN DEFENDANTS by way of bank accounts in the European Community, with corresponding banks including the American Express Bank in Frankfurt, Germany. Ultimately, the REYNOLDS AMERICAN DEFENDANTS receive payment for these cigarettes in their bank accounts in the United States. Sales of the cigarettes as described above with resulting payments to the REYNOLDS AMERICAN DEFENDANTS have, for example, occurred on August 10, 2006, February 4, 2006, February 25, 2006, March 17, 2006, March 29, 2006,

April 16, 2006, May 7, 2006, June 10, 2006, September 12, 2006, February 12, 2007, March 23, 2007, May 19, 2007, June 8, 2007, and on other dates.

108. Sales of REYNOLDS AMERICAN products into illegal channels have increased in 2008 and 2009 as a result of RJR's reacquisition of parts of its "duty-free" business in 2006.  Simultaneously, the relative weakness of the U.S. dollar has made authentic "made in the USA" goods a bargain compared to cigarettes manufactured in the EUROPEAN COMMUNITY.  This being the case, there has been an increase in demand for the "made in the USA" product.  While many other tobacco companies are adhering to anti money-laundering protocols which would make it impossible for criminal organizations to purchase their cigarettes, the REYNOLDS AMERICAN DEFENDANTS have failed to do so.

*Money Laundering Through Cigarette Manufacturing and Sales in the European Community*

109. Since their inception in July 2004, the REYNOLDS AMERICAN DEFENDANTS have, through their wholly owned subsidiary, R.J. REYNOLDS GLOBAL PRODUCTS, INC., entered into joint ventures for the production and sale of cigarettes which were manufactured in the EUROPEAN COMMUNITY.

110. On or about July 16, 2002, the ORIGINAL RJR DEFENDANTS acquired a fifty percent interest in R.J. Reynolds-Gallaher International SARL, a joint venture intended to produce "American-blend cigarettes" for sale in the EUROPEAN COMMUNITY, with specific marketing targets of France, Spain, the Canary Islands, Italy, Andorra, Belgium, and Luxembourg.  On or after the aforesaid acquisition, ownership and control of RJR's interest in the joint venture was placed in the hands of R.J. REYNOLDS GLOBAL PRODUCTS, INC.

In the merger of July 30, 2004, R.J. REYNOLDS GLOBAL PRODUCTS, INC. became a

subsidiary of REYNOLDS AMERICAN INC. in order to continue to enhance the RJR

DEFENDANTS' money-laundering enterprise.

111. Both before and after July 30, 2004, the primary purpose of R.J.

REYNOLDS GLOBAL PRODUCTS, INC. was to expedite the RJR DEFENDANTS' money-

laundering enterprise.  Consistent with its published business plan, the REYNOLDS

AMERICAN DEFENDANTS specifically targeted markets such as Andorra and the Canary

Islands in order to accomplish their goal of maximum illegal sales of their tobacco products in

exchange for criminal proceeds.  The instances of sales for criminal proceeds by the

REYNOLDS AMERICAN DEFENDANTS through R.J. REYNOLDS GLOBAL

PRODUCTS, INC. are too numerous to be enumerated.  They continue up to and including the

date of this complaint.

*Illegal Sales in the European Community*

112. Over the last five years and continuing to the present date, REYNOLDS

AMERICAN INC. has been responsible for large cigarette sales into illegal channels in the

European Community and has received criminal proceeds in payment for their cigarettes.  The

market for illegal cigarettes in the European Community is dominated by members of

organized crime groups.  Accordingly, virtually all of the money received by REYNOLDS

AMERICAN INC. as a result of cigarette sales to these channels constitutes criminal proceeds

that REYNOLDS AMERICAN INC. laundered through the sale of cigarettes.

*Reynolds American, Inc.'s Exploitation of Port Facilities, Banks, Wires, Mails, and Other Institutions in the European Community*

113. Since August 2004, REYNOLDS AMERICAN INC. has been responsible for the distribution of its brands through the EUROPEAN COMMUNITY and into various countries.  In addition to exploiting the port facilities of the EUROPEAN COMMUNITY as a part of its illegal scheme, REYNOLDS AMERICAN INC. through its sales to various EUROPEAN COMMUNITY companies misused or caused the misuse of EUROPEAN COMMUNITY wires and mails, banks, warehouses, and other private and public institutions in the EUROPEAN COMMUNITY.  In what was and is a pervasive and ongoing illegal scheme, REYNOLDS AMERICAN INC. has been and continues to be responsible for the sales of its products to and through various EUROPEAN COMMUNITY companies with the knowledge that the ultimate destination of its products is the illegal sale of its products into various nations, and with the further knowledge that the proceeds with which REYNOLDS AMERICAN INC. is ultimately paid constitute criminal proceeds.

114. All the aforesaid transactions were accomplished through the use of the U.S. wires and/or mails and EUROPEAN COMMUNITY wires and/or mails.  The criminal proceeds utilized to pay for the aforesaid cigarettes passed through financial institutions in the EUROPEAN COMMUNITY and ultimately into the coffers of REYNOLDS AMERICAN INC. in the United States.

*Travel and Entertainment by Reynolds American Inc. Employees*

115. Since August 2004, to advance the money-laundering scheme set forth above, the employees, executives, and managers of REYNOLDS AMERICAN INC. often travel extensively, both to supervise the schemes and to entertain REYNOLDS AMERICAN INC.'S customers who have been involved in illegal sales.  REYNOLDS AMERICAN INC.'S executives traveled to Europe, South America, and the Middle East to meet with, to entertain, and to maintain relations with these customers.

*Reynolds American Inc.'s Efforts to Deceive the Plaintiffs*

116. Since August 2004, REYNOLDS AMERICAN INC. caused the filing of false and fraudulent documents that misstated the destination and the value of cigarettes.  This was done to advance the money-laundering scheme.  The PLAINTIFFS reasonably relied upon the representations of REYNOLDS AMERICAN INC.'S agents because the DEFENDANTS were supposed to be acting in good faith.  The PLAINTIFFS have suffered great financial harm as a result of the misrepresentations made by REYNOLDS AMERICAN INC.'S agents.

117. REYNOLDS AMERICAN INC. entered into an understanding or agreement, express or tacit, with its distributors, customers, agents, consultants, and other coconspirators, to participate in a common scheme, plan, or design to commit tortious and illegal acts, including money laundering.  In pursuance of the agreement, REYNOLDS AMERICAN INC. and other tobacco companies formed, managed, and directed the affairs of

several groups including, without limitation: (a) International Committee on Smoking Issues;

(b) EEC Task Force on Consumerism; (c) International Duty Free Confederation; (d)

"Confederation of European Community Cigarette Manufacturers Ltd."; and (e) CECCM's

"Duty Free Study Group" which was comprised entirely of company representatives,

including those of REYNOLDS AMERICAN INC.  Acting through the aforesaid groups,

REYNOLDS AMERICAN INC. obstructed government oversight and falsely represented to

Plaintiffs and the public that REYNOLDS AMERICAN INC. was not involved in illegal

activities.

*Reynolds American Inc.'s Responsibility for its Agents, Employees, and Coconspirators*

118. The acts and omissions of the individuals employed by REYNOLDS

AMERICAN INC. are imputed to REYNOLDS AMERICAN INC. under the doctrines of

vicarious liability and *respondeat superior*.  REYNOLDS AMERICAN INC. actually

benefited from the performance of predicate acts through increased sales, profits, name-brand

recognition, and market share.  REYNOLDS AMERICAN INC. and its employees were

central figures and aggressors in the fraudulent scheme, and REYNOLDS AMERICAN

INC.'S personnel and executives performed their fraudulent acts on behalf of REYNOLDS

AMERICAN INC. within the scope and course of their employment with REYNOLDS

AMERICAN INC.

119. REYNOLDS AMERICAN INC. is liable under principles of agency.

REYNOLDS AMERICAN INC. is responsible for the conduct of its employees who had

either intentionally disregarded the law or had acted with plain indifference or willful blindness to its requirements.

*Reynolds American Inc.'s Use of Wires and Mails*

120. During all relevant times since August 2004, REYNOLDS AMERICAN INC. communicated with its coconspirators on virtually a daily basis by means of U.S. interstate and international wires as a means of obtaining orders for cigarettes, arranging for the sale and shipment of cigarettes, and arranging for and receiving payment for the cigarettes in question. Under principles of conspiracy and concert of action, REYNOLDS AMERICAN INC. is jointly and severally liable for the actions of its coconspirators in the furtherance of the money-laundering scheme.

121. REYNOLDS AMERICAN INC., its subsidiary corporations, and its coconspirators use the mail and telephonic and other wire forms of communication on a continual basis to pay for and confirm billing and payment for cigarettes, to account for the payment of cigarettes to REYNOLDS AMERICAN INC. and its subsidiaries, and to maintain an accounting of the illicit proceeds received by REYNOLDS AMERICAN INC. from the sale of the cigarettes, with said proceeds ultimately being returned to the REYNOLDS AMERICAN INC. in the United States.

122. Since August 2004, and continuing through the present date, REYNOLDS AMERICAN INC.'S coconspirators, the distributors and customers, utilize the mail and wire communications on a continuing basis in order to determine marketing strategies, order

cigarettes, arrange for sale of the cigarettes, arrange for distribution of cigarettes, arrange for payment of cigarettes, and to support other aspects of the money-laundering scheme.

123. At all relevant times since August 2004, REYNOLDS AMERICAN INC. engaged in a scheme to defraud and cheat the Plaintiffs.  The scheme to defraud and cheat was inconsistent with moral uprightness, fundamental honesty, fair play and right dealing in the general and business life of members of society.  In the execution of or attempt to execute this scheme, REYNOLDS AMERICAN INC. used the U.S. mail in violation of 18 U.S.C. Sections 2 and 1341, and interstate wires, and in violation of 18 U.S.C. Sections 2 and 1343.

124. In that the money-laundering enterprise is a multi-million dollar per year operation and is ongoing on a daily basis, it is impractical and impossible to delineate each fraudulent communication in what is a pervasive and ongoing use of the mails and wires in furtherance of the money-laundering activities.

125. REYNOLDS AMERICAN INC., in addition to using the mail and wire communications itself, caused the mailing and use of wire communications in that it acted with knowledge that the use of the mail and/or wire communications would follow in the ordinary course of business and/or could be reasonably foreseen as a result of its activities; and the mailing or use of wire communications was for the purpose of executing the scheme, to wit, the money-laundering activities.  The aforesaid mail and wire transmissions furthered the scheme and were essential to the scheme because the aforesaid communications were necessary for the coconspirators, who were separated by great distances, to effectuate their common goals within the money-laundering enterprise.

126. REYNOLDS AMERICAN INC. has used, and continues to use, the wires, mails, and Internet to further its scheme to defraud Plaintiffs and deprive them of money and property, while attempting to conceal its complicity in the money-laundering scheme.

127. Since its inception in August 2004, REYNOLDS AMERICAN INC. was a conspirator and direct participant in the affairs of the money-laundering enterprise, and each participant in the conspiracy is responsible for the actions of the others in pursuit of the money-laundering scheme.  For the benefit of REYNOLDS AMERICAN INC. and with the knowledge and authorization of high-ranking corporate officials of REYNOLDS AMERICAN INC., REYNOLDS AMERICAN INC., acting with and through its conspirators, agents and employees, carried out the foregoing activities to facilitate the money-laundering scheme.

128. REYNOLDS AMERICAN INC. entered into an understanding or agreement, express or tacit, with its distributors, customers, agents, consultants, and other coconspirators, to participate in a common scheme, plan, or design to commit tortious acts and thereby launder criminal proceeds.  In pursuance of the agreement, REYNOLDS AMERICAN INC. and its distributors, customers, agents, consultants, and other coconspirators acted tortiously by, among other things, committing the aforesaid acts constituting fraud, negligent misrepresentation, unjust enrichment, public nuisance, and negligence, thereby causing harm to Plaintiffs.  REYNOLDS AMERICAN INC., through joint action with its coconspirators, acted tortiously, recklessly, unlawfully, and negligently, to the detriment of Plaintiffs.  By means of the aforesaid concerted action, REYNOLDS AMERICAN INC. and its coconspirators are jointly and severally liable for the torts and other wrongful conduct alleged herein.

129. The above-described money-laundering enterprise, which is an association-in-fact, has generated millions of dollars in illegal profits for REYNOLDS AMERICAN INC. and its coconspirators.  A large portion of these illegal profits is returned to the Defendant in its offices and facilities in the United States.

130. All the aforesaid activities occurred with both the knowledge and the direction of persons at both middle management and high-level management positions within the Defendant corporation.  A substantial percentage of the cigarettes that are utilized in this enterprise are shipped from the United States.

## X.  INTEREST OF THE UNITED STATES, THE EUROPEAN COMMUNITY, AND THE MEMBER STATES IN THE RJR DEFENDANTS' SCHEMES

131. International money laundering has become a threat to U.S. security, as well as to the security of THE EUROPEAN COMMUNITY and the MEMBER STATES.  As Asa Hutchinson, then Director of the United States Drug Enforcement Administration, has stated:  "The illegal drug production that undermines America's culture also funds terror and erodes democracies across the globe.  They all represent a clear and present danger to our national security."  Since the money-laundering scheme that is the subject matter of this complaint is a fundamental part of the drug-production cycle, these money-laundering activities represent a threat to U.S. national security as well as the security of THE EUROPEAN COMMUNITY.

132. Money laundering through the purchase and sale of cigarettes has become a primary means by which terrorists finance their illegal activities.  The RJR DEFENDANTS

knowingly or negligently support the activities of terrorists when they allow terrorist groups to launder narcotics proceeds in THE EUROPEAN COMMUNITY through the purchase of U.S.-made cigarettes.

133. The majority of the conduct of the RJR DEFENDANTS that is material to this case is conducted by the RJR DEFENDANTS in the United States.  Further, substantial effects are experienced in the United States and in this district as a result of the schemes that are the subject matter of this complaint because:

(a.)   The RJR DEFENDANTS receive, and have received, the profits and proceeds of said schemes in the United States.  Such funds have been repatriated to this country through money laundering and other acts of concealment, all of which threaten the integrity of the U.S. financial system.

(b.)   The money-laundering schemes that are the subject matter of this complaint, in particular those involving Russian organized crime, are centered largely in and operate from this district.  The majority of the money-laundering activities described in relation to this portion of the scheme occurred in Queens, New York, and tens of millions of dollars of laundered criminal proceeds that constitute the subject matter of this complaint were laundered in Queens, New York.

(c.)   The United States and THE EUROPEAN COMMUNITY have recognized in international conventions their mutual interest in ending transnational money-laundering schemes.  The RJR DEFENDANTS' conduct contravenes the vital public interest in stemming such illicit conduct.

(d.)   Large volumes of false documents have been filed with the United States Customs Service and the Bureau of Alcohol, Tobacco and Firearms by the RJR DEFENDANTS

63

and/or their coconspirators. The purpose of these filings was to deceive the United States Customs Service and the Bureau of Alcohol, Tobacco and Firearms and allow the criminal activity to continue.

(e.) The money-laundering schemes are intertwined with organized crime in New York City. Some of the largest and most dangerous narcotics traffickers in the world reside and conduct business in the Eastern District of New York. Furthermore, certain individuals who work and reside in the Eastern District of New York have established a multi-million dollar industry within the Eastern District of New York for the laundering of criminal proceeds through cigarette sales. Millions of dollars worth of real estate has been purchased within the Eastern District of New York in conjunction with this money-laundering scheme.

(f.) This district and its transportation facilities have been used by the RJR DEFENDANTS as a springboard for the transnational shipment of cigarettes as part of the money-laundering scheme.

(g.) The money-laundering scheme is advanced by numerous acts of wire fraud and mail fraud, many of which occurred in the United States. The United States has an interest in preventing such schemes from being carried out through the U.S. telecommunications system and postal system.

134. Throughout THE EUROPEAN COMMUNITY, cigarettes and narcotics routinely form parts of the same criminal transactions, and the incidence of violence associated with such trade is rising rapidly. High-ranking executives of the RJR DEFENDANTS knew or reasonably should have known that their tobacco products were being sold to and through narcotics traffickers through illegal means. These executives failed

64

to act with reasonable care to investigate and abate these activities and failed otherwise to act to prevent the damage to Plaintiffs.

135. All the aforesaid activities occurred with the knowledge and at the direction of persons at both middle management and high-level management positions within the RJR DEFENDANTS.  The vast majority of the cigarettes utilized in the money-laundering schemes are shipped from the United States.  The vast majority of the activities of the RJR DEFENDANTS that are the subject matter of this complaint, including management decisions and direction of the schemes, are conducted by the RJR DEFENDANTS in the United States and, more particularly, from the RJR DEFENDANTS' offices in the State and City of New York.

