UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| THE EUROPEAN COMMUNITY, *et al.*,  ) | |
| ) | |
| Plaintiffs,  ) | Civ: 1:02-05771-NGG |
| ) | |
| v.  ) | ECF Case |
| ) | |
| RJR NABISCO, INC., *et al.*,  ) | Served: February 15, 2010 |
| ) | |
| Defendants.  ) | |
| ) | |

**DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT
OF MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(1) AND 12(B)(6)**

Gregory G. Katsas
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001

Mark R. Seiden
Phineas E. Leahey
Leslie B. Dubeck
JONES DAY
222 East 41st Street
New York, New York 10017

*Counsel for Defendants*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

PROCEDURAL BACKGROUND ........................................................................... 2

    A.    The First Action ............................................................................. 2

    B.    The Second Action ......................................................................... 3

    C.    The Third Action ............................................................................ 5

ARGUMENT ........................................................................................................ 6

    I.     PLAINTIFFS' CLAIMS ARE BARRED BY THE REVENUE RULE
AND THE PENAL-LAW RULE ......................................................... 7

    A.    The Revenue Rule and The Penal-Law Rule Bar Claims For
Sovereign Injuries To Foreign Governments .............................. 8

    B.    Plaintiffs Assert Primarily Sovereign Injuries ......................... 11

    C.    Plaintiffs' New Allegations of Competitive Injury Are Insufficient
to Circumvent the Revenue and Penal-Law Rules ................... 14

        1.    Plaintiffs' Alleged Competitive Injuries Are Inseparable
From Their Smuggling Allegations ............................. 15

        2.    Plaintiffs' Money-Laundering Claims Would Require
Direct and Indirect Enforcement of Foreign Penal Laws ........... 17

        3.    Plaintiffs' Money-Laundering Claims Would Subvert
Applicable Treaties ..................................................... 20

    II.    PLAINTIFFS CANNOT SATISFY RICO'S CAUSATION
REQUIREMENTS ........................................................................... 21

    A.    The Alleged Money-Laundering Scheme Was Not A "But-For"
Cause of Any Competitive Injuries ........................................... 22

    B.    The Alleged Money-Laundering Scheme Was Not A Proximate
Cause Of Any Competitive Injuries ........................................... 26

    C.    The Alleged Money-Laundering Scheme Was Not A Proximate
Cause Of Any Sovereign Injuries .............................................. 36

**TABLE OF CONTENTS (cont'd)**

III.   THE COMPLAINT IS FATALLY DEFICIENT IN OTHER RESPECTS ........ 38

    A.   Plaintiffs Fail To State RICO Claims ...................................................... 38

        1.   RICO Does Not Apply Extraterritorially To The Money-Laundering Scheme Alleged Here ................................................. 38

        2.   Corporations Cannot Be Part Of An Association-in-Fact Enterprise ....................................................................................... 41

        3.   Plaintiffs Fail To Satisfy Section 1964(c).................................... 42

        4.   Plaintiffs Cannot Seek Equitable Relief Under RICO ................. 42

    B.   Plaintiffs Fail To State Common-Law Claims......................................... 43

    C.   The EC's Claims Are Barred By Claim And Issue Preclusion................ 48

CONCLUSION.............................................................................................................. 49

## <u>TABLE OF AUTHORITIES</u>

**Page**

**CASES**

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,
    483 U.S. 143 (1987)......................................................................................................39

*AIM Int'l Trading, L.L.C. v. Valcucine S.p.A.*,
    No. 02 Civ. 1363, 2003 U.S. Dist. LEXIS 8594 (S.D.N.Y. May 21, 2003)...........................32

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
    458 U.S. 592 (1982).................................................................................................12, 45

*Am. Med. Ass'n v. United Healthcare Corp.*,
    588 F. Supp. 2d 432 (S.D.N.Y. 2008)......................................................................43

*Anza v. Ideal Steel Supply Corp.*,
    254 F. Supp. 2d 464 (S.D.N.Y. 2003)......................................................................28

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006)............................................................................................. passim

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009)....................................................................................7, 22, 35, 40

*Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*,
    268 F.3d 103 (2d Cir. 2001).................................................................................. passim

*Banco Nacional de Cuba v. Sabbatino*,
    376 U.S. 398 (1964)...................................................................................................9

*Beck v. Prupis*,
    529 U.S. 494 (2000)..................................................................................................36

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...............................................................................................7, 23

*Bernard v. Taub*,
    No. CV 90-0501, 1990 WL 34680 (E.D.N.Y. 1990)............................................................43

*Bridge v. Phoenix Bond & Indem. Co.*,
    128 S. Ct. 2131 (2008).............................................................................................33

*Canyon County v. Syngenta Seeds, Inc.*,
    519 F.3d 969 (9th Cir. 2008) ..................................................................................34

*City of New York v. Smokes-Spirits.com*,
  541 F.3d 425 (2d Cir. 2008)...............................................................................30, 35

*Commercial Cleaning Services, LLC v. Colin Serv. Sys., Inc.*,
  271 F.3d 374 (2d Cir. 2001)......................................................................................31

*Connecticut v. Am. Elec. Power Co.*,
  582 F.3d 309 (2d Cir. 2009)......................................................................................45

*County of Suffolk v. LILCO*,
  728 F.2d 52 (2d Cir. 1984)........................................................................................46

*Danny's Constr. Co. v. Birdair, Inc.*,
  136 F. Supp. 2d 134 (W.D.N.Y. 2000) ....................................................................49

*Davis v. Halperin*,
  813 F.2d 37 (2d Cir. 1987)........................................................................................49

*Discon, Inc. v. Nynex, Corp.*,
  93 F.3d 1055 (2d Cir. 1996)......................................................................................36

*Doe v. State of Israel*,
  400 F. Supp. 2d 86 (D.D.C. 2005) ...........................................................................39

*Dooner v. Keefe, Bruyette & Woods, Inc.*,
  157 F. Supp. 2d 265 (S.D.N.Y. 2001).......................................................................46

*Doron Precision Sys., Inc. v. FAAC, Inc.*,
  423 F. Supp. 2d 173 (S.D.N.Y. 2006).......................................................................29

*Estados Unidos Mexicanos v. DeCoster*,
  229 F.3d 332 (1st Cir. 2000)..........................................................................8, 12, 45

*Estados Unidos Mexicanos v. DeCoster*,
  59 F. Supp. 2d 120 (D. Me. 1999) .............................................................................8

*European Community v. Japan Tobacco, Inc.* (*EC II*),
  186 F. Supp. 2d 231 (E.D.N.Y. 2002) ........................................................... passim

*European Community v. RJR Nabisco, Inc.* (*EC I*),
  150 F. Supp. 2d 456 (E.D.N.Y. 2001) ..............................................3, 13, 48, 49

*European Community v. RJR Nabisco, Inc.* (*EC II Appeal*),
  355 F.3d 123 (2d Cir. 2004)........................................................................... passim

*European Community v. RJR Nabisco, Inc.*,
  424 F.3d 175 (2d Cir. 2005)................................................................................ 1, 5

*European Community v. RJR Nabisco, Inc.*,
    544 U.S. 1012 (2005) ............................................................................... 1, 5

*F. Hoffmann-La Roche Ltd v. Empagran S.A.*,
    542 U.S. 155 (2004) ................................................................................39, 40

*Globe Wholesale Tobacco v. Worldwide Wholesale Trading Inc.*,
    06 Civ. 2865, 2007 U.S. Dist. LEXIS 72656 (S.D.N.Y. 2007) .............................29

*Golden Pac. Bancorp v. FDIC*,
    273 F.3d 509 (2d Cir. 2001) ................................................................................45

*Gristede's Foods, Inc. v. Unkechauge Nation*,
    532 F. Supp. 2d 439 (E.D.N.Y. 2007) ....................................................29, 33, 36

*Hamilton v. Beretta U.S.A. Corp.*,
    264 F.3d 21 (2d Cir. 2001) ..................................................................................46

*Hawaii v. Standard Oil Co.*,
    405 U.S. 251 (1972) ............................................................................................36

*Hemi Group, LLC v. City of New York*,
    No. 08-969, Slip op. (U.S. Jan. 25, 2010) ................................................ passim

*Holmes v. Sec. Investor Prot. Corp.*,
    503 U.S. 258 (1992) ....................................................................21, 26, 37, 39

*Huntington v. Attrill*,
    146 U.S. 657 (1892) ..............................................................................................9

*Ideal Steel Supply Corp. v. Anza*,
    373 F.3d 251 (2d Cir. 2004) ................................................................................28

*In re JetBlue Airways Corp. Privacy Litig.*,
    379 F. Supp. 2d 299 (E.D.N.Y. 2005) ................................................................46

*Iqbal v. Hasty*,
    400 F.3d 143 (2d Cir. 2007) ................................................................................35

*Laborers Local 117 Health & Benefit Fund v. Philip Morris, Inc.*,
    191 F.3d 229 (2d Cir. 1999) ..........................................................................37, 44

*Lerner v. Fleet Bank, N.A.*,
    318 F.3d 113 (2d Cir. 2003) ..................................................................................7

*Leung v. Law*,
    387 F. Supp. 2d 105 (E.D.N.Y. 2005) ................................................................38

*Loucks v. Standard Oil Co.*,
   120 N.E. 198 (N.Y. 1918)...................................................................9

*Mills v. Polar Molecular Corp.*,
   12 F.3d 1170 (2d Cir. 1993)...........................................................44

*Mohawk Indus., Inc. v. Williams*,
   547 U.S. 516 (2006).......................................................................42

*Monahan v. New York City Dep't of Corr.*,
   214 F.3d 275 (2d Cir. 2000)...........................................................48

*Murphy v. Kuhn*,
   682 N.E.2d 972 (N.Y. 1997)...........................................................46

*N. S. Fin. Corp. v. Al-Turki*,
   100 F.3d 1046 (2d Cir. 1996).................................................38, 39, 40

*Nordlicht v. New York Tel. Co.*,
   799 F.2d 859 (2d. Cir. 1986)...........................................................47

*Norex Petroleum Ltd. v. Access Indus.*,
   540 F. Supp. 2d 438 (S.D.N.Y. 2007)..........................................40, 41

*O'Toole v. Northrop Grumman Corp.*,
   499 F.3d 1218 (10th Cir. 2007) ......................................................29

*Oki Semiconductor Co. v. Wells Fargo Bank*,
   298 F.3d 768 (9th Cir. 2002) ......................................................36, 38

*Ouaknine v. MacFarlane*,
   897 F.2d 75 (2d Cir. 1990)..............................................................36

*Pasquantino v. United States*,
   544 U.S. 349 (2005)....................................................................5, 23

*Religious Tech. Ctr. v. Wollersheim*,
   796 F.2d 1076 (9th Cir. 1986) ........................................................43

*Republic of Colombia v. Diageo N. Am. Inc.*,
   531 F. Supp. 2d 365 (E.D.N.Y. 2007) ....................................... passim

*Schwab v. Philip Morris USA, Inc.*,
   522 F.3d 215 (2d Cir. 2008)......................................................33, 34

*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985)........................................................................43

*Sedima v. Imrex Co., Inc.*,
   741 F.2d 482 (2d Cir. 1984) ............................................................................... 43

*SEIU Health & Welfare Fund v. Philip Morris Inc.*,
   249 F.3d 1068 (D.C. Cir. 2001) .......................................................................... 12

*Seville Indus. Mach. Corp. v. Southmost Machinery Corp.*,
   567 F. Supp. 2d 1146 (D.N.J. 1983) .................................................................. 42

*Small v. United States*,
   544 U.S. 385 (2005) ............................................................................................ 38

*Sperry v. Crompton Corp.*,
   863 N.E.2d 1012 (N.Y. 2007) .............................................................................. 46

*State of Sao Paulo of the Fed. Rep. of Brazil v. The Am. Tobacco Co.*,
   919 A.2d 1116 (Del. 2007) .................................................................................. 12

*Sure-Snap Corp. v. State Bank & Trust Co.*,
   948 F.2d 869 (2d Cir. 1991) ............................................................................... 49

*Sybersound Records, Inc. v. UAV Corp.*,
   517 F.3d 1137 (9th Cir. 2008) ............................................................................ 29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ..................................................................................... 29, 32

*The Antelope*
   23 U.S. (10 Wheat.) 66, 123 (1825) ..................................................................... 9

*Town of West Hartford v. Operation Rescue*,
   915 F.2d 92 (2d Cir. 1990) ................................................................................. 42

*Trane Co. v. O'Connor Sec.*,
   718 F.2d 26 (2d Cir. 1983) ................................................................................. 43

*United States v. Cooper Corp.*,
   312 U.S. 600 (1941) ............................................................................................ 42

*United States v. Huber*,
   603 F.2d 387 (2d Cir. 1979) ............................................................................... 42

*United States v. McClendon*,
   712 F. Supp. 723 (E.D. Ark. 1988) ..................................................................... 41

*United States v. Phillip Morris USA, Inc.*,
   566 F.3d 1095 (D.C. Cir. 2009) .......................................................................... 43

*United States v. Yousef,*
    327 F.3d 56 (2d Cir. 2003)........................................................................38

*Vicon Fiber Optics Corp. v. Scrivo,*
    201 F. Supp. 2d 216 (S.D.N.Y. 2002)...........................................36, 38

*Vigilant Ins. Co. v. Hous. Auth.,*
    87 N.Y.2d 36 (1995) .............................................................................47

*Wisconsin v. Pelican Ins. Co.,*
    127 U.S. 265 (1888)...........................................................................9, 12

*Wiwa v. Royal Dutch Petroleum Co.,*
    Civ. A. No. 96-8386, 2009 U.S. Dist. LEXIS 34843 (S.D.N.Y. March 18, 2009) ................39