136. All of the predicate acts set forth herein share the same purpose and the same victims, namely, THE EUROPEAN COMMUNITY and its MEMBER STATES, including the Republic of Austria, Kingdom of Belgium, Republic of Bulgaria, Republic of Cyprus, Czech Republic, Kingdom of Denmark, Republic of Estonia, Republic of Finland, French Republic, Federal Republic of Germany, Hellenic Republic, Republic of Hungary, Republic of Ireland, Italian Republic, Republic of Latvia, Republic of Lithuania, Grand Duchy of Luxembourg, Republic of Malta, Kingdom of the Netherlands, Republic of Poland, Portuguese Republic, Romania, Slovak Republic, Republic of Slovenia, Kingdom of Spain, and Kingdom of Sweden.

*The Palermo Convention*

137. On December 13, 2000, Under Secretary of State for Global Affairs Frank Loy signed the Palermo Convention on behalf of the United States.  The Palermo Convention was enacted in 2000 as a comprehensive treaty to fight organized crime.  The Palermo Convention entered into force on September 29, 2003, in accordance with Article 38 of the Convention.  It has been signed by all the Plaintiffs in this case and has been ratified by many of the Plaintiffs, including the European Community, Republic of Austria, Kingdom of Belgium, Republic of Cyprus, Kingdom of Denmark, Republic of Finland, French Republic, Federal Republic of Germany, Republic of Hungary, Italian Republic, Republic of Latvia, Republic of Lithuania, Grand Duchy of Luxembourg, Republic of Malta, Kingdom of the Netherlands, Republic of Poland, Portuguese Republic, Slovak Republic, Republic of Slovenia, Kingdom of Spain, and Kingdom of Sweden.  The Palermo Convention was ratified by the United States Senate in October 2005 and entered into full force and effect for the United States on or about December 3, 2005.

138. The Palermo Convention demonstrates the overriding U.S. interest in the prevention of transnational organized crime in all forms and, in particular, in relation to narcotics trafficking and money laundering.  The Palermo Convention, by its specific terms, confirms that by virtue of the United States' overriding interest in the prevention of organized crime, narcotics trafficking, and money laundering that foreign governments will be granted access to the U.S. courts even if the matter in question wholly or partially involves fiscal (tax) matters.

139. A letter from then Secretary of State, Colin L. Powell, to the President dated January 22, 2004, stated in pertinent part the following:

> The Convention and these two Protocols are the first multilateral law enforcement instruments designed to combat the phenomenon of transnational organized crime. . . . They thus would enhance the United States' ability to render and receive assistance on a global basis in the common struggle to prevent, investigate and prosecute transnational organized crime.
>
> . . . .
>
> . . . Article 6 is of crucial importance to global anti-money-laundering efforts because it for the first time imposes an international obligation on States Parties to expand the reach of their laundering laws to predicate offenses associated with organized criminal activities other than those related to narcotics trafficking that are addressed in the 1988 United States Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances. . . .
>
> . . . .
>
> Article 10 ("Liability of legal persons") compels States Parties to fill what historically has been a loophole in the ability of many states to combat organized crime—their inability to hold not only natural persons but also legal ones liable for illegal conduct. This provision requires the creation of criminal, <u>civil</u> or administrative liability, and accompanying sanctions, for corporations that participate in serious crimes involving an organized criminal group or in the offenses covered by the Convention (i.e., serious crimes generally as well as the offenses criminalized). Such corporate liability is without prejudice to the criminal liability of the natural persons who committed the offenses.
>
> . . . .
>
> Pursuant to Article 18 ("Mutual legal assistance"), State Parties are obligated to afford each other the widest measure of mutual legal assistance in investigations, prosecutions and judicial proceedings in relation to offenses within the scope of the Convention, provided that the state seeking assistance demonstrates that it has reasonable grounds to suspect that the offense is transnational in nature and involves an organized criminal group. . . .
>
> . . . .
>
> As is the case with extradition, Article 18, paragraph 22 provides that assistance may <u>not</u> be refused on the sole ground that the offense involves a <u>fiscal matter</u> or on the ground of bank secrecy.

(Emphasis added.)

140. The United States' signing of the Palermo Convention along with the recommendation letter of Secretary of State Powell conclusively demonstrate the United States' interest in the matters complained of in this Complaint without regard to whether they do or do not wholly or partially involve the fiscal (tax) matters of the Plaintiffs.

*The USA PATRIOT Act*

141. In 2001, the United States Congress passed the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act) Act of 2001. The Act was signed into law by President George W. Bush on October 26, 2001. USA PATRIOT Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001).

142. The USA PATRIOT Act demonstrates the United States' overarching interests in preventing transnational organized crime, including money laundering and the defrauding of foreign governments. In fact, the USA PATRIOT Act makes fraud against foreign governments a specified unlawful activity (SUA) so as to bring offenses against foreign governments, such as those pled in this complaint, within the purview of the U.S. money-laundering statutes and RICO.

143. Section 315 of the USA PATRIOT Act expanded the definition of specified unlawful activities to include an array of offenses committed against foreign governments. The USA PATRIOT Act states in pertinent part:

SEC. 315. INCLUSION OF FOREIGN CORRUPTION OFFENSES AS MONEY LAUNDERING CRIMES.

Section 1956(c)(7) of title 18, United States Code, is amended—

(1) in subparagraph (B)—

. . . .

(C) by adding at the end the following:

. . . .

"(vi) an offense with respect to which the United States would be obligated by a multilateral treaty, either to extradite the alleged offender or to submit the case for prosecution, if the offender were found within the territory of the United States;"

. . . .

By virtue of the currently existing multilateral treaties between the United States and the Plaintiffs, most of the offenses complained of in the Plaintiffs' lawsuit are extraditable offenses and, therefore, constitute specified unlawful activities for the money-laundering statute and for RICO. As such, the United States has, by passage of the USA PATRIOT Act, confirmed the United States' interest in the offenses that constitute the subject matter of this Complaint.

## XI. CONTINUING DAMAGE TO THE PLAINTIFFS AND COMPELLING NEED FOR INJUNCTIVE AND EQUITABLE RELIEF

144. THE EUROPEAN COMMUNITY and the MEMBER STATES have the right and duty to make claims for legal, equitable, and declaratory relief for redress against the RJR DEFENDANTS' organized crime and money-laundering conspiracy that is the subject matter of this complaint. As more specifically alleged below, THE EUROPEAN COMMUNITY and the MEMBER STATES are entitled to and hereby seek compensatory damages (or, alternatively, restitution at law), equitable relief (including injunctive relief and

disgorgement of ill-gotten gains), punitive damages, declaratory relief, and other remedies available at law and equity.

*Compensatory Damages*

145. For purposes of this complaint, the Plaintiffs do not seek damages or equitable relief from the Defendants that (a) would result in an obligation of indemnity under the Purchase Agreement dated as of March 9, 1999, as amended and restated as of May 11, 1999, among R.J. REYNOLDS TOBACCO COMPANY, RJR NABISCO, INC. (the "Sellers") and Japan Tobacco Inc. (the "Buyer"), being owed by the Buyer to any member of the Sellers' Group (as defined in the Purchase Agreement); or (b) were released and discharged in the Release executed by THE EUROPEAN COMMUNITY and certain MEMBER STATES dated December 14, 2007.  Without limitation, the Plaintiffs seek all available damages and equitable relief in regard to (i) any "RJR-brands" *other than* Camel, Doral, Dorchester, MacDonald, Magna, Maxim, Monte Carlo, More, Now, Passport, Quest, Salem, Select, Vantage, Winchester, Windsor, Winston, and any name variation of those brands; (ii) all "Brown & Williamson brands" sold by the REYNOLDS AMERICAN DEFENDANTS; (iii) all brands manufactured or sold as a result of any joint ventures between RJR and REYNOLDS AMERICAN, INC. and any other companies; and (iv) all cigarette brands, including those referred to above, for sales after December 14, 2007.

146. As a result of the RJR DEFENDANTS' wrongful activities, THE EUROPEAN COMMUNITY and the MEMBER STATES have been injured in their business

70

and property, and the RJR DEFENDANTS have secured vast profits and proceeds from their illegal scheme.  The injuries to the Plaintiffs include, but are not limited to, the following:

(a.)  *Lost Sales Due to Money-Laundering Scheme.*  Under the laws of the various MEMBER STATES, numerous MEMBER STATES have manufactured and/or distributed and/or sold cigarettes during the time relevant to this complaint.  As such, they are direct competitors in the market for cigarettes in the EUROPEAN COMMUNITY and in other markets in which they compete including, but not limited to, the United States.  The RJR DEFENDANTS' money-laundering scheme described in this complaint gives the RJR DEFENDANTS an unfair and illegal competitive advantage over the PLAINTIFFS and causes a loss of business and property to the MEMBER STATES because sales that would have been made by the PLAINTIFFS' legitimate business operations were lost to the DEFENDANTS' money-laundering enterprise.

(b.)  *Lost Sales Due to Illegal Distribution Scheme.*  In that several of the MEMBER STATES were direct competitors to the RJR DEFENDANTS, every pack of illegally distributed cigarettes unfairly and illegally supplanted sales of PLAINTIFFS' cigarettes.  Furthermore, the products distributed illegally by the RJR DEFENDANTS via their criminal scheme gained an unfair and illegal competitive advantage over the PLAINTIFFS whose products did comply with MEMBER STATE law and MEMBER STATE labeling requirements.  Health warnings and other information are mandated by MEMBER STATE law and follow a public policy tendency towards these matters espoused by many nations, including the United States.  The tobacco products illegally distributed by the RJR DEFENDANTS do not comply with these requirements.  This is of benefit to the RJR DEFENDANTS because their noncompliance gives them a competitive advantage over their competitors in the EUROPEAN

71

COMMUNITY market, including the MEMBER STATES.  In addition to the unfair and illegal

cost savings related to the labeling requirements, the fact that the illegal cigarettes contain

different information, are labeled in English, and other factors, are a significant selling point for

the illegally distributed product.  This translates into an unfair competitive advantage over their

direct competitors, the MEMBER STATES of the EUROPEAN COMMUNITY.  This is a

specifically intended and additional benefit to the RJR DEFENDANTS of their illegal and

criminal distribution scheme, and this causes additional losses to the PLAINTIFFS in that they

lose sales.

        (c.)    *Reduced Value of Sales*.  In addition to lost sales, the RJR

DEFENDANTS' money-laundering scheme described in this complaint gives the RJR

DEFENDANTS an unfair and illegal competitive advantage over the PLAINTIFFS and causes a

loss of business and property to the MEMBER STATES because the RJR DEFENDANTS' use

of the laundered narcotics proceeds, other criminal proceeds, and the illegal distribution scheme

allows the RJR DEFENDANTS to manipulate the prices of their illegally distributed product

which is intended to and, in fact, does have the effect of limiting the price at which the

PLAINTIFFS can sell their cigarettes.  Specifically, this loss is the differential between the

greater price at which the PLAINTIFFS could have sold their cigarettes (with no loss in sales

volume) and the reduced price at which they are forced to sell their products by the RJR

DEFENDANTS' narcotics and other criminal money-laundering scheme.  Simply put, but for the

RJR DEFENDANTS' narcotics and other criminal money-laundering and illegal distribution

scheme, the PLAINTIFFS would be able to demand a higher price for their products without

losing any sales because of the higher price.  This is an important and specifically intended effect

of the RJR DEFENDANTS' scheme.

(d.)     *Lost Profits from Cigarette Sales by PLAINTIFFS.*  In that the RJR DEFENDANTS' illegal distribution scheme gives the DEFENDANTS an unfair and illegal competitive advantage over their direct competitors, the MEMBER STATES, and illegally supplants the PLAINTIFFS' tobacco sales and reduces the prices at which the PLAINTIFFS can sell their products, the PLAINTIFFS make less profits from their competitive commercial activity.  This, in turn, has a negative effect on the economic viability of the PLAINTIFFS' tobacco operations and, in fact, several MEMBER STATES have had to close down their operations, and/or cut back operations, and/or sell their production and sales facilities.  Through their scheme, the RJR DEFENDANTS have acted to unfairly and illegally stifle their competitors, the MEMBER STATES of the EUROPEAN COMMUNITY.

(e.)     *Reduction of PLAINTIFFS' Ability to Compete in the United States and Other Markets.*  Due to the injuries suffered by the MEMBER STATES of the EUROPEAN COMMUNITY as described in this complaint, these PLAINTIFFS suffered an additional loss in that their ability to compete within the international markets including, but not limited to, the United States of America was reduced.  The MEMBER STATES not only produced and distributed cigarettes for domestic consumption, but also for export.  These export sales were significant in both volume and value.  In that the RJR DEFENDANTS' money-laundering and illegal distribution scheme injured the MEMBER STATES' cigarette manufacturing and distribution entities, as described in this complaint, the MEMBER STATES suffered from a reduced ability to compete in international markets including, but not limited to, the United States.  Through their scheme, the RJR DEFENDANTS have acted to unfairly and illegally stifle the MEMBER STATES in their bid for a share of the international cigarette market, including that of the United States.

(f.)     *Commercial Losses of the MEMBER STATES.*  The RJR DEFENDANTS'
money-laundering activities and their related conduct compete against the legal cigarette trade
within the MEMBER STATES and in particular compete against the MEMBER STATES that
participate in the marketplace as either buyers or sellers of cigarettes.  Entities that purchase and
sell cigarettes using laundered money enjoy an unfair competitive advantage over legitimate
businesses due to favorable exchange rates, lack of government oversight, and other factors
favoring the illegitimate trader.  Legitimate purchasers, manufacturers, and/or distributors of
cigarettes are direct competitors of the money-laundering conspirators.  As participants in the
marketplace, the MEMBER STATES suffer a direct loss of money and property as a result of
this illegal activity.

(g.)     *Damage to MEMBER STATES as Manufacturers and Distributors of
Cigarettes.*  Certain MEMBER STATES possessed and have the exclusive right to import and
distribute cigarettes within that MEMBER STATE.  These MEMBER STATES have been
adversely affected in their business and property as a direct result of the massive money-
laundering scheme to convert criminal proceeds into cigarettes, which was designed,
implemented, and controlled by the RJR DEFENDANTS.  The unfair advantage that the money-
laundering scheme afforded to the RJR DEFENDANTS impaired the ability of the MEMBER
STATES to compete effectively in their own cigarette markets.  As a result, warehouses and
other distribution facilities have been closed or otherwise rendered useless, and the MEMBER
STATES, as rightful distributors of cigarettes, lost millions of dollars, both in lost cigarette sales
as well as in the costs associated with the closing of factories, discharge of employees, and other
measures made necessary by the illegal acts of the RJR DEFENDANTS and their coconspirators.

(h.)     *DEFENDANTS' Misuse and Disruption of the Marketplace.*  THE
EUROPEAN COMMUNITY provides at its expense a marketplace without internal frontiers
that inures to the benefit of all commercial enterprises that operate within the borders of THE
EUROPEAN COMMUNITY.  This marketplace makes the sale of products such as cigarettes
easier and more profitable.  The money-laundering and other wrongful activities of the RJR
DEFENDANTS and their coconspirators make illicit use of this marketplace for their own
economic benefit and to the economic detriment of THE EUROPEAN COMMUNITY and the
MEMBER STATES.  Money laundering and associated wrongdoing disrupt the legitimate trade
and markets within THE EUROPEAN COMMUNITY, damage the economic viability of THE
EUROPEAN COMMUNITY, and cause harm to the financial institutions and infrastructure
within THE EUROPEAN COMMUNITY.

(i.)     *Damage to the Legitimate Economy.*  The RJR DEFENDANTS' money-
laundering scheme and related criminal activities cause a direct and adverse economic impact on
THE EUROPEAN COMMUNITY and the MEMBER STATES because this underground
economy, in which the RJR DEFENDANTS and their coconspirators play a significant and
material role, competes illegally against the legitimate economy of THE EUROPEAN
COMMUNITY and the MEMBER STATES, and thereby causes direct financial loss to the
PLAINTIFFS.

(j.)     *Damage to THE EUROPEAN COMMUNITY Financial Institutions.*  The
RJR DEFENDANTS' money-laundering scheme and related criminal activities undermine and
damage THE EUROPEAN COMMUNITY'S financial system.  The integrity of financial
institutions, including banks, is compromised when they are used to launder criminal proceeds.
Financial messaging systems such as the SWIFT system, based in Belgium, have been

75

compromised because they have been used on a continuing basis to expedite this money-laundering scheme.