**STATUTES**

18 U.S.C. § 1956 ..........................................................................................26

18 U.S.C. § 1957 ..........................................................................................26

18 U.S.C. § 1961(4) ......................................................................................41

18 U.S.C. § 1962 ....................................................................................36, 41

18 U.S.C. § 1964(a) ................................................................................42, 43

18 U.S.C. § 1964(b) ......................................................................................42

18 U.S.C. § 1964(c) ..........................................................................21, 42, 43

**OTHER AUTHORITIES**

Council Directive 2001/37/EC, 2001 O.J. (L 194) .....................................30

Council Directive 2003/33/EC, 2003 O.J. (L 152) .....................................29

Council Directive 89/552/EEC, 1989 O.J. (L 298)......................................30

Declaration of Eric Morgan de Rivery in Support of Defendants' Motion to Dismiss the
    Second Amended Complaint, dated February 15, 2010 ..........................32

Fed. R. Evid. 201 ..........................................................................................29

Federal Rule of Civil Procedure 9(b)...........................................................43

Federal Rule of Civil Procedure 12(b)(1) ...............................................7, 41

Federal Rule of Civil Procedure 12(b)(6) ...............................................7, 29, 32, 41

Federal Rule of Civil Procedure 44.1 ............................................................................32

Health & Consumers Directorate-General, *Report on the Implementation of the Tobacco Advertising Directive (2003/33/EC)*, COM (2008) 330 final (May 28, 2008), available at http://ec.europa.eu/health/ph_determinants/life_style/Tobacco/Documents/com_20 080520_en.pdf. ..............................................................................................................29

US-Belgium MLAT Report,  S. Exec. Rep. No. 100-29 ...............................................20

US-Greece MLAT Report,  S. Exec Rep. No. 106-24....................................................20

US-Italy MLAT Report,  S. Exec. Rep. No. 98-36........................................................21

US-Spain MLAT Report,  S. Exec. Rep. No. 102-35.................................................20, 21

## PRELIMINARY STATEMENT

This is the third action brought by the European Community ("EC"), and the second action brought by Member States, against R.J. Reynolds Tobacco Company ("RJR") and certain of its affiliates for an array of social and economic injuries allegedly caused by foreign criminal activities, including narcotics trafficking and the illegal distribution of RJR cigarettes.  Like its predecessors, this action impermissibly seeks enforcement of foreign public laws, in conflict with numerous precedents of the Second Circuit and of this Court, in this case and others, squarely holding that the revenue and the penal-law rules bar foreign governments from suing in United States courts for injuries suffered in their capacity as sovereigns.  *See*, *e.g.*, *Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 109-34 (2d Cir. 2001); *European Community v. Japan Tobacco, Inc.*, 186 F. Supp. 2d 231, 234-42 (E.D.N.Y. 2002), *aff'd*, 355 F.3d 123, 131-38 (2d Cir. 2004), *vacated*, 544 U.S. 1012 (2005), *reaff'd*, 424 F.3d 175 (2d Cir. 2005); *Republic of Colombia v. Diageo N. Am. Inc.*, 531 F. Supp. 2d 365, 383-401 (E.D.N.Y. 2007).

In an effort to avoid these precedents, Plaintiffs now allege, for the first time, a series of injuries suffered as competitors of RJR in European cigarette markets.  Specifically, Plaintiffs allege that they lost sales and profits because RJR-manufactured cigarettes were sold to European consumers at lower prices than those of cigarettes manufactured by the Member States.  In so doing, Plaintiffs are now attempting to replead this case into the one narrow aspect of this Court's decision in *Diageo* that they hope will allow them to survive this motion.  In *Diageo*, a case involving alleged money laundering and smuggling of liquor, this Court held that neither the revenue nor penal-law rules, nor the proximate-cause requirements applicable to RICO, barred the Republic of Colombia from seeking recovery for competitive injuries flowing from

money laundering alone and allegedly suffered by Colombia as a monopolistic seller of liquor within its borders.  *See* 531 F. Supp. 2d at 395-99, 430-38.

Plaintiffs fail to replead their case into *Diageo*.  For one thing, unlike the Republic of Colombia, Plaintiffs here offer no plausible explanation for how the alleged money laundering might result in any competitive advantage in the foreign sale of RJR's products.  For another, the proximate-cause analysis in *Diageo*, which this Court expressly regarded as a close question, involved one lawful seller that enjoyed a constitutional monopoly with respect to the product and markets at issue.  Despite their vague intimations to the contrary, Plaintiffs here do not enjoy monopolies, lawful or otherwise, over the sale of cigarettes in Europe.  And absent such monopolies, any competitive injury is not only remote from the alleged money laundering, but influenced by any number of other, legitimate market forces that break the causal chain as a matter of law.  As the Supreme Court reiterated just three weeks ago in the context of a motion to dismiss, a competitor cannot satisfy the proximate-cause requirement of RICO under these circumstances.  *See Hemi Group, LLC v. City of New York*, No. 08-969, Slip op. at 11-12 (U.S. Jan. 25, 2010).

For all of these reasons, and many others addressed below, this action should be dismissed in its entirety with prejudice.

## PROCEDURAL BACKGROUND

### A.      *The First Action*

In November 2000, the EC filed suit against RJR, Philip Morris International, and various of their related corporate entities.  The EC asserted RICO and common-law claims based on foreign taxes allegedly not collected, and law-enforcement expenses allegedly expended, as a result of cigarette smuggling in Europe.  This Court dismissed those claims.  The Court held that the EC had suffered no injury because, under the governing treaties, any revenue lost to the EC

from the alleged smuggling would have to be made up by contributions to the EC from its

Member States. *European Community v. RJR Nabisco, Inc.* (*EC I*), 150 F. Supp. 2d 456, 501-02

(E.D.N.Y. 2001).

    **B.**     ***The Second Action***

     In August 2001, the EC, now joined by ten Member States, filed a second action based on

the same alleged conduct, claims and injuries.  The Second Action alleged, as did *EC I*, that the

defendant tobacco companies were "actively involved in smuggling contraband cigarettes into

the EC." *European Community v. Japan Tobacco, Inc*. (*EC II*), 186 F. Supp. 2d 231, 233

(E.D.N.Y. 2002).  The Second Action further alleged that "in the process of smuggling

cigarettes, Defendants engaged the business and services of narcotics traffickers and money

launderers, and in so doing facilitated or engaged in the laundering of tainted money." *Id*.  The

EC claimed approximately nine different injuries caused by these alleged activities, including

lost taxes and customs duties, increased law-enforcement expenditures, border violations,

disruption of "legitimate trade and markets" within the EC, "harm to financial institutions and

infrastructure" of the EC, damage to the "internal market" of the EC, and interference with the

"duties, responsibilities, and legal authority" of the EC to regulate commerce, "combat money

laundering," and "abate harm to itself and the general public." *EC II* Compl. ¶ 39.  Neither the

EC nor the Member States alleged any competitive injury as a seller of cigarettes.

     This Court dismissed the Second Action in its entirety.  It held that the revenue rule

barred all of the RICO and common-law claims based on alleged smuggling of cigarettes.  As the

Court explained, the revenue rule provides that "'courts of one sovereign will not enforce final

tax judgments or unadjudicated tax claims of other sovereigns.'" *EC II*, 186 F. Supp. 2d at 234-

35, 237 (quoting *Canada*, 268 F.3d at 109).  Moreover, the revenue rule bars not only claims

seeking direct compensation for lost taxes, but also indirect claims "whereby the damages

alleged by plaintiff are derivative of unpaid foreign taxes, or based on the costs of enforcing foreign tax laws." *Id*. at 235 (citing *Canada*, 268 F.3d at 131-32).  Applying the revenue rule, this Court dismissed with prejudice all claims based on alleged smuggling.  *See id.* at 236-45.

This Court also dismissed, for failure to allege proximate cause, the RICO and common-law claims based on alleged money laundering.  As the Court explained, the alleged harms caused by money laundering were "only coherently alleged in concert with the smuggling scheme," and the "only apparent connection" between the alleged injuries and money laundering was "harm visited by money laundering as a link in the smuggling chain." *Id*. at 243.  Thus, absent smuggling harms for which the revenue rule barred recovery, the complaint set forth "no additional, distinct causal connection between the allegations of money laundering and the injuries asserted." *Id*.  Based on that failure to allege a cognizable causal chain, the Court dismissed both the RICO and the common-law claims.  *See id.* at 242-45.

Despite allowing Plaintiffs to replead their money-laundering claims in a new lawsuit, this Court expressed skepticism that such claims ultimately would survive.  It noted that the "vague nature of many of the injuries asserted" – such as those "asserting as injury the compromised integrity of Plaintiffs' various institutions and markets" – "simply do not make sense, as presented, in the context of specific claims involving money laundering." *Id.* at 243 n.6.  Moreover, addressing the policy concerns underlying the proximate-cause requirement of RICO, it noted that "to proceed on the money laundering grounds alone, especially in light of the extremely broad injuries alleged, would render proper assessment of damages a likely impossible task," and "may well expose Defendants to numerous claims stemming from the particular acts" at issue. *Id*. at 243 n.7.

The Second Circuit affirmed.  It too held that the revenue rule barred all of the claims based on alleged smuggling.  *European Community v. RJR Nabisco, Inc.* (*EC II Appeal*), 355 F.3d 123, 132 (2d Cir. 2004).  The Court explained that the revenue rule applies whenever "'the substance of the claim is, either directly or indirectly, one for tax revenues'" of a foreign sovereign.  *Id.* at 131 (quoting *Canada,* 268 F.3d at 130).  Direct enforcement occurs whenever a judgment for the plaintiffs "would require the defendants to reimburse them for lost tax revenues."  *Id.*  Additionally, indirect enforcement occurs whenever the remedy sought would give "extraterritorial effect" to foreign tax laws, or, as with "a suit seeking damages based on law enforcement costs," would "shift the cost of enforcing the tax laws onto the defendants."  *Id.* Applying those principles, the Court held that adjudicating any of the claims based on alleged smuggling "would implicate the concerns discussed in *Canada*, requiring the court to evaluate the policies behind the relevant foreign tax laws, interpret their provisions, and enforce them by awarding damages."  *Id.* at 132.  The Second Circuit also affirmed this Court's decision to dismiss the claims based on alleged money laundering without prejudice.  *See id.* at 138.[1]

## C.    *The Third Action*

This most recent amended complaint, Docket Entry # 73 ("*EC III* Compl."), filed by the EC and twenty-six Member States, is substantially similar, in many respects, to the complaints in *EC I* and *EC II*.  Although stripped of express references to "smuggling," the complaint still repeatedly alleges that Defendants engaged in the "illegal distribution" of cigarettes in Europe. *EC III* Compl. ¶ 146(b); *see also id.* ¶ 43 ("criminal distribution channels"); *id.* ¶ 112 ("sales into

---

[1]   The Supreme Court vacated the Second Circuit's decision for reconsideration in light of *Pasquantino v. United States*, 544 U.S. 349 (2005), which held that the revenue rule does not bar criminal RICO prosecutions by the U.S. government based on defrauding a foreign government of tax revenue.  *See European Community v. RJR Nabisco, Inc.*, 544 U.S. 1012 (2005).  On remand, however, the Second Circuit adhered to its prior decision that foreign sovereigns may not bring civil claims based on similar conduct.  *See European Community v. RJR Nabisco, Inc.*, 424 F.3d 175, 181 (2d Cir. 2005).

illegal channels"); ¶ 155(n) ("illegal distribution of tobacco products").  The complaint further alleges that, as part of that illegal distribution scheme, Defendants engaged in money laundering by selling cigarettes in exchange for the proceeds of narcotics trafficking and other criminal activities.  *Id.* ¶¶ 47, 53, 59, 69, 70.  Plaintiffs contend that, as a result of these sales, RJR facilitated the criminal activities of its distributors, imposed various social and economic harms on Europe, and competed unfairly with the Member States' own cigarette businesses.

Plaintiffs allege a vague, sweeping, and repetitive list of some three-dozen putative injuries.  *Id.* ¶ 146.  As in *EC II*, these harms include such alleged sovereign injuries as lost tax revenues, increased law-enforcement costs, border violations, disruption of legitimate trade and markets, and harm to financial institutions and infrastructure.  They also include such new alleged sovereign injuries as lost forfeiture proceeds, increased counter-terrorism costs, increased contributions to the EC budget, increased financial aid to Eastern Europe, and harm to the general population in Europe.  Finally, for the first time, they also include alleged competitive injuries to the Member States, as an undifferentiated group, arising from their own assertedly reduced cigarette sales and profits.  For all of these alleged harms, the EC and the Member States seek damages "at least equal to, and properly measured by, the total amount of criminal proceeds laundered by" RJR and its related companies.  *Id*. ¶ 147.

## ARGUMENT

Despite the length of Plaintiffs' latest complaint, the questions it raises are more focused than those presented at earlier stages of this litigation.  Under the Second Circuit's decision in *Canada* and this Court's decision in *Diageo*, the revenue and penal-law rules at a minimum bar claims asserted for any injury suffered by Plaintiffs in their capacity as foreign sovereigns.  Moreover, under this Court's decisions in *EC II* and *Diageo*, the revenue and penal-law rules also bar claims for competitive injuries allegedly caused by smuggling.  Accordingly, the

principal question presented is whether the Plaintiffs have alleged any competitive injury unrelated to smuggling and proximately caused by the alleged misconduct of money laundering. The answer to that question is no.

The applicability of the revenue and penal-law rules is a jurisdictional question subject to review under Federal Rule of Civil Procedure 12(b)(1). *See Diageo*, 531 F. Supp. 2d at 381. Dismissal under Rule 12(b)(1) is appropriate where the complaint on its face pleads claims barred by the revenue and penal-law rules. *See id.* at 380-81.

The existence of proximate causation is a merits question subject to review under Federal Rule of Civil Procedure 12(b)(6). *See Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 129-30 (2d Cir. 2003). To survive review under Rule 12(b)(6), a complaint must make specific factual allegations that support a plausible inference of liability. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). Mere conclusory statements in a complaint – such as a "formulaic recitation of the elements of a cause of action" – are neither sufficient to state a claim nor entitled to a presumption of truth. *Twombly*, 550 U.S. at 555; *see also Iqbal*, 129 S. Ct. at 1949. And legitimate factual allegations, to satisfy the plausibility requirement, must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1940.