(k.)    *Frustration of the Duty to Prevent Harm to Financial Institutions.  The* RJR DEFENDANTS' money-laundering scheme and related criminal activities subvert and undermine THE EUROPEAN COMMUNITY'S duties, responsibilities, and legal authority, and specifically inhibit the ability of THE EUROPEAN COMMUNITY to prevent harm to the financial institutions and infrastructure within THE EUROPEAN COMMUNITY.

(l.)    *Damage to MEMBER STATES (Bank Failures).*  When commercial banks fail wholly or partially as a result of money laundering, the MEMBER STATES sustain direct economic losses because they are often required to protect depositors who are victims of these bank failures.

(m.)    *Damage to MEMBER STATE Banks.*  Money laundering associated with the cigarette sales described in this Complaint has a direct and adverse impact on commercial banks owned wholly or partially by certain of the MEMBER STATES.  The underground currency exchange and illegal barter transactions associated with money laundering deprive commercial banks of transaction fees and other sources of income associated with the international and/or foreign exchange transactions that are displaced by these money-laundering activities.  When commercial banks fail as a result of money laundering, the MEMBER STATES sustain direct economic losses as a result of those failures.

(n.)    *Protection of MEMBER STATES' Currency*.  When each of the MEMBER STATES issues its currency, the MEMBER STATE acts as a guarantor of the stability of the currency it issues (see, however, the discussion of the Euro at paragraph (o.) below).  The MEMBER STATE provides value to the currency by its willingness to maintain the strength and

integrity of that currency.  When the RJR DEFENDANTS and their coconspirators launder the currency of a MEMBER STATE, they convert and make illicit use of the currency and thereby erode the stability and credibility of that currency, depriving the PLAINTIFFS of money and property.

(o.)     *Protection of the Euro.*  On January 1, 1999, THE EUROPEAN COMMUNITY created a new currency, the Euro.  It is the ultimate duty and responsibility of THE EUROPEAN COMMUNITY and the MEMBER STATES to protect the integrity of the Euro and the public's confidence in the Euro.  When the RJR DEFENDANTS and their coconspirators launder the Euro, they convert and make illicit use of the Euro, thereby undermining the integrity of the Euro, as well as public confidence in the Euro and in financial institutions that are based on the Euro.

(p.)     *Devaluation of PLAINTIFFS' Property.*  The money-laundering scheme of the RJR DEFENDANTS and their coconspirators involves the exchange of Euros and the currencies of the MEMBER STATES for U.S. dollars often at deeply discounted black-market exchange rates due to the criminal nature of these transactions.  The exchange of tens of millions of dollars worth of the PLAINTIFFS' currencies at a deep discount rate acts to devalue the PLAINTIFFS' currencies.  Because the PLAINTIFFS hold and own billions of dollars in their own currencies, the PLAINTIFFS suffer a direct loss of money and property when the money that they hold is thus devalued.

(q.)     *Distortion of the Money Supply.*  The process of laundering criminal proceeds through the purchase and sale of cigarettes involves the unrecorded and irregular physical removal of huge amounts of the Euro and local currency from the territory of the MEMBER STATES.  The money-laundering activities of the RJR DEFENDANTS, when they

77

involve an unrecorded and irregular removal of PLAINTIFFS' currencies, act to affect and distort the supply of money in the MEMBER STATES.  This distortion directly and adversely affects the official calculations of the money supply performed and maintained by THE EUROPEAN COMMUNITY and the MEMBER STATES, thereby causing additional expenditures of funds by the PLAINTIFFS to detect and compensate for the huge unrecorded and irregular physical removals of PLAINTIFFS' currencies, depriving the PLAINTIFFS of money and property.

(r.)    *Balance of Payments.*  The process of laundering criminal proceeds through the purchase and sale of U.S.-made cigarettes involves the illegal conversion of Euros and local currency into U.S. dollars outside the facilities provided by THE EUROPEAN COMMUNITY and the MEMBER STATES for this exchange.  The money-laundering activities of the RJR DEFENDANTS, when they involve an unrecorded and irregular conversion of the PLAINTIFFS' currencies into U.S. dollars, distort the official balance of payments calculated and maintained by the PLAINTIFFS, thereby causing additional expenditures of funds by the PLAINTIFFS to detect and compensate for the huge unrecorded and irregular foreign exchange operations, depriving the PLAINTIFFS of money and property.

(s.)    *Right, Title, and Interest in the Proceeds of Crime.*  Under the laws of the MEMBER STATES, the MEMBER STATES possess title in, or have a right to the proceeds of, any criminal activity infringing their interests.  This right is a civil right of reparation.  The RJR DEFENDANTS' and their coconspirators' schemes as described in this Complaint caused and continue to cause a loss of money and property to THE EUROPEAN COMMUNITY and the MEMBER STATES because, for example, the laundering of the criminal proceeds prevents the

MEMBER STATES from collecting the money and property constituting the proceeds of criminal activity, to which right or title has vested in the MEMBER STATES.

(t.)     *Right, Title, and Interest in the Instrumentalities of Crime.*  Under the laws of the MEMBER STATES, the MEMBER STATES possess title in, or have a right to, any property used in the commission of a crime infringing their interests, including money and goods and bribes paid to facilitate sales.  This right is a civil right of reparation.  The RJR DEFENDANTS' money laundering described in this Complaint, for example, causes a loss of business and property to the MEMBER STATES because the laundering of the criminal proceeds prevents the MEMBER STATES from acquiring title in or rights to the instrumentalities used in the commission of criminal activity, which title or right has vested in the MEMBER STATES.

(u.)     *Money Laundering Facilitates Organized Crime.*  The money-laundering scheme by the RJR DEFENDANTS facilitates organized crime including narcotics trafficking, arms trafficking, and other offenses.  THE EUROPEAN COMMUNITY, the MEMBER STATES, and indeed, the United States, are harmed by such conduct.  But for the active assistance of the RJR DEFENDANTS, money launderers and criminals could not have carried out and have laundered the proceeds of their criminal activities to the detriment of THE EUROPEAN COMMUNITY and the MEMBER STATES.

(v.)     *Costs of Fighting Money Laundering.*  The RJR DEFENDANTS' money-laundering scheme and related criminal activities cause direct economic losses to THE EUROPEAN COMMUNITY and the MEMBER STATES in the form of increased expenditures to prevent money laundering, including financial audits, anti-money-laundering protocols,

periodic meetings and conferences to address specifically RJR DEFENDANTS' conduct, and other expenditures that are necessitated by such conduct.

(w.)    *Costs of Regulating Transactions and Detecting Money Laundering.* Financial institutions in THE EUROPEAN COMMUNITY must train staff in detecting and reporting suspicious transactions and in any event report all transactions over EUR 15,000 to the authorities in the MEMBER STATES.  Specially constituted financial intelligence units ("FIU") must then quickly investigate the reported transactions as well as carrying out other investigations into money laundering.  As a result, the MEMBER STATES have been injured in their business and property because of the costs to financial institutions of detecting and reporting such transactions and because of the funds and resources required for MEMBER STATES to carry out investigations in order to detect money laundering.

(x.)    *Law-Enforcement Costs of Fighting Underlying Criminal Activity.*  THE EUROPEAN COMMUNITY and the MEMBER STATES are required to expend large amounts of money on law-enforcement activities to combat the criminal activity that is facilitated by the money laundering and related activities of the RJR DEFENDANTS and their coconspirators. Such criminal activity includes, but is not limited to, narcotics trafficking, weapons trafficking, terrorism, and an array of other organized criminal activities.  But for the money-laundering activities of the RJR DEFENDANTS, the efficacy of these crimes would be diminished, the incentive to commit these crimes would be reduced, and the law enforcement and other costs incurred by THE EUROPEAN COMMUNITY and the MEMBER STATES would be accordingly diminished.

(y.)    *Damage to EUROPEAN COMMUNITY and MEMBER STATE Property.* The means employed by the RJR DEFENDANTS and their coconspirators routinely result in

damage to or the destruction of property of THE EUROPEAN COMMUNITY or the MEMBER STATES, such as automobiles and vessels.  This damage to the PLAINTIFFS' property is foreseeable and anticipated by the RJR DEFENDANTS and their coconspirators, and results in additional expenditures by THE EUROPEAN COMMUNITY and MEMBER STATES to repair and replace the damaged property.

(z.)  *Damage to MEMBER STATES for Expenses to Store and Destroy Proceeds of Criminal Activity.*  As a result of the massive money-laundering scheme perpetrated by the RJR DEFENDANTS, the Italian Republic, for example, has been required to warehouse, store, and ultimately destroy huge volumes of cigarettes and other property used in the scheme. For example, at one storage facility alone, the Italian Republic was storing two million master cases of cigarettes that were purchased with the proceeds from crime.  Often, such cigarettes must be stored for a long period of time because they will serve as evidence in legal actions. Accordingly, the average case of cigarettes seized by law-enforcement authorities in Italy remains in storage approximately six years.  The cost to the Italian Republic for the storage of these cigarettes, including warehouse facilities, employees, insurance, and costs associated with the full-time process of destroying cigarettes equals approximately thirteen dollars per master case of cigarettes.  Accordingly, the Italian Republic currently spends approximately twenty-six million dollars per year simply to warehouse, store, and destroy seized cigarettes.  Of the cigarettes so stored, substantial percentages are the products of the RJR DEFENDANTS.  Other MEMBER STATES currently incur similar costs and resulting losses.

(aa.)  *MEMBER STATES' Contributions to EUROPEAN COMMUNITY Expenditures.*  The MEMBER STATES have suffered an injury to business and property because

they have been required to contribute additional funding to THE EUROPEAN COMMUNITY as a result of the money-laundering activities of the RJR DEFENDANTS and their coconspirators.

(bb.)   *MEMBER STATE Local Expenditures to Support EUROPEAN COMMUNITY Action.*  The MEMBER STATES have suffered an injury to business and property because they have been required to expend additional funds and resources to support, on a local level, the additional efforts, activities, and expenditures of THE EUROPEAN COMMUNITY due to the money-laundering activities of the RJR DEFENDANTS and their coconspirators.

(cc.)   *Distortion of the "Fourth Resource."*  Huge volumes of irregular transactions have gone unrecorded due to the RJR DEFENDANTS' money-laundering scheme. This has produced distortions in the system of contributions made by the MEMBER STATES to THE EUROPEAN COMMUNITY.  As a result, some MEMBER STATES have suffered injury to their business and property because they have been required to contribute more than their correct share of the "fourth resource."  THE EUROPEAN COMMUNITY has been injured in its business and property because increased expenditures of funds and resources are required to detect and compensate for the distortions produced in the fourth resource contribution assessments produced by the huge money-laundering transactions of the RJR DEFENDANTS and their coconspirators.

(dd.)   *Frustration of THE EUROPEAN COMMUNITY'S Duty to Fulfill Its Obligations to the MEMBER STATES.*  The money laundering and related criminal activities of the RJR DEFENDANTS and their coconspirators substantially inhibit the capacity of THE EUROPEAN COMMUNITY to execute its duties to regulate foreign commerce; to regulate customs territories, free-trade zones, and customs-bonded warehouses; to regulate transportation

82

into THE EUROPEAN COMMUNITY or within its borders, including the use of the roads; to regulate the free movement of goods within THE EUROPEAN COMMUNITY; to regulate safety and security at sea; to combat money laundering; to protect and promote the economic well being of its citizens; and to abate harm to itself and to the general public within THE EUROPEAN COMMUNITY.

(ee.)    *Damage to EUROPEAN COMMUNITY'S Regulation of its Customs Territory.*  THE EUROPEAN COMMUNITY has a Customs Territory and a Customs Border separate and apart from the borders of the MEMBER STATES.  The violation and permeation of that Border and that Territory by money-laundering activities and the illegal transport of money into and out of THE EUROPEAN COMMUNITY violates the legal rights of THE EUROPEAN COMMUNITY, threatens the safety, security, and well-being of governmental personnel and property within THE EUROPEAN COMMUNITY, and interferes with and damages the regulatory system and authority of THE EUROPEAN COMMUNITY.

(ff.)    *Damage to the MEMBER STATES Regarding Protection of Their Borders.* Each of the MEMBER STATES has a national territory and borders separate and apart from the borders of the other MEMBER STATES and THE EUROPEAN COMMUNITY.  The violation and permeation of those borders and that national territory by money-laundering activities and the illegal transport of money into and out of the MEMBER STATES violates the legal rights of the MEMBER STATES, threatens the safety, security, and well-being of governmental personnel and property within the MEMBER STATES, and interferes with and damages the regulatory system and authority of the MEMBER STATES.  The MEMBER STATES suffer injury to their money and property from the additional expenditures required to counteract the

83

scheme of the RJR DEFENDANTS and their coconspirators through additional equipment, personnel, border facilities, and other means.

(gg.)  *Injury to THE EUROPEAN COMMUNITY and MEMBER STATES Due to RJR DEFENDANTS' Support of Totalitarian Regimes and Terrorist Groups.*  Illegal cigarette sales by the RJR DEFENDANTS and their coconspirators into Iraq and other areas resulted in direct financial benefits to totalitarian regimes and to terrorist groups that have caused harm to THE EUROPEAN COMMUNITY and to the MEMBER STATES, including but not limited to destruction of public property, death and/or injury of government personnel, diminished economic productivity, increased law-enforcement expenses, and other costs associated with combating terrorism.

(hh.)  *Damage Caused by Bribery of Public Officials.*  Money-laundering activities, bribery of government officials, and other related criminal acts conducted in various countries, have caused severe harm to THE EUROPEAN COMMUNITY and the MEMBER STATES, including but not limited to increased law-enforcement and military expenditures, disruption of public services, expenses to stabilize unstable political situations in Eastern Europe that affect Western Europe, and damage to the trade and the economy of THE EUROPEAN COMMUNITY and the MEMBER STATES.

(ii.)  *Expenses and costs incurred to address, remedy, and repair the effects of the RJR DEFENDANTS' money laundering.*  The EUROPEAN COMMUNITY and MEMBER STATES have been injured in their business and property because they have been required to incur expenses and costs to address and remedy the money-laundering activities of the RJR DEFENDANTS and the effects thereof.  The PLAINTIFFS have suffered economic losses and other damages as a result of the need to address and remedy the money laundering conducted by

the RJR DEFENDANTS and the effects thereof.  The PLAINTIFFS are entitled to restitution and reimbursement for such losses and damages.

(jj.)   *Customs Duties and Taxes.*  As a result of the activities of the RJR DEFENDANTS, large amounts of cigarettes have been introduced into THE EUROPEAN COMMUNITY, and the proper duties and taxes have not been paid on the aforesaid cigarettes. As a result of the RJR DEFENDANTS' wrongful activities, the PLAINTIFFS, THE EUROPEAN COMMUNITY, and the MEMBER SATES, have been deprived of the money and property that they would have obtained from the lawful importation and sale of cigarettes, and RJR DEFENDANTS have secured vast profits and proceeds from their illegal scheme.  This money and property includes, but is not limited to the following:

(i.)   Customs duties that are levied exclusively for the benefit of THE EUROPEAN COMMUNITY.  A portion of said customs duties is retained by the MEMBER STATES pursuant to the own resources decisions of THE EUROPEAN COMMUNITY as ratified by all the MEMBER STATES.

(ii.)   Value-added tax levied on cigarettes.  This tax is shared between THE EUROPEAN COMMUNITY and its MEMBER STATES.

(iii.)   Excise taxes that would have been paid on the cigarettes in question absent the wrongful activities of the RJR DEFENDANTS and their coconspirators.

(iv.)   The RJR DEFENDANTS' schemes also harmed THE EUROPEAN COMMUNITY and the MEMBER STATES by supplanting sales of lawfully sold cigarettes on which duties, money, and taxes would have been paid to THE EUROPEAN COMMUNITY and its MEMBER STATES.

147. THE EUROPEAN COMMUNITY and the MEMBER STATES and their economies have suffered losses at least equal to, and properly measured by, the total amount of criminal proceeds laundered by the RJR DEFENDANTS.  These losses were directly and proximately caused by the money-laundering activities of the RJR DEFENDANTS and their coconspirators.  THE EUROPEAN COMMUNITY and the MEMBER STATES have the duty and responsibility to protect against, and to seek redress for, such losses.