## I.   PLAINTIFFS' CLAIMS ARE BARRED BY THE REVENUE RULE AND THE PENAL-LAW RULE

In large measure, whether this complaint survives a motion to dismiss turns on the distinction between sovereign and private acts, interests, or injuries. Sovereign or public acts (*jure imperii*) are those done by a government "by virtue of [its] sovereign authority," such as enforcement of its own revenue, penal, or other public laws. *See Canada*, 268 F.3d at 132-33 n.41. In contrast, private or commercial acts (*jure gestionis*) are those "that are private or

commercial in character," such as operating a business.  *See id.*  Although foreign countries may

sue in United States courts "to assert their proprietary interests, *i.e.* economic interests that are

the same as a private litigant may have," there appear to be "no cases where foreign nations have

been permitted to sue in United States federal courts to implement their *sovereign* interests."

*Estados Unidos Mexicanos v. DeCoster*, 59 F. Supp. 2d 120, 122 (D. Me. 1999), *aff'd*, 229 F.3d

332 (1st Cir. 2000).

As explained in detail below, the revenue and penal-law rules bar foreign sovereigns

from litigating in United States courts over alleged sovereign injuries.  That principle governs

most of this case.  The vast bulk of injuries alleged here by Plaintiffs are sovereign in character:

these include sovereign injuries for which *EC II* bars recovery, such as lost tax revenues and

increased law-enforcement costs; sovereign injuries for which *Diageo* bars recovery, such as

alleged harms to the economy, money supply, border, public safety, and political stability, as

well as allegedly lost forfeitures; and other unquestionably sovereign injuries such as increased

costs to fund the EC, to conduct foreign policy, and to combat terrorism.  The revenue and penal-

law rules also bar the assertedly commercial claims here, which involve disguised smuggling

allegations and which, in any event, seek in substance to enforce foreign penal laws.

### A. The Revenue Rule and The Penal-Law Rule Bar Claims For Sovereign Injuries To Foreign Governments

The revenue rule "is a longstanding common law doctrine providing that courts of one

sovereign will not enforce final tax judgments or unadjudicated tax claims of other sovereigns."

*Canada*, 268 F.3d at 109.  The revenue rule "is implicated whenever 'the substance of the claim

is, either directly or indirectly, one for tax revenues.'"  *EC II Appeal*, 355 F.3d at 131 (quoting

*Canada*, 268 F.3d at 130).  Direct enforcement occurs when a foreign sovereign seeks to invoke

United States law – including RICO and the common law – to recover damages for lost tax

revenues.  *See Canada*, 268 F.3d at 131.  Indirect enforcement occurs when a foreign sovereign

seeks to recover for the costs of enforcing its tax laws.  *See id.* at 131-32 (foreign sovereign

cannot "indirectly enforce its revenue laws simply by pleading tort damages based on the costs

of enforcing those laws").

 The penal-law rule is an equally longstanding rule that "[t]he Courts of no country

execute the penal laws of another."  *The Antelope*, 23 U.S. (10 Wheat.) 66, 123 (1825) (Marshall,

C.J.).  The "test whether a law is penal" is "whether the wrong sought to be redressed is a wrong

to the public or a wrong to the individual."  *Huntington v. Attrill*, 146 U.S. 657, 668 (1892); *see*

*also Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 414 n.15 (1964) ("[A] penal law for

the purposes of this doctrine is one which seeks to redress a public rather than a private wrong.");

*Loucks v. Standard Oil Co.*, 120 N.E. 198, 198 (N.Y. 1918) (Cardozo, J.) (penal law "awards a

penalty to the state . . . suing in the interest of the whole community to redress a public wrong").

Thus, the penal-law rule applies "not only to prosecutions and sentences for crimes and

misdemeanors but to all suits in favor of the state for the recovery of pecuniary penalties for any

violation of statutes for the protection of its revenue, or other municipal laws, and to all

judgments for such penalties."  *Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 290 (1888).  Like

the revenue rule, the penal-law rule bars indirect, as well as direct, enforcement of foreign penal

laws.  *See Canada*, 268 F.3d at 130 n.38.  Moreover, "the revenue and penal law rules are

parallel," and the penal-law rule thus "prevents [a] court from hearing actions that directly or

indirectly enforce a foreign sovereign's penal laws to the same extent that the revenue rule

prevents [a] court from hearing actions to enforce a foreign sovereign's revenue laws."  *Diageo*,

531 F. Supp. 2d at 399.

The revenue and penal-law rules reflect broader concerns about enforcement in United States courts of the sovereign interests of foreign governments.  As the Second Circuit explained in *Canada*, "United States courts have traditionally been reluctant to enforce foreign laws that are '*jure imperii*.'"  268 F.3d at 132.  Enforcement of revenue rules and penal rules is "a classic example of '*jure imperii*' acts."  *See id.* at 132 n.41.  Thus, the bar on enforcing the revenue and penal rules of a foreign sovereign "is just one aspect of a cautionary approach of domestic courts to enforcing foreign laws."  *Id.*

In *Diageo*, this Court applied these principles to dismiss RICO and common-law claims based on alleged money laundering and smuggling of liquor.  Like Plaintiffs here, the Republic of Colombia asserted that the money laundering and smuggling caused a wide range of injuries to its economy, financial infrastructure, law-enforcement activities, and safety and well-being of its citizens.  This Court held that the revenue rule barred not only claims for "lost liquor taxes," but also claims for any other injury suffered by Colombia or its agencies "in their sovereign capacity."  531 F. Supp. 2d at 391.  The Court identified several categories of such "sovereign" injuries for which the revenue rule barred recovery:

> "eros[ion] of the stability and credibility" of the Colombian peso; "[d]istortion of the [m]oney supply;" "distort[ion] [of] the official balance of payments;" "permeation of the Colombian border and the Territory of the Republic;" threat to the "safety, security, and well-being of governmental personnel and property;" interference with "the regulatory system and authority of the Republic;" "disruption of public services;" "expenses to stabilize unstable political situations in entire regions of Colombia;" damage to the Colombian "trade and the economy;" "interfere[nce] with use by the public of a public space;" "endanger[ment] and injur[y] [to] the property, life, health, safety, and comfort of a considerable number of persons;" "injur[y] [to] the economic well being of the citizens of the Republic of Colombia and the Dements;" "creat[ing] great dangers to the community, including Plaintiffs' economic and non-economic interests;" and "fraud on the public."

*Id.* at 391-92 & n.5 (alterations by the Court in *Diageo*).  The Court further held that the penal-law rule, which it described as "very similar to the revenue rule," also barred claims for alleged

harms that Colombia or its agencies "suffer in their sovereign capacity." *Id.* at 399-400.  In particular, the Court held that the penal-law rule barred claims for forfeitures lost as a result of alleged money laundering, which would constitute impermissible enforcement of the Colombian penal law "providing that the Colombian government may seize instrumentalities of crime." *Id.* at 401.[2]  The only claim that survived, in part, was one for "lost revenue and profits" allegedly suffered by Colombia in its commercial capacity as a seller of liquor. *See id.* at 393-99.[3]

### B.     *Plaintiffs Assert Primarily Sovereign Injuries*

In paragraph 146 of their latest complaint, Plaintiffs offer a hodgepodge of some three-dozen alleged injuries.  Of these, only the first seven, *EC III* Compl. ¶ 146(a)-(g), are even arguably commercial.  The rest of them are sovereign, most obviously so.  For all of these, the revenue and penal-law rules bar recovery:

***Harm to economy and financial infrastructure.***  Plaintiffs seek recovery for diffuse alleged harms to their markets, economies, financial institutions, currency, money supply, and balance of payments. *EC III* Compl. ¶ 146(h)-(r), (dd).  In *Diageo*, this Court held that the revenue rule bars recovery for indistinguishable sovereign injuries allegedly caused by money laundering. *See* 531 F. Supp. 2d at 391-92 & n.5 (recovery barred for "damage to the Colombian trade and the economy," "injury to the economic well being of the citizens of the Republic of Colombia," "erosion of the stability and credibility of the Colombian peso," "distortion of the money supply," and "distortion of the official balance of payments" (internal brackets and

---

[2] The Court reached this conclusion despite the plaintiffs' allegation that Colombia possessed a *civil* right to the proceeds and instrumentalities of crime. *See Diageo*, 531 F. Supp. 2d at 401.

[3] The Court held that a claim for "adverse economic impact" might bear on commercial as well as sovereign injuries, but was nonetheless "too vague" to survive a motion to dismiss. *See Diageo*, 531 F. Supp. 2d at 392.  The Court further noted that improper labeling might bear on the permissible commercial claims, but that, even then, the revenue or penal-law rules would nonetheless bar any claim based on improper labeling "if it requires the court to enforce Colombian labeling laws." *See id.*

quotations omitted)).  Moreover, to the extent Plaintiffs use generalized allegations of economic

harm – such as "Damage to the Legitimate Economy", *EC III* Compl. ¶ 146(i)) – to suggest

competitive injuries as well as sovereign ones, the allegations are nonetheless "too vague to

withstand" a motion to dismiss.  *See Diageo*, 531 F. Supp. 2d at 392 (dismissing allegation of

"adverse economic impact").

 These claims are barred for another reason as well:  States of the United States may seek

redress, through the doctrine of *parens patriae* standing, for injuries to "the health and well being

– both physical and economic – of its residents in general."  *Alfred L. Snapp & Son, Inc. v.

Puerto Rico ex rel. Barez*, 458 U.S. 592, 601-07 (1982).  Foreign nations, however, may not

proceed as *parens patriae*.  *See Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332, 335-41

(1st Cir. 2000); *SEIU Health & Welfare Fund v. Philip Morris Inc*., 249 F.3d 1068, 1073 (D.C.

Cir. 2001); *State of Sao Paulo of the Fed. Rep. of Brazil v. The Am. Tobacco Co*., 919 A.2d 1116,

1122 (Del. 2007).  As the First Circuit explained in *DeCoster*, the "primary justification for

recognizing *parens patriae* standing in the States" rests on federalism-based considerations

specific to the states, *see* 229 F.3d at 337, and extending that doctrine to foreign nations, absent

clear authorization from the political branches, would raise a "particularly compelling concern"

of judicial interference with their control over foreign policy, *see id.* at 340.

 *Civil forfeitures.*  Plaintiffs seek to recover money allegedly subject to civil forfeiture, as

the proceeds of criminal activity, under the laws of the Member States.  *EC III* Compl. ¶ 146(s)-

(u).  For well over a century, the penal-law rule has clearly barred recovery for such civil

forfeitures.  *See Pelican Ins. Co.*, 127 U.S. at 290 (penal-law rule applies to civil suits "for the

recovery of pecuniary penalties"); *Diageo*, 531 F. Supp. at 401 (penal-law rule bars recovery for

damages "to enforce the Colombian law providing that the Colombian government may seize instrumentalities of crime").

      *Law-enforcement costs.*  Plaintiffs seek to recover costs allegedly incurred to combat organized crime, money laundering, and terrorism, and to store criminal proceeds for use as evidence.  *EC III* Compl. ¶ 146(v)-(z), (ii).  These claims seek indirect enforcement of foreign revenue and penal laws.  *See EC II Appeal*, 355 F.3d at 131 ("a suit seeking damages based on law enforcement costs is an attempt to shift the cost of enforcing the tax laws onto the defendants, and would therefore require the court indirectly to enforce the tax laws"); *Diageo*, 531 F. Supp. 2d at 399 (penal-law rule prohibits indirect enforcement "to the same extent" as revenue rule).  Plaintiffs cannot plead around this rule simply by alleging that money laundering or terrorism damages government property.  To the contrary, in *Diageo*, this Court held that the revenue and penal-law rules barred claims that an alleged money-laundering scheme imposed a "threat to the 'safety, security, and well-being of government personnel and property.'"  *See* 531 F. Supp. 2d at 391 n.5 (revenue rule); *see also id.* at 399-401 (penal-law rule).

      *Support of EC activities.*  The Member States seek to recover for contributions made to support unspecified (presumably law-enforcement) activities by the EC.  *EC III* Compl. ¶ 146(aa)-(cc).  The Member States make these contributions pursuant to treaty commitments undertaken in their capacities as sovereign nations.  *See EC I*, 150 F. Supp. 2d at 501-02.  These obligations are quintessentially *jure imperii* – and thus not subject to enforcement through damages awards in civil litigation.  *See Canada*, 268 F.3d at 132-33 & n.41.

      *Border penetration.*  Plaintiffs seek recovery for "permeation" of their "borders" due to alleged money laundering.  *EC III* Compl. ¶ 146(ee)-(ff).  In *Diageo*, this Court held that the revenue and penal-law rules bar recovery for "permeation of the Colombian border and the

Territory of the Republic" by an alleged scheme of money-laundering.  *See*  531 F. Supp. 2d at 391 n.5 (revenue rule); *see also id.* at 399-401 (penal-law rule).

***Bribery.***  Plaintiffs seek to recover for various harms allegedly caused by the bribery of its public officials.  *EC III* Compl. ¶ 146(hh).  Those alleged harms are:  "damages to the trade and the economy" of Member States and "increased law-enforcement and military expenditures," both of which we have addressed above; "disruption of public services," for which a *verbatim* allegation was held barred in *Diageo*, *see* 531 F. Supp. 2d at 391 n.5; and "expenses to stabilize unstable political situations in Eastern Europe" – in other words, the conduct of foreign policy by sovereign nations, another function that is quintessentially *jure imperii*.

***Lost tax revenues.***  Finally, Plaintiffs seek to recover for taxes and duties evaded by the alleged money laundering and illegal distribution of cigarettes.  *EC III* Compl. ¶ 146(jj).  The revenue rule unquestionably bars any such recovery.  *See*, *e.g.*, *EC II Appeal*, 355 F.3d at 132; *Canada*, 268 F.3d at 131.