148. As a direct and proximate result of the money-laundering activities that are conducted, aided, and encouraged by the RJR DEFENDANTS, losses of hundreds of millions of dollars per year are being suffered by THE EUROPEAN COMMUNITY and its MEMBER STATES, including the Republic of Austria, Kingdom of Belgium, Republic of Bulgaria, Republic of Cyprus, Czech Republic, Kingdom of Denmark, Republic of Estonia, Republic of Finland, French Republic, Federal Republic of Germany, Hellenic Republic, Republic of Hungary, Republic of Ireland, Italian Republic, Republic of Latvia, Republic of Lithuania, Grand Duchy of Luxembourg, Republic of Malta, Kingdom of the Netherlands, Republic of Poland, Portuguese Republic, Romania, Slovak Republic, Republic of Slovenia, Kingdom of Spain, and Kingdom of Sweden.  THE EUROPEAN COMMUNITY and the MEMBER STATES have been deprived of money and property in this manner throughout the 1990s and continuing through the present time.  If the money-laundering activities of the RJR DEFENDANTS are not stopped, THE EUROPEAN COMMUNITY and the MEMBER STATES will continue to lose money and property in the future.  In addition, THE EUROPEAN COMMUNITY and the MEMBER STATES have been required to expend large amounts of money in their efforts to stop money laundering and to recoup funds that they have lost as a result of the activities of the RJR DEFENDANTS.

*Restitution*

149. Restitution at law is available as an alternative remedy to compensatory damages where, as here, a defendant has engaged in deliberate wrongdoing.  Under this restitutionary remedy, a defendant who is consciously tortious in acquiring a benefit is deprived of any profit derived from his wrongful action.  Plaintiffs hereby seek the legal remedy of restitution, as an alternative remedy to compensatory damages, in order to assure that the most effective and manageable remedy is available to Plaintiffs, and to deter deliberate and wrongful conduct that has conferred illicit profits upon the RJR DEFENDANTS.  In connection with Plaintiffs' request for restitution at law, Plaintiffs seek all appropriate ancillary relief, including without limitation an accounting of profits and/or the appointment of a receiver to assist in the determination of the restitution claim.

*Punitive Damages*

150.  The organized crime and money-laundering activities undertaken and facilitated by the RJR DEFENDANTS and their coconspirators were performed in a wanton, reckless, and/or malicious manner.  In light of the nature and reprehensibility of the RJR DEFENDANTS' and their coconspirators' conduct; the actual or tacit approval of such illicit conduct by senior management of the RJR DEFENDANTS; the actual and potential harm to the public and PLAINTIFFS caused by such conduct; and the financial benefits that accrued to

the RJR DEFENDANTS as a result of such conduct, punitive damages can and should be

assessed in an amount to be determined.


*Declaratory Relief*


151. Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201,

2202, Plaintiffs are entitled to a declaration of the rights and other legal relations between the

parties since a case of actual controversy exists.  The Federal Declaratory Judgment Act is

intended to promote clarification of the legal relations at issue and afford prompt relief from

uncertainty and insecurity.


*Injunctive and Other Equitable Relief*


152. All of the losses described above will continue into the future, absent

judgment in Plaintiffs' favor and injunctive and equitable relief, including:

> *RICO Equitable & Injunctive Relief.*

153. Under the RICO statute, 18 U.S.C. § 1964(a), and pursuant to inherent

equitable powers of the Court, the U.S. District Court is empowered to prevent and restrain

violations of 18 U.S.C. § 1962 by issuing appropriate orders, including without limitation: (i)

ordering any person to divest himself or herself of any interest, direct or indirect, in any

enterprise; (ii) imposing reasonable restrictions on the future activities or investments of any

person that affect interstate or foreign commerce, including, but not limited to, prohibiting any

person from engaging in the same type of endeavor as the enterprise engaged in; and (iii)

ordering dissolution or reorganization of any enterprise, making due provision for the rights of

innocent persons.  In addition, under 28 U.S.C. § 1651(a), the U.S. District Courts are

empowered to "issue all writs necessary or appropriate in aid of their respective jurisdictions

and agreeable to the usages and principles of law."  Consistent with these powers, the

PLAINTIFFS seek an order that:

> (a.)    compels each of the RJR DEFENDANTS that is found to have violated

the relevant common-law, statutory, or equitable standard to disgorge all proceeds derived from

any such violation and to make restitution to Plaintiffs;

> (b.)    imposes a constructive trust and equitable lien upon the RJR

DEFENDANTS' ill-gotten gains, including without limitation those profits and proceeds derived

from the transactions with organized crime networks and the money-laundering scheme, and

compels the RJR DEFENDANTS to disgorge to Plaintiffs all ill-gotten gains derived from such

schemes;

> (c.)    orders the imposition of a constructive trust and equitable lien upon all

monies laundered by the RJR DEFENDANTS as a part of the money-laundering scheme and

compels the RJR DEFENDANTS to disgorge to Plaintiffs an amount equal to the total amount of

monies laundered through the aforesaid scheme;

> (d.)    orders divestiture of all interests held by the RJR DEFENDANTS, directly

or indirectly, in the enterprises involved in the organized crime and money-laundering activities;

> (e.)    orders divestiture of REYNOLDS AMERICAN INC.'S interest in the

ORIGINAL RJR DEFENDANTS;

> (f.)    enjoins the RJR DEFENDANTS and their respective agents, servants,

officers, directors, employees, and all persons acting in concert with them, from laundering the

proceeds of criminal activities through the sale of cigarettes or otherwise engaging in conduct

that violates any common-law, statutory, or equitable standard;

(g.)     enjoins the RJR DEFENDANTS and their respective agents, servants,

officers, directors, employees, and all persons acting in concert with them from selling cigarettes

without proper documentation, shipping records, markings, and similar indicia of compliance

with law that would allow the proper tracking of the cigarettes and the funds with which they

were purchased so that they cannot be sold illegally;

(h.)     enjoins the RJR DEFENDANTS and their respective agents, servants,

officers, directors, employees, and all persons acting in concert with them from selling cigarettes

to any distributor or any other person who cannot fully and accurately account for where the

cigarettes will ultimately be sold;

(i.)     enjoins the RJR DEFENDANTS and their respective agents, servants,

officers, directors, employees, and all persons acting in concert with them from engaging in any

practices by which distributors, shippers, or wholesalers can purchase cigarettes by making

payments to offshore corporations, offshore bank accounts, or other locations that limit the

ability of government officials to track the sale of cigarettes or the payment for said cigarettes;

(j.)     orders the RJR DEFENDANTS to create and utilize adequate protocols by

which all cigarettes manufactured by the RJR DEFENDANTS and all payments made for such

cigarettes into THE EUROPEAN COMMUNITY can be adequately tracked and monitored by

governmental officials of THE EUROPEAN COMMUNITY and the MEMBER STATES;

(k.)     orders the RJR DEFENDANTS to take all reasonable and necessary steps

to terminate ongoing money laundering and prevent future money laundering, including the

adoption of any necessary labeling, tracking devices, or other means that would allow the RJR

DEFENDANTS and/or THE EUROPEAN COMMUNITY and the MEMBER STATES to track and monitor the movement of cigarettes into and within THE EUROPEAN COMMUNITY;

(l.)     orders the RJR DEFENDANTS to disclose all knowledge within their possession concerning the names, locations, activities, and procedures of their non-legitimate customers;

(m.)     orders the RJR DEFENDANTS to implement "know-your-customer" protocols and rules for the acceptance of payments for their products that make it difficult or impossible for criminals to launder criminal proceeds through the purchase of DEFENDANTS' products;

(n.)     orders the RJR DEFENDANTS to adopt, monitor, and enforce appropriate compliance programs to deter and remedy money-laundering activities involving their products;

(o.)     orders the RJR DEFENDANTS to abate and prevent conduct that facilitates the misuse of the ports and transportation facilities of the EC and MEMBER STATES, and/or disrupts the marketplace, by their employees and agents engaged in the illegal distribution of tobacco products and the laundering of the proceeds of crime.

154. For purposes of this complaint, all of the foregoing injunctive and equitable remedies and those injunctive and equitable remedies that may hereafter be sought by THE EUROPEAN COMMUNITY and the MEMBER STATES or ordered by the Court with respect to THE EUROPEAN COMMUNITY'S and the MEMBER STATES' claims under RICO shall be referred to as "RICO Equitable & Injunctive Relief."

*Common-Law Equitable & Injunctive Relief.*

155. Under the state and federal common law, and pursuant to the inherent equitable powers of the Court, the U.S. District Court is empowered to prevent and restrain the

91

RJR DEFENDANTS' and their coconspirators' money-laundering activities, enter prohibitory and mandatory injunctions, and impose other equitable relief, to provide full relief to Plaintiffs and to prevent continuing harm to the Plaintiffs' interests.  In addition, the federal courts are empowered under 28 U.S.C. § 1651(a) to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  Consistent with these powers, THE EUROPEAN COMMUNITY and the MEMBER STATES seek an order that:

(a.) compels each of the RJR DEFENDANTS that is found to have violated a relevant common-law, statutory, or equitable standard to disgorge all proceeds derived from any such violation and to make restitution to Plaintiffs;

(b.) imposes a constructive trust and equitable lien upon the RJR DEFENDANTS' ill-gotten gains, including without limitation those profits and proceeds derived from the transactions with organized crime networks and the money-laundering scheme, and compels the DEFENDANTS to disgorge to Plaintiffs all ill-gotten gains derived from such schemes;

(c.) orders the imposition of a constructive trust and equitable lien upon all monies laundered by the RJR DEFENDANTS as a part of the money-laundering scheme and compels the RJR DEFENDANTS to disgorge to Plaintiffs an amount equal to the total amount of monies laundered through the aforesaid scheme;

(d.) orders divestiture of REYNOLDS AMERICAN INC.'S interest in the ORIGINAL RJR DEFENDANTS;

(e.) enjoins the RJR DEFENDANTS and their respective agents, servants, officers, directors, employees, and all persons acting in concert with them, from laundering the

proceeds of criminal activities through the sale of cigarettes or otherwise engaging in conduct

that violates any common-law, statutory, or equitable standard;

(f.)     enjoins the RJR DEFENDANTS and their respective agents, servants,

officers, directors, employees, and all persons acting in concert with them from selling cigarettes

without proper documentation, shipping records, markings, and similar indicia of compliance

with law that would allow the proper tracking of the cigarettes and the funds with which they

were purchased so that they cannot be sold illegally;

(g.)     enjoins the RJR DEFENDANTS and their respective agents, servants,

officers, directors, employees, and all persons acting in concert with them from selling cigarettes

to any distributor or any other person who cannot fully and accurately account for where the

cigarettes will ultimately be sold;

(h.)     enjoins the RJR DEFENDANTS and their respective agents, servants,

officers, directors, employees, and all persons acting in concert with them from engaging in any

practices by which distributors, shippers, or wholesalers can purchase cigarettes by making

payments to offshore corporations, offshore bank accounts, or other locations that limit the

ability of government officials to track the sale of cigarettes or the payment for said cigarettes;

(i.)     orders the RJR DEFENDANTS to create and utilize adequate protocols by

which all cigarettes manufactured by the RJR DEFENDANTS and all payments made for such

cigarettes into THE EUROPEAN COMMUNITY can be adequately tracked and monitored by

governmental officials of THE EUROPEAN COMMUNITY and the MEMBER STATES;

(j.)     orders the RJR DEFENDANTS to take all reasonable and necessary steps

to terminate ongoing money laundering and prevent future money laundering, including the

adoption of any necessary labeling, tracking devices, or other means that would allow the

93

DEFENDANTS and/or THE EUROPEAN COMMUNITY and the MEMBER STATES to track and monitor the movement of cigarettes into and within THE EUROPEAN COMMUNITY;

(k.) orders the RJR DEFENDANTS to disclose all knowledge within their possession concerning the names, locations, activities, and procedures of their non-legitimate customers;

(l.) orders the RJR DEFENDANTS to implement "know-your-customer" protocols and rules for the acceptance of payments for their products that make it difficult or impossible for criminals to launder criminal proceeds through the purchase of RJR DEFENDANTS' products;

(m.) orders the RJR DEFENDANTS to adopt, monitor, and enforce appropriate compliance programs to deter and remedy money-laundering activities involving their products; and

(n.) orders the RJR DEFENDANTS to abate and prevent conduct that facilitates the misuse of the ports and transportation facilities of the EC and MEMBER STATES, and/or disrupts the marketplace, by their employees and agents engaged in the illegal distribution of tobacco products and the laundering of the proceeds of crime.

156. For purposes of this complaint, all of the foregoing injunctive and equitable remedies, and those injunctive and equitable remedies that may hereafter be sought by Plaintiffs or ordered by the Court on Plaintiffs' state and federal common-law claims, shall be referred to as "Common-Law Equitable & Injunctive Relief."

COUNT I
MEMBER STATES

(AS TO ALL RJR DEFENDANTS)
(RICO, 18 U.S.C. § 1962(a))

157. The MEMBER STATES restate and reallege paragraphs one (1) through one hundred fifty-six (156) and further allege:

158. The RJR DEFENDANTS, along with their coconspirators in the money-laundering schemes, including associated distributors, shippers, currency dealers, wholesalers, money brokers, and other participants in the schemes identified above, were, at relevant times, an association-in-fact of individuals and corporations engaged in, and the activities of which affected, interstate and foreign commerce, and thus constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4) (the "RJR Money-Laundering Enterprise").  These persons and entities were and are associated in fact for the purpose, among others, of illegally laundering criminal proceeds of criminal activity to the economic detriment of Plaintiffs.  The RJR Money-Laundering Enterprise is an ongoing organization whose constituent elements function as a continuing unit for the common purpose of maximizing the sale of tobacco products through illegal means and carrying out other elements of the RJR DEFENDANTS' scheme.  The RJR Money-Laundering Enterprise has an ascertainable structure and purpose beyond the scope of the RJR DEFENDANTS' predicate acts and the conspiracy to commit such acts.  The Enterprise has engaged in and its activities have affected interstate and foreign commerce.  The Enterprise continues through the concerted activities of the RJR DEFENDANTS to disguise the nature of the wrongdoing, to conceal the proceeds thereof, and to conceal the RJR DEFENDANTS' participation in the Enterprise in order to avoid and/or

95

minimize their exposure to criminal and civil penalties and damages.  The role of each

DEFENDANT in the RJR Money-Laundering Enterprise has been set forth above.

159. In connection with the fraudulent schemes set forth above, and to further

their illegal aims, the RJR DEFENDANTS have engaged in numerous acts of "racketeering

activity," and each of the RJR DEFENDANTS has aided and abetted each other of the RJR

DEFENDANTS and other coconspirators in committing those acts of "racketeering activity"

within the meaning of RICO.  18 U.S.C. §§ 1961, et seq.; 18 U.S.C. § 2.  The RJR

DEFENDANTS have committed multiple predicate acts of racketeering including, but not

limited to:

(a.)     Money Laundering.  (18 U.S.C. §§ 1956(a)(1), 1961(1)(B)).  Knowing

that the property involved in certain financial transactions represented the proceeds of some form

of unlawful activity, the RJR DEFENDANTS conducted or attempted to conduct financial

transactions in interstate and foreign commerce involving the proceeds of specified unlawful

activity with the intent to promote the carrying on of specified unlawful activity; or did so

knowing that the transactions were designed in whole or in part to conceal or disguise the nature,

the location, the source of ownership, or the control of the proceeds of specified unlawful

activity, or did so knowing that the transactions were designed in whole or in part to avoid a

transaction-reporting requirement under state or federal law.  The RJR DEFENDANTS knew

that the funds they received in exchange for cigarettes in the manners set forth in this Complaint

represented the proceeds of specified unlawful activity, including without limitation narcotics

trafficking, wire fraud, mail fraud, and violations of the Travel Act.  The RJR DEFENDANTS

also knew that such transactions constituted offenses against a foreign nation involving the

manufacture, importation, sale, or distribution of a controlled substance.  The RJR

96

DEFENDANTS knowingly conducted and attempted to conduct such financial transactions with the intent to promote the carrying on of such unlawful activity.  In addition, the RJR DEFENDANTS knowingly conducted and attempted to conduct such financial transactions with the intent to conceal or disguise the nature (proceeds of racketeering activity), the location, the source (drug traffickers, money launderers), the ownership, and/or the control of the proceeds of specified unlawful activity.  Finally, the RJR DEFENDANTS knowingly conducted and attempted to conduct such financial transactions to avoid transaction-reporting requirements under state or federal law, including without limitation currency and monetary instrument reports.