## C.   *Plaintiffs' New Allegations of Competitive Injury Are Insufficient to Circumvent the Revenue and Penal-Law Rules*

Besides expanding upon its list of alleged sovereign injuries, Plaintiffs further allege, for the first time, that a "money laundering scheme" and "illegal distribution scheme" gave Defendants an "unfair and illegal competitive advantage over the Plaintiffs," and thereby reduced the Plaintiffs' own cigarette sales and profits.  *EC III* Compl. ¶ 146(a)-(g.).  Although the revenue and penal-law rules ordinarily do not bar claims based on competitive injury, they nonetheless bar these claims for three reasons:  first, Plaintiffs' alleged competitive injuries are inseparable from their smuggling allegations, which this Court has held cannot support any claim; second, the competitive injuries are said to flow from alleged money laundering, claims

which would involve the impermissible enforcement of foreign penal laws; and third, adjudicating the money-laundering claims would subvert international treaties.

### 1. Plaintiffs' Alleged Competitive Injuries Are Inseparable From Their Smuggling Allegations

This Court has twice held that the revenue or penal-law rules bar claims by a foreign government based on alleged smuggling, regardless of whether the smuggling is said to have caused sovereign or competitive injury. Because the competitive injuries alleged in this case are bound up in disguised smuggling allegations, they are barred by the revenue and penal-law rules.

In *EC II*, this Court held that the revenue rule barred all of Plaintiffs' claims based on alleged smuggling, which "would necessarily cause this court to pass on foreign tax laws." 186 F. Supp. 2d at 236-37. The Court also dismissed claims based on alleged money laundering because "the harm visited on Plaintiffs by Defendants' money laundering [was] only coherently alleged in concert with the smuggling scheme." *Id*. at 243; *see also id.* ("Stripped of the harms suffered from smuggling, the complaint offers no additional causal connection between the allegations of money laundering and the injuries asserted."). Doubtful that Plaintiffs could allege such a "discrete connection," the Court nonetheless allowed Plaintiffs one more opportunity to replead their money-laundering claims. *See id.* at 243 & nn.6 & 7.

*Diageo* further clarifies this analysis in two relevant respects. First, this Court made clear that the revenue and penal-law rules bar all claims for sovereign injuries, whether alleged to be the product of money laundering, smuggling, or both. *See* 531 F. Supp. 2d at 391-93 & n.5, 399-400. Second, this Court made clear that the revenue rule bars all claims based on alleged smuggling, even if such smuggling is alleged to have caused only competitive injury. *See id.* at 394 ("Plaintiffs' claims for lost tax revenues and profits resulting from the alleged enterprise's tax evasion clearly constitutes direct enforcement of Colombian tax laws and, as a result, are

barred by the revenue rule.").  Under these rulings, the only litigable claims are those based on competitive injuries allegedly caused by money laundering but not smuggling.

In response to these rulings, Plaintiffs delete from their complaint all express references to the term "smuggling."  Nonetheless, Plaintiffs continue to allege – and repeatedly so – that Defendants orchestrated a scheme of "illegal distribution," "criminal distribution," and distribution through "illegal channels."  *EC III* Compl. ¶¶ 43, 108, 112, 146(b)-(e), (o), 155(n).  Moreover, Plaintiffs allege that their "competitive disadvantage" arose because Defendants assertedly sold their product "into criminal distribution channels."  *Id.* ¶¶ 43-44; *see also id.* ¶ 44 ("By operating outside the legal framework for fair business operations, the manufacturer creates an unfair advantage for itself as against its competitors[.]").  And they allege that the "underground economy" in which Defendants assertedly participate "competes illegally against the legitimate economy" in which EC Members sell cigarettes, and thereby causes them harm.  *Id.* ¶ 146(i).  These allegations have little inherent connection to money laundering, but are essential to show competitive injuries allegedly caused by smuggling.  To be sure, Plaintiffs do allege that the "money-laundering scheme described in this complaint" gave Defendants "an unfair and illegal competitive advantage."  *Id.* ¶ 146(a).  But as explained above, according to the complaint itself, this "money-laundering scheme" included illegal distribution – *i.e.*, smuggling – as one of its essential elements.  The Complaint does not allege that money laundering by itself – unconnected to any illegal distribution of cigarettes – caused the Plaintiffs any competitive injury as competing sellers of cigarettes.  And because no such "discrete connection" is apparent, the Court may not supply it by inference.  *See EC II*, 186 F. Supp. 2d at 243.

Not only do Plaintiffs still assert claims that depend on smuggling, but even their money-laundering allegations are their smuggling predecessors in disguise.  For example:

- *Compare EC I* Compl. ¶ 146 ("Defendants, by their conduct of *selling cigarettes to smugglers*, creating false and misleading documents, improperly labeling shipments of cigarettes, and setting forth mechanisms of payment by which smugglers may pay for the cigarettes without being detected by government investigations all continue to exacerbate the problem of cigarette smuggling in [the EC and Member States] and to damage the [Plaintiffs]" (emphasis added)) *with EC III* Compl. ¶ 185 ("[Defendants], by their conduct of *selling cigarettes to money launderers*, creating false and misleading documents, improperly labeling shipments of cigarettes, and establishing and employing mechanisms of payment by which criminals may pay for the cigarettes without being detected by government investigations, all continue to injure the [Plaintiffs]" (emphasis added)).

- *Compare EC I* Compl. ¶ 122 ("Upon their receipt of such ill-gotten gains by wire transfers from *the smugglers and/or their associates*, the [Defendants] used and invested such income and proceeds, or a portion thereof, to acquire an interest in, establish, and operate the RJR *Smuggling Enterprise*" (emphases added)) *with EC III* Compl. ¶ 163 ("Upon their receipt of such ill-gotten gains by wire transfers from *money launderers and/or their associates*, the [Defendants] used and invested such income and proceeds, or a portion thereof, to acquire an interest in, establish, and operate the RJR *Money-Laundering Enterprise*" (emphases added)).

- *Compare EC I* Compl. ¶ 40 ("If the *smuggling activities* of the Defendants are not stopped, [the EC and Member States] will continue to lose money and property in the future"(emphasis added)) *with EC III* Compl. ¶ 148 ("If the *money-laundering activities* of the [Defendants] are not stopped, [the EC and Member States] will continue to lose money and property in the future" (emphasis added)).

In sum and substance, the complaint requires smuggling to establish a causal link between money laundering and any competitive injury to the Plaintiffs.  The revenue rule thus bars the complaint in its entirety.  *See EC II*, 186 F. Supp. 2d at 243.

## 2.  Plaintiffs' Money-Laundering Claims Would Require Direct and Indirect Enforcement of Foreign Penal Laws

Even assuming Plaintiffs' alleged competitive injuries were caused by money laundering but not smuggling, adjudicating the money-laundering claims still would involve passing on foreign criminal laws.  The penal-law rule thus bars the claims based on alleged money-laundering, just as the revenue rule bars the claims based on alleged smuggling.

Plaintiffs' allegations of competitive injury are perfunctory.  Perhaps mindful of *Diageo*, Plaintiffs begin their litany of alleged injuries with seven that are nominally competitive.  *EC III* Compl. ¶ 146(a)-(g).  But the vast bulk of their alleged injuries are sovereign, *see id.* ¶ 146(h)-(jj), and their *only* alleged "interest" in this case, *see id.* ¶¶ 131-43, is in enforcing statutes and treaties addressed to criminal activity ranging from organized crime to narcotics trafficking to terrorism.

According to Plaintiffs, the money laundering alleged here violates the Plaintiffs' own criminal laws.  *See*, *e.g*., *EC III* Compl. ¶¶ 211-12 ("Money laundering and related criminal activities are a violation of law and a public nuisance" and "constitute conduct that is proscribed by applicable laws, administrative regulations, and directives.").  Plaintiffs further allege that "laundering criminal proceeds through the purchase and sale of cigarettes" involves:  "the unrecorded and irregular physical removal of huge amounts of the Euro and local currency from the territory" of the Member States, the "illegal conversion of Euros and local currency into U.S. dollars," and the "illegal transport of money into and out of" the EC.  *Id*. ¶ 146(q), (r), (ee).  Plaintiffs also seek recovery for an "array" of other "related" foreign crimes, including "narcotics trafficking, arms trafficking, and other offenses", *id*. ¶ 146(u), "bribery of government officials", *id*. ¶ 146(hh), and "knowingly or negligently supporting the activities of terrorists", *id*. ¶ 132.

The remedies sought by Plaintiffs also involve enforcement of foreign public law, criminal or otherwise.  Plaintiffs seek to enjoin Defendants from:  (1) "laundering the proceeds of criminal activities . . . or otherwise engaging in conduct that violates any common-law, statutory, or equitable standard"; (2) "selling cigarettes without proper documentation, shipping records, markings, and similar indicia of compliance with law"; (3) failing to use "adequate protocols" by which cigarettes and payments "can be adequately tracked and monitored by

governmental officials"; and (4) facilitating "the misuse of the ports and transportation facilities" of the EC and its Member States. *Id*. ¶¶ 153, 155. Further, Plaintiffs claim damages "at least equal to, and properly measured by, the total amount of criminal proceeds laundered by the [Defendants]." *Id*. ¶ 147.

In sum, based on exclusively sovereign interests, Plaintiffs seek to impose liability for alleged criminal acts occurring outside the United States and in violation of their own criminal laws, to compel compliance with such laws, and to recover damages expressly measured in terms of "criminal proceeds."

We recognize that the revenue and penal-law rules do not bar foreign sovereigns from pursuing genuinely commercial claims. This Court has made clear that the revenue and penal-law rules would not bar a foreign government from pursuing commercial claims arising out of decisions, for example, "to drill for oil, manufacture airplanes, or provide postal services," because the "commercial activities" of a foreign government "do not involve the kind of moral or political judgments that the tax or revenue laws typically involve." *Diageo*, 531 F. Supp. 2d at 386. Under that reasoning, Plaintiffs here could sue to enforce contractual rights arising from their cigarette businesses, and such lawsuits would not significantly implicate their "social sensibilities" or "political and moral judgments" or "ideological leanings." *See Canada*, 268 F.3d at 111. Here, however, the EC and its Member States seek to base liability largely on the violation of their own criminal and other public laws, to obtain injunctive relief compelling compliance with those laws, and to recover damages expressly measured as criminal proceeds. Such a lawsuit cannot fairly be described as commercial.

For these reasons, the revenue and penal-law rules bar not only the numerous claims based on alleged sovereign injuries, but also the claims based on alleged injuries that, in the context of this case, are only nominally competitive.

### 3. Plaintiffs' Money-Laundering Claims Would Subvert Applicable Treaties

The adjudication of Plaintiffs' money-laundering claims also would subvert mutual legal assistance treaties ("MLATs") between the United States and Member States of the EC. Those treaties confirm that foreign sovereigns may not, through civil litigation in United States courts, pursue claims based on alleged money laundering.

These MLATs specifically address money laundering and related crimes. *See, e.g.*, US-Belgium MLAT Rep., S. Exec. Rep. No. 100-29, at 1 (treaty developed to combat international money-laundering); US-Greece MLAT Rep., S. Exec Rep. No. 106-24, at 69 (treaty "expected to be a valuable weapon for the United States in efforts to combat organized crime, transnational terrorism, international drug trafficking and other crimes"). They describe what kinds of assistance the United States will provide to foreign sovereigns:

> a broad range of assistance with respect to investigations and prosecutions in criminal matters, extending to assistance in all related proceedings, whether criminal, civil, or administrative. This would include, for example, cooperation in proceedings, which may be civil in nature, to forfeit the proceeds of drug trafficking, restitution to crime victims or the collection of criminal fines.

US-Spain MLAT Report, S. Exec. Rep. No. 102-35, at 2; *id.* at 6 ("the Treaty may be invoked to provide assistance for civil forfeiture proceedings against instrumentalities or proceeds of crime (*e.g.*, drug trafficking) or for disgorgement proceedings brought by an administrative agency (*e.g.*, the [SEC]) to recover the profits from illegal practices)"). Yet they do *not* authorize foreign governments to litigate in U.S. courts to enforce laws against money laundering.

Because MLATs reflect "careful deliberation" regarding what type of assistance the United States will provide other countries to combat international money laundering, they are "intended by both governments to set the parameters" for cooperation.  *Canada*, 268 F.3d at 120. Like the tax treaties analyzed in *Canada*, *see* 268 F.3d at 120-21, the MLATs provide assistance to foreign sovereigns for enforcement of their own penal laws *in their own courts*.  Also like those tax treaties, the MLATs provide that requests for assistance must be made to the *Executive* Branch – not the Judiciary.  *See, e.g.*, US-Italy MLAT Rep., S. Exec. Rep. No. 98-36, at 3-4; US-Spain MLAT at 22.  In seeking assistance from the courts of this country, Plaintiffs thus would "undermine the considered policy judgment of our political branches," and seek to obtain for themselves "assistance [they have] not negotiated for and that would be greater than the assistance our government would likely receive as a litigant" in their courts.  *Canada*, 268 F.3d at 122.  That would give Plaintiffs an unjustified windfall of assistance, and upset foreign policy properly established by the political branches.  *See Canada*, 268 F.3d at 119 ("In this area of foreign relations policy where the political branches have primacy, courts must be wary of intruding in a way that undermines carefully conceived and negotiated policy choices.").

## II.    PLAINTIFFS CANNOT SATISFY RICO'S CAUSATION REQUIREMENTS

To state a private civil RICO claim, a plaintiff must allege that it was injured "by reason of a violation" of RICO's substantive provisions.  18 U.S.C. § 1964(c).  This "by reason of" element requires a plaintiff to prove "that the defendant's violation not only was a 'but for' cause of [its] injury, but was the proximate cause as well."  *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992).  Proximate cause requires a "direct relation" between the specific conduct alleged to violate RICO and any ensuing injury to the plaintiff.  *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006).