(b.)    International Money Laundering.  (18 U.S.C. §§ 1956(a)(2), 1961(1)(B)).  The RJR DEFENDANTS transported, transmitted, and/or transferred monetary instruments or funds to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, or did so knowing that the monetary instruments or funds involved in the transportation, transmission, or transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of a specified unlawful activity, or to avoid a transaction-reporting requirement under state or federal law.   By such conduct, the RJR DEFENDANTS engaged in financial transactions within the meaning of 18 U.S.C. § 1956(c)(4).  Among other things, the RJR DEFENDANTS knew that money orders and funds sent from South America, the Caribbean, and Europe to the United States to pay for cigarettes purchased in bulk represented the proceeds of specified unlawful activity, including without limitation wire fraud, mail fraud, and violations of the Travel Act.  The RJR

97

DEFENDANTS also knew that such specified unlawful activity was an offense against a foreign nation involving the manufacture, importation, sale, or distribution of a controlled substance. The RJR DEFENDANTS also aided and abetted violations of 18 U.S.C. § 1956(a)(1) and § 1956(a)(2).

(c.)    Conspiracy to Engage in Money Laundering.  18 U.S.C. §§ 1956(h), 1961(1)).  The RJR DEFENDANTS conspired to commit offenses defined in 18 U.S.C. § 1956 – including § 1956(a)(1) and § 1956(a)(2).  The RJR DEFENDANTS, by their words and actions, agreed to accept currency, monetary instruments, and funds with the knowledge that the currency, monetary instruments, and funds represented the proceeds of specified unlawful activity conducted by themselves and their coconspirators.  The RJR DEFENDANTS adopted the common purpose of the conspiracy and participated in its consummation.  The goal of the money-laundering conspiracy was to deprive Plaintiffs of money and property, while assuring that the profits derived from cigarette sales were repatriated to the benefit of the RJR DEFENDANTS in a clandestine manner to avoid detection and prosecution.

(d.)    Money Laundering (18 U.S.C. §§ 1957, 1961(1)).  DEFENDANTS knowingly engaged or attempted to engage in monetary transactions in the United States, in criminally derived property having a value greater than $10,000 and derived from specified unlawful activity.  18 U.S.C. § 1957(f)(3) and § 1956(c)(7).  DEFENDANTS engaged in monetary transactions, including deposits, withdrawals, transfers, or exchanges, in or affecting interstate or foreign commerce, involving funds or monetary instruments by, through, or to financial institutions.  DEFENDANTS knew that the funds or instruments received in exchange for their cigarettes represented the proceeds of specified unlawful activity, including but not limited to, wire fraud, mail fraud, and violations of the Travel Act.  The RJR DEFENDANTS

knew that such specified unlawful activity included offenses against foreign nations involving the manufacture, importation, sale, or distribution of controlled substances.

      (e.)    Money Laundering of Proceeds of Offenses against Foreign Nations.  (18 U.S.C. § 1956(c)(7)(B)(vi); 18 U.S.C. § 1961(1)(B)).  The RJR DEFENDANTS, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted or attempted to conduct financial transactions in interstate and foreign commerce involving the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity; or did so knowing that the transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or did so knowing that the transactions were designed in whole or in part to avoid transaction-reporting requirements under state or federal law.  The RJR DEFENDANTS knew that the proceeds of transactions with narcotics traffickers, participants in organized crime, money launderers, and others engaged in criminal conduct represented the proceeds of specified unlawful activity, including without limitation offenses with respect to which the United States would be obligated by a multilateral treaty either to extradite the alleged offender or to submit the case for prosecution, if the offender were found within the territory of the United States.  Specifically, the RJR DEFENDANTS laundered the proceeds of offenses that are subject to multilateral treaties, including without limitation the United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances (1988), and the International Convention for the Suppression of the Financing of Terrorism (2001), and the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions (adopted November 21, 1997, entered into force in the United States February 15, 1999).

(i.)    The RJR DEFENDANTS have laundered the proceeds of various offenses covered by the United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, including, for example: (i) the conversion or transfer of property, knowing that such property is derived from narcotics trafficking, or from an act of participation in such offense or offenses, for the purpose of concealing or disguising the illicit origin of the property or of assisting persons involved in the commission of such an offense or offenses to evade the legal consequences of their actions; (ii) the financing of narcotics trafficking; (iii) the concealment or disguise of the true nature, source, location, disposition, movement, rights with respect to, or ownership of property, knowing that such property is derived from narcotics trafficking or from an act of participation in such an offense or offenses; (iv) the acquisition, possession or use of property, knowing, at the time of receipt, that such property was derived from narcotics trafficking or from an act of participation in such offense or offenses; and (v) participation in, association or conspiracy to commit, attempts to commit, and aiding, abetting, facilitating, and concealing the commission of acts of narcotics trafficking.

(ii.)    The DEFENDANTS have laundered the proceeds of various offenses covered by the International Convention for the Suppression of the Financing of Terrorism (2001), including, for example, providing material support and resources to persons and entities engaged in terrorist activities, and providing assets, including products and services, to those persons and entities, acting with knowledge that such persons and entities, including without limitation the PKK and the former Iraqi regime, were engaged in terrorism or the sponsorship of terrorist activities.  Such persons and entities that engage in terrorist activity are so tainted by their criminal conduct that providing any assets, material support, or resources to any of them facilitates such terrorist activities.

100

(iii.)    The DEFENDANTS have laundered, and conspired to launder, the proceeds of various offenses covered by the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions (adopted November 21, 1997, entered into force in the United States February 15, 1999), including for example the proceeds of transactions obtained or continued as a consequence of payments, direct and indirect, to foreign public officials.  As alleged above, DEFENDANTS made payments or provided things of value to foreign public officials, retained or obtained business as a result of such payments, and laundered the proceeds of those transactions, often through venues known for bank secrecy.

(f.)    Money Laundering of Proceeds of Terrorism.  (18 U.S.C. § 1956(c)(7)(D); 18 U.S.C. § 1961(1)(B); 18 U.S.C. § 1961(1)(G)).  The RJR DEFENDANTS, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted or attempted to conduct financial transactions in interstate and foreign commerce involving the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity; or did so knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or did so knowing that the transaction was designed in whole or in part to avoid a transaction-reporting requirement under state or federal law.  DEFENDANTS knew that the proceeds of transactions with persons and entities engaged in terrorism represented the proceeds of specified unlawful activity, including but not limited to acts of terrorism.

(g.)    Money Laundering of Proceeds of Offenses Against a Foreign Nation Involving Narcotics Trafficking.  (18 U.S.C. § 1956(c)(7)(B); 18 U.S.C. § 1961(1)(B)).  Knowing that the property involved in a financial transaction represented the proceeds of some

form of unlawful activity, the RJR DEFENDANTS conducted or attempted to conduct financial transactions in interstate and foreign commerce involving the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity; or did so knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or did so knowing that the transaction was designed in whole or in part to avoid transaction-reporting requirements under state or federal law.  The RJR DEFENDANTS knew that the proceeds of transactions with narcotics traffickers, money launderers, and others engaged in criminal activity represented the proceeds of specified unlawful activity, including an offense against a foreign nation involving the manufacture, importation, sale, or distribution of a controlled substance.

(h.)      Money Laundering of Proceeds of Offenses Against a Foreign Nation Involving a Scheme to Defraud Foreign Banks.  (18 U.S.C. § 1956(c)(7)(B)(iii); 18 U.S.C. § 1961(1)(B)).  The DEFENDANTS, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted or attempted to conduct financial transactions in interstate and foreign commerce involving the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity; or, knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source of ownership, or the control of the proceeds of specified unlawful activity, or knowing that the transaction was designed in whole or in part to avoid a transaction-reporting requirement under state or federal law.  DEFENDANTS engaged in and facilitated financial transactions and acts of money laundering that deprived foreign banks, including those belonging to Plaintiffs, of money and property that would have been paid to such banks through

102

the lawful transaction of business.  DEFENDANTS knowingly engaged in financial transactions designed to launder the proceeds of fraud, or a scheme or attempt to defraud, foreign banks belonging to Plaintiffs.

(i.)   Money Laundering of Proceeds of Violations of Foreign Corrupt Practices Act.  (18 U.S.C. § 1956(c)(7)(D); 18 U.S.C. § 1961(1)(B)).  In general, the Foreign Corrupt Practices Act (FCPA) makes it unlawful for DEFENDANTS, or any officer, director, employee, or agent thereof, to pay or promise to pay money or any thing of value to any foreign official for purposes of influencing any act or decision of the foreign official in his or her official capacity, inducing such official to do or omit to do any act in violation of the lawful duty of such official, or securing any improper advantage, or inducing such foreign official to use his or her influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality, in order to assist DEFENDANTS in obtaining or retaining business for or with, or directing business to, any person.  "Foreign official" means any officer or employee of a foreign government or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of such entities.

The DEFENDANTS, acting through intermediaries, provided money or things of value to foreign officials to obstruct oversight of DEFENDANTS' conduct, preclude discovery of their involvement in money laundering and other criminality, and thereby permit their business to continue.  The DEFENDANTS, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted or attempted to conduct financial transactions in interstate and foreign commerce involving the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful

activity; or, knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source of ownership, or the control of the proceeds of specified unlawful activity, or knowing that the transaction was designed in whole or in part to avoid a transaction-reporting requirement under state or federal law.

(j.)     Providing Material Support or Resources to Designated Foreign Terrorist Organizations.  (18 U.S.C. § 2339(B) and 18 U.S.C. § 1961(1)(G)).  As from June 1999 and continuing until at least 2002 in the United States and elsewhere, the RJR DEFENDANTS and their agents with each other and with others known and unknown, did knowingly provide, conspire to provide, and aid and abet others in providing, material support or resources to the PKK, a designated FTO, in violation of 18 U.S.C. § 2339(B).  The object of the conspiracy was to provide funds, goods, services, and other assets to the PKK, which caused the DEFENDANTS' cigarette shipments to be sent into Iraq and financed the PKK's terrorist activities and operations.

(k.)     Wire fraud and mail fraud.  (18 U.S.C. §§ 1341, 1343, 1961(1)(B)).  The RJR DEFENDANTS devised a scheme or artifice to defraud and/or to obtain money by means of false pretenses, representations, or promises, and used the mails and wires for the purpose of executing the scheme, and acted with a specific intent to defraud by devising, participating in, and/or abetting the scheme.  The wire and mail communications were made during the course of the conspiracy that covered at least 2002 through 2009.  Hundreds of telephone conversations and faxes were made to further the fraudulent scheme on virtually a daily basis during the course of the conspiracy, including without limitation those identified in paragraphs 53, 66, 75-79, 104-108, 109-111, 112-113, and others.  These telephone conversations, mailings, and wire transfer of funds furthered the scheme by expediting the secret payments to the RJR DEFENDANTS of

funds that constituted the proceeds of criminal activity and were part of a clandestine system for the remittance of such proceeds to the RJR DEFENDANTS.  The RJR DEFENDANTS, acting through their employees, agents, and coconspirators, made or caused to be made such telephone calls, mailings, and wire transfers of funds to further the scheme.  The RJR DEFENDANTS knew that their coconspirators, in the course of carrying out the RJR DEFENDANTS' directions and orders, would use or cause to be used the interstate and international wires and mails.  The motive for committing fraud is plain: the acquisition of criminals as additional customers by laundering their criminal proceeds meant increased profits and market share for the RJR DEFENDANTS.

(l.)     Violation of the Travel Act.  (18 U.S.C. §§ 1952, 1961(1)(B)).  The RJR DEFENDANTS traveled in interstate or foreign commerce, and used facilities in interstate and foreign commerce, including the mail, with intent to distribute the proceeds of unlawful activity, and to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of unlawful activity, and thereafter performed or attempted to perform unlawful activity.  The RJR DEFENDANTS knew that the funds provided to them represented the proceeds of unlawful activity, including trafficking in narcotics and controlled substances, and knew that, by accepting such payments, they aided the efforts of the drug traffickers to launder their ill-gotten gains.  The RJR DEFENDANTS and their representatives and coconspirators traveled across national borders and otherwise used the facilities of foreign commerce to distribute the proceeds of unlawful activity to the benefit of the RJR DEFENDANTS.  By this conduct, the RJR DEFENDANTS promoted, managed, established, and facilitated such unlawful activity.

160. The acts described above form a "pattern" of racketeering activity within 18 U.S.C. § 1961(5). The DEFENDANTS and others with whom they have been associated have been related in their common objectives of maximizing global cigarette sales and utilizing money laundering to achieve this end. The DEFENDANTS' predicate acts have had the same or similar purposes, results, participants, victims, and methods of commission, and occurred over at least a six-year period. The predicate acts have been consistently repeated and are capable of further repetition.

161. The DEFENDANTS' pattern of racketeering activities dates from at least January 1, 2002, through the present and threatens to continue in the future.

162. The RJR DEFENDANTS used or invested, directly or indirectly, racketeering income, or a part thereof, or the proceeds of such income, to acquire an interest in, establish, and operate, the RJR Money-Laundering Enterprise, which is and was engaged in, or the activities of which affect and have affected, interstate or foreign commerce, in violation of 18 U.S.C. § 1962(a). The RJR DEFENDANTS were principals in the racketeering scheme. The MEMBER STATES suffered multiple injuries to their economic interests as a result of this use and investment of racketeering income.

163. Specifically, the RJR DEFENDANTS received the income and proceeds of a pattern of racketeering activity in which they participated as principals, including an international money-laundering scheme, acts of wire fraud and mail fraud, and violations of the Travel Act. Upon their receipt of such ill-gotten gains by wire transfers from money launderers and/or their associates, the RJR DEFENDANTS used and invested such income and proceeds, or a portion thereof, to acquire an interest in, establish, and operate the RJR Money-Laundering Enterprise, which was and is engaged in interstate and foreign commerce.

In particular, the RJR DEFENDANTS used the proceeds of the scheme:  (a) to operate the RJR Money-Laundering Enterprise; (b) to replenish the supply of cigarettes for ultimate sale to known money launderers; (c) to acquire, purchase, and subsidize facilities necessary to the RJR Money-Laundering Enterprise, including sales, distribution, and manufacturing operations (e.g., its Puerto Rico plant), secret offices, and offshore companies and bank accounts; (d) to compensate employees and agents of the RJR DEFENDANTS engaged in the money-laundering activities; (e) to pay expenses incurred in connection with money-laundering activities such as telephone bills incurred in the wire-fraud scheme and travel costs incurred by such employees; and (f) to establish a money-laundering scheme, infrastructure, and network.  In sum, the RJR DEFENDANTS did not reinvest the proceeds of racketeering activity in their general business operations, but instead used and invested such proceeds to establish the infrastructure of, acquire an interest in, and operate the RJR Money-Laundering Enterprise, and it was this use and investment that harmed the MEMBER STATES.  The use and investment of the proceeds of racketeering activity occurred in several ways, including but not limited to the following:

(a.)    The proceeds from the money-laundering enterprise finance the unlawful sales and marketing operations that promote the increase of sales in succeeding years.

(b.)    The increased market volume and premium prices charged to money-laundering customers are utilized to offset the additional expenses incurred by the DEFENDANTS when they pay for the additional shipping and handling charges associated with the clandestine movement of the cigarettes through the circuitous routes established by the DEFENDANTS.

(c.)     The RJR DEFENDANTS built up and fostered clandestine relationships with money brokers and money-laundering organizations throughout the world, including THE EUROPEAN COMMUNITY and the MEMBER STATES, which solidified and strengthened those brokers and organizations and enabled them to engage in other criminal conduct.

164. The MEMBER STATES were injured in their business and property by reason of the RJR DEFENDANTS' use and investment of racketeering income to acquire, establish, and operate the RJR Money-Laundering Enterprise.  Absent this use and investment of racketeering income, the criminals who launder their criminal proceeds through the purchase of cigarettes would find their crimes less profitable and more difficult to commit, and the economic injury to the MEMBER STATES would have been avoided in whole or in part.

165. As a direct and proximate result of the violations set forth above, the Plaintiffs, the MEMBER STATES, have been injured in their business and property as set forth more fully above in paragraphs one hundred forty-four (144) through one hundred forty-nine (149).  The DEFENDANTS' violations of 18 U.S.C. § 1962(a) caused these losses. Under the provisions of 18 U.S.C. § 1964(c), the MEMBER STATES are entitled to bring this action and recover herein treble damages, the costs of bringing the suit, pre-judgment interest, and reasonable attorneys' fees.  Furthermore, the Plaintiffs seek a declaratory judgment in their favor pursuant to 28 U.S.C. § 2201(a).