For the reasons explained above, the only claim that this Court has not previously rejected as barred by the revenue and penal-law rules is one that the alleged money-laundering scheme (but not the alleged smuggling scheme) proximately caused the Member States injury as competing sellers of cigarettes. In *Diageo*, this Court held that Colombia, in what it described as a "close case", 531 F. Supp. 2d at 432, had barely alleged that a money-laundering scheme was the proximate cause of its competitive injuries as the only lawful seller of liquor in Colombia. *See id.* at 430-38. *Diageo* is distinguishable for two reasons. First, unlike in *Diageo*, Plaintiffs here make no plausible allegations of a "but for" causal link between the alleged money laundering and reduced prices for Defendants' products. Second, unlike in *Diageo*, Plaintiffs here do not enjoy a monopoly, lawful or otherwise, on the sale of cigarettes in Europe. That distinction is critical: Because the relevant markets here are competitive, any possible causal link between alleged RICO violations and competitive injuries would be obscured by any number of legitimate market forces. Under these circumstances, a competitor cannot satisfy the proximate-cause requirement of RICO, as the Supreme Court made clear in *Anza*, 547 U.S. at 457-60, and confirmed just three weeks ago in *Hemi Group*, Slip Op. at 5-15.

### A.     *The Alleged Money-Laundering Scheme Was Not A "But-For" Cause of Any Competitive Injuries*

In their various allegations of competitive injury, Plaintiffs assert that Defendants achieved an unfair competitive advantage through related schemes of money laundering and illegal distribution of cigarettes. *EC III* Compl. ¶ 146(a)-(g). For the most part, Plaintiffs do not attempt to distinguish between the two, except for a single unelaborated assertion that the "money-laundering scheme" gave Defendants an "unfair and illegal competitive advantage" in the relevant cigarette markets. *Id.* ¶ 146(a). By itself, that conclusory allegation is neither sufficient to plead causation nor entitled to be presumed true. *See Iqbal*, 129 S. Ct. at 1949-50;

- 22 –

*Twombly*, 550 U.S. at 555-56.  Moreover, in the remainder of the Complaint, Plaintiffs fail to allege any more specific facts to support a plausible inference of but-for causation.[4]

That missing link distinguishes this case from *Diageo*.  There, Colombia alleged lost profits because the defendants sold their liquor at lower prices than did Colombia.  *See* 531 F. Supp. 2d at 380.  This Court discerned two possible connections between that competitive advantage and the alleged scheme of money laundering and illegal distribution:  (1) a "tax evasion discount" resulting from "the amount of the Colombian taxes that the importers are unlawfully evading," and (2) a "money-laundering discount" resulting from "the fact that narcotics traffickers are willing to 'sell' their U.S. dollars for less than their face value."  *Id*.  As to the alleged money-laundering scheme, the Court deemed causation to be adequately pleaded based on the following allegations:  Colombian narcotics traffickers with dollars from drug sales in the United States were willing to exchange those dollars for Colombian pesos at a significant discount, which reflected the "value" of having the dollars laundered; the discounted dollars were acquired first by money brokers and then by importers of liquor to Colombia; the importers then used the discounted dollars to purchase liquor from the defendant liquor manufacturers; and, finally, the importers then passed along their savings on the discounted dollars to consumers of liquor in Colombia.  *See id.* at 376-80.

Plaintiffs here allege no plausible analogous scheme.  In a general account of what is described as "the money-laundering cycle", *EC III* Compl. ¶¶ 35-36, Plaintiffs attempt to conjure

---

[4]    The alleged "money-laundering scheme" encompasses four categories of predicate acts:  (1) money laundering, (2) providing material support to terrorists, (3) mail and wire fraud, and (4) Travel Act violations.  *See EC III* Compl. ¶ 159.  While the Complaint must be dismissed on causation grounds, we note that the allegations of mail and wire fraud are deficient on their face:  The "'object of the [mail and wire] fraud . . . [must] be money or property in the victim's hands.'"  *Pasquantino v. United States*, 544 U.S. 349, 365 (2000) (citation omitted).  Here, the object of the alleged fraud – "acquisition of criminals as additional customers," *EC III* Compl. ¶ 159(k) – is not money or property in the alleged victims' hands.

up parallels with *Diageo*, with generic descriptions of relationships among narcotics traffickers, money brokers, importers, and defendant manufacturers. *See id.* ¶¶ 37-41. But the attempted analogy to *Diageo* fails for two reasons: first, Plaintiffs repeatedly allege that many European importers of Defendants' cigarettes *are* narcotics traffickers.[5] By Plaintiffs' own logic, those importers should be looking to sell – not buy – narcotics-derived euros at a discount. Second, Plaintiffs allege that the relevant trafficking operations are based in Colombia (for cocaine) or Russia and the Middle East (for heroin). *See id.* ¶¶ 31-32. Accordingly, cigarette sales in *Europe*, unlike liquor sales in *Colombia*, cannot generate the local currency – pesos, rubles, or riyal – that the traffickers ultimately seek to repatriate.

Plaintiffs describe the "money-laundering cycle" as follows: Narcotics traffickers based in Colombia accumulate euros from cocaine sales in Europe; they then sell those euros to a money broker, at a discount, in exchange for pesos; importers in turn "buy these monies from the money broker at a substantial discount" and use them to pay for cigarettes. *Id.* ¶¶ 38-39. Applying this generic system to the facts alleged in the complaint, the narcotics trafficker, which is also the cigarette importer, would be *selling* euros at a discount, in order to launder its narcotics-derived euros. The complaint offers no plausible explanation for how such an importer could both pay for the "service" of having its euros laundered, *Diageo*, 531 F. Supp. 2d at 379, and, at the same time, receive a discount to be passed on to cigarette consumers. Nor does the complaint explain how Colombian narcotics traffickers, in seeking to repatriate the profit from sales in Europe, could do so by seeking to buy euros, rather than sell them for pesos.

---

[5] *See EC III* Compl. ¶ 39 ("[i]n many instances, the narcotics trafficker . . . is also the importer"); *id.* ¶ 41 ("Many narcotics traffickers who sell drugs in [Europe] now also purchase and import cigarettes."); *id.* ¶ 47 (RJR allegedly sold cigarettes "to criminals" in exchange for "criminal proceeds"); *id.* ¶ 53 (RJR allegedly sold cigarettes to "narcotics traffickers and money launderers," who in turn sold to consumers); *id.* ¶ 61 ("Colombian cocaine barons" allegedly purchased cigarettes, for sale in Colombia to "repatriate cocaine profits"); *id.* ¶ 134 ("Throughout the [EC], cigarettes and narcotics routinely form parts of the same criminal transaction[.]").

Plaintiffs further allege that European cigarette importers exchange euros for dollars, which they use to buy Defendants' cigarettes. *See, e.g.*, *EC III* Compl. ¶ 146(p) ("The money-laundering scheme . . . involves the exchange of Euros . . . for U.S. dollars often at deeply discounted black-market exchange rates due to the criminal nature of these transactions."). These exchanges, to unknown sellers of dollars, cannot be the source of any competitive advantage. To the contrary, Plaintiffs themselves allege that the European importers sell euros at a "deep discount," *see id.*, and thus buy dollars (and therefore cigarettes) at a *premium*.

In addition to these general allegations about the "money-laundering cycle," the complaint describes two specific types of money-laundering transactions. The first involves "cut outs" – intermediaries used to conceal the flow of cash or goods. Plaintiffs allege that RJR sold cigarettes to such intermediaries in Panama or Croatia, which then sold the cigarettes to companies in the EC. *See id.* ¶¶ 104-08. Plaintiffs also describe "simple and overt" money-laundering transactions in which Defendants' employees allegedly traveled to Colombia to trade cigarettes for drug proceeds. *See* ¶¶ 70-71, 74. However, the complaint neither alleges that either type of transaction created a money-laundering discount nor describes facts from which such a discount could plausibly be inferred.

Finally, even if there sometimes were a money-laundering discount, the complaint fails to connect such a discount to relevant cigarette sales in Europe. With regard to the alleged "typical money broker system" and the alleged hand-to-hand transactions in Colombia, the complaint does not allege that any of the cigarettes involved were sold in European markets. *See id.* ¶¶ 37-41, 70-71, 74. The complaint does allege that cigarettes from the specific transactions through Panama or Croatia were bound for Europe, but fails to plead the essential elements of money laundering with respect to those transactions. Specifically, the money-laundering statutes

prohibit transactions involving the proceeds of specified unlawful activity, *see* 18 U.S.C. §§ 1956 & 1957, and the complaint does not allege that the transactions through Panama or Croatia involved the proceeds of a specified unlawful activity.  *See EC III* Compl. ¶¶ 104-07 (not alleging the source of money paid to RJR in these transactions).

In sum, Plaintiffs fail to allege that any money laundering was a but-for cause of any competitive injury, because the complaint does not describe how that alleged conduct could give RJR's cigarettes a competitive advantage in Europe.

### B.      *The Alleged Money-Laundering Scheme Was Not A Proximate Cause Of Any Competitive Injuries*

Even assuming that Plaintiffs have adequately pleaded but-for causation, they have not adequately pleaded that the alleged money-laundering scheme was a proximate cause of any competitive injury.  On the facts alleged, any such injury would be far too removed from any money-laundering to satisfy the proximate-cause requirement of RICO.

**1.**  The Supreme Court repeatedly has stressed the importance of the proximate-cause requirement for civil RICO claims.  In *Holmes*, the Court held that RICO, like the common law, requires "some *direct* relation between the injury asserted and the injurious conduct."  503 U.S. at 268 (emphasis added).  This directness requirement advances several policy objectives, including a desire to avoid "difficult" inquiries "to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors."  *See id.* at 269-70.  The Court applied the directness requirement to bar claims that a stock-manipulation scheme caused broker-dealers to fail, which in turn caused financial injury to their customers (to whom, the Court assumed, the plaintiff was subrogated).  *See id.* at 271-73.  The Court explained that this claim would entail an unmanageable inquiry into, among other things, "the extent to which [the customers'] inability to collect from the broker-dealers' was the result of the alleged conspiracy

to manipulate, as opposed to, say, the broker-dealers' poor business practices or their failure to anticipate developments in the financial markets." *Id.* at 272-73.

In *Anza*, the Supreme Court undertook "to apply the principles discussed in *Holmes* to a dispute between two competing businesses" in a competitive market. 547 U.S. at 453. Ideal Steel Supply Corporation alleged that its competitor, National Steel Supply, secured a competitive advantage by unlawfully failing to charge applicable sales taxes, and thereby caused Ideal to lose sales and profits. *See Anza*, 547 U.S. at 453-54. The Court held that these allegations did not satisfy the proximate-cause requirement of RICO. It concluded that the alleged injury was not "direct" because "[t]he cause of Ideal's asserted harms . . . is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Id.* at 458. Citing *Holmes*, the Court noted "the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action." *Id.* And it highlighted two related difficulties in attempting to determine competitor harms in a competitive market: "National . . . could have lowered its prices for any number of reasons unconnected to the asserted pattern of fraud," and "Ideal's lost sales could have resulted from factors other than [National's] alleged acts of fraud." *Id.* at 458-59. This "discontinuity" in the causal chain was dispositive. *See id.*

**2.** *Anza* governs this case. As in *Anza*, the conduct alleged to violate RICO (here, money laundering) is "entirely distinct" from the conduct that directly caused any competitive injury (in both cases, "offering lower prices" to consumers in the relevant market). *See* 547 U.S. at 458. Moreover, each causal "discontinuity" identified in *Anza* is present here: retailers of Defendants' products in Europe could have reduced prices "for any number of reasons unconnected to" the alleged money-laundering scheme, and any lost sales by Plaintiffs "could have resulted from

factors other than" that alleged scheme.  *See id.*  In fact, each "discontinuity" is much greater here than in *Anza*.

First, any connection between the alleged RICO violations and lower prices would be far more obscure here than in *Anza*.  In *Anza*, the cost-savings made possible by the alleged tax evasion would have been relatively straightforward to calculate, as the Supreme Court itself acknowledged.  *See id.* at 460.  Here, in contrast, Plaintiffs allege that money laundering produces such competitive advantages as discounts on exchange rates and reduced labeling, labor, and raw-material costs.  *EC III* Compl. ¶¶ 146(b), (c), (f).  Quantifying the amount of reduced costs attributable to any money laundering would be a daunting task, for cost differentials could arise not only from money laundering, but also from a variety of market forces such as, among other things, comparative input costs in Europe and the United States, as well as legitimate fluctuations in currency exchange rates.[6]

Second, any connection between a defendant's lower prices and a plaintiff's lost sales is also far more obscure here than in *Anza*.  In *Anza*, the plaintiff and defendant were the two "principal competitor[s]" in a single local market within New York City, *see* 547 U.S. at 453-54, so that "[i]ncreases in sales at one of the competitor's stores . . . generally occur[red] with concomitant decreases in the other's sales."  *Anza v. Ideal Steel Supply Corp.*, 254 F. Supp. 2d 464, 465 (S.D.N.Y. 2003), *rev'd*, 373 F.3d 251 (2d Cir. 2004), *rev'd* 547 U.S. 451 (2006).  In this case, Plaintiffs include twenty-six sovereign nations that compete against each other, and against numerous privately owned cigarette manufacturers, in markets across Europe and beyond.  The existence of such multiple competitors attenuates any causal connection even more.

---

[6] Plaintiffs themselves allege that the "relative weakness of the U.S. dollar" has made Defendants' cigarettes "a bargain" compared to cigarettes manufactured in Europe.  *EC III* Compl. ¶ 108.  That alone illustrates a significant competitive advantage having nothing to do with any alleged money laundering.

*See*, *e.g.*, *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1148 (9th Cir. 2008) ("This

case would require an even more speculative analysis than *Anza* because Sybersound has more

than one principal competitor."); *Gristede's Foods, Inc. v. Unkechauge Nation*, 532 F. Supp. 2d

439, 445 (E.D.N.Y. 2007) (no proximate cause because "plaintiff is one of many proprietors

affected by the defendant's alleged actions"); *Globe Wholesale Tobacco v. Worldwide Wholesale*

*Trading Inc.*, 06 Civ. 2865, 2007 U.S. Dist. LEXIS 72656, at *13 (S.D.N.Y. 2007) (no proximate

cause because "plaintiff is one of many competitors harmed by defendants' lower prices").