COUNT II

MEMBER STATES

(AS TO ALL RJR DEFENDANTS)
(RICO, 18 U.S.C. § 1962(b))

166. The MEMBER STATES restate and reallege paragraphs one (1) through one hundred sixty-five (165) and further allege:

167. The RJR DEFENDANTS acquired or maintained, directly or indirectly, through a pattern of racketeering activity, an interest in and control of the RJR Money-Laundering Enterprise, which was and is engaged in, or the activities of which affect and have affected, interstate or foreign commerce in violation of 18 U.S.C. § 1962(b). The Plaintiffs, the MEMBER STATES, have been injured by the DEFENDANTS' acquisition and maintenance of an interest in and control of the enterprise through a pattern of racketeering activity.

168. The DEFENDANTS, through a pattern of racketeering activity, acquired or maintained, directly or indirectly, an interest in and control of the RJR Money-Laundering Enterprise that engaged in the activities which affect interstate and foreign commerce. Specifically, the RJR DEFENDANTS maintained control of the RJR Money-Laundering Enterprise by means of racketeering activities, including, for example: (a) interstate and international wire communications in violation of 18 U.S.C. § 1343 (orders and instructions for payment were placed telephonically and RJR had total control over the enterprise and the payment for their product); (b) money laundering in violation of 18 U.S.C. §§ 1956 and 1957 (RJR controlled and concealed the flow of the proceeds of the cigarette sales – a key aim of the scheme – through money laundering); and (c) violations of the Travel Act, 18 U.S.C., §

109

1952 (cross-border travel and transactions to facilitate money laundering and other illicit activities).  Through this pattern of racketeering activities, which also included transmitting false statements to government authorities, the RJR DEFENDANTS were able to acquire and maintain an interest in and control of the RJR Money-Laundering Enterprise.  This interest and control furthered, concealed, and protected the operations of the money-laundering enterprise, and thereby permitted the RJR Money-Laundering Enterprise to flourish without detection.

169. As a direct and proximate result of the DEFENDANTS' acquisition and maintenance of an interest in and control of the RJR Money-Laundering Enterprise, the Plaintiffs, the MEMBER STATES, have suffered the loss of money and property as set forth more fully above in paragraphs one hundred forty-four (144) through one hundred forty-nine (149).  The DEFENDANTS' violations of 18 U.S.C. § 1962(b) caused these losses.  Under the provisions of 18 U.S.C. § 1964(c), the MEMBER STATES are entitled to bring this action and recover herein treble damages, the costs of bringing the suit, pre-judgment interest, and reasonable attorneys' fees.  Furthermore, the Plaintiffs seek a declaratory judgment in their favor pursuant to 28 U.S.C. § 2201(a).

COUNT III

MEMBER STATES

(AS TO ALL RJR DEFENDANTS)
(RICO, 18 U.S.C. § 1962(c))

170. The MEMBER STATES restate and reallege paragraphs one (1) through one hundred sixty-nine (169) and further allege.

171. The RJR DEFENDANTS, through the commission of two or more acts constituting a pattern of racketeering activity, directly or indirectly participated in the operation or management of the RJR Money-Laundering Enterprise, the activities of which affect interstate or foreign commerce.

172. At all relevant times, the RJR DEFENDANTS participated in the operation or management of an "enterprise," within the meaning of 18 U.S.C. § 1961(4).  The RJR DEFENDANTS, operating together and individually, directed and controlled the RJR Money-Laundering Enterprise.  The RJR DEFENDANTS operated, managed, and exercised control over the money-laundering enterprise by, among other things: (a) establishing a money-laundering scheme in which the coconspirators facilitated the money-laundering scheme and concealed and remitted to the RJR DEFENDANTS the proceeds of the money-laundering scheme; (b) compelling their customers to sell cigarettes at prices set by the RJR DEFENDANTS; and (c) investing and using the proceeds of the money-laundering scheme in the enterprise.

173. As a direct and proximate result of the violations set forth above, the Plaintiffs, the MEMBER STATES, have been injured in their business and property as set forth more fully above in paragraphs one hundred forty-four (144) through one hundred forty-nine (149).  The RJR DEFENDANTS' violations of 18 U.S.C. § 1962(c) caused these losses.  Under the provisions of 18 U.S.C. § 1964(c), the MEMBER STATES are entitled to bring this action and recover herein treble damages, the costs of bringing the suit, pre-judgment interest, and reasonable attorneys' fees.  Furthermore, the Plaintiffs seek a declaratory judgment in their favor pursuant to 28 U.S.C. § 2201(a).

COUNT IV

MEMBER STATES

(AS TO ALL RJR DEFENDANTS)
(RICO, 18 U.S.C. § 1962(d))

174. The MEMBER STATES restate and reallege paragraphs one (1) through one hundred seventy-three (173) and further allege:

175. The RJR DEFENDANTS entered into an agreement with each other and with distributors, shippers, currency dealers, and wholesalers to join in the conspiracy to violate 18 U.S.C. §§ 1962(a), 1962(b), and 1962(c).  Each RJR DEFENDANT entered into an agreement to join the conspiracy, and undertook acts in the furtherance of the conspiracy and knowingly participated in the conspiracy.  The purpose of the conspiracy was to acquire and service new customers by laundering the proceeds of their criminal activity to the economic detriment of Plaintiffs and to the economic benefit of the RJR DEFENDANTS.  The conspirators carried out the scheme and each conspirator was put on notice of the general nature of the conspiracy, that the conspiracy extended beyond the individual role of any single member, and that the conspiratorial venture functioned as a continuing unit for a common purpose.  The RJR DEFENDANTS adopted the goal of furthering and facilitating the criminal endeavor.  Their stake in the money-laundering venture was in making profits and increasing market share through their informed and interested cooperation with their criminal customers, and their active assistance, stimulation, and instigation of the money-laundering activities. The RJR DEFENDANTS engaged in an actionable wrong, committed jointly with their coconspirators, and the acts of each member of the conspiracy are imputed to the others because of their common purpose and intent.  The RJR DEFENDANTS, acting with their

112

coconspirators, engaged in common action for a common purpose by common agreement and understanding among the group, and are subject to common responsibility.

176. The RJR DEFENDANTS, together with each member of the conspiracy, agreed and conspired to violate: (1) 18 U.S.C. § 1962(a) by using, or causing the use of, income they derived from the above-described pattern of racketeering activities in the acquisition, establishment, and/or operation of the enterprise, the activities of which affect interstate or foreign commerce; (2) 18 U.S.C. § 1962(b) by acquiring or maintaining, or causing the acquisition or maintenance of, through a pattern of racketeering activity, an interest or control in the enterprise, the activities of which affect interstate or foreign commerce; (3) 18 U.S.C. § 1962(c) by participating, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, including an agreement that the conspirators, or one of them, would commit or cause the commission of two or more racketeering acts constituting such a pattern; and (4) violating the USA Patriot Act.

177. The RJR DEFENDANTS participated in and cooperated with each other and with their coconspirators in the aforementioned conspiracy that enabled each cigarette manufacturer and distributor to enhance its market share, suppress its competition, and promote sale of its products.

178. As a result of the conspiracy, the RJR DEFENDANTS and their coconspirators facilitated the laundering of large volumes of money that constituted the proceeds of criminal activity.

179. The membership of the conspiracy in question includes the RJR DEFENDANTS and tobacco distributors, the shippers, the wholesalers, currency brokers, and the RJR DEFENDANTS' subsidiary corporations, who act in concert to produce the

cigarettes, mislabel or fail to properly label the cigarettes, sell the cigarettes, and arrange for payment in a way that is undetectable by governmental authorities, with said payments ultimately being returned to the RJR DEFENDANTS in the United States.  As coconspirators, the RJR DEFENDANTS are liable for all of the actions committed by all of the coconspirators within the conspiracy and are liable for all of the damages sustained by the MEMBER STATES that were caused by any members of the conspiracy, regardless of whether the RJR DEFENDANTS were themselves directly involved in a particular aspect of the enterprise.

180. As a direct and proximate result of the violations set forth above, the Plaintiffs, the MEMBER STATES, have been injured in their business and property as set forth more fully above in paragraphs one hundred forty-four (144) through one hundred forty-nine (149).  The RJR DEFENDANTS' violations of 18 U.S.C. § 1962(d) caused these losses. Under the provisions of 18 U.S.C. § 1964(c), the MEMBER STATES are entitled to bring this action and recover herein treble damages, the costs of bringing the suit, pre-judgment interest, and reasonable attorneys' fees.  Furthermore, the Plaintiffs seek a declaratory judgment in their favor pursuant to 28 U.S.C. § 2201(a).

COUNT V

MEMBER STATES

(AS TO ALL RJR DEFENDANTS)
(RICO, 18 U.S.C. §§ 1964(a), 1964(c), 28 U.S.C. § 1651(a))

181. The MEMBER STATES restate and reallege paragraphs one (1) through one hundred eighty (180) and further allege:

114

182. The United States District Court is empowered to prevent and restrain violations of 18 U.S.C. § 1962 by issuing appropriate orders, including, but not limited to: ordering any person to divest himself or herself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor in which the enterprise engaged, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.  18 U.S.C. § 1964(a).

183. The RJR DEFENDANTS currently are actively engaged in the activities set forth within this complaint that promote and support the money laundering that is the subject matter of this complaint.

184. The RJR DEFENDANTS intend to continue said activities and to interfere with investigations by governmental officials into the RJR DEFENDANTS' and their coconspirators' money-laundering activities.

185. The RJR DEFENDANTS, by their conduct of selling cigarettes to money launderers, creating false and misleading documents, improperly labeling shipments of cigarettes, and establishing and employing mechanisms of payment by which criminals may pay for the cigarettes without being detected by government investigations, all continue to injure the MEMBER STATES.

186. As a result of the RJR DEFENDANTS' conduct in violation of 18 U.S.C. §§ 1962(a), 1962(b), 1962(c), and 1962(d), the MEMBER STATES have been and continue to be irreparably injured as is alleged more fully above.

187. As a result of the nature of the money-laundering activities, it is impossible, as a practical matter, for the MEMBER STATES to put a complete halt to said money-laundering activities as long as the RJR DEFENDANTS continue to conduct these activities.  In addition, the MEMBER STATES have suffered and will continue to suffer injury, to business and property to an extraordinary degree as a result of the RJR DEFENDANTS' unlawful conduct.

188. Money damages will not provide a full and complete remedy for the RJR DEFENDANTS' unlawful conduct.  There is no adequate remedy at law that will protect the MEMBER STATES in the future from these money-laundering activities if the RJR DEFENDANTS do not cease their involvement in and support of money-laundering activities. Pursuant to 18 U.S.C. §§ 1964(a), 1964(c), as well as 28 U.S.C. § 1651(a), the MEMBER STATES demand full RICO Injunctive and Equitable Relief.  Furthermore, the Plaintiffs seek a declaratory judgment in their favor pursuant to 28 U.S.C. § 2201(a).

COUNT VI

EUROPEAN COMMUNITY AND MEMBER STATES

(AS TO ALL RJR DEFENDANTS)
(COMMON-LAW FRAUD)

189.  Plaintiffs restate and reallege paragraphs one (1) through one hundred eighty-eight (188) and further allege:

190. The RJR DEFENDANTS and their coconspirators intentionally falsified documents, falsified shipping records, and generated false and misleading billing records concerning the payment for cigarettes so as to mislead the Plaintiffs, THE EUROPEAN

116

COMMUNITY and the MEMBER STATES, as to the purchasers of and source of funds for

payment for their cigarettes.  The RJR DEFENDANTS and their coconspirators made these

false and material statements and representations and failed to disclose material information in

such documents and records with intent to defraud the Plaintiffs.  The RJR DEFENDANTS

made these material misrepresentations and omissions with the knowledge and intention that

the Plaintiffs, THE EUROPEAN COMMUNITY and the MEMBER STATES, would

reasonably rely on said documents.  The RJR DEFENDANTS entered into an understanding

or agreement, express or tacit, with their distributors, customers, agents, consultants, and other

coconspirators, to participate in a common scheme, plan, or design to commit the aforesaid

tortious acts, and thereby launder criminal proceeds to the detriment of THE EUROPEAN

COMMUNITY and the MEMBER STATES.  In pursuance of the agreement, the RJR

DEFENDANTS and their distributors, customers, agents, consultants, and other

coconspirators acted tortiously by, among other things, committing the aforesaid acts

constituting fraud, thereby causing harm to Plaintiffs.  The RJR DEFENDANTS, through

agreement and joint action with their coconspirators, acted tortiously, recklessly, and

unlawfully to the detriment of Plaintiffs.  By means of the aforesaid concerted action, the RJR

DEFENDANTS and their coconspirators are jointly and severally liable for the torts and other

wrongful conduct alleged herein.

191. Plaintiffs reasonably relied upon the RJR DEFENDANTS'

misrepresentations, and incurred damage as a result of such reliance.  Specific examples of the

process by which these activities occurred are set forth above.

192. The Plaintiffs, THE EUROPEAN COMMUNITY and the MEMBER

STATES, reasonably relied upon falsified or misleading documents produced or procured by

the RJR DEFENDANTS, and were thereby misled in the course of performing their duty to fight against money laundering and related criminal activity.

193. Furthermore, the RJR DEFENDANTS knowingly and intentionally generated false, misleading, and material information, and intentionally concealed other material information, concerning their role in money laundering in connection with the sale of their products.

194. The Plaintiffs, THE EUROPEAN COMMUNITY and the MEMBER STATES, reasonably relied upon data and information provided to them by the RJR DEFENDANTS and/or their coconspirators and agents in acting or refraining from acting with respect to money-laundering activities.

195. The RJR DEFENDANTS, in falsifying documents to expedite money laundering, in providing misleading information, and in concealing material and true information concerning their money-laundering activities, acted in willful, wanton, gross, and callous disregard for the rights of the Plaintiffs, THE EUROPEAN COMMUNITY and the MEMBER STATES. The aforesaid actions were taken knowingly for the purpose of supporting the activities of the RJR DEFENDANTS' coconspirators and with the intent of increasing the profits and sales of the RJR DEFENDANTS and harming THE EUROPEAN COMMUNITY and the MEMBER STATES.

196. RJR DEFENDANTS were duty-bound to disclose the material information concerning the destination of tobacco shipments and the concealed sources of funds used to purchase cigarettes. By law, no person may make false statements to the government. Having undertaken to make representations to THE EUROPEAN COMMUNITY and the MEMBER STATES, DEFENDANTS were obligated to provide full,

complete, and truthful information concerning the destination of tobacco shipments and the

sources of funds to purchase their products.  RJR DEFENDANTS had superior, if not

exclusive, knowledge of such information, and it was not readily available to the Plaintiffs.

RJR DEFENDANTS intended and knew, or should have known, that Plaintiffs would

reasonably rely, act, and refrain from acting, on the basis of false and/or incomplete

information provided to Plaintiffs by RJR DEFENDANTS, and Plaintiffs did so to their

detriment.  Under these circumstances, RJR DEFENDANTS' conduct amounts to fraudulent

misrepresentation and fraudulent concealment, and an effective conversion of Plaintiffs'

money and property.

196. As a direct and proximate result of the RJR DEFENDANTS' fraud and

the Plaintiffs' reliance upon said fraud, the Plaintiffs have been injured as are set forth more

fully above in paragraphs one hundred forty-four (144) through one hundred forty-nine (149).

The Plaintiffs demand judgment for damages, both compensatory and punitive, as well as full

Common-Law Injunctive and Equitable Relief.  Furthermore, the Plaintiffs seek a declaratory

judgment in their favor pursuant to 28 U.S.C. § 2201(a).


COUNT VII

EUROPEAN COMMUNITY AND MEMBER STATES

(AS TO ALL RJR DEFENDANTS)
(PUBLIC NUISANCE – DAMAGES)


198. Plaintiffs restate and reallege paragraphs one (1) through one hundred

ninety-seven (197) and further allege:

199. Plaintiffs are governmental authorities.

119

200. Money laundering and related illicit activities are a violation of U.S. law and a public nuisance.

201. The money-laundering activities in the United States and THE EUROPEAN COMMUNITY of the RJR DEFENDANTS:  (a) have substantially and unreasonably interfered with, offended, injured and endangered, and continue to interfere with, offend, injure and endanger, the public health, morals, safety, convenience, and well-being of the general public, the financial infrastructure of THE EUROPEAN COMMUNITY, and the operation of the market for tobacco products in THE EUROPEAN COMMUNITY and the MEMBER STATES and have interfered with and endangered the Customs Territory, Customs Border, and free market which THE EUROPEAN COMMUNITY is bound to protect; (b)  constitute conduct that is proscribed by applicable laws, administrative regulations, and directives; (c)  constitute conduct of a continuing nature and/or have produced a permanent or long-lasting effect, and the DEFENDANTS know or should know that said conduct has a significant harmful effect upon the public right.