Other considerations complicate the inquiry even more.  First, Plaintiffs have alleged

competitive injury from money laundering not only by Defendants, but also by the much larger

company Philip Morris.  *See EC II* Compl. ¶ 39.  Any proximate-cause analysis would have to

take that conduct into account.  Second, the European Union "has pursued, over the last 20 years,

a comprehensive tobacco control policy that aims at fighting tobacco consumption and reducing

the number of smokers."  Health & Consumers Directorate-General, *Report on the*

*Implementation of the Tobacco Advertising Directive (2003/33/EC)*, COM (2008) 330 final (May

28, 2008), available at http://ec.europa.eu/health/ph_determinants/life_style/Tobacco/Documents

/com_20080520_en.pdf.[7]  Any proximate-cause analysis would have to account for the lost sales

---

[7] This report may be considered on a motion to dismiss pursuant to Rule 12(b)(6) because it is judicially
noticeable.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("courts must consider the
complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to
dismiss, in particular, . . . matters of which a court may take judicial notice"); Fed. R. Evid. 201 (judicial notice may
be taken of a fact that is "capable of accurate and ready determination by resort to sources whose accuracy cannot
reasonably be questioned.").  Plaintiffs cannot reasonably challenge the accuracy of their own report.  *See, e.g.,*
*O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) (concluding that the district court
abused its discretion by failing to take judicial notice of a fact published on Northrop Grumman's website where
Northrop Grumman has not explained "why its own website's posting of historical [facts] is unreliable"); *Doron*
*Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n. 8 (S.D.N.Y. 2006) (on "a 12(b)(6) motion to dismiss,
a court may take judicial notice of information publicly announced on a party's website, as long as the website's
authenticity is not in dispute and it is capable of accurate and ready determination").  Moreover, the fact that the
European Community since 1988 has pursued a comprehensive tobacco control policy is readily determined by
reference to other sources, including various EC directives.  *See, e.g.*, Council Directive 2003/33/EC, 2003 O.J. (L
152) 16-19 (banning cross-border advertising of tobacco products in printed media, radio and on-line services);

that Member States suffered as a result of their own anti-smoking initiatives.  Third, Plaintiffs participate in cigarette markets not only as sellers, but also as "bulk purchasers."  *EC III* Compl. ¶ 6; *see also id.* ¶ 146(f).  Any proximate-cause analysis would have to take into account the *benefits* from lower prices that Plaintiffs may have received as cigarette buyers.  Fourth, Plaintiffs allege that cigarette importers in Europe, once they obtain cheap dollars through money laundering, then purchase cigarettes from Defendants at a premium.  *See EC III* Compl. ¶ 48(b). If that were true, any proximate-cause analysis would have to determine how much of the money-laundering "discount" was retained by the importers themselves, how much was transferred directly to Defendants through premium wholesale payments, and how much was passed along to cigarette consumers in the form of reduced prices.  Only the last of these would be relevant to the competitive injuries alleged here by Plaintiffs.

For all of these reasons, a recent warning of the Second Circuit is fully apt here: "following the causal chain and measuring damages" in this case would "involve evidentiary complexities beyond what a fact-finder should be expected to reasonably or reliably parse through," given the "host of market factors unrelated to the alleged RICO violation."  *City of New York v. Smokes-Spirits.com*, 541 F.3d 425, 442 (2d Cir. 2008), *rev'd on other grounds sub nom. Hemi Group, LLC v. City of New York*, No. 08-969 (U.S. Jan. 25, 2010).

**3.**  Dismissal in this case is not foreclosed by the proximate-cause holding of *Diageo*.  In *Diageo*, this Court held that the Republic of Colombia had barely pleaded sufficient proximate cause between the money-laundering scheme alleged in that case and competitive injuries

---

(continued…)

Council Directive 2001/37/EC, 2001 O.J. (L 194) 26-34 (requiring larger warning labels and banning descriptors suggesting that one tobacco product is less harmful than another); Council Directive 89/552/EEC, 1989 O.J. (L 298) 23-30 (prohibiting all forms of television advertising for cigarettes).

allegedly suffered by Colombia in its "constitutional monopoly on the domestic manufacture and sale of liquor", 531 F. Supp. 2d at 377.  The Court recognized that the proximate-cause inquiry would require it to disentangle competitive advantages attributable to money laundering (which it called a "narco-laundering discount") from competitive advantages attributable to illegal distribution (which it called a "tax-evasion discount" for which the revenue rule barred recovery).  *See id.* at 394, 434-35.  The Court further recognized that this inquiry would require the kind of complex, multi-factor analysis about which *Anza* had expressed substantial concern. *See id.* at 435.  Nonetheless, the Court analogized the case to *Commercial Cleaning Services, LLC v. Colin Serv. Sys., Inc.*, 271 F.3d 374 (2d Cir. 2001), in which the Second Circuit addressed competitive injury and proximate causation in the context of head-to-head bidders for specific contracts.  *See* 531 F. Supp. 2d at 435 ("The Second Circuit explained that determining causation and damages is simpler in the context of head-to-head bidders[.]").  After analyzing what it described as a "close case that falls somewhere in between" *Commercial Cleaning* and *Anza*, *id.* at 432, the Court ultimately concluded that *Commercial Cleaning* was more closely on point, and dismissal on proximate-cause grounds was therefore unwarranted, because (1) the alleged money-laundering injuries were "reasonably direct" and (2) "there is no more direct plaintiff to bring a civil RICO claim against Defendants."  *Id.* at 435-36.

*Diageo* is by its own terms inapposite.  Unlike the Republic of Colombia, Plaintiffs here do not enjoy any monopoly, constitutional or otherwise, on the sale of cigarettes in Europe.  To be sure, Plaintiffs vaguely allege that "[s]everal" of the Member States "have held a constitutional monopoly" on the domestic manufacture or sale of cigarettes."  *EC III* Compl. ¶ 6. But Plaintiffs do not say which Member States held such a monopoly, when such monopolies were held, or even whether there was any such monopoly within any applicable limitations

period.  Moreover, Plaintiffs describe "[m]any" of the Member States simply as market participants, rather than constitutional monopolists.  *Id.*  And in discussing current competitive arrangements within Europe, Plaintiffs acknowledge that the EC "provides" to citizens of Member States "a marketplace without internal borders" – which includes a marketplace for "the sale of products such as cigarettes."  *Id.* ¶ 146(h).

In any event, despite Plaintiffs' studied ambiguity on this point, the treaties and published judicial decisions of the EC and of Member States make clear that the Member States compete, and in the past have competed, with private domestic and international tobacco companies, which conduct business in the Member States at the manufacturing, wholesale, and retail levels. *See* Declaration of Eric Morgan de Rivery in Support of Defendants' Motion to Dismiss the Second Amended Complaint, dated February 15, 2010, at ¶¶ 4-9 and Exhs. 1-14 thereto.[8]  As Plaintiffs' own laws show, virtually all State tobacco monopolies in the EC have long been dismantled.  Even in cases where Member States had a monopoly over the *manufacture* of cigarettes, such Member States were obliged to allow competing companies to import, and sell within their jurisdictions, unlimited quantities of tobacco products manufactured by competitors outside the State.  *Id.* ¶ 6.  Not only do Plaintiffs lack the privileged monopoly status of Colombia in *Dieago*, but the EC and Member States markets, as their own public record

---

[8] This affidavit may be considered on a motion to dismiss pursuant to Rule 12(b)(6) for at least two independent reasons: first, Plaintiffs incorporated EU and Member State monopoly law into their Complaint by reference; and second, foreign law is subject to judicial notice pursuant to Federal Rule of Civil Procedure 44.1. *See, e.g.*, *Tellabs, Inc.*, 551 U.S. at 322 ("courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"); *AIM Int'l Trading, L.L.C. v. Valcuine S.p.A.*, No. 02 Civ. 1363, 2003 U.S. Dist. LEXIS 8594, at *19  (S.D.N.Y. May 21, 2003) ("In a typical litigation involving foreign law, a motion to dismiss may be an appropriate time to decide the substance of another country's law that bears on the case at hand.").

documents acknowledge, are intensely competitive and the wide variety of offerings to consumers from international companies has been increasing. *Id*. ¶¶ 7-9.

Such robust market competition tips this case towards *Anza* and away from *Commercial Cleaning*. Where market competition is significantly constrained, the proximate-cause inquiry might become manageable at some point, as in the case of lawful monopolies (*Diageo*), head-to-head bidding for specific contracts (*Commercial Cleaning*), or competition in a lottery system for a fixed number of tax liens, *see Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2144 (2008) ("here, unlike in *Holmes* and *Anza*, there are no independent factors that account for respondents' injury"); *Hemi Group*, Slip Op. at 12 ("plaintiff's theory of causation in *Bridge* was 'straightforward':  Because of the zero-sum nature of the auction, and because the county awarded bids on a rotational basis, each time a fraud-induced bid was awarded, a particular legitimate bidder was necessarily passed over").  But where, as here, the plaintiff and the defendant participate in numerous competitive input and output markets, the defendant could have lowered its prices for any number of reasons unconnected to the alleged RICO violation, and the plaintiff likewise could have lost revenues or profits for any number of reasons other than the defendant's lowered prices.  Under these circumstances, the controlling precedent is *Anza*.  *See* 547 U.S. at 458-60; *Schwab v. Philip Morris USA, Inc.*, 522 F.3d 215, 228, 230 (2d Cir. 2008) ("price impact" theory of competitive injury "exemplifies the kind of vague inquiry into damages that the Supreme Court forbade in *Anza*"); *Gristede's Foods*, 532 F. Supp. 2d at 446-47 (rejecting, on proximate-cause grounds, claims based on alleged competitive injury in competitive cigarette markets).

**4.** Subsequent decisions have undercut the persuasive force of *Diageo*'s proximate cause analysis in several respects.  In *Diageo*, the Court analyzed directness by reference to

considerations of foreseeability and whether the alleged injury was within the zone of interests that Congress sought to protect in enacting RICO and the underlying predicate offenses. *See* 531 F. Supp. 2d at 434. Subsequently, the Supreme Court clarified that these considerations are not sufficient grounds for characterizing alleged injuries as "direct" for proximate-cause purposes under RICO. *See Hemi Group*, Slip op. at 9-10. In *Diageo*, the Court found it significant that there was "no more direct plaintiff to bring a civil RICO claim" based on the injuries alleged. *See* 531 F. Supp. 2d at 435. Subsequently, the Second and Ninth Circuits clarified that the direct-injury requirement does not turn on that consideration. *See Schwab*, 522 F.3d at 228, 230 ("immediate victims" cannot seek recovery for alleged market-based competitive injury; case "exemplifies the kind of vague inquiry into damages that the Supreme Court forbade in *Anza*"); *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 983 n.13 (9th Cir. 2008) ("under *Anza*, the likelihood of more direct victims bringing suit is not essential to a finding of no proximate cause"). In *Diageo*, the Court reasoned that possible intervening causes – in the flow of the alleged "money-laundering discount" from Colombian narcotics traffickers to money brokers to Colombian liquor importers to Colombian consumers, and in the flow of liquor from North American manufacturers to multiple distributors to Colombian consumers – could be disregarded for proximate-cause purposes because the defendants were alleged to be acting in concert with all of the relevant parties. *See* 531 F. Supp. 2d at 437-38. Subsequently, the Supreme Court clarified that a RICO plaintiff "cannot escape the proximate cause requirement merely by alleging that the fraudulent scheme embraced all of those indirectly harmed by the alleged conduct," lest "RICO proximate cause precedent become a mere pleading rule." *See Hemi Group*, Slip op. at 10. In *Diageo*, the Court reasoned that a proximate-cause dismissal would be premature at the motion-to-dismiss stage, before "knowing what facts will emerge in discovery

or what methodology the parties will use to prove and disprove damages." 531 F. Supp. 2d at

436.  Subsequently, the Supreme Court clarified that every complaint must allege specific facts

establishing a plausible entitlement to relief, *see Iqbal*, 129 S. Ct. at 1949-50 (reversing *Iqbal v.

Hasty*, 400 F.3d 143 (2d Cir. 2007), cited in *Diageo*, 531 F. Supp. 2d at 382), and that the

directness of an alleged injury, for purposes of the proximate-cause requirement of civil RICO, is

a legal question subject to resolution on a motion to dismiss, *see Hemi Group*, Slip op. at 1-2.

Collectively, these decisions raise at least a question whether *Diageo* remains good law.

This case does not present that question.  Instead, it presents only the question whether *Diageo*

should be *extended* to circumstances where the defendant's RICO violation is alleged to have

harmed competitors in a free market with many lawful participants.  The answer to that question

is no.  This case is surely closer to *Anza* than to *Commercial Cleaning*, and recent decisions have

only reinforced that conclusion by applying *Anza* broadly, and by narrowing the circumstances in

which allegations of competitive injury are cognizable through civil claims under RICO.  *See*,

*e.g.*, *Hemi Group*, Slip op. at 5-15; *Smokes-Spirits.com*, 541 F.3d at 441-42 (construing *Anza* "to

limit RICO standing" for claims "of a *competitor* complaining of another merchant's ability to

offer lower prices").

**5.**  Plaintiffs alternatively allege that Defendants gained competitive advantage through

an "illegal distribution scheme" – *i.e.*, smuggling – that sought to avoid various European

regulatory requirements and taxes.  *See EC III* Compl. ¶ 146(b), (jj).  But Plaintiffs do not allege

smuggling as a predicate RICO act, *see id.* ¶ 159, and this Court already has held that the

revenue rule would bar claims based on smuggling, *see Diageo*, 531 F. Supp. 2d at 394-99.  To

the extent Plaintiffs' theory is that the alleged money-laundering scheme somehow facilitated

cigarette smuggling, the money laundering still could not be a proximate cause of harms caused

by smuggling.  An allegation that one act "furthers, facilitates, permits or conceals an injury that happened or could have happened independently of the act," is insufficient to establish proximate cause.  *See Vicon Fiber Optics Corp. v. Scrivo*, 201 F. Supp. 2d 216, 219 (S.D.N.Y. 2002).