202.  The money-laundering activities of the RJR DEFENDANTS in the United States, THE EUROPEAN COMMUNITY, and the MEMBER STATES have been, and continue to be, effectuated through widespread criminal activity, including mail fraud, wire fraud, and other illegal acts.

203. The RJR DEFENDANTS facilitated the laundering of criminal proceeds by means of a variety of acts and omissions conducted in or directed from the United States, including the following: (a) The RJR DEFENDANTS laundered criminal proceeds by covertly receiving funds that they knew or should have known were the proceeds of criminal acts and took steps to conceal the source and nature of the criminal proceeds.  (b) The RJR

120

DEFENDANTS arranged a process by which cigarettes purchased by criminals could be paid for by secret payments into offshore corporations and/or offshore bank accounts so as to conceal revenues derived from criminal activities. (c) The RJR DEFENDANTS filed or caused the filing with THE EUROPEAN COMMUNITY and/or the MEMBER STATES of false and fraudulent documents that misstated the value of, the intended destination of, and the source of funds for the purchase of cigarettes that were placed within customs-bonded warehouses and/or free-trade zones within THE EUROPEAN COMMUNITY. (d) The RJR DEFENDANTS sold large volumes of U.S.-made cigarettes into Iraq in violation of U.S. laws and to the detriment of the Plaintiffs. (e) The RJR DEFENDANTS failed to supervise the distribution of their tobacco products to assure that such products were not sold into criminal channels or paid for with illicit funds. (f) The RJR DEFENDANTS failed to act reasonably when they were put on notice of their involvement with money launderers. (g) The RJR DEFENDANTS entered into an understanding or agreement, express or tacit, with their distributors, customers, agents, consultants, and other coconspirators, to participate in a common scheme, plan, or design to commit the aforesaid tortious acts and thereby launder money to the detriment of THE EUROPEAN COMMUNITY and the MEMBER STATES. In pursuance of the agreement, RJR and its distributors, customers, agents, consultants, and other coconspirators acted tortiously by, among other things, committing the aforesaid acts constituting public nuisance, thereby causing harm to Plaintiffs. The RJR DEFENDANTS, through joint action with their coconspirators, acted tortiously, recklessly, unlawfully, and negligently to the detriment of Plaintiffs. By means of the aforesaid concerted action, the RJR DEFENDANTS and their coconspirators are jointly and severally liable for the torts and other wrongful conduct alleged herein.

204. Through these and other intentional and negligent acts and omissions, the RJR DEFENDANTS have substantially and unreasonably offended, interfered with, and caused damage to the public in the exercise of rights common to all, in a manner such as to (a) offend public morals, (b) interfere with use by the public of a public place, (c) endanger and injure the property, life, health, safety, peace, convenience, and comfort of a considerable number of persons; and (d) injure and interfere with the market for tobacco products in THE EUROPEAN COMMUNITY and the MEMBER STATES; and (e) injure the economic well being of the citizens of THE EUROPEAN COMMUNITY and the MEMBER STATES. The acts and omissions of the RJR DEFENDANTS constitute a public nuisance under state and federal common law. This public nuisance, or some part of it, continues unabated to the detriment of Plaintiffs' interests and has undermined and endangered the Customs Territory, Customs Border, and free market that THE EUROPEAN COMMUNITY is bound to protect.

205. The RJR DEFENDANTS knew, or reasonably should have known, that their acts and omissions relating to money laundering created great dangers to the community, including Plaintiffs' economic and non-economic interests. The DEFENDANTS directly, or through their coconspirators, undermined THE EUROPEAN COMMUNITY'S duties and authority to regulate ports; to regulate foreign commerce; to regulate customs territories, free-trade zones, and customs-bonded warehouses; to regulate transportation into THE EUROPEAN COMMUNITY or within its borders; to ensure and regulate the free movement of goods within THE EUROPEAN COMMUNITY; to regulate safety and security at sea; to regulate and take action to protect against breaches of THE EUROPEAN COMMUNITY Customs Territory or THE EUROPEAN COMMUNITY Customs Border; and to regulate and set rules to combat money laundering, all harms different from those suffered by members of

the general public or the Member States, and all wrongs which it is the duty and responsibility of THE EUROPEAN COMMUNITY to redress.

206. The RJR DEFENDANTS have acted maliciously, wantonly, and with a recklessness that bespeaks an improper motive and vindictiveness, and have engaged in outrageous and oppressive conduct and with a reckless or wanton disregard of safety and rights.  Their conduct amounts to a fraud on the public.

207. As a direct and proximate result of the acts and/or omissions of the RJR DEFENDANTS, which constitute a public nuisance, Plaintiffs have sustained and continue to sustain injury as set forth more fully in paragraphs one hundred forty-four (144) through one hundred forty-nine (149).  THE EUROPEAN COMMUNITY and the MEMBER STATES each have the right to recover damages as set forth in paragraphs one hundred forty-four (144) through one hundred forty-nine (149) in that each has suffered damages that are unique to it and which are of a kind different from those suffered by the general public.

208. By reason of the injury to their economic and non-economic interests due to the public nuisance described in the preceding paragraphs to this complaint, Plaintiffs are entitled to an award of damages, including actual, compensatory, restitutionary, and punitive damages.  Furthermore, the Plaintiffs seek a declaratory judgment in their favor pursuant to 28 U.S.C. § 2201(a).

COUNT VIII

EUROPEAN COMMUNITY AND MEMBER STATES

(AS TO ALL RJR DEFENDANTS)
(PUBLIC NUISANCE – INJUNCTIVE RELIEF)


209. Plaintiffs restate and reallege paragraphs one (1) through two hundred eight (208) and further allege:

210. Plaintiffs are governmental authorities.

211. Money laundering and related criminal activities are a violation of law and a public nuisance.

212. The money-laundering activities in the United States and THE EUROPEAN COMMUNITY of the RJR DEFENDANTS:  (a) have substantially and unreasonably interfered with, offended, injured and endangered, and continue to interfere with, offend, injure and endanger, the public health, morals, safety, convenience, and well-being of the general public, the financial infrastructure of THE EUROPEAN COMMUNITY, and the operation of the market for tobacco products in THE EUROPEAN COMMUNITY and the MEMBER STATES and have interfered with and endangered the Customs Territory, Customs Border, and free market which THE EUROPEAN COMMUNITY is bound to protect; (b)  constitute conduct that is proscribed by applicable laws, administrative regulations, and directives; (c)  constitute conduct of a continuing nature and/or have produced a permanent or long-lasting effect, and the DEFENDANTS know or should know that said conduct has a significant harmful effect upon the public right.

213.  The money-laundering activities of the RJR DEFENDANTS in the United States, THE EUROPEAN COMMUNITY, and the MEMBER STATES have been,

124

and continue to be, effectuated through widespread criminal activity, including mail fraud, wire fraud, and other illegal acts.

214. The RJR DEFENDANTS facilitated the laundering of criminal proceeds by means of a variety of acts and omissions conducted in or directed from the United States, including those set forth in paragraphs 46-130 above.

215. Through these and other intentional and negligent acts and omissions, the RJR DEFENDANTS have substantially and unreasonably offended, interfered with, and caused damage to the public in the exercise of rights common to all, in a manner such as to (a) offend public morals, (b) interfere with use by the public of a public place, (c) endanger and injure the property, life, health, safety, peace, convenience, and comfort of a considerable number of persons; and (d) injure and interfere with the market for tobacco products in THE EUROPEAN COMMUNITY and the MEMBER STATES; and (e) injure the economic well being of the citizens of THE EUROPEAN COMMUNITY and the MEMBER STATES. The acts and omissions of the RJR DEFENDANTS constitute a public nuisance under state and federal common law. This public nuisance, or some part of it, continues unabated to the detriment of Plaintiffs' interests and has undermined and endangered the Customs Territory, Customs Border, and free market that THE EUROPEAN COMMUNITY is bound to protect.

216. The RJR DEFENDANTS knew, or reasonably should have known, that their acts and omissions relating to money laundering created great dangers to the community, including Plaintiffs' economic and non-economic interests. The DEFENDANTS directly, or through their coconspirators, undermined THE EUROPEAN COMMUNITY'S duties and authority to regulate ports; to regulate foreign commerce; to regulate customs territories, free-trade zones, and customs-bonded warehouses; to regulate transportation into THE

125

EUROPEAN COMMUNITY or within its borders; to ensure and regulate the free movement of goods within THE EUROPEAN COMMUNITY; to regulate safety and security at sea; to regulate and take action to protect against breaches of THE EUROPEAN COMMUNITY Customs Territory or THE EUROPEAN COMMUNITY Customs Border; and to regulate and set rules to combat money laundering, all harms different from those suffered by members of the general public or the Member States, and all wrongs which it is the duty and responsibility of THE EUROPEAN COMMUNITY to redress.

217. The RJR DEFENDANTS have acted maliciously, wantonly, and with a recklessness that bespeaks an improper motive and vindictiveness, and have engaged in outrageous and oppressive conduct and with a reckless or wanton disregard of safety and rights.  Their conduct amounts to a fraud on the public.

218. As a direct and proximate result of the acts and/or omissions of the RJR DEFENDANTS, which constitute a public nuisance, Plaintiffs have sustained and continue to sustain injury as set forth more fully in paragraphs one hundred forty-four (144) through one hundred forty-nine (149).  In addition, damages do not constitute a full and adequate remedy at law, and for this reason Plaintiffs are therefore entitled to full common-law injunctive and equitable relief, including a judgment permanently enjoining RJR DEFENDANTS from the continuation of activities constituting a public nuisance, and compelling RJR DEFENDANTS to take steps to abate and prevent the money laundering that is the subject matter of this complaint.  Furthermore, the Plaintiffs seek a declaratory judgment in their favor pursuant to 28 U.S.C. § 2201(a).

COUNT IX

EUROPEAN COMMUNITY AND MEMBER STATES

(AS TO ALL RJR DEFENDANTS)
(UNJUST ENRICHMENT)

219. Plaintiffs restate and reallege paragraphs one (1) through two  hundred eighteen (218) and further allege:

220. The RJR DEFENDANTS were unjustly enriched through their money-laundering scheme at Plaintiffs' expense.  The acts and omissions of the RJR DEFENDANTS and others have placed in the possession of these DEFENDANTS money under such circumstances that in equity and good conscience they ought not to retain it.

221.  The RJR DEFENDANTS were unjustly enriched through their money-laundering scheme.  The RJR DEFENDANTS entered into an understanding or agreement, express or tacit, with their distributors, customers, agents, consultants, and other coconspirators, to participate in a common scheme, plan, or design to commit the aforesaid tortious acts and thereby launder the proceeds of criminal activity to the detriment of THE EUROPEAN COMMUNITY and the MEMBER STATES.  In pursuance of the agreement, the RJR DEFENDANTS and their distributors, customers, agents, consultants, and other coconspirators acted tortiously by, among other things, committing the aforesaid acts constituting unjust enrichment, thereby causing harm to Plaintiffs.  The RJR DEFENDANTS, through joint action with their coconspirators, acted tortiously, recklessly, unlawfully, and negligently, to the detriment of Plaintiffs.  By means of the aforesaid concerted action, the RJR DEFENDANTS and their coconspirators are jointly and severally liable for the torts and other wrongful conduct alleged herein.

222. THE EUROPEAN COMMUNITY provides at its expense a marketplace without internal frontiers that inures to the benefit of all commercial enterprises that operate within the borders of THE EUROPEAN COMMUNITY.  It is this marketplace that makes the sale of products such as cigarettes more expeditious and profitable.  The RJR DEFENDANTS and their coconspirators in laundering the proceeds of criminal activity, make illicit use of this marketplace to their economic benefit and to the economic detriment of THE EUROPEAN COMMUNITY and the MEMBER STATES.  The RJR DEFENDANTS were unjustly enriched through their money-laundering scheme.  By reason of their money-laundering scheme, the RJR DEFENDANTS were enabled to illegally enhance profits, market share, and the sales price of their international tobacco operations.

223. The unjust enrichment of the RJR DEFENDANTS was accomplished at the expense of Plaintiffs.  By reason of the money-laundering scheme, Plaintiffs were, and continue to be, deprived of money and property, and have suffered other economic and non-economic injuries, and RJR DEFENDANTS reaped vast profits and proceeds from their illegal scheme.

224. Under these circumstances, the receipt and retention of the money derived from money-laundering operations are such that, as between Plaintiffs and RJR DEFENDANTS, it is unjust for RJR DEFENDANTS to retain it.

225. Equity and good conscience require the RJR DEFENDANTS to pay damages and restitution to Plaintiffs, disgorge their ill-gotten gains and, to effectuate these remedies, a constructive trust and equitable lien should be imposed by this Court upon the proceeds obtained by the RJR DEFENDANTS by reason of money-laundering activities, which proceeds are rightly owned by and belong to Plaintiffs.  Plaintiffs have been injured as

128

set forth more fully in paragraphs one hundred forty-four (144) through one hundred forty-nine (149), and are entitled to recover actual, compensatory, and punitive damages.  Judgment in Plaintiffs' favor should include full Common-Law Injunctive and Equitable Relief.  Furthermore, the Plaintiffs seek a declaratory judgment in their favor pursuant to 28 U.S.C. § 2201(a).

COUNT X

MEMBER STATES

(AS TO ALL RJR DEFENDANTS)
(UNJUST ENRICHMENT)

226. Plaintiffs restate and reallege paragraphs one (1) through two hundred twenty-five (225) and further allege:

227. RJR DEFENDANTS received funds, including the proceeds of narcotics trafficking, and received the instrumentalities of illicit conduct.  Such funds and instrumentalities, and the proceeds thereof, were and are the property of the MEMBER STATES as of the time of the commission of the illicit conduct.

228. By appropriating Plaintiffs' funds and property for themselves, DEFENDANTS have been enriched at Plaintiffs' expense.  RJR DEFENDANTS have rejected demands for compensation.

229. Under the circumstances, in good conscience and equity, RJR DEFENDANTS cannot retain such funds and instrumentalities, and the proceeds thereof.

230. Equity and good conscience require the RJR DEFENDANTS to pay damages and restitution to Plaintiffs, disgorge their ill-gotten gains and, to effectuate these

remedies, a constructive trust and equitable lien should be imposed by this Court upon the

proceeds obtained by RJR DEFENDANTS by reason of money-laundering activities, which

proceeds are rightly owned by and belong to Plaintiffs.  Plaintiffs are entitled to damages,

including actual, compensatory, and punitive damages, and their injuries are set forth more

fully above in paragraphs one hundred forty-four (144) through one hundred forty-nine (149).

Judgment in Plaintiffs' favor should include full Common-Law Injunctive and Equitable

Relief.  Furthermore, the Plaintiffs seek a declaratory judgment in their favor pursuant to 28

U.S.C. § 2201(a).


## COUNT XI

## EUROPEAN COMMUNITY AND MEMBER STATES

### (AS TO ALL RJR DEFENDANTS)
### (NEGLIGENCE)


231. Plaintiffs restate and reallege paragraphs one (1) through two hundred

thirty (230) and further allege:

232. DEFENDANTS owed, and continue to owe, a duty of reasonable care to

refrain from causing foreseeable loss to the Plaintiffs.  DEFENDANTS were and are obligated

to avoid negligently causing harm to Plaintiffs and were and are duty-bound to:

(a.)    design, implement, and utilize effective monitoring and oversight

procedures, including appropriate compliance programs, to deter and detect money laundering-

related activities by their employees and agents;

(b.)     investigate and terminate the money laundering-related conduct of their employees and agents, particularly inasmuch as their managerial personnel with decision-making authority were put on reasonable notice of such illicit conduct;

(c.)     deal with the Plaintiffs, and their representatives, in an honest, good faith, and forthright manner;

(d.)     terminate sales of their tobacco products to or through persons or entities known to be engaged, directly or indirectly, in money laundering;

(e.)     comply with federal and state statutes and the standards of care reflected therein;

(f.)     produce, market, and distribute their cigarette products lawfully and with due care; and

(g.)     use proper practices and procedures in the hiring, selection, approval, instruction, training, supervision, and discipline of employees and agents engaged in the production, marketing, and distribution of their products, some of whom the RJR DEFENDANTS knew, or reasonably should have known, were assisting and otherwise engaged in money laundering.

233. As manufacturers, distributors, and dominant participants in the marketplace, RJR DEFENDANTS had, and continue to have, the authority and ability to act reasonably to prevent money laundering in connection with the sale of their products for the protection of Plaintiffs.  Reasonable steps could and should have been taken by the RJR DEFENDANTS to prevent or reduce the risk of their products being sold to persons who were using the purchase of cigarettes to launder the proceeds of criminal activity.