In *Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768 (9th Cir. 2002), the Court dismissed  RICO claims based on money laundering that was done to conceal a theft of the plaintiff's property.  The Court noted that the money laundering might have been a cause of the theft, because the defendants may not have undertaken the theft absent an ability to launder the proceeds.  *Id.* at 774.  Nonetheless, the Court concluded that "this type of speculative 'but for' causation is insufficient to state a RICO violation," because the money laundering lacked the necessary "direct relationship" to the theft.  *Id.*  Here, any competitive injuries were directly caused not by the alleged money laundering, but by the subsequent alleged illegal distribution of cigarettes.[9]

### C.    *The Alleged Money-Laundering Scheme Was Not A Proximate Cause Of Any Sovereign Injuries*

As explained above, the revenue and penal-law rules clearly bar claims based on the numerous sovereign injuries alleged here by Plaintiffs.  For the sake of completeness, we briefly note that the alleged sovereign injuries also fail on proximate-cause grounds as well.

---

[9]  For all of these reasons, Plaintiffs cannot establish that any alleged violation of 18 U.S.C. § 1962(c), which makes it unlawful to conduct the affairs of an enterprise through a pattern of racketeering activity, was a proximate cause of their alleged competitive injuries.  *See Anza*, 547 U.S. at 457.  Plaintiffs similarly cannot show that any alleged violation of  § 1962(a) or (b) was a "but-for" cause of any competitive injury.  These subsections make it unlawful to "invest" the proceeds of racketeering activity in any enterprise or to "acquire or maintain" an enterprise through a pattern of racketeering.  Thus, a plaintiff must allege a "use or investment injury" or "acquisition or maintenance injury," that is "distinct from the injury resulting from the predicate acts."  *Discon, Inc. v. Nynex, Corp.*, 93 F.3d 1055, 1062-63 (2d Cir. 1996); *accord Ouaknine v. MacFarlane*, 897 F.2d 75, 83 (2d Cir. 1990); *Gristede's Food*, 532 F. Supp. 2d at 446-47.  Plaintiffs do not describe how the alleged violations of § 1962(a) or (b) could cause a competitive harm distinct from that suffered by competing at a disadvantage against RJR's cigarettes.  And because Plaintiffs ascribe their injuries to Defendants' alleged predicate acts of money laundering, those injuries cannot have been caused by the alleged violations of subsections (a) and (b).  Finally, because plaintiffs cannot plead any substantive RICO claim, their conspiracy claims under § 1962(d) "necessarily must fail" as well.  *Discon Inc.*, 93 F.3d at 1064; *see also Beck v. Prupis*, 529 U.S. 494, 505 (2000).

*Quasi-sovereign injuries*.  Many of the alleged injuries involve diffuse harms to the marketplace, economy, currency, money supply, and balance of payments of the EC and its Member States.  *See*, *e.g.*, *EC III* Compl. ¶ 146(h)-(k), (n)-(r).  This Court twice has held that allegations of this nature are too vague to permit an appropriate proximate-cause analysis.  *See Diageo*, 531 F. Supp. 2d at 392 ("adverse economic impact" too vague); *EC II*, 186 F. Supp. 2d at 243 n.7 ("Plaintiffs' failure with respect to the money laundering grounds is exacerbated by the vague nature of many of the injuries asserted, *e.g.*, those claims asserting as injury the compromised integrity of Plaintiffs' various institutions and markets."); *see also Hawaii v. Standard Oil Co.*, 405 U.S. 251, 264 n.14 (1972) ("Measurement of an injury to the general economy . . . necessarily involves an examination of . . . every variable that affects the State's economic health – a task extremely difficult in the real economic world rather than an economist's hypothetical model" (internal quotations omitted)).

*Derivative Injuries*.  Plaintiffs also allege injuries derivative of harm to financial institutions allegedly injured by money laundering.  *See EC III* Compl. ¶ 146 (l), (m), (w).  Those allegations cannot support a proximate-cause finding.  *See, e.g.*, *Holmes*, 503 U.S. at 268-69 (at common law and under RICO, "a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover"); *Laborers Local 117 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 235-36 (2d Cir. 1999) (similar).

*Criminal Activity.*  Plaintiffs allege that Defendants, by selling cigarettes to narcotics traffickers, members of organized crime, and terrorist organizations, facilitated the criminal activity of those organizations and individuals.  *See EC III* Compl. ¶ 146(u), (gg).  As explained above, allegations that money laundering facilitates the underlying criminal activity cannot

establish that the money laundering is a proximate cause of that activity.  *See*, *e.g.*, *Oki Semiconductor Co.*, 298 F.3d at 774; *Leung v. Law*, 387 F. Supp. 2d 105, 122 (E.D.N.Y. 2005) (dismissing RICO claims based on alleged money laundering; "a predicate act cannot be deemed to have proximately caused a plaintiff's injury, even if it was an integral part of the underlying criminal scheme, unless the plaintiff's original loss could not have occurred without the commission of the predicate act."); *Vicon Fiber Optics Corp.*, 201 F. Supp. 2d at 219.

## III.    THE COMPLAINT IS FATALLY DEFICIENT IN OTHER RESPECTS

Apart from the overarching failures addressed above, the complaint is legally deficient in several additional respects.

### A.    *Plaintiffs Fail To State RICO Claims*

#### 1.    RICO Does Not Apply Extraterritorially To The Money-Laundering Scheme Alleged Here

Plaintiffs seek damages for harms that they allegedly suffered within their own territories, based on conduct that allegedly occurred largely within their own territories.  Application of RICO would therefore be impermissibly extraterritorial.

Federal statutes are presumed to apply only within sovereign United States territory.  *See, e.g.*, *Small v. United States*, 544 U.S. 385, 388-89 (2005) (noting "the legal presumption that Congress ordinarily intends its statutes to have domestic, not extraterritorial, application").  That presumption may be rebutted only "when Congress clearly expresses its intent to do so." *United States v. Yousef*, 327 F.3d 56, 86 (2d Cir. 2003).  Because "[t]he RICO statute is silent as to any extraterritorial application," *N. S. Fin. Corp. v. Al-Turki*, 100 F.3d 1046, 1051 (2d Cir. 1996), Plaintiffs cannot rebut the presumption against extraterritoriality.

Consistent with that presumption, courts have limited RICO to cases involving significant conduct or effects within the United States.  *See  Al-Turki*, 100 F.3d at 1051-52.  These tests

apply "only insofar as they serve the RICO statute's purpose, which is to protect . . . *domestic markets* from corrupt foreign influences."  *Wiwa v. Royal Dutch Petroleum Co*., Civ. A. No. 96-8386, 2009 U.S. Dist. LEXIS 34843, *14 (S.D.N.Y. March 18, 2009) (quotation marks omitted; emphasis added).  Further, RICO may not be used as "an avenue through which to litigate the political crises of the global community."  *Doe v. State of Israel*, 400 F. Supp. 2d 86, 115 (D.D.C. 2005).

In *Al-Turki*, the Second Circuit suggested that an "effects" test based primarily on antitrust law, rather than a "conduct" test based primarily on securities law, should determine the territorial scope of RICO.  *See* 100 F.3d at 1052.  Because antitrust law was the model for and informs construction of RICO, *see Holmes*, 503 U.S. at 267; *Agency Holding Corp. v. Malley-Duff & Assocs., Inc*., 483 U.S. 143, 156 (1987), that suggestion should be followed.[10]  In any event, Plaintiffs satisfy neither of the two possible tests.

The "effects" test is satisfied only when a transaction "has *substantial* effects within the United States."  *Al-Turki*, 100 F.3d at 1051 (emphasis added).  "Transactions with only remote and indirect effects in the United States do not qualify as substantial."  *Id*.  Moreover, Plaintiffs cannot satisfy the territoriality requirement by pointing to domestic effects unrelated to their claim; to the contrary, effects within the United States must "give rise . . . to the plaintiff's claim."  *F. Hoffmann-La Roche Ltd v. Empagran S.A*., 542 U.S. 155, 173 (2004).  Here, the effects that give rise to the claims are all centered in Europe.  As explained above, Plaintiffs seek to recover for a litany of sovereign injuries allegedly suffered within their own territories:  harms to the economy and financial infrastructure of the Member States; lost forfeitures under the laws

---

[10] In *Diageo*, this Court applied a disjunctive conduct and effects tests "despite the language in *Al-Turki*." *See* 531 F. Supp. 2d at 420.  Defendants respectfully reserve this issue for further review in the Court of Appeals.

of the Member States; increased law-enforcement costs within the Member States; support of EC activities by the Member States; border penetration of the Member States; bribery of officials in the Member States; and lost tax revenues to the Member States.  *See EC III* Compl. ¶ 146(h)-(jj).  Moreover, as to the alleged competitive injuries, Plaintiffs describe themselves as manufacturers of cigarettes, and large sellers of cigarettes, "within their borders."  *See id.* ¶ 6.  Particularly given that description, Plaintiffs' formulaic and unelaborated allegation of competitive harm "in the market for cigarettes in the [EC] and in other markets in which they compete including, but not limited to, the United States", *id.* ¶ 146(a), is too conclusory to establish effects within the United States, *see Iqbal*, 129 S. Ct. at 1949-50, and, in any event, suggests at most an insubstantial effect within the United States.  Finally, Plaintiffs' allegation that the asserted money-laundering scheme threatens "the integrity of the U.S. financial system," *EC III* Compl. ¶ 133(a), is entirely beside the point, as that alleged effect is not what gives rise to Plaintiffs' own claims.  *See Empagram*, 542 U.S. at 173.

Plaintiffs also fail to satisfy the "conduct" test, which requires conduct within the United States that is "material to the completion" of the alleged scheme, as opposed to "[m]ere preparatory activities."  *See Al-Turki*, 100 F.3d at 1050-52.  The "conduct" test is thus satisfied only where conduct within the United States "'directly caused' the loss" for which the plaintiff seeks compensation.  *See id.* (citation omitted).  Plaintiffs here allege sovereign and competitive injuries in Europe caused by an alleged money-laundering scheme directed by Defendants in the United States.  Faced with comparable allegations, courts have held that the "conduct" test was not met.  For example in *Norex Petroleum Ltd. v. Access Indus.*, 540 F. Supp. 2d 438, 443-44 (S.D.N.Y. 2007), the Court held RICO inapplicable to an alleged scheme to take over a Russian oil company through money laundering, tax evasion, and bribery of foreign officials.  The

plaintiff alleged that the defendant had "operated and directed the Illegal Scheme" from the

United States, made relevant communications from within the United States, wired money used

in the scheme "through banks in the United States," and traveled "between the United States and

Russia" to implement the scheme.  *See id.* at 443-44.  Despite those allegations, the Court

dismissed the case because none of the alleged domestic conduct was a direct cause of the

plaintiff's losses.  *See id.*  The same conclusion should apply here.[11]

### 2.     Corporations Cannot Be Part Of An Association-in-Fact Enterprise

RICO is violated only if a defendant, through a pattern of racketeering activity, invests in,

acquires, or manages an "enterprise."  *See* 18 U.S.C. § 1962(a)-(d).  RICO defines an

"enterprise" to include "any individual, partnership, *corporation*, association, or other legal

entity, and any union or group of *individuals associated in fact* although not a legal entity."  18

U.S.C. § 1961(4) (emphasis added).  In this case, Plaintiffs define the necessary "enterprise" as

an "association-in-fact of individuals and corporations."  *See EC III* Compl. ¶ 158.  But

corporations cannot be part of an association-in-fact "enterprise" for two reasons:  first, under

ordinary usage, corporations are not "individuals" (the operative definitional term for

association-in-fact enterprises); second, to treat corporations as "individuals" would reduce the

separate definitional reference to any "corporation" to surplusage.  *See United States v.*

*McClendon*, 712 F. Supp. 723, 729 (E.D. Ark. 1988) (corporation is not "individual" who may

---

[11] There is an open issue whether questions about the territorial coverage of RICO are jurisdictional ones subject to review under Federal Rule of Civil Procedure 12(b)(1), or merits ones subject to review under Rule 12(b)(6).  Like the plaintiffs in *Diageo*, we believe that these questions are merits ones.  However, the distinction is immaterial in this case, because Defendants do not seek to establish extraterritoriality by reference to materials outside of the complaint.  *See Diageo*, 531 F. Supp. 2d at 381-82.

be part of association-in-fact enterprise); *Seville Indus. Mach. Corp. v. Southmost Machinery Corp.*, 567 F. Supp. 2d 1146, 1151 (D.N.J. 1983) (same).[12]

### 3.   Plaintiffs Fail To Satisfy Section 1964(c)

RICO affords a cause of action to "[a]ny person injured in his business or property by reason of a violation" of RICO.  18 U.S.C. § 1964(c).  As explained above, Plaintiffs cannot satisfy the causation requirements of Section 1964(c).  Plaintiffs also fail to satisfy two further elements of that provision:  First, a foreign government suing to vindicate its sovereign interests is not a "person" that may sue or be sued under RICO.  *See United States v. Cooper Corp.*, 312 U.S. 600, 604 (1941) ("Since, in common usage, the term 'person' does not include the sovereign, statutes employing the phrase are ordinarily construed to exclude it.").  Second, injuries to sovereign interests are not injuries to "business or property" within the meaning of RICO.  *See Town of West Hartford v. Operation Rescue*, 915 F.2d 92, 103-04 (2d Cir. 1990).[13]

### 4.   Plaintiffs Cannot Seek Equitable Relief Under RICO

Plaintiffs' claim for equitable relief under RICO, *EC III* Compl. ¶¶ 181-88, must be dismissed because only the federal government may seek equitable relief under RICO.