131

234. The RJR DEFENDANTS, as manufacturers, distributors, and dominant participants in the marketplace, have a special ability and duty to exercise reasonable care to detect and guard against the risks associated with the distribution of their products, for the benefit and protection of those foreseeably and unreasonably placed at risk of harm from the distribution of their products, including Plaintiffs.

235. The RJR DEFENDANTS' unreasonable acts and omissions created and enhanced the risk that their products would be distributed to persons who would use the purchase of cigarettes to launder criminal proceeds.

236. The RJR DEFENDANTS' unreasonable acts and omissions affirmatively and foreseeably caused substantial economic and non-economic damages to the Plaintiffs, and otherwise obstructed their ability to protect themselves from harms associated with money laundering.  The RJR DEFENDANTS, acting with and through their employees, agents, and coconspirators, breached their duty of care, as aforesaid, by acts and/or omissions that posed an unreasonable and foreseeable risk of harm to Plaintiffs.  The RJR DEFENDANTS entered into an understanding or agreement, express or tacit, with their distributors, customers, agents, consultants, and other coconspirators, to participate in a common scheme, plan, or design to commit the aforesaid tortious acts, and thereby launder criminal proceeds to the detriment of THE EUROPEAN COMMUNITY and the MEMBER STATES.  In pursuance of the agreement, the RJR DEFENDANTS and their distributors, customers, agents, consultants, and other coconspirators acted tortiously by, among other things, committing the aforesaid acts constituting negligence, thereby causing harm to Plaintiff.  The RJR DEFENDANTS, through joint action with their coconspirators, acted tortiously, recklessly, unlawfully, and negligently, to the detriment of Plaintiffs.  By means of the aforesaid concerted action, the RJR

DEFENDANTS and their coconspirators are jointly and severally liable for the torts and other wrongful conduct alleged herein.  The RJR DEFENDANTS' tortious conduct proximately caused, and continues to cause, damage to the economic and non-economic interests of the Plaintiffs, as set forth more fully in paragraphs one hundred forty-four (144) through one hundred forty-nine (149).

237. The RJR DEFENDANTS have acted maliciously, wantonly, and with a recklessness that bespeaks an improper motive and vindictiveness, and have engaged in outrageous and oppressive conduct and with a reckless or wanton disregard of safety and rights.  Their conduct amounts to a fraud on the public.

238. By reason of the injury to their economic and non-economic interests due to the negligence of the RJR DEFENDANTS, as aforesaid, Plaintiffs are entitled to an award of damages, including actual, compensatory, and punitive damages.  In addition, damages do not constitute a full and adequate remedy at law, and for this reason, Plaintiffs are entitled to full Common-Law Injunctive and Equitable Relief, including a judgment permanently enjoining RJR DEFENDANTS from the continuation of activities constituting negligence, and compelling RJR DEFENDANTS to take steps to abate and prevent the laundering of criminal proceeds through the purchase and sale of their products.  Furthermore, the Plaintiffs seek a declaratory judgment in their favor pursuant to 28 U.S.C. § 2201(a).

COUNT XII

EUROPEAN COMMUNITY AND MEMBER STATES

(AS TO ALL RJR DEFENDANTS)
(NEGLIGENT MISREPRESENTATION)


239. Plaintiffs restate and reallege paragraphs one (1) through two hundred thirty-eight (238) and further allege:

240. The RJR DEFENDANTS owed, and continue to owe, a duty of reasonable care to refrain from causing foreseeable loss to Plaintiffs.  The RJR DEFENDANTS have assumed the special duty to speak truthfully to government officials, and particularly due to their superior knowledge of their own conduct, were bound to speak with due care.  The RJR DEFENDANTS were and are obligated to avoid negligently causing foreseeable harm to Plaintiffs, and were and are duty-bound to exercise reasonable care to: (a) refrain from negligently misrepresenting -- through documents and other forms of communication that the RJR DEFENDANTS knew or should have known would be reasonably relied on by Plaintiffs -- the payment for and/or value of cigarettes; the destination of cigarettes; and the sources of funds with which cigarettes are purchased; (b) be truthful in their representations to Plaintiffs and their representatives concerning money laundering and other improper activities as aforesaid; and (c) avoid misleading Plaintiffs when providing Plaintiffs with such information as the DEFENDANTS possess concerning the money laundering associated with the RJR DEFENDANTS' products into THE EUROPEAN COMMUNITY.

241. The RJR DEFENDANTS breached their duty to Plaintiffs by negligently making various material misrepresentations and/or failing to disclose material information to Plaintiffs and their representatives as aforesaid.

134

242. The RJR DEFENDANTS have acted maliciously, wantonly, and with a recklessness that bespeaks an improper motive and vindictiveness and have engaged in outrageous and oppressive conduct and with a recklessness or wanton disregard of the Plaintiffs' interests and rights.  Their conduct amounts to a fraud on the public.

243. The RJR DEFENDANTS, acting with and through their employees, agents, and coconspirators, breached their duty of care, as aforesaid, by acts and/or omissions that posed an unreasonable risk of foreseeable harm to Plaintiffs.

244. Plaintiffs reasonably relied on DEFENDANTS' misrepresentations and, as a result, DEFENDANTS' breach proximately caused, and continues to cause, damage to the economic interest of Plaintiffs.  The RJR DEFENDANTS entered into an understanding or agreement, express or tacit, with their distributors, customers, agents, consultants, and other coconspirators, to participate in a common scheme, plan, or design to commit the aforesaid tortious acts and thereby launder the proceeds of criminal activity to the detriment of THE EUROPEAN COMMUNITY and the MEMBER STATES.  In pursuance of the agreement, RJR and its distributors, customers, agents, consultants, and other coconspirators acted tortiously by, among other things, committing the aforesaid acts constituting negligent misrepresentation, thereby causing harm to Plaintiffs.  The RJR DEFENDANTS, through joint action with their coconspirators, acted tortiously, recklessly, unlawfully, and negligently, to the detriment of Plaintiffs.  By means of the aforesaid concerted action, the RJR DEFENDANTS and their coconspirators are jointly and severally liable for the torts and other wrongful conduct alleged herein.

245. By reason of the injury to its interests due to the negligence, malice, and recklessness of the RJR DEFENDANTS, as set forth more fully in paragraphs one hundred

forty-four (144) through one hundred forty-nine (149), Plaintiffs are entitled to an award of damages, including actual, compensatory, and punitive damages.  In addition, damages do not constitute a full and adequate remedy at law, and for this reason, Plaintiffs are entitled to full Common-Law Injunctive and Equitable Relief, including a judgment permanently enjoining the RJR DEFENDANTS from the continuation of activities that gave rise to PLAINTIFFS' claim of negligent misrepresentation.  Furthermore, the Plaintiffs seek a declaratory judgment in their favor pursuant to 28 U.S.C. § 2201(a).

COUNT XIII

MEMBER STATES

(AS TO ALL RJR DEFENDANTS)
(COMMON-LAW CONVERSION)

246. The MEMBER STATES restate and reallege paragraphs one (1) through two hundred forty-five (245) and further allege:

247. The RJR DEFENDANTS received funds, including the proceeds of narcotics trafficking, and received the instrumentalities of illicit conduct.  Such funds and instrumentalities, and the proceeds thereof, were and are the property of the Member States as of the time of the commission of the illicit conduct.

248. The RJR DEFENDANTS were obligated either to remit such funds and instrumentalities to Plaintiffs, or to refuse to accept such funds and instrumentalities.  The RJR DEFENDANTS did neither.  Instead, the RJR DEFENDANTS appropriated the funds and instrumentalities for their own use.

249. The RJR DEFENDANTS misappropriated Plaintiffs' money and property, and have rejected demands for compensation.

250. The RJR DEFENDANTS have assumed and exercised ownership over funds and instrumentalities belonging to the Plaintiffs.  Plaintiffs have sustained and will continue to sustain damages as a result of the RJR DEFENDANTS' conversion, for which the RJR DEFENDANTS are liable to Plaintiffs.

251. The RJR DEFENDANTS have acted maliciously, wantonly, and with a recklessness that bespeaks an improper motive and vindictiveness, and have engaged in outrageous and oppressive conduct and with a reckless or wanton disregard of safety and rights.  Their conduct amounts to a fraud on the public.

252. By reason of the injury to their economic and non-economic interests due to the negligence of the RJR DEFENDANTS, as set forth more fully above in paragraphs one hundred forty-four (144) through one hundred forty-nine (149), Plaintiffs are entitled to an award of damages, including actual, compensatory, and punitive damages.  In addition, damages do not constitute a full and adequate remedy at law, and for this reason, Plaintiffs are entitled to full Common-Law Injunctive and Equitable Relief, including a judgment permanently enjoining DEFENDANTS from the continuation of activities constituting conversion, and compelling DEFENDANTS to take steps to abate and prevent the laundering of criminal proceeds through the purchase and sale of their products.  Furthermore, the Plaintiffs seek a declaratory judgment in their favor pursuant to 28 U.S.C. § 2201(a).

COUNT XIV

MEMBER STATES

(AS TO ALL RJR DEFENDANTS)
(MONEY HAD AND RECEIVED)


253. The MEMBER STATES restate and reallege paragraphs one (1) through two hundred fifty-two (252) and further allege:

254. The RJR DEFENDANTS knowingly received money belonging to Plaintiffs, including funds representing the proceeds of illicit conduct.

255. The RJR DEFENDANTS benefited from the receipt of money, the benefit of which remains with the RJR DEFENDANTS.  A trust or equitable lien is impressed upon such money and the proceeds thereof.

256. Under principles of equity and good conscience, the RJR DEFENDANTS should not be permitted to keep the money and the proceeds thereof.  The RJR DEFENDANTS knew that the funds in question were the proceeds of illicit conduct and, as such, were the property of Plaintiffs.  Through deceit and acts of concealment, the RJR DEFENDANTS received, handled, deposited, and transferred such funds to their own accounts.  Plaintiffs have changed their positions as a result of the RJR DEFENDANTS' conduct and have been precluded from taking action against those persons involved in the illicit conduct, including the RJR DEFENDANTS, at the time of such conduct.  The RJR DEFENDANTS' conduct was tortious, a trespass upon the rights and interests of Plaintiffs, and fraudulent.

257. Equity and good conscience require the RJR DEFENDANTS to pay damages and restitution to Plaintiffs, disgorge their ill-gotten gains and, to effectuate these

138

remedies, a constructive trust and equitable lien should be imposed by this Court upon the

proceeds obtained by the RJR DEFENDANTS by reason of money-laundering activities,

which proceeds are rightly owned by and belong to Plaintiffs.  Further, or in the alternative,

Plaintiffs are entitled to damages, including actual, compensatory, and punitive damages, and

their injuries are set forth more fully above in paragraphs one hundred forty-four (144)

through one hundred forty-nine (149).  Judgment in Plaintiffs' favor should include full

Common-Law Injunctive and Equitable Relief.  Furthermore, the Plaintiffs seek a declaratory

judgment in their favor pursuant to 28 U.S.C. § 2201(a).

## DEMAND FOR JUDGMENT

WHEREFORE, the Plaintiffs demand judgment in their favor and against

DEFENDANTS as follows:

258. Pursuant to COUNT I, damages, including interest, against the RJR

DEFENDANTS, jointly and severally, the precise amount to be supplied to the Court upon a

trial on the merits; treble the actual damages pursuant to 18 U.S.C. § 1964(c), along with an

award of the costs of the suit and a reasonable attorney's fee.

259. Pursuant to COUNT II, damages, including interest, against the RJR

DEFENDANTS, jointly and severally, the precise amount to be supplied to the Court upon a

trial on the merits; treble the actual damages pursuant to 18 U.S.C. § 1964(c), along with an

award of the costs of the suit and a reasonable attorney's fee.

260. Pursuant to COUNT III, damages, including interest, against the RJR

DEFENDANTS, jointly and severally, the precise amount to be supplied to the Court upon a

trial on the merits; treble the actual damages pursuant to 18 U.S.C. § 1964(c), along with an award of the costs of the suit and a reasonable attorney's fee.

261. Pursuant to COUNT IV, damages, including interest, against the RJR DEFENDANTS, jointly and severally, the precise amount to be supplied to the Court upon a trial on the merits; treble the actual damages pursuant to 18 U.S.C. § 1964(c), along with an award of the costs of the suit and a reasonable attorney's fee.

262. Pursuant to COUNT V, RICO Injunctive and Equitable Relief against the RJR DEFENDANTS, jointly and severally, along with an award of the costs of the suit and a reasonable attorney's fee.

263. Pursuant to COUNT VI, against the RJR DEFENDANTS, jointly and severally, an award of compensatory, restitutionary, and punitive damages, with interest, the precise amount to be supplied to the Court upon a trial of the merits; Common-Law Injunctive and Equitable Relief; and the costs of the suit and a reasonable attorney's fee.

264. Pursuant to COUNT VII, against the RJR DEFENDANTS, jointly and severally, an award of compensatory, restitutionary, and punitive damages, with interest, the precise amount to be supplied to the Court upon a trial of the merits; and the costs of the suit and a reasonable attorney's fee.

265. Pursuant to COUNT VIII, against the RJR DEFENDANTS, jointly and severally, Common-Law Injunctive and Equitable Relief; and the costs of the suit and a reasonable attorney's fee.

266. Pursuant to COUNT IX, against the RJR DEFENDANTS, jointly and severally, an award of compensatory, restitutionary, and punitive damages, with interest, the

precise amount to be supplied to the Court upon a trial of the merits; Common-Law Injunctive and Equitable Relief; and the costs of the suit and a reasonable attorney's fee.

267. Pursuant to COUNT X, against the RJR DEFENDANTS, jointly and severally, an award of compensatory, restitutionary, and punitive damages, with interest, the precise amount to be supplied to the Court upon a trial of the merits; Common-Law Injunctive and Equitable Relief; and the costs of the suit and a reasonable attorney's fee.

268. Pursuant to COUNT XI, against the RJR DEFENDANTS, jointly and severally, an award of compensatory, restitutionary, and punitive damages, with interest, the precise amount to be supplied to the Court upon a trial of the merits; Common-Law Injunctive and Equitable Relief; and the costs of the suit and a reasonable attorney's fee.

269. Pursuant to COUNT XII, against the RJR DEFENDANTS, jointly and severally, an award of compensatory, restitutionary, and punitive damages, with interest, the precise amount to be supplied to the Court upon a trial of the merits; Common-Law Injunctive and Equitable Relief; and the costs of the suit and a reasonable attorney's fee.

270. Pursuant to COUNT XIII, against the RJR DEFENDANTS, jointly and severally, an award of compensatory, restitutionary, and punitive damages, with interest, the precise amount to be supplied to the Court upon a trial of the merits; Common-Law Injunctive and Equitable Relief; and the costs of the suit and a reasonable attorney's fee.

271. Pursuant to COUNT XIV, against the RJR DEFENDANTS, jointly and severally, an award of compensatory, restitutionary, and punitive damages, with interest, the precise amount to be supplied to the Court upon a trial of the merits; Common-Law Injunctive and Equitable Relief; and the costs of the suit and a reasonable attorney's fee.

272. Such other and similar relief as the Court deems just, proper, and equitable.

273. PLAINTIFFS demand a trial by jury as to all issues triable as of right by jury.

Dated:        New York, New York
              November 23, 2009


                             KRUPNICK, CAMPBELL, MALONE,
                             BUSER, SLAMA, HANCOCK,
                             LIBERMAN & McKEE, P.A.


                             By_____

                             Kevin A. Malone, Esquire
                             Carlos A. Acevedo, Esquire  (CA-6427)
                             100 Courthouse Law Plaza
                             700 Southeast Third Avenue
                             Fort Lauderdale, Florida  33316
                             954-763-8181 telephone
                             954-763-8292 facsimile

                             and

SPEISER, KRAUSE, NOLAN & GRANITO
John J. Halloran, Jr. (JH-2515)
Frank H. Granito, III (FG-9760)
Frank H. Granito, Jr. (FG-1969)
Kenneth P. Nolan (KN-3388)
Two Grand Central Tower
140 East 45th Street, 34th Floor
New York, New York 10017
212-661-0011 telephone
212-953-6483 facsimile

and

Edward F. Farrell, Esquire
Villanueva 31, 1° Izda.
28001 Madrid, Spain
011-3491-575-0370 telephone

and

SACKS & SMITH, L.L.C.
Andrew B. Sacks, Esquire
Stuart H. Smith, Esquire
John K. Weston, Esquire
114 Old York Road
Jenkintown, Pennsylvania  19046
800-578-5300 telephone
215-925-8200 telephone

ATTORNEYS FOR PLAINTIFFS