With considerable precision, RICO specifies what parties may obtain what remedies. Section 1964(a) gives the district courts "jurisdiction to prevent and restrain violations" of RICO, but Section 1964(b), which provides that "[t]he Attorney General may institute proceedings under this section," thereby limits the availability of injunctive relief to claims brought by the

---

[12] We recognize that the Second Circuit rejected this argument in *United States v. Huber*, 603 F.2d 387 (2d Cir. 1979).  Recently, however, the United States endorsed this view in an *amicus* brief in the Supreme Court.  *See* Brief for the United States as *Amicus Curiae* Supporting Respondents at 6, *Mohawk Indus., Inc. v. Williams*, 547 U.S. 516 (2006) (No. 05-465).  Defendants therefore wish to preserve the argument for further review.

[13] We recognize that this Court has rejected these arguments at some length.  *See EC I*, 150 F. Supp. 2d at 486-500.  Nonetheless, defendants wish to preserve these issues for further review in the Court of Appeals.

federal government.  Section 1964(c) confirms that limitation:  it provides a separate cause of

action for "[a]ny person injured in his business or property by reason of a violation" of RICO,

but expressly limits the available remedies to "threefold the damages" plus attorneys' fees.

Construing these provisions, many courts have held that private plaintiffs may not obtain

injunctive relief under RICO.  *See*, *e.g.*, *United States v. Phillip Morris USA, Inc.*, 566 F.3d

1095, 1145-46 (D.C. Cir. 2009) ("Section 1964(b) reserves for the government the ability to

'institute' a cause of action for equitable remedies[.]"); *Religious Tech. Ctr. v. Wollersheim*, 796

F.2d 1076, 1077 (9th Cir. 1986) ("injunctive relief is not available to a private plaintiff in a civil

RICO action"); *Am. Med. Ass'n v. United Healthcare Corp.*, 588 F. Supp. 2d 432, 445-46

(S.D.N.Y. 2008) ("this Court will not infer that the right to injunctive and declaratory relief

exists for private litigants under Section 1964 of RICO"); *Bernard v. Taub*, No. CV 90-0501,

1990 WL 34680, at *3-4 (E.D.N.Y. 1990) ("Congress did not empower the district courts to

grant provisional relief in the form of preliminary injunction to private plaintiffs in civil RICO

cases.").  Although the Second Circuit has not definitively resolved the issue, it has twice

expressed "serious doubt" that plaintiffs besides the federal government may obtain injunctive

relief under RICO.  *Trane Co. v. O'Connor Sec.*, 718 F.2d 26, 28 (2d Cir. 1983); *see Sedima v.

Imrex Co., Inc.*, 741 F.2d 482, 498 (2d Cir. 1984) ("Subsection 1964(a) . . . is not a general grant

of jurisdiction" to award injunctive relief), *rev'd on other grounds*, 473 U.S. 479 (1985).

### B. *Plaintiffs Fail To State Common-Law Claims*

Plaintiffs allege seven common-law claims.  Many of these raise particularly obvious

applications of the revenue and penal-law rules.  Others fail for independent reasons as well.  We

address each of them in turn.

*Fraud.*  Plaintiffs' fraud claims fail for at least three separate reasons.  First, to satisfy the

standards of particularity required for pleading fraud under Federal Rule of Civil Procedure 9(b),

Plaintiffs must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). Plaintiffs do not remotely satisfy these standards. Instead, they make only wholly generalized allegations that "the RJR Defendants," at unspecified times and places, falsely stated to unspecified Plaintiffs "that they are unable to determine to whom the[ir] product was sold." *EC III* Compl. ¶ 85; *see also id.* ¶ 190 (alleging that "[t]he RJR defendants and their coconspirators intentionally falsified shipping records, and generated false and misleading billing records concerning the payment of cigarettes so as to mislead the Plaintiffs").

Second, Plaintiffs fail to connect their fraud claims to any alleged competitive injury. Instead, Plaintiffs allege that these putative false statements impaired their ability "to apprehend the conspirators who are trafficking in the cigarettes as a part of the scheme to launder criminal proceeds." *EC III* Compl. ¶ 87; *see also id.* ¶192 (alleging that Plaintiffs were "misled in the course of performing their duty to fight against money laundering and related criminal activity"). Those are sovereign injuries, for which the revenue and penal-law rules clearly bar recovery. Plaintiffs hint at competitive impacts in alleging that Defendants misstated "the destination and value of cigarettes" in order to lower their insurance costs. *Id.* ¶ 88. But in contrast to the other alleged statements noted above, Plaintiffs do not contend that they relied on these alleged statements in any way, much less that they did so in their capacity as Defendants' competitors.

Finally, Plaintiffs fail to allege that any of the putative misstatements was a proximate cause of their alleged injuries. Fraud claims are subject to the same stringent proximate-cause standards that govern RICO claims. *See Laborers Local 17 Health & Benefit Trust Fund v.*

*Philip Morris, Inc.*, 191 F.3d 229, 242-43 (2d Cir. 1999).  For the reasons explained above in Part II, Plaintiffs cannot satisfy those standards here.

   **Public Nuisance.**  A public nuisance is an "unreasonable interference with a right common to the general public."  *See Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 326 (2d Cir. 2009).  As the alleged public nuisance in this case, Plaintiffs contend that Defendants endangered "the public health, morals, safety, convenience, and well-being of the general public."  *EC III* Compl. ¶ 201; *see also id. ¶* 204 (alleging that Defendants "caused damage to the public in the exercise of rights common to all"); *id.* ¶ 205 (alleging that Defendants undermined the EC's ability to regulate ports, commerce, customs, transportation, safety at sea).  As a matter of law and as pleaded in this case, these are *parens patriae* claims, *see Snapp*, 458 U.S. at 601-07, which foreign sovereigns may not litigate in the courts of this country.  *See DeCoster*, 229 F.3d at 335-41.  They are also alleged sovereign injuries, for which the revenue and penal-law rules clearly preclude recovery.

   **Unjust Enrichment.**  Unjust enrichment requires (1) enrichment of the defendant, (2) at the expense of the plaintiff, (3) in circumstances where "equity and good conscience require the defendant to make restitution."  *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 519 (2d Cir. 2001).  Here, Plaintiffs seek to recover the "proceeds" of alleged money-laundering activities, "which proceeds are rightly owned by and belong to Plaintiffs."  *EC III* Compl. ¶ 225; *see also id.* ¶ 226 (alleging that Defendants "received funds, including the proceeds of narcotics trafficking, and received the instrumentalities thereof," which were property of the Member States "as of the time of the commission of the illicit conduct").  These claims seek to directly enforce the forfeiture laws of the Member States, and are thus barred by the penal-law rule.  *See Diageo*, 531 F. Supp. 2d at 401.  In addition, a claim of unjust enrichment "falls under the

umbrella of quasi-contract, or contract implied-in-law" and therefore "requires proof of a legally cognizable relationship between the parties." *See, e.g.*, *In re JetBlue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299, 329 (E.D.N.Y. 2005) (plaintiffs "do not allege any facts to support a finding of 'direct dealings or an actual, substantive relationship' between themselves and any defendant" (citations omitted)).  Even where strict "privity" is not required, an "attenuated" relationship between the parties precludes an unjust enrichment claim as a matter of law.  *See, e.g.*, *Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007).  Plaintiffs have not alleged, nor can they, the required relationship or connection between the parties.

*Negligence***.**  Plaintiffs allege that Defendants negligently failed to investigate its customers, so as to avoid doing business with narcotics traffickers and money launderers.  *See EC III* Compl. ¶ 233.  This claim fails for at least two different reasons.  First, Defendants had no duty of care to prevent criminal activities by the purchasers of its products.  *See Hamilton v. Beretta U.S.A. Corp.*, 264 F.3d 21, 29-30 (2d Cir. 2001) (firearms manufacturers lacked duty of care to victims of crime in marketing and distributing handguns).  Second, negligence claims require either personal injury or damage to physical property; pecuniary injury alone cannot support a claim for negligence.  *See County of Suffolk v. LILCO*, 728 F.2d 52, 62 (2d Cir. 1984); *Dooner v. Keefe, Bruyette & Woods, Inc.*, 157 F. Supp. 2d 265, 285 (S.D.N.Y. 2001).  Accordingly, the sovereign injuries alleged here are clearly barred by the revenue and penal-law rules, and the only competitive injuries alleged – pecuniary injuries for lost sales and profits – cannot support a claim for negligence.

*Negligent misrepresentation***.**  Plaintiffs' claim for negligent misrepresentation fails for several different reasons.  To begin with, claims for negligent misrepresentation require a "special relationship of trust and confidence" between the plaintiff and defendant.  *See Murphy v.*

*Kuhn*, 682 N.E.2d 972, 974 (N.Y. 1997).  Here, the only alleged relationships between Plaintiffs and Defendants are that (1) Defendants are regulated parties subject to Plaintiffs' laws regarding narcotics trafficking, money laundering, and civil forfeitures, and (2) Defendants and Plaintiffs are competitors in various cigarette markets.  Neither relationship is even colorably one of special "trust and confidence."  Moreover, Plaintiffs' allegations of negligent misrepresentation track their fraud allegations.  *See EC III* Compl. ¶¶ 242 (pattern of alleged misrepresentations "amount to a fraud on the public").  Like the fraud allegations, they are entirely unconnected to any competitive injury allegedly suffered by Plaintiffs.

**Conversion.**  Conversion is the "unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights."  *See*, *e.g.*, *Vigilant Ins. Co. v. Hous. Auth.*, 660 N.E. 2d 1121, 1126 (N.Y. 1995).  Plaintiffs' conversion claim is that Defendants "received funds, including the proceeds of narcotics trafficking, and received the instrumentalities of illicit conduct.  Such funds and instrumentalities, and the proceeds thereof, were and are the property of the Member States as of the time of the commission of the illicit conduct."  *EC III* Compl. ¶ 247.  The penal-law rule clearly bars this undisguised attempt to enforce the forfeiture laws of foreign nations.  *See Diageo*, 531 F. Supp. 2d at  401.

**Money had and received.**  Plaintiffs attempt yet one final impermissible attempt to enforce their forfeiture laws in the courts of this country.  One of the essential elements of a claim for money had and received is that "defendant received money belonging to plaintiff."  *Nordlicht v. New York Tel. Co.*, 799 F.2d 859, 865 (2d. Cir. 1986).  In their claim for money had and received, Plaintiffs allege that Defendants "knowingly received money belonging to Plaintiffs, including funds representing the proceeds of illegal conduct."  *EC III* ¶ 254; *see also*

*id.* ¶ 255 ("the funds in question were the proceeds of illicit conduct and, as such, were the property of Plaintiffs").  Moreover, Plaintiffs do not attempt even a pretense of linking these allegations to any alleged competitive injury.  The penal-law rule bars this claim.  *See Diageo*, 531 F. Supp. 2d at 401.

> C.      *The EC's Claims Are Barred By Claim And Issue Preclusion*

In *EC I*, the European Community alleged RICO and common-law claims against various RJR entities arising from an alleged scheme "to smuggle RJR's tobacco products into the EC and the territories of various EC Member States and to launder the proceeds of drug trafficking." 150 F. Supp. 2d at 460.  This Court rejected those claims as a matter of law, on the ground that the EC did not suffer, and could not suffer, any injury from the alleged scheme of money laundering and smuggling.  *See id.* at 501-02.  Basic preclusion doctrines foreclose the EC's attempt to relitigate identical claims in this case.

Under the doctrine of claim preclusion, a final judgment precludes a subsequent action if: (1) the judgment was an adjudication on the merits; (2) involving the same parties; and (3) claims asserted in the subsequent action were, or could have been, raised in the prior action.  *See Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 284-85 (2d Cir. 2000).  Each of these elements is satisfied:  First, *EC I* was dismissed on the merits because the EC as a matter of law had suffered no injury.  150 F. Supp. 2d at 501-02.  Second, this case involves the same parties or privies:  the EC continues to be a plaintiff, and various RJR entities – including the companies originally sued and their corporate successors – continue to be the defendants.  Third, both cases

arise out of the same core of operative facts; indeed, as explained above, both cases involve essentially identical facts and transactions.[14]

Issue preclusion is similarly dispositive.  That doctrine applies where (1) there has been a final determination on the merits, (2) the party against whom preclusion is sought had a full and fair opportunity to litigate, and (3) the issue to be precluded was determined in the prior action. *See Davis v. Halperin*, 813 F.2d 37, 39 (2d Cir. 1987).  These elements are all clearly satisfied: *EC I* was dismissed on the merits; the European Community had a full and fair opportunity to litigate that case; and this Court specifically determined that the EC did not, and could not, suffer any cognizable injury from alleged money laundering and smuggling of cigarettes into the territory of its Member States.  *See EC I*, 150 F. Supp. 2d at 501-02.  Because the EC cannot relitigate that issue in this case, it cannot prevail on any of its claims.

## CONCLUSION

For all of these reasons, the Second Amended Complaint should be dismissed in its entirety with prejudice.

---

[14] The EC cannot avoid claim preclusion by alleging new competitive injuries.  "Under modern principles of *res judicata*, a party cannot split [its] claim by first seeking one type of remedy in one action and later asking for another type of relief in a second action."  *Danny's Constr. Co. v. Birdair, Inc*., 136 F. Supp. 2d 134, 146 (W.D.N.Y. 2000) (citation omitted); *see also Sure-Snap Corp. v. State Bank & Trust Co*., 948 F.2d 869, 875 (2d Cir. 1991) (same).

Dated: February 15, 2010
      New York, New York

                              Respectfully Submitted,

                              JONES DAY

                              /s Mark R. Seiden

                              Mark R. Seiden
                              Phineas E. Leahey
                              Leslie B. Dubeck
                              222 East 41st Street
                              New York, New York  10017
                              Telephone:  (212) 326-3939
                              Facsimile:   (212) 755-7306
                              mrseiden@jonesday.com
                              peleahey@jonesday.com
                              lbdubeck@jonesday.com

                              Gregory G. Katsas
                              51 Louisiana Avenue, N.W.
                              Washington, D.C.  20001-2113
                              Telephone: (202) 879-3939
                              Facsimile (202) 626-1700
                              ggkatsas@jonesday.com

                              *Counsel for Defendants*