UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


THE EUROPEAN COMMUNITY, *et al.*,

          Plaintiffs,

against-

RJR NABISCO, INC., *et al.*,

          Defendants.

CASE NO:  CV-02-5771
          (NGG)(VVP)


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(1) AND 12(B)(6)**


Date of Service:  April 1, 2010

KRUPNICK, CAMPBELL, MALONE,
BUSER, SLAMA, HANCOCK,
LIBERMAN & McKEE, P.A.

Kevin A. Malone, Esquire
kmalone@krupnicklaw.com
Carlos A. Acevedo  (CA-6427)
cacevedo@krupnicklaw.com
12 Southeast Seventh Street, Suite 801
Fort Lauderdale, Florida  33301
954-763-8181 telephone
954-763-8292 facsimile

SPEISER, KRAUSE, NOLAN &
GRANITO

John J. Halloran, Jr. (JH-2515)
JJH@ny.speiserkrause.com
Two Grand Central Tower
140 East 45th Street
New York, NY 10017
212-661-0011 telephone
212-953-6483 facsimile

ATTORNEYS FOR PLAINTIFFS

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 4

    Plausibility of Money-Laundering Allegations ................................................................. 4

    The Marketplace for Cigarettes in the European Community ........................................... 9

ARGUMENT ....................................................................................................................... 14

I.    PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE REVENUE RULE OR PENAL
    LAW RULE ................................................................................................................... 14

    A.    The Complaint Properly Pleads Claims for Equitable Relief. ............................... 14

        1.    This Court is Empowered to Hear Claims for Equitable Relief. .............. 15

        2.    The Common Law Empowers This Court to Grant Equitable Relief....... 15

        3.    Equitable Relief is Not Barred by the Revenue Rule or Penal Law Rule. 17

        4.    This Court Has the Inherent Power to Hear Plaintiffs' Equitable Claims. 21

        5.    U.S. Policy Favors Access to the Courts on Equitable Claims................. 22

        6.    RICO Does Not Dilute This Court's Power to Hear Equitable Claims.... 23

        7.    The Complaint Properly Alleges Claims for Equitable Relief. ................ 24

    B.    The Complaint Properly Pleads Claims for Damages. ......................................... 26

        1.    Plaintiffs' Claims for Damages Are Cognizable Under *Diageo*.............. 26

        2.    The Revenue and Penal Law Rules Should Not Bar Plaintiffs' "Sovereign"
            Claims for Damages................................................................................. 29

II.    PLAINTIFFS HAVE ADEQUATELY PLED CAUSATION UNDER BOTH RICO
    AND THE COMMON LAW ........................................................................................ 32

    A.    Plaintiffs' RICO Allegations Are Sufficient to Allege Proximate Cause. .............. 32

        1.    *Diageo* Is Still Good Law. ...................................................................... 32

        2.    Competition Does Not Preclude Causation. ............................................. 34

    B.    Plaintiffs Properly State Claims Under the Common Law.................................... 38

|  | 1. | Plaintiffs Have Properly Pled Proximate Cause Under The Common Law. ................................................................................................ 38 |
|  | 2. | Fraud. ............................................................................................... 40 |
|  | 3. | Public Nuisance. .............................................................................. 42 |
|  | 4. | Negligence. ...................................................................................... 43 |
|  | 5. | Negligent Misrepresentation. ........................................................... 45 |
|  | 6. | Unjust Enrichment, Conversion, and Money Had and Received. .............. 46 |

III. THE COMPLAINT IS SUFFICIENT IN ALL OTHER RESPECTS ............................. 47

A. Plaintiffs Adequately Plead RICO Claims ............................................................. 47

1. Extraterritoriality ................................................................................. 47

2. Corporations Can Be Part of an Association-in-Fact Enterprise. ............. 48

3. Plaintiffs Are RICO "Persons" and Have Sustained RICO Injuries ......... 49

B. The EC's Claims Are Not Barred by Issue Preclusion ......................................... 49

CONCLUSION ................................................................................................................. 50

CERTIFICATE OF SERVICE ........................................................................................... 51

# TABLE OF AUTHORITIES

## Cases

*Abrahams v. Young & Rubicam,*
    79 F.3d 234 (2d Cir. 1996)..............................................................................34, 39

*AFA Protective Sys., Inc. v. Am. Tel. & Tel. Co., Inc.,*
    57 N.Y.2d 912 (1982)..............................................................................46

*Alfred L. Snapp & Son v. Puerto Rico,*
    458 U.S. 592 (1982)..............................................................................28, 42

*Anza v. Ideal Steel Supply Corp.,*
    126 S. Ct. 1991 (2006)..............................................................................passim

*Armstrong v. Guccione,*
    470 F.3d 89 (2d Cir. 2006)..............................................................................22

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009)..............................................................................32, 34

*Attorney General of Canada v. R.J. Reynolds,*
    268 F.3d 103 (2d Cir. 2001)..............................................................................17, 18, 31

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.,*
    344 F.3d 211 (2d Cir. 2003)..............................................................................39

*Bridge v. Phoenix Bond & Indemnity Co.,*
    128 S. Ct. 2131 (2008)..............................................................................passim

*Bush v. Western,*
    Prec. Ch. 530, 24 Eng. Rep. 237 (1720)..............................................................................21

*Califano v. Yamasaki,*
    442 U.S. 682 (1979)..............................................................................22

*Center Cadillac, Inc. v. Bank Leumi Trust Co.,*
    808 F. Supp. 213 (S.D.N.Y. 1992)..............................................................................41

*Chase Manhattan Bank, N.A. v. Hoffman,*
    665 F. Supp. 73 (D. Mass. 1987)..............................................................................17

*Commercial Cleaning Servs., LLC v. Colin Serv. Sys., Inc.,*
    271 F.3d 374 (2d Cir. 2001)..............................................................................36, 37, 38

*Connecticut v. Am. Elec. Power Co.*,
  582 F.3d 309 (2d Cir. 2009)............................................................................ 16, 42

*Desiano v. Warner-Lambert Co.*,
  326 F.3d 339 (2d Cir. 2003)................................................................................... 39

*Disability Advocates, Inc. v. Paterson*,
  2010 WL 786657 (E.D.N.Y. Mar. 1, 2010)....................................................... 17, 24

*Dunlap Tire and Rubber Corp. v. C Corp.*,
  53 A.D.2d 150, 385 N.Y.S.2d 971 (1976) ............................................................ 45

*Estados Unidos Mexicanos v. DeCoster*,
  229 F.3d 332 (1st Cir. 2000)............................................................................ 42, 43

*European Community v. RJR Nabisco, Inc.*,
  355 F.3d 123 (2d Cir. 2004).................................................................. 30, 31, 49, 50

*European Community v. RJR Nabisco, Inc.*,
  424 F.3d 175 (2d Cir. 2005)............................................................................ 22, 31

*Forschner Group v. Arrow Trading Co.*,
  124 F.3d 402 (2d Cir. 1997)................................................................................... 24

*Giuliano v. Everything Yogurt, Inc.*,
  819 F. Supp. 240 (E.D.N.Y. 1993) ....................................................................... 41

*Graceland Corp. v. Consolidated Laundries Corp.*,
  7 A.D.2d 89 (1st Dep't 1958), *aff'd*, 6 N.Y.2d 900 (1959)................................... 28

*Grunwald v. Bornfreund*,
  668 F. Supp. 128 (E.D.N.Y. 1987) ....................................................................... 41

*Grupo Mexicano De Desarrollo v. Alliance Bond Fund*,
  527 U.S. 308 (1999)................................................................................................ 21

*Hamilton v. Beretta U.S.A. Corp.*,
  96 N.Y.2d 222 (2001) ............................................................................................ 44

*Hemi Group, LLC v. City of New York*,
  130 S. Ct. 983 (2010)............................................................................ 32, 33, 34, 37

*Hoffmann-La Roche Ltd. v. Empagran S.A.*,
  542 U.S. 155 (2004)................................................................................................ 48

*Holmes v. Securties Investor Protection Corporation*,
  503 U.S. 258 (1992)................................................................................................ 36

*Hydro Investors, Inc. v. Trafalgar Power Inc.*,
227 F.3d 8 (2d Cir. 2000) ................................................................ 45

*Ileto v Glock, Inc.*,
349 F.3d 1191 (9th Cir. 2003) ........................................................ 44

*In re Oil Spill by The Amoco Cadiz*,
954 F.2d 1279 (7th Cir. 1992) .................................................. 26, 28

*International Products Co. Erie Railway Co.*,
244 N.Y. 331 (1927) ...................................................................... 46

*Johnson v. Bryco Arms*,
304 F. Supp. 2d 383 (E.D.N.Y. 2004) ............................................ 44

*Kashi v. Gratsos*,
790 F.2d 1050 (2d Cir. 1986) ......................................................... 39

*Kingsland v. Erie County Agr. Soc.*,
298 N.Y. 409 (1949) ...................................................................... 38

*Kriz v. Schum*,
75 N.Y.2d 25 (1989) ...................................................................... 38

*Laborers Local 17 Health & Benefit Trust Fund v. Philip Morris, Inc.*,
191 F.3d 229 (2d Cir. 1999) ........................................................... 39

*Landy v. Mitchell Petroleum Technology Corp.*,
734 F. Supp. 608 (S.D.N.Y. 1990) ................................................ 41

*Leo v. General Electric Co.*,
145 A.D.2d 291 (2d Dep't 1989) .................................................... 28

*Lerner v. Fleet Bank, N.A.*,
459 F.3d 273 (2d Cir. 2006) ........................................................... 38

*Mann v. Merrill Lynch, Pierce, Fenner, & Smith*,
488 F.2d 75 (5th 1973) ................................................................... 50

*Moore v. PaineWebber, Inc.*,
189 F.3d 165 (2d Cir. 1999) ........................................................... 38

*NAACP v. AcuSport, Inc.*,
271 F. Supp. 2d 435 (E.D.N.Y. 2003) ............................................ 39

*New York Trap Rock Corp. v. Clarkstown*,
299 N.Y. 77 (1949) ........................................................................ 22

*Norex Petroleum Ltd. v. Access Indus. Inc.*,
   540 F. Supp. 2d 438 (S.D.N.Y. 2007) ............................................................... 47, 48

*People ex rel. Bennett v. Laman*,
   277 N.Y. 368 (1938) ............................................................................................ 16, 22

*Pfizer, Inc. v. Gov't of India*,
   434 U.S. 308 (1977) ............................................................................................ 26, 29

*Philip Morris USA, Inc. v. Otamedia Ltd.*,
   331 F. Supp. 2d 228 (S.D.N.Y. 2004) ................................................................. 24

*Porter v. Warner Holding Co.*,
   328 U.S. 395 (1946) ............................................................................................ 22

*Provincial Gov't of Marinduque v. Placer Dome, Inc.*,
   582 F.3d 1083 (9th Cir.  2009), *pet'n for cert filed*, No. 09-944 (U.S. Feb. 10, 2010). ......... 15

*Republic of Colombia v. Diageo*,
   531 F. Supp. 2d 365 (E.D.N.Y. 2007) ......................................................... passim

*Republic of Panama v. Air Panama Internacional, S.A.*,
   745 F. Supp. 669 (S.D. Fla. 1988) ...................................................................... 15

*Republic of Philippines v. Marcos*,
   806 F.2d 344 (2d Cir. 1986) ................................................................................ 15, 16

*Republic of Philippines v. Marcos*,
   862 F.2d 1355 (9th Cir. 1988) (*en banc*) ........................................................ 15, 16

*Republic of Turkey v. OKS Partners*,
   797 F. Supp. 64 (D. Mass. 1992) ........................................................................ 15

*SEC v. Berger*,
   322 F.3d 187 (2d Cir. 2003) ................................................................................ 48

*Simmons v. Everson*,
   124 N.Y. 319 (1891) ............................................................................................ 39

*Springs Mills, Inc. v. Ultracashmere House, Ltd.*,
   724 F.2d 352 (2d Cir. 1983) ................................................................................ 24

*State v. Schenectady Chems. Inc.*,
   103 A.D.2d 33, 479 N.Y.S.2d 1010 (3d Dep't 1984) ........................................ 39

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
   402 U.S. 1 (1971) ................................................................................................ 24, 26

*Tellabs, Inc v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...................................................................................... 11

*The Sapphire*,
    78 U.S. 164 (1870)......................................................................................... 26

*Triestman v. Fed. Bureau of Prisons*,
    470 F.3d 471 (2d Cir. 2006)........................................................................... 34

*United States SEC v. Manterfield*,
    [2008] EWHC 1349 (QB)........................................................................ 18, 19

*United States SEC v. Manterfield*,
    [2009] EWCA Civ 27 ............................................................................. 18, 19

*United States v. City of New York*,
    2010 WL 318087 (E.D.N.Y. Jan. 21, 2010) .................................................. 17

*United States v. First Nat'l City Bank*,
    379 U.S. 378 (1965)....................................................................................... 17

*United States v. Huber*,
    603 F.2d 387 (2d Cir. 1979)........................................................................... 48

*United States v. Ira S. Bushey & Sons, Inc.*,
    363 F. Supp. 110 (D. Vt. 1973), *aff'd*, 487 F.2d 1393 (2d Cir. 1973) .................................. 16

*United States v. Ivey*,
    139 D.L.R. (4th) 570 (Ontario Court of Appeal 1996)............................. 20, 28, 29

*United States v. Levy*,
    [1999] Carswell Ont 926 (Ont. Gen. Div.) .......................................... 19

*United States v. Philip Morris USA, Inc.*,
    566 F.3d 1095 (D.C. Cir. 2009) *petition for cert. filed*, 78 USLW 3501 (U.S. Feb. 19, 2010)
    (No. 09-978)................................................................................................. 23

*United States v. Solvents Recovery Serv.*,
    496 F. Supp. 1127 (D. Conn. 1980)............................................................... 24

*Wimberly v. Yates*,
    2008 WL 895979 (E.D. Cal. 2008)................................................................. 1

**Statutes**

All Writs Act,
    28 U.S.C. § 1651 ................................................................................. 15, 21

FED. R. CIV. P. § 12(b)(6) ...................................................................... 11

FED. R. CIV. P. § 19 ................................................................................ 50

FED. R. CIV. P. § 41(b) ........................................................................... 50

FED. R. CIV. P. § 9(b) ............................................................................. 41

Foreign Trade Antitrust Improvements Act of 1982,
    15 U.S.C. § 6a .................................................................................... 48

Racketeer Influenced and Corrupt Organizations Act,
    18 U.S.C. § 1964 [RICO] ............................................................... passim

**Treatises**

Garrett, *The Law of Nuisances*
    (London 1908) ................................................................................... 21

Pomeroy, *Equity Jurisprudence* § 1349 (5th ed. 1941) ........................... 24

RESTATEMENT (SECOND) OF TORTS § 821B (1979) ......................... 21, 39, 40

**Other Authorities**

Affidavit of Jed Dryer,
    *Diageo Brands B.V. v. UETA, Inc.*, No. 09-00028 (S.D. Tx. Mar. 13, 2009) ........................ 6

Brenner, *Nuisance Law and the Industrial Revolution*
    3 Jour. Legal Stud. 403 (1974) ......................................................... 21

Brief for the United States as *Amicus Curiae*,
    *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 537 U.S. 1000 (2002),
    No. 01-1317 (Oct. 2002) ................................................................... 18

Congreso de Colombia, Ley 170 de 1994 (diciembre 15), Diario Oficial No. 41,637 del 15 de
    diciembre de 1994 [Congress of Colombia, Law 170 of 1994 (December 15), Official
    Register No. 41,637, Dec. 15. 1994] ................................................ 12

Convention Against Transnational Organized Crime,
  opened for signature Dec. 13, 2000, 40 I.L.M. 335, ratified by the United States on Nov. 3,
  2005 [Palermo Convention] .............................................................................................. 30, 43

Executive Order No. 12,978,
  60 Fed. Reg. 54, 579 (Oct. 21, 1995) ...................................................................................... 25

Final Act Embodying the Results of the Uruguay Round of Multilateral Trade Negotiations,
  Apr. 15, 1994, LEGAL INSTRUMENTS--RESULTS OF THE URUGUAY ROUND Vol 1
  (1994), 33 I.L.M. 1225 (1994) [GATT 1994] ........................................................................ 12

GAO, *Terrorist Financing*
  (GAO-04-163) .......................................................................................................................... 25

PDD-42 (Oct. 21, 1995),
  cited in *U.S. International Crime Control Strategy* (June 1998.) .......................................... 25

Press Release, "European Commission and JT International (Japan Tobacco) sign 15-year
  Agreement to combat contraband and counterfeit cigarettes" (Dec. 14, 2007)
  http://europa.eu/rapid/pressReleasesAction.do?reference=IP/07/1927&format=HTML&aged
  =0&language (last visited Mar. 29, 2010) ............................................................................. 14

Press Release, "European Commission and Philip Morris International Sign 12-Year Agreement
  to Combat Contraband and Counterfeit Cigarettes" (July 9, 2004),
  http://www.eurunion.org/news/press/2004/200400110.htm (last visited Mar. 29, 2010) ...... 14

Press Release, Serious Fraud Office, "SFO Restrains $100M in Allen Stanford Case" (30 June
  2009), http://www.sfo.gov.uk/press-room/latest-press-releases/press-releases-2009/sfo-
  restrains-$100m-in-allen-stanford-case.aspx (last visited March 29, 2010) .......................... 20

Remarks By The President To The United Nations General Assembly (Sept. 23, 2009),
  http://www.whitehouse.gov/the_press_office/remarks-by-the-president-to-the-united-nations-
  general-assembly/ (last visited Mar. 29, 2010) ..................................................................... 23

Respondent's Factum of the United States of America,
  *United States v. Ivey*, No. C23578 (9 September 1996) (Ontario Court of Appeal) .. 20, 28, 29

SEC Litigation Release No. 20,872,
  95 SEC Docket 189 (Jan. 28, 2009) ........................................................................................ 18

*SEC v. Antar*, SEC Litigation Release No. 15,008,
  62 SEC Docket 1480 (Aug. 8, 1996) ....................................................................................... 19

*SEC v. Antar,* SEC Litigation Release No. 15,251,
  63 SEC Docket 2054 (Feb. 10, 1997) ...................................................................................... 19

Second Amended Complaint,
  *Republic of Colombia v. Diageo North America Inc.*, No. 04-04372 (E.D.N.Y. Feb. 13, 2006)
  ............................................................................................................................. 10

Speech of Deputy Attorney General David W. Ogden,
  78th Interpol General Assembly (Oct. 12, 2009)................................................. 23, 31

Statement Given Under Oath of Luz María Zapata Zapata ¶ 3,
  *Republic of Colombia v. Diageo,* No. 04-04372 (E.D.N.Y. June 19, 2006).................... 10, 13

Statement of Stuart E. Schiffer, Acting Assistant Attorney General, Civil Division, U.S.
  Department of Justice, Hearing Before the U.S. Senate Special Committee on Aging,
  Medicare Enforcement Actions: The Federal Government's Anti-Fraud Efforts,
  Serial No. 107-11 (July 26, 2001)......................................................................... 20

Transcript of Oral Argument,
  *Republic of Colombia v. Diageo,* No. 04-04372 (E.D.N.Y. Aug. 15, 2007)......................... 11

Transcript of Oral Argument,
  *Republic of Colombia v. Diageo,* No. 04-04372 (E.D.N.Y. Feb. 2, 2007)............................ 11

Treaty of Lisbon Amending the Treaty on European Union and the Treaty Establishing the
  European Community, Dec. 13, 2007, 2007 O.J. (C 306) 1, (effective Dec. 1, 2009)............. 1

*U.S. Int'l Crime Control Strategy* (June 1998),
  http://clinton4.nara.gov/media/pdf/iccs.pdf (last visited. Mar. 29, 2010) .............................. 25

*United States v. Dozortsev,*
  (No. 08-CR-044 (CPS) (E.D.N.Y.).......................................................................... 1

*United States v. Fanchini,*
  (No. 07-CR-736 (CPS) (E.D.N.Y.).......................................................................... 1

## PRELIMINARY STATEMENT

This case involves the claims of the European Community[1] and 26 of its Member States. With Court permission, the complaint has been amended to add additional party Plaintiffs, to reflect mergers, acquisitions, and the creation of new corporations within the Defendant group, and to update and reflect the ongoing criminal misconduct of both the original RJR Defendants and new corporations resulting from mergers (collectively "RJR").

This second amended complaint ("SAC") alleges and explains in detail how these Defendants have, both before and since the merger, knowingly and intentionally laundered hundreds of millions of dollars in narcotics proceeds as a part of their scheme to increase their market share and sales through long-term relationships with organized crime groups throughout the world.[2] As the SAC alleges, this scheme has resulted in significant financial benefits not only for RJR, but also for U.S., EU, Russian, and Colombian organized crime groups, and has provided direct financial benefits to various terrorist organizations.[3] This scheme began at least

---

[1] Under the Treaty of Lisbon Amending the Treaty on European Union and the Treaty Establishing the European Community, effective 1 December 2009, the European Union became the legal successor to the European Community. Plaintiffs may move to amend the caption shortly to reflect this change.

[2] New evidence continues to become available concerning the misconduct of the Defendants and the relationship of that misconduct to this District. For example, in the Eastern District of New York, Ricardo Fanchini recently pled guilty to narcotics trafficking and Nikolai Dozortsev pled guilty to money laundering as part of an extensive scheme to sell narcotics and launder the proceeds of those narcotics sales through the purchase and sale of cigarettes. *See United States v. Fanchini*, (No. 07-CR-736 (CPS) (E.D.N.Y.); *United States v. Dozortsev*, (No. 08-CR-044 (CPS) (E.D.N.Y.). This scheme involved the illegal sale of cigarettes with, at its peak, cigarette shipments being made approximately every five to seven days. The public record shows that some of this product was seized by the Plaintiffs' customs authorities and certain shipments were predominated by brands owned by and manufactured by the RJR Defendants. *See Wimberly v. Yates*, 2008 WL 895979 at *6 n.5 (E.D. Cal. 2008) ("A court may take judicial notice of court records.")

[3] Plaintiffs have made specific allegations that RJR provided financial support to the PKK, a foreign terrorist organization, as well as the former regime of Saddam Hussein. Additional,

in the early 1990s, continued through the August 2004 merger that created Reynolds American Inc., and continues to the present date unabated.  A key element of this criminal scheme is the use of informal currency exchanges such as the Black Market Peso Exchange in Panama by which some of RJR's largest distributors obtain enormous amounts of narcotics proceeds which they then use to pay RJR for cigarettes.  (SAC ¶¶ 65-66, 101, 104-08.)

RJR's scheme has injured Plaintiffs in numerous ways, as set out in paragraph 146 of the SAC, including without limitation:

1.     Commercial losses.  Many of the Member States are or have been commercial participants in the cigarette market.  The SAC delineates the losses which the Member States experience as competitors in the market as a result of the illegal competition caused by RJR's money-laundering scheme.  (SAC ¶¶ 146(a)-(g).)

2.     Physical damage to the EU and Member States' property as a result of RJR's illegal activities.  (SAC ¶ 146(y).)

3.     Injury to the marketplace which the EU and Member States have created and are bound to protect, and its participants.  (SAC ¶¶ 146(h), (cc)-(dd).)

Plaintiffs allege violations of U.S. domestic law.  Their claims are <u>not</u> based on violations of foreign law, foreign criminal laws, or foreign revenue laws.  Plaintiffs assert common law claims under both state and federal common law with jurisdiction based upon diversity of citizenship and federal-question jurisdiction.  In addition, some Plaintiffs make claims for damages under Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964 ("RICO").  In their claims for equitable relief under state common law, which are critically

---

more time-sensitive allegations concerning the relationship between RJR's products and other terrorist groups can be made *in camera* if necessary.

important, Plaintiffs seek to enjoin RJR's misconduct <u>in the United States</u>.  Absent an injunction, RJR's scheme will likely continue to grow and harm Plaintiffs further in the future.

RJR's motion does not include a Statement of Facts, but rather intersperses factual assertions throughout its arguments.  RJR essentially acknowledges that this Court's ruling in *Republic of Colombia v. Diageo*, 531 F. Supp. 2d 365 (E.D.N.Y. 2007), sets forth the controlling law in this case.  (*See* D. Br. 19.)  ("We recognize that the revenue and penal-law rules do not bar foreign sovereigns from pursuing genuinely commercial claims".)[4]  However, they have attempted to distinguish this case from *Diageo* by making two factual assertions which they call "critical" but which are wholly incorrect.  (D. Br. 22.)  The first is that "Plaintiffs here offer no plausible explanation for how the alleged money laundering might result in any competitive advantage in the foreign sale of RJR's products." (D. Br. 2.)  The second is that "the proximate-cause analysis in *Diageo* . . . involved <u>one</u> lawful seller that enjoyed a constitutional monopoly with respect to the product and markets at issue."  (D. Br. 2 (emphasis added).)  In other words, the Defendants mistakenly assert that the "monopolies" in Colombia are somehow different from the "monopolies" in the EU Member States.

RJR's first argument is swiftly dispatched.  The money-laundering scheme, the money-laundering discount, and the impact of money laundering on the Plaintiffs have been pled in the same way and are almost exactly the same as in *Diageo*.  This can be demonstrated most graphically by the fact that the SAC alleges that RJR actually sells their cigarettes to some of the exact same distributors in Panama to whom the liquor companies sell their liquor.  These

---

[4] Since it was decided in 2007, *Diageo* has been followed or cited with approval in over a dozen cases.  There is no doubt that *Diageo* is good law in this circuit.  The only way the Defendants can escape *Diageo* is to show that this case is so factually dissimilar from *Diageo* that its rulings do not apply.

distributors acquire the same narcotics proceeds from the same Black Market Peso Exchange and obtain the same money-laundering discount without regard to whether they ultimately use these "narco dollars" to pay RJR or Diageo.  The money-laundering schemes are almost identical because the participants in the two schemes are often identical and they operate in identical fashions regardless of the product.

RJR's argument concerning the "monopolies" and the competitive market place in the EU is equally unavailing.  A comparison of the record concerning the Colombian "monopolies" (which were closely considered by this Court and formed the basis for its ruling in *Diageo*) with the EU "monopolies" described below (and as largely admitted in the Defendants' papers), demonstrates that the competitive situation in the two cases is almost identical.

In short, the two factual points that RJR describes as essential to their distinction of *Diageo* are both mistaken.  RJR's arguments therefore fail.  *Diageo* is controlling precedent in this case, and the ruling in this case should follow *Diageo*.

## STATEMENT OF FACTS

### *Plausibility of Money-Laundering Allegations*

There is no legitimate argument by which this case can be distinguished from *Diageo*, and the two complaints are equally plausible.  The core allegations of the money-laundering scheme as between the two complaints are the same.  The allegations as to the nature and cause of the Plaintiffs' commercial losses are virtually identical.  (*Compare, e.g.*, SAC ¶ 146 (a),(b),(c),(d), and (e) with *Diageo* Second Amended Complaint ¶ 103 (a),(b),(c),(d), and (e) (Ex. "1").)  In *Diageo*, the court deemed causation to be adequately pleaded based on the following facts:

1.      Traffickers with drug proceeds exchange those proceeds at a discount;

2.      The funds are acquired by brokers who then sell them to distributors or importers at a discount;

3.      The funds are used by distributors or importers to purchase liquor from defendants; and

4.      Importers pass on this discount to consumers.  (D. Br. 23.)

A very similar scheme is pled in the SAC.  Narcotics traffickers sell drugs in Europe (or the United States) and sell the proceeds to brokers.  (SAC ¶ 38 ("the drug cartel exports narcotics to the MEMBER STATES where they are sold for Euros;" then "the cartel contacts the money broker and negotiates a contract" where the proceeds are sold to the broker at a discount).)[5]  The funds are then acquired by importers. (SAC ¶ 39 ("Importers buy these monies from the money brokers at a substantial discount off the 'official' exchange rates and use these monies to pay for shipments of items (such as cigarettes)").)  The discount is passed on to the consumers in the form of lower prices. (SAC ¶ 146(f) ("Entities that purchase and sell cigarettes using laundered money enjoy an unfair competitive advantage over legitimate businesses due to favorable exchange rates").)  "The RJR DEFENDANTS' money-laundering scheme described in this complaint gives the RJR DEFENDANTS an unfair and illegal competitive advantage over the PLAINTIFFS."  (SAC ¶ 146(a).)  While the details may vary, Plaintiffs have alleged a money-laundering scheme analogous to the scheme in *Diageo*, and are entitled at this stage to gather and present evidence to support their allegations.

Having found those allegations plausible in *Diageo*, this Court should reach the same result here.  The pleadings are so similar because the two money-laundering schemes are almost

---

[5] There are of course many variations to the money-laundering scheme and the scheme evolves regularly to avoid detection by law enforcement.  The portions of the SAC reflected herein are

identical and, in some instances, the key participants in the two schemes <u>are</u> identical.

For example, Plaintiffs have alleged that RJR sells to a company located in Panama known as UETA.  (SAC ¶¶ 43-45, 106.)  This is the same UETA that buys liquor from Diageo and Pernod Ricard and which is currently the target of discovery in *Diageo*.[6]  UETA is a major distributor for both RJR and Diageo, is a major participant in each company's money-laundering scheme, and operates in a virtually identical fashion in both cases.

A glimpse into UETA's operation can be gleaned from an affidavit filed in the District Court of Webb County, Texas, in March of 2009, in an action filed by Diageo against UETA Inc. (which was settled shortly thereafter).  *See* Affidavit of Jed Dryers, *Diageo Brands B.V. v. UETA, Inc.*, No. 09-00028 (S.D. Tx. Mar. 13, 2009).  That affidavit and its attachments (Ex. "3") demonstrate several facts which are pertinent to this Court's understanding of the "plausibility" of the Plaintiffs' allegations.  First, the affidavit demonstrates that at one single point in time, at UETA's facilities in Laredo, Texas, UETA held inventory of Diageo's products worth approximately $37,000,000.00.  In spite of the fact that UETA is ostensibly a Delaware company (actually based in Florida) and in spite of the fact that all of the product in this instance was delivered to Texas, UETA actually buys the product and pays for the product from its offices in Panama.  (See bills of sale attached to Ex. "3".)  Furthermore, UETA delivers payments through the SWIFT system and through banks in New York in the same way as is alleged in the complaint before this Court.  (*See* SAC ¶¶ 2, 146(j).)  UETA uses the same companies in Panama to purchase and sell the cigarettes it acquires from RJR.  (SAC ¶ 106.)

---

simply one example of how the scheme works in the case before this Court.
[6] Portions of a discovery request pending in *Diageo* are attached hereto as Exhibit "2."

The SAC similarly alleges that the Reynolds American Defendants "have made, sold, and shipped both RJR and Brown & Williamson-brand cigarettes to Panama and elsewhere, and received criminal proceeds in payments for cigarettes" from a company called Giovannex which the RJR Defendants use as a "cut out" to ship cigarettes all over the world.  (SAC ¶¶ 43-45, 100-05.)  The SAC alleges that payment for sales to Giovannex are made in criminal proceeds which are obtained from the Black Market Peso Exchange.  Because the money launderers of the Black Market Peso Exchange make no distinction as to whether the "narco dollars" are to be used to purchase liquor or cigarettes, the scheme, discounts, and ultimate impact on legitimate companies are the same regardless of the product.  (SAC ¶ 39.)

The specific methods used by brokers and traffickers to launder drug proceeds have varied during the relevant period, but the basic elements of the money-laundering cycle remain the same:

1.      A Panamanian distributor purchases narcotics proceeds (at a discount) in U.S. dollars from a broker on the Black Market Peso Exchange.  (SAC ¶¶ 33, 65-66.)

2.      Using those dollars, the distributor buys cigarettes from RJR specifically for sale into the illegal channels in Europe.  (SAC ¶¶ 104-06.)

3.      RJR ships the cigarettes to the distributor.  (SAC ¶¶ 105-06.)

4.      The distributor sells the cigarettes to customers in Europe who may pay in euros or local currency.  (SAC ¶¶ 66, 105-06.)

5.      The cigarettes are distributed and sold at retail in Europe.  (The distribution is often illegal, but this is not an essential part of the scheme.)  (SAC ¶ 41.)

6.      The cycle is self-sustaining, and each illegally distributed cigarette is sold at an artificially lower price due to the increased purchasing power of the distributor as a result of the discount at which it purchases the narcotics dollars.  (SAC ¶¶ 40, 44.)

7.      RJR enjoys the benefit of additional customers, increased market share, and a competitive advantage in Europe because its products are sold at a price below the normal retail price in Europe.  (SAC ¶ 48.)

8.      Plaintiffs, as legitimate traders in the market, suffer a competitive disadvantage as a result of the cheap cigarettes.  (SAC ¶¶ 44, 146 (a)-(g).)

At times, the cigarette traders will also acquire narcotics proceeds at a discount and use those discounted dollars to pay the distributor for the cigarettes.  The above cycle applies equally to Colombian liquor sales.[7]

Pointing to Plaintiffs' allegation that in certain instances "European importers of Defendants' cigarettes are narcotics traffickers," RJR opines that "those importers should be looking to sell—not buy—narcotics-derived euros at a discount."  (D. Br. 24.)  This misstates Plaintiffs' allegations as well as the way money laundering works.  Usually, when a narcotics trafficker buys cigarettes, he buys them not to sell them at a profit, but rather to launder his narcotics proceeds.  He has already made a large profit from the narcotics sales.  He is now looking to convert those proceeds into the product of something other than a narcotics sale so that he can use the money.  (There are countries located in Europe (other than the Plaintiffs)

---

[7] The Defendants may attempt to argue that it will be difficult for the Plaintiffs to prove that this money-laundering discount is in fact passed on to consumers and, therefore, has an impact on the legitimate cigarette market in the EU.  However, this exact argument was made by the liquor companies in *Diageo*, and the Court ruled in favor of the Plaintiffs.  The Court found:  "At this early stage of the litigation, it is not possible to determine that, as a matter of law, Plaintiffs will not be able to prove to a reasonable degree of certainty that Defendants' money laundering

where the laundering of narcotics proceeds is a serious crime, but where the laundering of cigarette proceeds is not a crime, even if the cigarettes were illegally sold.  Accordingly, the simple act of converting narcotics proceeds into cigarette proceeds effectively launders the money.)  Since the narcotics trafficker's financial success does not depend on whether the ciagarette sales are profitable, he can sell his cigarettes at the price he paid for them, or even less than the price he paid for them, and still obtain the desired benefits.  Narcotics traffickers have such a surplus of narcotics proceeds that they will often sell their cigarettes at or below the price they paid for them so as to increase the volume of cigarette sales and the speed of their cigarette sales so as to allow them to launder more narcotics proceeds.  For example, in the Fanchini-Dozortsev heroin money-laundering scheme described above, the narcotics traffickers made cigarette shipments as often as every five days to launder the extraordinary volumes of narcotics proceeds they had accumulated.  *(See* n. 2, *supra.)* The cheaper they sell the cigarettes, the more cigarettes they can sell, and the more money they can launder.  Thus, the money-laundering discount is even more pronounced when the narcotics trafficker is also the seller of cigarettes.

### The Marketplace for Cigarettes in the European Community

The second, equally flawed prong of the Defendants' factual argument is that the plaintiffs in *Diageo* were "the only lawful seller of liquor in Colombia."  (D. Br. 22.)  Yet, the record in *Diageo* demonstrates that the Departments of Colombia do not enjoy a monopoly that renders their position in the marketplace superior to that of the Member States as described in the SAC.  Any "monopoly" held by the Departments exists in name only.  As Diageo and Pernod Ricard admitted in that case, they (and other private companies) operate freely in Colombia and

caused Plaintiffs to lose revenues and profits."  *Diageo*, 531 F. Supp. 2d at 436.

have substantial legal sales of their products in Colombia.  The "monopolies" within the

Departments operate as simple competitors in the marketplace that must compete not only with

private companies such as Diageo and Pernod Ricard, but also with the other Departments which

have the right to sell their products throughout Colombia.  Therefore, the competitive

marketplace in Colombia is very similar to that which exists within the European Union.

The proof of these points is found throughout the record in the *Diageo* case which is

currently pending before this Court.  For example, in the *Diageo* second amended complaint, at

paragraph 20, it states: "However, the market has long been open to competition from foreign

manufacturers, which import their liquor products into Colombia."  *Diageo*, No. 04-04372

(E.D.N.Y. Feb. 13, 2006).  The record confirms this many times.  For example, in the affidavit of

Luz Maria Zapata Zapata (filed on behalf of the Plaintiffs in the *Diageo* case), the affiant stated:

> "The Colombian Departments manufacture and distribute distilled alcoholic
> beverages, such as aguardientes, rums and aperitifs.  In this business, the
> Departments compete in the Colombian liquor market just as any private
> individual.  In effect, the departmental distillers are governed by the same tax
> rules as private enterprises.  Therefore, the Departments pay the same taxes that
> private individuals performing the same activity pay, and they do not derive any
> benefits whatsoever due to their nature as a public entity."

Statement Given Under Oath of Luz María Zapata Zapata ¶ 3, *Republic of Colombia v. Diageo,*

No. 04-04372 (E.D.N.Y. June 19, 2006).  (Ex. "4".)  Various oral arguments have confirmed

these facts.  For example, in arguments in *Diageo* before this Court, on February 2, 2007,

counsel for the Plaintiffs explained:

> As the record amply shows it is a monopoly in name only.  The defendants readily
> admit they have operations where they legally sell liquor in Colombia. . . .  The
> monopoly really just -- it is sort of a historical throwback from when maybe it
> [was] more real than it is today.

Transcript of Oral Argument at 48:20-25, *Republic of Colombia v. Diageo,* No. 04-04372

(E.D.N.Y. Feb. 2, 2007).  In arguments in *Diageo* before Magistrate Judge Pohorelsky on August

7, 2007, the following statements were made:

> MR MALONE [for the Plaintiffs]: The liquor monopoly so-to-speak is a
> monopoly in name only.  These defendants for many, many years, have had the
> legal right to import and distribute their products in Colombia separate and apart
> from this so-called monopoly. . . .

> THE COURT: Okay.  So both are sanctioned by the government.

> MR. MALONE: They're both completely permissible.

> . . . .

> MR. ICHEL [for the defendants]: In any event, we don't dispute
> everything.  The last statement that Mr. Malone said about the monopolies being
> able to produce Aguar Diente and importers being able to import separately
> imported liquors like scotch, that's correct.

Transcript of Oral Argument at 19:6-10, 13-14; 20:21-25, *Republic of Colombia v.*

*Diageo,* No. 04-04372 (E.D.N.Y. Aug. 15, 2007).

RJR attempts to distinguish between the EU and Colombia by arguing that "Member

States are required to" make sure there is "no discrimination" in favor of any of these "State

monopolies."  (Rivery Aff. ¶ 5.)[8]  The same rule exists in Colombia, a party to the General

---

[8] Defendants' submission of the de Rivery affidavit is clearly improper.  The affidavit should be
disregarded or stricken.  The de Rivery affidavit does not address any question of subject-matter
jurisdiction and is intended to support the Defendants' arguments under  Rule 12(b)(6) for a
failure to state a claim upon which relief can be granted.  While "documents" incorporated by
reference in a complaint may be considered in a 12(b)(6) motion, *Tellabs, Inc v. Makor Issues &
Rights, Ltd.,* 551 U.S. 308, 322 (2007), the de Rivery affidavit references documents and other
sources clearly <u>not</u> incorporated by the complaint, as well as legal and factual commentary on the
relevance and meaning of those materials.  *Tellabs* reiterates black-letter law that a 12(b)(6)
analysis must "accept all factual allegations in the complaint as true."  *Id.*  Out of an abundance
of caution Plaintiffs will respond to the affidavit, but Plaintiffs limit their response to citations to
the complaint and/or to those facts which can reasonably be inferred from the pleadings.  Should

Agreement on Tariffs and Trade (GATT) 1994 and a member of the World Trade Organization. (*See* Arts. II, III, & XVII of GATT 1994, Art. III of the Agreement on Government Procurement, incorporated into Colombian national legislation by Law 170 of 1994.)

The liquor market in Colombia and the cigarette market in the EU are remarkably similar. The Defendants' own expert states that: "Traditionally, most national markets were dominated by national monopolies . . . ." (Rivery Aff. ¶ 7.)  He further states that private competitors "have displaced almost all former State monopolies and, for the reasons stated above, any such monopolies would be subject to external competition . . . ." (Rivery Aff. ¶ 8.)  This is the same scenario as was before the court in *Diageo* ("the market has long been open to competition from foreign manufacturers, which import their liquor products into Colombia." *Diageo* Second Amended Complaint ¶ 20.)  The SAC summarizes the Member States' commercial role in the cigarette industry as follows:

> Many of the MEMBER STATES act in a commercial capacity in regard to cigarettes in that they now or have in the past manufactured, sold, and/or been bulk purchasers of cigarettes.  As such, the illegal conduct of the RJR DEFENDANTS has directly harmed the commercial interests of the Plaintiffs and has caused them to suffer a loss of money and property.  Several of the MEMBER STATES within the EUROPEAN COMMUNITY have held a constitutional monopoly on the domestic manufacture and/or sale of cigarettes.  During the period relevant to this complaint, several MEMBER STATES have operated one or more cigarette manufacturing facilities within their borders.  These MEMBER STATES, along with other MEMBER STATES, have sold and/or distributed cigarettes, both made by the MEMBER STATES or those which have been legally imported into the MEMBER STATE.  By virtue of the aforesaid activities, these MEMBER STATES have been large sellers and, in some instances, the largest sellers and producers of cigarettes within their borders.  As such, they have a very large financial stake in the tobacco business and are the most harmed by illegal competition.  As a result of the actions of the RJR DEFENDANTS as set forth more fully below, these MEMBER STATES and the EUROPEAN

---

the Court desire an evidentiary response to the de Rivery affidavit, the Plaintiffs can and will provide one.

> COMMUNITY have experienced a large reduction in their business and have lost
> money and property as a result.

(SAC ¶ 6.)  The complaint further states:

> Certain MEMBER STATES possessed and have the exclusive right to import and
> distribute cigarettes within that MEMBER STATE. . . .  The unfair advantage that
> the money-laundering scheme afforded to the RJR DEFENDANTS impaired the
> ability of the MEMBER STATES to compete effectively in their own cigarette
> markets.

(SAC ¶ 146(g).)  An example of such a Member State is Italy.  As a country which once

had the underline(exclusive) right to distribute cigarettes within its borders, Italy bought and

distributed the brands of many manufacturers, including RJR.

If anything, the competitive disadvantage in the EU has been more direct and more

severe than in *Diageo*.  For example, when Italy was buying and distributing RJR brands, the

Italian government suffered the ultimate head-to-head competition: it was attempting to sell RJR

cigarettes at legal prices while RJR's coconspirators were selling the identical brands illegally

into the Italian market with a money-laundering discount.  Even in instances where there was no

direct brand-to-brand competition, the competitive harm to cigarettes manufactured or sold by

the Member States was in fact more direct than the competition for liquor products in Colombia.

As is described above, the Colombian Departments produce certain specific types of alcohol

such as aguardientes, rums, and aperitifs.  Statement of Zapata ¶ 3, *supra*.  (Ex. "4".)  The

competing private companies largely sell liquors such as scotch.  In contrast, the spectrum of

RJR- and Brown & Williamson-brand cigarettes made by Reynolds American Inc. compete

head-to-head with the cigarette brands made and/or sold by the Member States; these products

are more interchangeable and therefore compete more directly than the different varieties of

liquor sold in Colombia.

**ARGUMENT**

I.   **PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE REVENUE RULE OR PENAL LAW RULE**

    A.   **The Complaint Properly Pleads Claims for Equitable Relief.**

The SAC alleges claims for equitable relief under state and federal common law and RICO, thereby invoking this Court's diversity and federal-question jurisdiction.  RJR's motion does not directly address these equitable claims; however, the main objective of this case is to obtain injunctive and other remedial relief to combat and deter RJR's continuing criminal scheme.  RJR is the only major tobacco manufacturer that has not agreed to enter into a cooperation agreement with Plaintiffs to end illicit trade and criminal activities involving its products.[9]  Absent an Order of this Court, RJR will continue the criminal scheme to the detriment of Plaintiffs, the United States, and their citizens.

Plaintiffs' argument begins with a legal discussion of their equitable claims because: (a) equitable relief is the main objective of this case; (b) this Court has not addressed such claims in prior proceedings in *Diageo*; and this Court has indicated that adequate briefing is required to allow the Court to address such claims.  *Diageo*, 531 F. Supp. 2d  at 448.

---

[9] Philip Morris International and Japan Tobacco International both have executed publicly disclosed, multi-year cooperation agreements with the EC and the Member States.  *See* Press Release, "European Commission and Philip Morris International Sign 12-Year Agreement to Combat Contraband and Counterfeit Cigarettes" (July 9, 2004), http://www.eurunion.org /news/press/2004/200400110.htm (last visited Mar. 29, 2010); Press Release, "European Commission and JT International (Japan Tobacco) sign 15-year Agreement to combat contraband and counterfeit cigarettes" (Dec. 14, 2007) http://europa.eu/rapid/pressReleases Action.do?reference=IP/07/1927&format=HTML&aged=0&language (last visited Mar. 29, 2010).

### 1.      *This Court is Empowered to Hear Claims for Equitable Relief.*

Plaintiffs seek equitable relief under multiple, independent sources of legal authority—state common law, federal common law, RICO, the All Writs Act, and U.S. policy—any one of which supports this Court's jurisdiction.  While asserting that equitable relief is unavailable under RICO (D. Br. 42), RJR overlooks the other bases for invoking this Court's equitable power.

In *Diageo*, this Court denied a motion to dismiss the equitable claims of foreign governments, finding that the viability of such claims should be determined "in an appropriate motion at the conclusion of discovery."  *Diageo*, 531 F. Supp. 2d  at 448.  The same result should obtain here.  If, however, this Court were to address the equitable claims on this motion, there is ample basis to hold that this Court has power to entertain the equitable claims.

### 2.      *The Common Law Empowers This Court to Grant Equitable Relief.*

This Court is empowered to enjoin RJR's organized crime and money-laundering schemes.  It is settled law that a foreign government may seek equitable relief from a U.S. court to enjoin, deter, and remedy cross-border frauds.  *See e.g.*, *Republic of Philippines v. Marcos*, 806 F.2d 344 (2d Cir. 1986) (affirming equitable relief arising from conversion scheme); *Republic of Philippines v. Marcos*, 862 F.2d 1355, 1364 (9th Cir. 1988) (*en banc*) (affirming injunctive relief predicated on equitable claim for constructive trust); *Republic of Panama v. Air Panama Internacional, S.A.*, 745 F. Supp. 669 (S.D. Fla. 1988) (granting injunction to preserve assets of Air Panama); *Republic of Turkey v. OKS Partners*, 797 F. Supp. 64 (D. Mass. 1992) (denying motion to dismiss claims for equitable replevin and constructive trust); *Provincial Gov't of Marinduque v. Placer Dome, Inc.*, 582 F.3d 1083, 1085 (9th Cir.  2009) (governmental claims, including public nuisance claim seeking injunctive relief, did not implicate act-of-state doctrine;

case remanded to state court) (Hon.  Frederic Block, Senior U.S. District Judge for the E.D.N.Y.,

sitting by designation), *pet'n for cert filed*, No. 09-944 (U.S. Feb. 10, 2010).  At a minimum, the

motion to dismiss such equitable claims should be denied, and the equitable claims should be

addressed "at the conclusion of discovery."  *Diageo*, 531 F. Supp. 2d at 447-448.

      Whether the availability of equitable relief is addressed in this motion or at the

conclusion of discovery, New York and federal common law authorize injunctive and other

equitable relief in this case.  *See, e.g.*, *People ex rel. Bennett v. Laman*, 277 N.Y. 368, 379-80

(1938) (courts possess the inherent equitable power to enjoin the "exercise of any trade or

business which is either illegal or dangerous to human life, detrimental to health, or the occasion

of great public inconvenience") (citation omitted); *see also Marcos*, 806 F.2d 344 (2d Cir. 1986)

(sustaining the government's conversion claim under state law and federal common law and

affirming equitable relief);  *United States v. Ira S. Bushey & Sons, Inc.*, 363 F. Supp. 110, 120

(D. Vt. 1973) (Oakes, Circuit Judge) (awarding permanent injunction in public nuisance case on

government's application; "the old law of public nuisance is being reshaped by the courts to fit

the 'realities of modern technology'") (citation omitted), *aff'd*, 487 F.2d 1393 (2d Cir. 1973);

*Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 326-31 (2d Cir. 2009) ("federal courts have

successfully adjudicated complex common law public nuisance cases [brought by government

plaintiffs] for over a century"); *Marcos*, 862 F.2d at 1359 (injunctive relief was proper in a civil

action brought by foreign government); *Diageo*, 531 F. Supp. 2d at 447-48 ("Defendants fail to

cite any authority that Plaintiffs are not entitled to equitable relief on their state law claims").

      This Court's power to award equitable relief is strongest where, as here, the remedy

would serve an overarching public interest.  "Courts of equity may, and frequently do, go much

farther both to give and withhold relief in furtherance of the public interest than they are

accustomed to go when only private interests are involved." *United States v. First Nat'l City Bank*, 379 U.S. 378, 383 (1965) (citation omitted).  In cases affecting the public interest, this Court has recognized that "equitable power to remedy past wrongs is broad."  *See Disability Advocates, Inc. v. Paterson*, 2010 WL 786657 at *1 (E.D.N.Y. Mar. 1, 2010) (Garaufis, J.) (citation omitted); *see also United States v. City of New York*, 2010 WL 318087 at *21 (E.D.N.Y. Jan. 21, 2010) (Garaufis, J.) ("The court recognizes that the City's deliberate and persistent failure to address the historically low numbers of minorities in the FDNY supports broader, rather than narrower, relief").

> **3.**      *Equitable Relief is Not Barred by the Revenue Rule or Penal Law Rule*.

Given the fundamental importance of equitable relief, courts on both sides of the Atlantic have consistently granted equitable relief to foreign governments, and have declined to apply the penal law rule or the revenue rule to bar such equitable claims.

U.S. courts have previously declined to bar equitable and other civil claims under the revenue rule or the penal law rule.  This Court has denied a motion to dismiss the equitable claims of foreign governments, finding that the viability of such claims should be determined "in an appropriate motion at the conclusion of discovery."  *Diageo*, 531 F. Supp. 2d at 447-48; *see also Chase Manhattan Bank, N.A. v. Hoffman*, 665 F. Supp. 73, 76 (D. Mass. 1987) (enforcing Belgian judgment in a foreign criminal case and declining to apply "penal rule").  Although it relies upon *Attorney General of Canada v. R.J. Reynolds*, 268 F.3d 103 (2d Cir. 2001), RJR overlooks the fact that the U.S. Solicitor General, in his *amicus curiae* brief in *Canada*, expressly carved out "equitable" claims from the United States' position that the revenue rule barred Canada's claim for collection of taxes as an element of damages under civil RICO.  *See* Brief for the United States as *Amicus Curiae* at 14-15 n.1, *Attorney General of Canada v. R.J. Reynolds*

*Tobacco Holdings, Inc.*, 537 U.S. 1000 (2002), No. 01-1317 (Oct. 2002).[10]  Nothing in *Canada*

impairs this Court's power to hear Plaintiffs' equitable claims under state common law.[11]

Consistent with its position in *Canada*, the U.S. government regularly seeks equitable

relief in foreign courts in criminal and civil cases in EU Member State courts, unfettered by the

revenue rule, penal law rule, or related ancient doctrines.  For example, in *United States SEC v.*

*Manterfield*, [2009] EWCA Civ 27 (Court of Appeal, Civil Division), the English Court of

Appeal emphasized that the penal law rule (and by implication the corollary revenue rule) should

not prevent international cooperation and access to the courts.  In 2007, the SEC commenced an

action in U.S. District Court against Glenn Manterfield, a UK citizen and resident, for defrauding

Taiwanese investors.  *See* SEC Litigation Release No. 20,872, 95 SEC Docket 189 (Jan. 28,

2009).  In 2008, the SEC applied to the UK High Court to enjoin the transfer of $1 million held

by Manterfield in the UK.  Manterfield opposed the application and argued that the SEC was not

entitled to injunctive relief because it was seeking to enforce "the penal law of a foreign State."

*See United States SEC v. Manterfield*, [2008] EWHC 1349 (QB) at ¶ 33.  The High Court ruled

that the claim was not barred by the penal law rule because the SEC had sought the "equitable

remedy" of disgorgement of ill-gotten gains, and consequently granted an injunction freezing

Manterfield's assets.  *Id.* at ¶ 39.  The Court of Appeal agreed that the penal law rule was

inapplicable because the SEC was "a regulatory body seeking to obtain 'disgorgement' or [was]

seek[ing] [injunctive] protection until an order of disgorgement could be obtained" and

---

[10] See http://www.justice.gov/osg/briefs/2002/2pet/6invit/2001-1317.pet.ami.inv.pdf (last visited March 29, 2010).

[11] The equitable claims seek injunctive and remedial relief for violation of U.S. domestic law—not enforcement of foreign tax or criminal law—and, therefore, the revenue and the penal law rules have no application.

dismissed the appeal.  *See United States SEC v. Manterfield*, [2009] EWCA Civ 27 at ¶ 23.  The

Court of Appeal stated:

> It is incontrovertible that fraudulent activity of the kind allegedly engaged in by
> Mr Manterfield is an international problem requiring international co-operation to
> prevent such wrong-doing and to penalize those who engage in it. . . .  Bodies like
> the SEC in the US and comparable institutions in other countries exist in order to
> further the objective of combating fraudulent conduct. In these circumstances it
> seems to me nothing to the point that the SEC is not funded by the British
> taxpayer and that the fraud took place in the United States and did not affect UK
> citizens.  Such parochial considerations do not require me in the exercise of my
> discretion to refuse the relief sought.

*Id*. at ¶ 33 (citation omitted).  *See also United States v. Levy*, [1999] Carswell Ont 926 (Ont. Gen.

Div.) (granting motion of U.S. and FTC to trace and freeze assets connected to telemarketing

scheme). [12]

    *Manterfield* reflects the U.S. government's ongoing practice of seeking equitable relief in

foreign courts, unaffected by the revenue rule or the penal law rule.  The U.S. Justice

Department, in particular, regularly seeks injunctive and other equitable relief in foreign courts

in criminal cases, including cases brought in EU Member State courts.  In April 2009, the U.S.

Department of Justice obtained a restraining order from a UK criminal court over $100 million in

assets allegedly acquired by R. Allen Stanford as part of a suspected $7 billion investment

---

[12] Consistent with *Manterfield* and *Levy*, the SEC has directly appeared in foreign courts in
several proceedings involving cross-border fraud.  For example, New Yorkers will recall Edward
"Crazy Eddie" Antar and his massive securities fraud in the 1980s.  The SEC obtained a
judgment for $73,496,432 against Antar in the District of New Jersey, and thereafter engaged in
a worldwide effort to locate and repatriate Antar's ill-gotten gains through litigation in
Switzerland (Geneva & Zurich) (*SEC v. Antar*, SEC Litigation Release No. 15,008, 62 SEC
Docket 1480 (Aug. 8, 1996))), the United Kingdom (*id.*), and Liechtenstein, Israel, and Canada
(*SEC v. Antar*, SEC Litigation Release No. 15,251, 63 SEC Docket 2054 (Feb. 10, 1997)).

fraud.[13]  The Justice Department's Civil Division has actively sought injunctive and other equitable relief in foreign courts.[14]

Arguing against application of the revenue and penal law rules, the United States has successfully pursued a claim for common law nuisance or restitution in the Canadian courts.  *See United States v. Ivey*, 139 D.L.R. (4th) 570, 574 (Ontario Court of Appeal 1996).  In *Ivey*, the United States argued that its action to enforce a U.S. judgment under CERCLA "may involve a claim by a foreign sovereign" but the claim should be cognizable because it "is derived from, and similar to, a claim for common law nuisance or restitution and is therefore, in substance, of a commercial or private law character."  (*See Ivey,* Respondent's Factum of the United States of America, No. C23578 at 26(3) (9 September 1996) (Ontario Court of Appeal).)  The Court of Appeal agreed, and held that the United States may seek to enforce a restitutionary and remedial judgment in action akin to "common law claim for nuisance" and the claim was not barred by the penal law rule, revenue rule or any corollary rule.  *See Ivey*, 139 D.L.R. (4th) at 574.

Just as the United States seeks injunctive relief and other equitable remedies in EU and other foreign courts, this Court should remain open to Plaintiffs' claims for equitable relief under basic principles of U.S. common law, and equitable claims are not barred by either the penal law

---

[13] *See* Press Release, Serious Fraud Office, "SFO Restrains $100M in Allen Stanford Case" (30 June 2009) at http://www.sfo.gov.uk/press-room/latest-press-releases/press-releases-2009/sfo-restrains-$100m-in-allen-stanford-case.aspx (last visited March 29, 2010).

[14] *See* Statement of Stuart E. Schiffer, Acting Assistant Attorney General, Civil Division, U.S. Department of Justice, Hearing Before the U.S. Senate Special Committee on Aging, Medicare Enforcement Actions: The Federal Government's Anti-Fraud Efforts, Serial No. 107-11 at 49, 62 (July 26, 2001) ("In appropriate civil cases [in foreign courts], [the United States] can seek to shut down boiler rooms, enjoin con-artists from telemarketing into the United States, and freeze corporate and individual assets for eventual restitution to victims of the fraud"); *see also* Press Release, Federal Trade Commission, "Internet Pyramid Operators, Fortuna Alliance, Could Return Over $5 Million to Consumers," (Feb. 24, 1997) (DOJ and FTC obtained a court order in Antigua freezing funds linked to a pyramid scheme).

rule or the revenue rule.[15]

### 4.    This Court Has the Inherent Power to Hear Plaintiffs' Equitable Claims.

Plaintiffs seek injunctive and other equitable relief under the All Writs Act (SAC ¶ 27), which provides for remedies akin to those available in the English Court of Chancery.  *Grupo Mexicano De Desarrollo v. Alliance Bond Fund*, 527 U.S. 308, 318 (1999).  The English Court of Chancery has long granted injunctive relief to prevent tortious conduct.  *See, e.g.*, *Bush v. Western*, Prec. Ch. 530, 24 Eng. Rep. 237 (1720) (injunction granted to enjoin diversion of water-course).  The doctrine of public nuisance, for example, has long been employed to restrain "interference with the operation of a public market."  *See* Restatement (Second) of Torts § 821B, cmt a (1979); Garrett, *The Law of Nuisances* at 2 (London 1908) ("In the time of Edward III, we find . . .  interference with a market dealt with as [a] nuisance[]") (footnote omitted); Brenner, *Nuisance Law and the Industrial Revolution* 3 Jour. Legal Stud. 403, 404 n. 2 (1974) (early English law provided that a monopoly, fair, or market "could be protected by a nuisance action").  Because the English Court of Chancery was empowered to enjoin tortious conduct before the American Revolution, this Court has the power to award equitable relief under the All Writs Act in this case.

State common law likewise empowers this Court to entertain Plaintiffs' equitable claims.  In diversity, substantive state law controls the state law claims.  Under New York law, courts possess the inherent equitable power to enjoin the "exercise of any trade or business which is either illegal or dangerous to human life, detrimental to health, or the occasion of great public

---

[15] Plaintiffs may not generally seek "injunctive relief compelling defendants to obey their own [foreign] tax laws," *European Community v. RJR Nabisco, Inc.*, 424 F.3d 175, 182 n.10 (2d Cir.

inconvenience." *See Bennett*, 277 N.Y. at 379-80.  "The power of the court to restrain acts which are dangerous to human life, detrimental to the public health and the occasion of great public inconvenience and damage is one that is possessed by all courts of equity."  *Id.* at 384; *accord New York Trap Rock Corp. v. Clarkstown*, 299 N.Y. 77, 84 (1949) (government unit may bring action to enjoin public nuisance on the ground that "[t]he right to exist necessarily implies the right to take such steps as are essential to protect existence").

Congress has not abrogated this Court's equitable power to combat tortious and other wrongful conduct under common law.  "Absent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction." *Califano v. Yamasaki*, 442 U.S. 682, 705 (1979); *accord Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) ("[u]nless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied"); *Armstrong v. Guccione*, 470 F.3d 89, 102 (2d Cir. 2006) (same).  Here, no clear statutory command restricts this Court's historic equitable powers. Plaintiffs therefore should be permitted to seek equitable relief.

### 5.    *U.S. Policy Favors Access to the Courts on Equitable Claims.*

On September 23, 2009, President Barack Obama spoke before the United Nations General Assembly in New York and called for a "new era of engagement with the world" based upon "the guiding principle of international cooperation."[16]  Three weeks later, U.S. Deputy Attorney General David W. Ogden appeared before the 78th Interpol General Assembly in

---

2005); however, this is a money-laundering case brought under U.S. domestic law, and that principle therefore does not apply.
[16] See Remarks By The President To The United Nations General Assembly (Sept. 23, 2009), http://www.whitehouse.gov/the_press_office/remarks-by-the-president-to-the-united-nations-

Singapore.[17]  Mr. Ogden recognized the serious and evolving challenges of cross-border crime where "[a] member of a transnational criminal organization can now victimize people and institutions in distant nations without ever physically entering those nations."  *Id.*  He articulated the U.S. policy of "a global partnership against international criminal organizations [which] requires each of us to have in place laws that allow us to enforce the criminal and non-conviction based judgments and freeze orders of other nations"—laws that, he noted, are already in place here.  *Id.*  This policy *invites* foreign governments to seek enforcement of foreign "criminal" judgments and equitable "freeze orders" in U.S. courts and thereby confirms that this Court can and should exercise jurisdiction over Plaintiffs' equitable claims.

### 6.   *RICO Does Not Dilute This Court's Power to Hear Equitable Claims.*

As this Court has recognized, the Supreme Court and the Second Circuit have yet to determine whether equitable relief is available to persons injured by a violation of RICO, and the issue should be deferred to "an appropriate motion at the conclusion of discovery."  *Diageo*, 531 F. Supp. at 448.  That approach should be adopted in this case also, particularly while proceedings on the general subject of equitable relief under RICO are pending before the Supreme Court.[18]

---

general-assembly/ (last visited Mar. 29, 2010).

[17] *See* Speech of Deputy Attorney General David W. Ogden, 78th Interpol General Assembly (Oct. 12, 2009), http://www.justice.gov/dag/speeches/2009/dag-speech-091012.html (last visited March 29, 2010).

[18] Defendants rely upon *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095 (D.C. Cir. 2009) (D. Br. 43); however, that case is before the Supreme Court at the petition stage.  *See United States v. Philip Morris USA, Inc.*, 566 F.3d 1095 (D.C. Cir. 2009) *petition for cert. filed*, 78 USLW 3501 (U.S. Feb. 19, 2010) (No. 09-978).

### 7.     The Complaint Properly Alleges Claims for Equitable Relief.

"Once a right and a violation have been shown, the scope of a district court's equitable

powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable

remedies."  *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971); *accord*

*Disability Advocates, Inc. v. Paterson*, 2010 WL 786657 at *1 (E.D.N.Y. Mar. 1, 2010)

(Garaufis, J.) (where a district court has found a violation, the scope of its "equitable power to

remedy past wrongs is broad") (citation omitted).[19]

"A district court has a wide range of discretion in framing an injunction in terms it deems

reasonable to prevent wrongful conduct."  *Springs Mills, Inc. v. Ultracashmere House, Ltd.*, 724

F.2d 352, 355 (2d Cir. 1983) (citation omitted).  Injunctive relief is also available to prevent

threatened, future harms.  *See* Pomeroy, *Equity Jurisprudence* § 1349 at 953 (5th ed. 1941) ("A

court of equity has jurisdiction to restrain existing or threatened public nuisances by injunction").

This lawsuit seeks to combat and deter conduct that poses grave and ongoing harm to

Plaintiffs, the United States, and their people.  RJR's illicit trade in cigarettes has funded terrorist

groups such as the PKK, which has attacked Plaintiffs' interests, property, and citizens.  (SAC ¶¶

80-83.)  Through its coconspirators, RJR paid the family of Saddam Hussein and others to allow

the PKK to import cigarettes into Iraq, in violation of U.S. law.  (SAC ¶ 80.)  This wrongdoing

---

[19] The fundamental principles of equity jurisdiction articulated by *Swann* and *Disability Advocates* have been applied in private cases involving illicit trade and business disputes.  *See, e.g., Forschner Group v. Arrow Trading Co.*, 124 F.3d 402, 406 (2d Cir. 1997) (injunction affirmed on basis of claims under the Lanham Act and unfair competition under New York common law).  Indeed, under *Swann* and other authorities, a court may "proscribe[] certain lawful conduct" to eradicate an illicit commercial scheme.  *See Philip Morris USA, Inc. v. Otamedia Ltd.*, 331 F. Supp. 2d 228, 246 (S.D.N.Y. 2004).  *Swann* has also been invoked in situations akin to public nuisance cases.  *United States v. Solvents Recovery Serv.*, 496 F. Supp. 1127, 1143 (D. Conn. 1980) (relying on *Swann* in action to abate and remedy allegedly unlawful

is part of a serious global problem; the "highly profitable illicit trade in cigarettes" is one method

by which terrorist groups, such as al Qaeda and Hezbollah, finance their illegal activities.  *See,*

*e.g.*, GAO, *Terrorist Financing* at 11 (GAO-04-163).

RJR's ongoing international money laundering poses a dangerous threat.  International

money laundering causes "unparalleled violence, corruption, and harm . . . in the United States

and abroad" and "constitute[s] an unusual and extraordinary threat to the national security of the

United States, foreign policy, and economy of the United States."  Executive Order No. 12,978,

60 Fed. Reg. 54, 579 (Oct. 21, 1995) (declaring a "national emergency" to deal with the threat of

international money laundering and narcotics trafficking).  In the face of this "national

emergency," President Clinton signed Presidential Decision Directive 42 and "ordered agencies

of the executive branch of the U.S. government to . . . work more closely with other governments

to develop a global response to this threat."  *See* PDD-42 (Oct. 21, 1995), cited in *U.S. Int'l*

*Crime Control Strategy,* at 4 (June 1998), http://clinton4.nara.gov/media/pdf/iccs.pdf (last

visited. Mar. 29, 2010).

As pled in the SAC, RJR's illicit trade, and fueling of organized crime, terrorist groups,

and money laundering, have injured Plaintiffs' business and property (i.e., commercial losses),

and this conduct should be enjoined.  Moreover, RJR's cross-border wrongdoing has harmed the

single marketplace created and maintained by the EU and Member States (and the participants

therein, including Member States), which gives rise to a claim for injunctive relief.   RJR's

scheme is continuing and threatens Plaintiffs with future injuries.  (*See, e.g.,* n.2, *supra*.)  Given

that Plaintiffs have pled legal "right[s]" that have been infringed by RJR's past and ongoing

---

groundwater pollution; "[a]s with any equity case, the nature of the violation determines the
scope of the remedy").

"violation[s]" of federal and state law, the equitable claims should proceed and the motion to dismiss should be denied.  *See Swann*, 402 U.S. at 15.

> **B.** **The Complaint Properly Pleads Claims for Damages.**

"Plaintiffs, in their commercial capacity, [may] bring federal and state civil tort claims." *Diageo*, 531 F. Supp. 2d at 401; *accord Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 318-19 (1977) (foreign governments are "entitled to prosecute any civil claim in the courts of the United States upon the same basis as a domestic corporation or individual might do"); *The Sapphire*, 78 U.S. 164, 167-68 (1870) (foreign governments have a constitutionally protected right of access to the courts on civil claims "without reference to the subject-matter of the controversy"); *In re Oil Spill by The Amoco Cadiz*, 954 F.2d 1279, 1314 (7th Cir. 1992) (France and French municipalities were entitled to recover damages, including the expense of salaries and equipment, incurred during an oil spill cleanup).

> **1.** ***Plaintiffs' Claims for Damages Are Cognizable Under Diageo.***

Plaintiffs assert several claims for damages (SAC ¶ 146); however, for the sake of brevity, this subsection addresses only those claims sustainable under *Diageo* or not specifically addressed there.

***Commercial Losses***.  Under the common law and RICO, 18 U.S.C. § 1964(c), Plaintiffs have properly alleged claims for damages.  Because there is no material difference between the commercial losses suffered by Plaintiffs in this case and those in *Diageo*, Plaintiffs' claims for commercial losses should go forward.  *See* Statement of Facts, *supra*.

Based on *Diageo*, and consistent with this Court's order allowing amendment of the Complaint, Plaintiffs sue in their commercial capacities, seeking recovery of specific, economic losses caused by Defendants' money-laundering scheme.  These include lost sales (SAC ¶

146(a)-(b)), reduced value of sales (*id.* ¶ 146(c)), lost profits (*id.* ¶ 146(d)), harm to Plaintiffs'

ability to compete in the United States and other markets (*id.* ¶ 146(e)), commercial losses of

Member States (*id.* ¶ 146(f)), and damage to Member States as manufacturers and distributors of

cigarettes, which includes diminution of the value of state-owned franchises (*id.* ¶ 146(g)).

Many Plaintiffs were active participants in the tobacco business during the relevant period (as

producers or sellers) and the economic harm to Plaintiffs' business interests arising from RJR's

scheme is clear and quantifiable.  (*Id.* ¶ 146(a)-(g).)  Plaintiffs' claims for commercial losses,

including "lost revenues and profits resulting from the enterprise's money laundering," are

cognizable.  *Diageo*, 531 F. Supp. 2d at 395.

Under *Diageo*, Plaintiffs may seek damages for commercial losses, without regard for the

penal law rule or the revenue rule.  *Diageo*, 531 F. Supp. 2d at 395 ("The revenue rule does not

bar Plaintiffs' claims for lost revenues and profits resulting from the enterprise's money

laundering"); *id.* at 400 ("Plaintiffs' alleged lost revenue and profit is a harm that Plaintiffs suffer

in their private capacity as commercial actors and, as a result, claims based on that harm are not

barred by the penal law rule").

**Specific Harm to the EU's Single Marketplace and Plaintiffs.**  This Court in *Diageo*

had no occasion to address the viability of claims alleging specific harm to the EU single

marketplace.  That claim is viable as pled.

RJR's ongoing scheme has damaged the single marketplace created, owned, regulated,

and operated by the EU and the Member States.  This single market was created, in part, by the

EU and the Member States for the economic benefit of the market participants (*i.e.*, Member

States) and is maintained as a free and open marketplace without internal borders.  (SAC ¶¶ 5,

201.)  RJR has damaged both the marketplace and Plaintiffs through its ongoing money-

laundering scheme.  (SAC ¶¶ 146(h); 201-08.)  As participants in the EU single market,

Plaintiffs have suffered commercial losses from RJR's exploitation of the market and money-

laundering scheme, all of which are cognizable.  *Diageo*, 531 F. Supp. 2d at 395.  Plaintiffs have

also incurred specific costs to remediate the damage to the EU market, including damages

associated with special audits; the convening of Europe-wide meetings and task forces to address

RJR's ongoing scheme; and other remedial actions addressing RJR's illicit money laundering.

(*See, e.g.*, SAC ¶¶ 146(v), 146(ii).)

Defendants' scheme to harm the EU marketplace is a classic public nuisance.  (SAC ¶¶

198-208.)  The individual and specific harms suffered by Plaintiffs by reason of RJR's illicit

conduct therefore give rise to a claim for damages.  *See Graceland Corp. v. Consolidated*

*Laundries Corp.*, 7 A.D.2d 89, 91 (1st Dep't 1958) ("one who suffers damage or injury, beyond

that of the general inconvenience to the public at large, may recover for such nuisance in

damages or obtain [an] injunction to prevent its continuance"), *aff'd*, 6 N.Y.2d 900 (1959); *Leo*

*v. General Electric Co.*, 145 A.D.2d 291, 294 (2d Dep't 1989) (same).

Plaintiffs' "common law nuisance" claim to recover for commercial losses and remediate

the economic injuries resulting from RJR's scheme is, in substance, "of a commercial or private

law character" that gives rise to a claim for compensation.  *See Ivey*, *supra*, U.S. Respondent's

Factum, at 26; *accord In re Oil Spill by The Amoco Cadiz*, 954 F.2d 1279, 1314 (7th Cir. 1992).

In light of the commercial or private law character of Plaintiffs' nuisance claims, those claims

are viable.  *Diageo*, 531 F. Supp. 2d at 395.

**Harms to Specific Proprietary Interests of Plaintiffs.**  Plaintiffs own property and may

seek damages for tangible harm to their property rights and interests.  *See Alfred L. Snapp & Son*

*v. Puerto Rico*, 458 U.S. 592, 601-02 (1982) (a government "is bound to have a variety of

proprietary interests" and "may, for example, own land or participate in a business venture" all of which interests may be protected "in court"); *Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 318-19 (1977).  RJR has harmed Plaintiffs' property interests.  Most notably, RJR's material support of foreign terrorist organizations such as the PKK and the former regime of Saddam Hussein has resulted in the destruction of public property.  (SAC ¶ 146(gg).)  The EU and Member States have otherwise incurred injury to their physical property by reason of RJR's scheme, including the destruction of or damage to government-owned automobiles and vessels.  (SAC ¶ 146(y).)  In addition, EU banks, including banks owned by Member States, incurred pecuniary harm by reason of RJR's money-laundering scheme (SAC ¶ 146(j)-(m)), including deprivation of transaction fees and other income.  (SAC ¶ 146(m)).  (*See also* SAC ¶ 146(ii) (expenses and costs incurred to address and remedy Reynolds' money-laundering activities).)  RJR's conduct has damaged the EU's single marketplace.  (SAC ¶¶ 146(h), 201-08).  These claims for compensation are of a "commercial or private law character" (*Ivey*, Respondent's Factum, *supra*), and Plaintiffs' claims for compensation for injuries to their business and property are viable.  *Diageo*, 531 F. Supp. 2d at 395.

## 2. *The Revenue and Penal Law Rules Should Not Bar Plaintiffs' "Sovereign" Claims for Damages.*

As discussed above, the revenue and penal law rules do not affect Plaintiffs' equitable claims (§ I.A, *supra*), or claims for "commercial losses" and other non-sovereign or proprietary losses (§ I.B(1), *supra*).  By failing to address those claims in detail, RJR has essentially conceded the point.

***Plaintiffs Do Not Seek to Enforce Foreign Public Law.***  The revenue and the penal law rules should not be expanded to cover Plaintiffs' "sovereign" claims for damages.  RJR incorrectly characterizes Plaintiffs' action as seeking "enforcement of foreign public laws."  (D.

29

Br. 1.)  In fact, and as pled, the action is predicated on *U.S.* domestic law, against a *U.S.* company, for illegal and tortious conduct on *U.S.* soil.[20]  It does not seek to enforce a foreign criminal or tax judgment.  It does not seek to enforce foreign criminal or revenue laws.   The revenue rule and penal law rule should not apply.  Recent developments reinforce this conclusion.

***Treaty Law Supports Access to the Courts.***   Under treaty law, this Court may entertain claims for damages seeking to combat and remedy harms arising from organized crime, money laundering and terrorism.  In 2004, the Second Circuit recognized that the "Palermo Convention of 2000, Vienna Convention of 1988, and Joint EU-U.S. Ministerial Statement on Combating Terrorism (2001) all express a policy of cooperation and reciprocal access to foreign and domestic courts in order to combat organized crime and terrorism."  *European Community v. RJR Nabisco, Inc.*, 355 F.3d 123, 136 n.7 (2d Cir. 2004) (citations omitted).  RJR overlooks this ruling.  Far from barring "claims based on alleged money laundering" (D. Br. 20-21), treaty law allows for "reciprocal access to foreign and domestic courts in order to combat organized crime and terrorism."  *Id.* at 136 n.7.  Now that the United States has ratified the Palermo Convention, the Second Circuit's ruling applies with greater force,[21] and the penal law rule and revenue rule should not bar claims to combat and remedy organized crime, money laundering, and terrorism.[22]

_____

[20] The Second Amended Complaint alleges that the decision-making and key acts of the conspiracy occurred in New York.  (*See* SAC ¶¶ 51, 74, 133, 135 ("The vast majority of the activities of the RJR DEFENDANTS that are the subject matter of this complaint, including management decisions and direction of the schemes, are conducted by the RJR DEFENDANTS in the United States and, more particularly, from the RJR DEFENDANTS' offices in the State and City of New York.").)

[21] The Second Circuit noted that the Palermo Convention was "unratified by the United States" as of its decision in 2004.  *Id.* at n.7.  The United States ratified the Palermo Convention on November 3, 2005.  In cases seeking to combat organized crime and money laundering, State Parties, including the United States, should provide the widest possible judicial assistance and

***DOJ Policy Supports Reciprocal Judicial Cooperation.*** RJR builds its motion on 19th century case law (D. Br. 9) while overlooking the Justice Department's most recent and authoritative policy statement, supporting the ability of U.S. courts to hear cases involving foreign law. (*See* § I.A.5.) On October 12, 2009, Deputy Attorney General Ogden articulated the U.S. policy calling for "a global partnership against international criminal organizations" which requires, *inter alia*, reciprocal enforcement of "criminal and non-conviction based judgments and freeze orders of other nations." *See* n. 17, *supra*. This 2009 policy statement—confirming an open door to enforcement of foreign criminal judgments and other foreign orders in U.S. courts—undermines RJR's assertion that the revenue rule and penal law rule should be broadly applied to bar any claim that might be characterized (correctly or incorrectly) as "enforcement of foreign public law." (D. Br. 1.)[23]

---

cooperation to Plaintiffs (art. 18); assistance to those injured by organized crime and money laundering (art. 25(1)); and secure equitable relief such as "restitution" from the offending parties (art. 25(2)). The Convention specifically undermines the revenue rule by providing that cross-border assistance cannot be denied in "fiscal" matters (art. 18(22)). It also renders the penal rule inapplicable by calling for reciprocal assistance, cooperation, and equitable relief in organized crime and money laundering cases.

[22] Reynolds also argues that *Canada's* treaty analysis should foreclose access to the courts in this case (D. Br. 21); "[t]his reasoning, however, was called into question in the Supreme Court's decision in *Pasquantino.*" *See Diageo*, 531 F. Supp. 2d at 398 n.10, *citing European Community v. RJR Nabisco*, 424 F.3d 175, 182 n.9 (2d Cir. 2005).

[23] There should be no doubt that the Plaintiffs' equitable claims, and damages claims for commercial losses and other proprietary or non-sovereign injuries, are not barred by the revenue or the penal law rules. In addition, in light of the treaty considerations and policy considerations described above, this Court should not consider dismissing Plaintiffs' "sovereign" claims for damages without first soliciting a statement of position from the U.S. State Department as to whether it "consents" to allowing Plaintiffs access to the Courts for such sovereign claims. The Second Circuit has made it clear, on repeated occasions, that "sovereign" claims can be heard where the executive branch "indicate[s] its consent to the suit by . . . submitting a statement from the State Department . . . ." *European Community v. RJR Nabisco, Inc.*, 355 F.3d 123, 132 (2d Cir. 2004); *European Community v. RJR Nabisco, Inc.*, 424 F.3d 175, 181 (2d Cir. 2005).

## II.   PLAINTIFFS HAVE ADEQUATELY PLED CAUSATION UNDER BOTH RICO AND THE COMMON LAW

### A.   Plaintiffs' RICO Allegations Are Sufficient to Allege Proximate Cause.

#### 1.   *Diageo Is Still Good Law.*

In *Diageo*, 531 F. Supp. 2d 365, this Court so thoroughly addressed and analyzed the law of RICO causation that there is no need to reiterate the analysis and conclusions here.  The pleadings and the underlying facts in *Diageo* are so similar to this case that *Diageo* clearly controls the issue of RICO causation.[24]  (*See* Statement of Facts at 9-13.)

Arguing that the SAC fails to allege that the money-laundering scheme proximately caused Plaintiffs' competitive losses, RJR contends that *Diageo* no longer remains good law.  In fact, *Diageo* is consistent with the Supreme Court's recent decision in *Bridge v. Phoenix Bond & Indemnity Co.,* 128 S. Ct. 2131 (2008), and is not undercut by *Hemi Group, LLC v. City of New York*, 130 S. Ct. 983 (2010), *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) or the Circuit Court opinions cited by Defendants.

*Hemi* did not change the law regarding proximate cause and does not conflict with or call into question this Court's reasoning in *Diageo*.  In *Hemi*, the City of New York brought civil RICO actions against several out-of-state cigarette retailers alleging that the City suffered injury as a result of the defendants' Internet sale of cigarettes to city residents without proper reporting under the Jenkins Act.  The Supreme Court concluded that the Jenkins Act required the defendants to file reports only with the State, not the City, and the City's harm was directly caused by the customers' failure to pay taxes. The Supreme Court declined to extend RICO liability to situations "where the defendant's fraud on a third party (the state) has made it easier for a fourth party (the taxpayer) to

cause harm to the plaintiff (the City)." *Hemi*, 130 S. Ct. at 990.  In contrast, Plaintiffs here allege that RJR actively controls, manages, and operates a money-laundering enterprise that directly injures them by diminishing Plaintiffs' profits and market share.  As in *Diageo*, no intervening, independent actors break the causal chain that originates with RJR's RICO violation.

Thus, RJR should not be heard to contrast this Court's determination regarding intervening cause in *Diageo* and the Supreme Court's comments in *Hemi*.  In *Diageo*, this Court determined that the plaintiffs had adequately pled a money-laundering scheme in which the other participants did not act independently of the *Diageo* defendants but instead were managed, directed, and/or controlled by those defendants for the purpose of laundering money.  *Diageo*, 531 F. Supp. 2d at 437-38.[25]  The *Hemi* court was concerned with the plaintiff's attempt to broaden the scope of entities directly injured by the defendants' RICO violation merely by broadly defining the scheme so as to embrace remote victims.  This Court in *Diageo* did not expand proximate cause beyond its traditional RICO boundaries in that manner.

Likewise, *Diageo's* proximate cause ruling did not impermissibly turn on considerations of foreseeability as RJR suggests.  Instead, consistent with Second Circuit precedent, this Court merely considered foreseeability as one additional factor in its proximate cause analysis.  In fact, the fundamental basis for this Court's ruling in *Diageo* was a finding of direct injury which meets the Supreme Court's standard.  *Diageo* at 432, 435-36.  Further, the Second Circuit's foreseeability requirement, as applied by this Court in *Diageo*, does not expand the "directness" requirement recognized in *Anza v. Ideal Steel Supply Corp.*, 126 S. Ct. 1991, 1998 (2006), and reiterated in

---

[24] In the event the Court finds that additional allegations are necessary to support Plaintiffs' RICO claims, Plaintiffs would request leave to amend to make those allegations.

[25] Plaintiffs similarly allege herein that Defendants through their conduct dictate the price of cigarettes throughout the distribution chain.  (*See* SAC ¶¶ 146(c), 172.)

*Hemi*.  *See Abrahams v. Young & Rubicam, Inc.*, 79 F.3d 234, 237 (2d Cir. 1996) (plaintiffs should be in the category the statute meant to protect, and the harm should be mischief the statute sought to avoid).  *Diageo* at 434.

Finally, neither *Iqbal* nor *Hemi* cast doubt on this Court's determination that a proximate-cause dismissal based on the pleadings was inappropriate in *Diageo*.  *Iqbal* makes clear that all factual allegations of a complaint must be taken as true for purposes of a motion to dismiss.  *Iqbal*, 129 S. Ct. at 1949-50.  If those factual allegations make a plausible claim from which the court can draw the reasonable inference that the defendant is liable for the misconduct alleged, dismissal is forbidden.  *Id.* at 1949.  In *Diageo*, as here, the plaintiffs made detailed factual allegations, not legal conclusions or threadbare, formulaic recitations of the elements of their causes of action.  Likewise, the *Diageo* plaintiffs, as here, alleged a plausible claim that they were directly harmed by the defendants' misconduct.  While the exact measure of that damage was not known, lack of mathematical certainty as to damages is not a ground for dismissal at the pleadings stage.  *See Bridge*, 128 S. Ct. at 1236 n.3.  Nor does RJR's contention that providing damages may be a "daunting task" (D. Br. 22, 28) qualify as a ground for dismissal.  *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 476 (2d Cir. 2006) (on motion to dismiss, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim"; dismissal is improper even if the pleadings reveal that recovery would be "very remote and unlikely").  This Court properly allowed the *Diageo* plaintiffs to develop their damages theory through discovery and expert testimony.  The same result should follow here.

### 2.    *Competition Does Not Preclude Causation.*

RJR argues that the presence of competitors in the marketplace defeats Plaintiffs' theory of causation.  Recent case law refutes this notion.  In *Bridge v. Phoenix Bond & Indemnity Co.*, 128 S.

Ct. 2131 (2008), the Supreme Court unanimously found that competitors, who were injured by the defendants' fraudulent manipulation of a rotating tax lien auction, had adequately alleged that the scheme proximately caused their injuries.  The plaintiff in *Bridge* complained that the defendants' conduct enabled them to obtain a "disproportionate share of liens," "depriv[ing] them and other bidders of their fair share of liens and the attendant financial benefits."  *Bridge*, 128 S. Ct. at 2136. This "fair share" at its simplest would be a function that takes into account the number of legitimate participants in the rotational mechanism and the number of bids to be awarded.  Unfairly passed-over competing bidders were allowed to sue for their lost "fair share" and the financial benefits stemming therefrom.

Here, Plaintiffs similarly seek their "fair share" of the market, represented by their "fair share" of sales they would have made but for RJR's money laundering.  The determination of each plaintiff's "fair share" in this case would be no more difficult than it would be in *Bridge* or in *Diageo*.  Although RJR complains (as did the *Diageo* defendants), that determination of the loss would be too attenuated, this Court recognized that proof of the exact measure of those losses at the pleading stage was unnecessary:

> [T]he court has no way of knowing what facts will emerge in discovery or what methodologies the parties' experts will use to prove and disprove damages.  For instance, it is entirely possible that Defendants possess market analyses that reach conclusions as to the effects of key market variables, such as consumer preferences, Colombian taxes, and elasticity of demand.  To the extent Plaintiffs simply seek to use Defendants' real-time market analyses, it may be very simple for Plaintiffs to prove at least some level of damages.  Similarly, it very well may be that Plaintiffs' and Defendants' experts share key assumptions or methodologies that greatly simplify many of the problematic issues raised in *Anza*.

*Diageo*,  531 F. Supp. at 436.  In other words, RJR's objections go to weight, not dismissability.

The Court in *Bridge* also recognized that absence of mathematical certainty as to damages at the pleading stage should not foreclose recovery so long as the plaintiff alleges a factually based claim of direct injury.  *See Bridge*, 128 S. Ct. at 1236 n.3 ("While a precise understanding of the county's system may be necessary to calculate respondents' damages, nothing in our disposition turns on this issue.  For present purposes, it suffices that respondents allege they "suffered the loss of property related to the liens they would have been able to acquire, and the profits flowing therefrom, had [petitioners] not implemented their scheme and acquired liens in excess of their appropriate share through their violation of the County Rule.")

"Competitive losses," which were found to be actionable under RICO in *Bridge* and *Commercial Cleaning Servs., LLC v. Colin Serv. Sys., Inc.*, 271 F.3d 374, (2d Cir. 2001), require just that: "competition."  Thus RJR's argument that somehow the existence of "competition" defeats the notion of causation itself does not hold and is inconsistent with *Commercial Cleaning Services*, *Bridge*, this Court's ruling in *Diageo*, and even *Anza*.  The key factor therefore is not the existence of competition, but to determine on which side of the spectrum—with *Diageo*, *Commercial Cleaning*, and *Bridge* on one side and *Anza* on the other side—the instant case lays.  For the reasons enunciated by this Court in *Diageo*, this case, with analogous plaintiffs who have suffered analogous injury via an analogous scheme (indeed, the Plaintiffs have alleged that these Defendants sell to some of the *very same distributors* that deal in the money laundering-liquor cycle, (*see* SAC ¶ 45, 105-106), lies closer to *Diageo*, *Commercial Cleaning*, and *Bridge* than to *Anza*.

Further, as in *Diageo*, there exists no more directly injured party than Plaintiffs who can be relied upon to vindicate the fraud.  In *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258 (1992), the Supreme Court found that SIPC could not sue because its injury was derivative of the injury to the directly injured broker-dealers, who could be relied upon to bring suit to

Case 1:02-cv-05771-NGG-PK   Document 87   Filed 04/30/10   Page 48 of 63 PageID #: 2082

vindicate their interests.  In *Anza*, and most recently in *Hemi*, the Supreme Court reasoned that the

directly injured party, the State of New York, could be relied upon to sue to vindicate its interests.

The plaintiff's injury in those cases thus was only derivative of the direct injury to the State of New

York.  Here, there is no party more directly injured, to whose injury Plaintiffs' claims would be

derivative.

      *Bridge*, and for that matter *Hemi*, refute RJR's assertion that whether more directly injured

parties exist is no longer an important factor in the "directness" analysis.  *Bridge*, 128 S. Ct. at 2144

(noting that "here, unlike in *Holmes* and *Anza*, there are no independent factors that account for

respondent's injury, there is no risk of duplicative recoveries by plaintiffs removed at different

levels of injury from the violation, and no more immediate victim is better situated to sue").  The

unanimous Court further noted that "indeed, both the District Court and the Court of Appeals

concluded that respondent and other losing bidders were the only parties injured by petitioners'

misrepresentations.").  The same was also true in *Hemi*, where the Court noted that "[o]ne

consideration we have highlighted as relevant to the RICO 'direct relationship' requirement is

whether better situated plaintiffs would have an incentive to sue."  *Hemi*, 130 S. Ct. at 990.

      Accordingly, this Court's consideration of this factor in *Diageo* as part of its proximate

cause analysis was proper.  As this Court correctly reasoned, "[t]he instant case is similar to

*Commercial Cleaning* in that there is no person who has been injured more directly than Plaintiffs.

As a result, if Plaintiffs are not permitted to bring the instant claim, it would appear that Defendants'

money-laundering enterprise would not give rise to an actionable civil RICO claim."  *Diageo*, 531

F. Supp 2d. at 433; *accord Commercial Cleaning*, 271 F.3d at 385 ("There is no class of potential

plaintiffs who have been more directly injured by the alleged RICO conspiracy than the defendant's

business competitors, who have a greater incentive to ensure that a RICO violation does not go

undetected or unremedied, and whose recovery would indirectly cure the loss suffered by these plaintiffs."); *see also Bridge*, 128 S. Ct. at 2144 (there was "no more immediate victim better situated to sue").  In sum, this case rests securely on the *Commercial Cleaning*, *Bridge*, and *Diageo* side of the spectrum and well away from *Anza*.

    **B.**    **Plaintiffs Properly State Claims Under the Common Law.**

The SAC alleges seven common law claims which contain all of the required elements, including proximate cause.  To the extent the Court finds any individual count to be inadequate in any way, Plaintiffs should be granted leave to amend and correct any inadequacy.

    **1.**    ***Plaintiffs Have Properly Pled Proximate Cause Under The Common Law.***

Plaintiffs' common law allegations are sufficient to establish proximate cause.  First, common law proximate cause is a question of fact that should not be decided on the pleadings. *See Kriz v. Schum*, 75 N.Y.2d 25, 34 (1989) ("because the determination of legal causation turns upon questions of foreseeability and what is foreseeable and what is normal may be the subject of varying inferences, as is the question of negligence itself, these issues generally are for the fact finder to resolve) (citation and internal quotes omitted); *Kingsland v. Erie County Agr. Soc.*, 298 N.Y. 409, 424 (1949) ("The issue of proximate cause was also properly left to the jury").

Where, as here, plaintiffs allege common law claims and RICO claims, courts must evaluate the state-law claims separate and apart from the RICO claims.  This is because common law claims need not meet the "more stringent showing of proximate cause" required by RICO. *See Moore v. Paine Webber, Inc.*, 189 F.3d 165, 179 (2d Cir. 1999) (Calabresi, J., concurring) ("at common law, the element of foreseeability is generally satisfied by a showing that the plaintiff was in a foreseeable category of persons who might be harmed"); *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 285 n.5 (2d Cir. 2006) (same); *Desiano v. Warner-Lambert Co.*, 326 F.3d

339, 348 (2d Cir. 2003) (same); *Abrahams v. Young & Rubicam*, 79 F.3d 234, 239 (2d Cir. 1996)

("We are unable to say that [plaintiff] can prove no set of facts based on his complaint that would

entitle him to relief on his negligence claim" and "the RICO ruling [on causation] is not

dispositive of a negligence claim").[26]

  State common law claims may be brought where the alleged injury incurred is a direct or

indirect consequence of a defendant's acts or omissions. *See, e.g.*, Restatement (Second) of

Torts, § 824 cmt. B ("liability . . . arises because one person's acts set in motion a force or chain

of events resulting in the invasion" and such "acts may be a direct and immediate cause of the

invasion . . . or they may be an indirect cause of the invasion"); *NAACP v. AcuSport, Inc.*, 271 F.

Supp. 2d 435, 497 (E.D.N.Y. 2003) ("Here, where the welfare and safety of an entire community

is at stake, the cause need not be so proximate as in individual negligence cases").

  Under common law, causation may be established through acts of a defendant's

independent contractors, *State v. Schenectady Chems. Inc.*, 103 A.D.2d 33, 479 N.Y.S.2d 1010,

1014 (3d Dep't 1984); agents, Restatement (Second) of Torts, § 824 cmt. C; licensees, *id.* cmt.

D; and co-conspirators, *Simmons v. Everson*, 124 N.Y. 319 (1891); *see also Kashi v. Gratsos*,

790 F.2d 1050, 1054 (2d Cir. 1986) ("Proof of a civil conspiracy under New York law connects a

---

[26] Disregarding Second Circuit authority, RJR argues that the common law fraud claims "are
subject to the same stringent proximate-cause standards that govern RICO claims." (D. Br. 44-
45 citing *Laborers Local 17 Health & Benefit Trust Fund v. Philip Morris, Inc.*, 191 F.3d 229,
242-43 (2d Cir. 1999).) *Laborers Local 17* is inapposite. As the Second Circuit subsequently
explained, *Laborers Local 17* "arose under RICO, and therefore the applicable standard of
causation . . . was the standard that was established by that federal statute." *Desiano v. Warner-
Lambert Co.*, 326 F.3d 339, 348 (2d Cir. 2003). *Desiano* reaffirmed the basic rule that common
law claims must be assessed under common law standards of proximate cause, not RICO
standards. *Desiano*, 326 F.3d at 348. *Laborers Local 17* thus should not be applied to state law
claims. *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 344 F.3d 211, 219 (2d
Cir. 2003) ("[w]e have subsequently cautioned against the broad application of the proximate

defendant with the transaction and . . . charges him with the acts and declarations of his coconspirators . . . and exposes that defendant to joint and several liability for the victim's losses") (citations and internal quotes omitted).  At the pleading stage, under common law, a plaintiff need only allege facts showing that a defendant's acts (or those of its agents, contractors, licensees, or co-conspirators), "set in motion a force or chain of events resulting in the [harm]."   Restatement (Second) of Torts, § 824 cmt. B.

Plaintiffs have adequately pled causation under those common law standards.  They allege that Reynolds' tortious scheme—carried out with and through agents and coconspirators—caused foreseeable commercial losses and other proprietary harm to Plaintiffs. (*See, e.g.*, SAC ¶¶ 198-208.)   Accordingly, the motion to dismiss the common law claims should be denied.

## 2. *Fraud.*

The SAC alleges two general bases for Plaintiffs' fraud claim.  First, Plaintiffs allege that RJR, along with its coconspirators, falsified the shipping and billing records for their cigarettes and these misrepresentations were intended to and did mislead the Plaintiffs as to the destination and value of those cigarettes.  (SAC ¶¶ 49(h), 88, 89, 116, 190.)  These fraudulent representations were an integral part of RJR's money-laundering scheme because they concealed the shipments' true recipient and allowed the cigarettes to be shipped to forbidden destinations. Misrepresentation of the shipment's value allowed RJR to reduce dramatically the surety bonds on those shipments, which in turn allowed RJR to unfairly reduce its costs.  (SAC ¶ 88.)  As a

cause requirement set forth in *Laborer's Local 17* to state statutes, noting that the proximate cause requirements of RICO [are] more stringent than those of most states") (citation omitted).

result of these fraudulent misrepresentations by RJR and coconspirators, the money-laundering

scheme was furthered, causing Plaintiffs to lose revenues and profits.

The SAC also alleges that RJR falsely represented to Plaintiffs that it was unable to

identify to whom its products were sold.  (SAC ¶¶ 49 (k), 86, 87, 193-94.)  Likewise, through

trade associations such as ICOSI, EEC Task Force on Consumerism, EDFC, and CECCM, RJR

falsely represented to Plaintiffs that it was not involved in illegal activities.  (SAC ¶ ¶ 90, 117,

193-94.)  These misrepresentations furthered the money-laundering scheme and damaged

Plaintiffs by hobbling their ability to combat RJR's money-laundering scheme.  (SAC ¶¶  85-87.)

These allegations of fraud satisfy the pleading requirements of Federal Rule 9(b) because

it is sufficient if the complaint pleads the general content of the misrepresentation without stating

the exact words used.  *Giuliano v. Everything Yogurt, Inc.*, 819 F. Supp. 240, 244 (E.D.N.Y.

1993) (citing cases).  This is especially true where relevant information is exclusively in the

defendants' possession.  *Landy v. Mitchell Petroleum Technology Corp.*, 734 F. Supp. 608, 622

(S.D.N.Y. 1990); *Grunwald v. Bornfreund*, 668 F. Supp. 128, 131 (E.D.N.Y. 1987).  Rule 9(b)

motions should be denied if the pleading contains some allegations of fraud.  *Center Cadillac,*

*Inc. v. Bank Leumi Trust Co.*, 808 F. Supp. 213, 228 (S.D.N.Y. 1992); *Giuliano*, 819 F. Supp. at

244.

Against that legal background, the 273-paragraph, 142-page SAC is sufficiently specific

to inform RJR of the claims against it.  Plaintiffs allege facts regarding a number of fraudulent

transactions that were an integral part of Defendants' money-laundering scheme.  They identify

participants, dates and places for each.  For example, Plaintiffs reasonably identify transactions

involving RJR and Giovannex in which RJR intentionally misrepresented the destination of their

cigarettes as a part of their money-laundering scheme. The allegations include dates (August

2004, February 2005, March 2005 and April 2005), the makers of the misrepresentations (Reynolds American Defendants and Giovannex) and the general content of the misrepresentation (destination outside the EC).  (SAC ¶ 88, 105.)  Similarly Plaintiffs identify fraudulent transactions with Maritrade giving specific dates of payments, participants and general content.  (SAC ¶ 107.)  Plaintiffs also identify by date and place transactions involving shipments of cigarettes to Iraq which necessitated fraudulent statements regarding the destination of said cigarettes.  (SAC ¶ 78, 89.)  This complaint amply satisfies Rule 9(b); if the Court concludes otherwise, Plaintiffs' specifically request an opportunity to address any concerns through amendment.

### 3.    *Public Nuisance.*

RJR argues that Plaintiffs' public nuisance claims are not cognizable because they are brought in Plaintiffs' *parens patriae* capacity.  *See Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332 (1st Cir. 2000).  On its face, the SAC is not predicated on the *parens patriae* doctrine. Plaintiffs bring the public nuisance claims to protect their own commercial and proprietary interests, in addition to the public interest.  *See Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 340, 368 (2d Cir. 2009) (public entities and land trusts have standing in their proprietary capacities as property owners to assert claims to abate a public nuisance).

Specifically, a state has a legal and equitable right to pursue its proprietary interests. *Snapp*, 458 U.S. at 601-02.  As the SAC amply details, these are exactly the interests that Plaintiffs seek to vindicate.  In particular, Plaintiffs have alleged damages in their commercial capacity including, without limitation, lost sales, reduced value of sales, and lost profits.  (SAC ¶ 146 (a)-(g).)  The SAC also seeks redress for damages to the single marketplace that the EU and Member States created, own, operate, and regulate.  (SAC ¶¶ 146(h), 201, 203, 212, 215.)  Thus,

Plaintiffs have a proprietary interest in protecting the marketplace from the harm being caused by RJR's money-laundering scheme.  Finally, the SAC seeks damages for tangible harm to its property rights and interests including, but not limited to, injury to government-owned property such as automobiles and vessels.  (SAC ¶ 146(y).)

As noted above, even if the Court were to find that Plaintiffs' public nuisance claims also seek to vindicate certain quasi-sovereign interests encompassed by *parens patriae* standing, *DeCoster* itself recognized that such **"quasi-sovereign"** claims were appropriate where "there is a clear indication of intent to grant such standing expressed by the Supreme Court or by the two coordinate branches of government."  *DeCoster*, 229 F.2d at 336.[27]  The Executive Branch and Congress have taken a clear position as to cross-border organized crime and money laundering— through the Palermo Convention and otherwise—and the importance of redressing the harm that results to a state's quasi-sovereign interests in protecting it citizens.  As such, this case falls into the exception recognized in *DeCoster*.

Since Plaintiffs have standing in their sovereign and non-sovereign capacities to assert their public nuisances claims, Counts VII and VIII should not be dismissed.

### 4. *Negligence.*

RJR argues that Plaintiffs cannot satisfy the duty element of a negligence claim. Defendants, however, ignore the unique circumstances created by their absolute control over their distribution and payment practices and the direct and foreseeable result those practices have on the Plaintiffs.  Although mere foreseeability of harm may not give rise to a duty, New York courts have recognized duties predicated on the danger of a third person's tortious or criminal

---

[27] Plaintiffs do not concede that DeCoster's holding regarding a foreign state's standing to bring parens partiae claims is correct but in light of the fact that Plaintiffs have clearly stated non-

misconduct where a relationship between the defendant and the third party wrongdoer provides the defendant with the ability to minimize the risk because of the degree of control it exercises over the third party. *See Johnson v. Bryco Arms*, 304 F. Supp. 2d 383 (E.D.N.Y. 2004); *see also*, *Ileto v Glock, Inc.*, 349 F.3d 1191, 1204-05 (9th Cir. 2003) (plaintiffs' allegations that defendants' marketing and distribution strategies were designed to increase firearms sales to illegal buyers were sufficient to meet the requirements for establishing a duty of care).

Here, Plaintiffs allege facts showing that RJR knew or should have known it was distributing its cigarettes to criminals but also allege that Defendants have the actual ability to control that distribution. (SAC ¶¶ 23, 43-45, 49-50, 56-58, et al.)  Those allegations support a duty on RJR's part to avoid doing business with narcotics traffickers and money launderers.

Plaintiffs' negligence claims differ materially from those in *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222 (2001).  First, *Hamilton* was decided on summary judgment *after* Plaintiffs were unable to adduce evidence that (1) "defendants were a direct link in the causal chain that resulted in plaintiffs' injuries"; (2) "defendants were realistically in a position to prevent the wrongs"; or (3) that "the manufacturer knows or has reason to know those distributors are engaging in substantial sales of guns into the gun-trafficking market on a consistent basis." *Hamilton*, 750 N.E.2d at 1062, 1064.  Having pled all these points with factual support, Plaintiffs should be permitted to develop further record proof to establish their claims.

Second, *Hamilton* itself recognized that a duty may arise where there is a relationship between a defendant and a third-person tortfeasor that encompasses defendant's actual control of the third person's actions.  *Id.* at 1061.  Plaintiffs here have alleged a relationship between RJR

---

parens patriae claims, it would seem appropriate to defer full argument on that issue.

and the other participants in the money-laundering scheme in which RJR exercises actual control over those entities.  (*See, e.g.*, SAC ¶¶ 49, 56, 69.)

Finally, despite RJR's protests to the contrary, personal injury or property damage is not necessary for a negligence claim, and even if it were, Plaintiffs have alleged property damage. First, as acknowledged by Defendants, the rule against recovering damages for economic loss does not apply when the plaintiff alleges property damage.  In such cases, plaintiffs can be compensated not only for physical damage to their property but also for economic losses, such as lost profits, which are caused by the defendant's acts of negligence.  *See, e.g., Dunlap Tire and Rubber Corp. v. C Corp.*, 53 A.D.2d 150, 385 N.Y.S.2d 971 (1976).  Plaintiffs herein allege that they have suffered property damage as a result of RJR's negligence. (SAC § 146(y).)   As such, Plaintiffs' action in tort is not foreclosed by the nature of their damages and trial is necessary to determine the extent to which Defendants' negligence caused said damages.

Second, the economic-loss rule is not always applied in negligence cases.  *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 16 (2d Cir. 2000).  Instead, the economic-loss rule was developed as a way of enforcing the dictates of privity in product liability law and preventing tort remedies from eliminating the customary limitations involved in cases addressing the sale of goods.  *Id.*  Thus, courts have applied the economic-loss rule to prevent the recovery of damages that are inappropriate because they actually derive from breach of contract as opposed to tort.  *Id.*  In this case, the economic-loss rule does not bar Plaintiffs' negligence claim because Plaintiffs have not alleged the existence of a contractual relationship between the parties.

### 5.    *Negligent Misrepresentation.*

RJR argues that Plaintiffs' negligent misrepresentation claim is defective because the Plaintiffs' lack a "special relationship of trust and confidence" with RJR.  However, in first

formally recognizing recovery for negligent misrepresentation, the Court in *International Products Co. Erie Railway Co.*, 244 N.Y. 331, 338, (1927), explained that such a "special relationship" exists whenever "in morals and good conscience the one has the right to rely upon the other for information, and the other giving the information owes a duty to give it with care." Further the issue of whether a "special relationship" exists sufficient to state a cause of action for negligent misrepresentation should be left to the finder of fact. *AFA Protective Sys., Inc. v. Am. Tel. & Tel. Co., Inc.*, 57 N.Y.2d 912 (1982). Plaintiffs herein have alleged facts sufficient to establish a special relationship such that in "morals and good conscience" RJR had a duty to give correct information and Plaintiffs had a right to rely on it, to wit: Plaintiffs requested that RJR provide information on seized cigarettes at a time and place that RJR knew the importance of said information and that the Plaintiffs would rely upon it. (*See* SAC ¶¶ 85-87.)

Defendants also complain that Plaintiffs have not adequately pled proximate cause in connection with their negligent misrepresentation claim. However, as explained above, the standard for alleging of proximate cause is relaxed at the pleading stage of common law claims such as negligent misrepresentation. Plaintiffs' SAC sufficiently alleges that Defendants' negligent misrepresentations resulted in competitive injury to Plaintiffs so as to meet the common law standard.

### 6.     *Unjust Enrichment, Conversion, and Money Had and Received.*

As currently pled, Plaintiffs' claims for unjust enrichment, conversion, and money had and received (*See* SAC Counts IX, X, XIII, XIV) seek damages that this Court has held are barred by the penal law rule; *i.e.*, the proceeds and instrumentalities of crime. *Diageo*, 531 F. Supp. 2d at 401. Therefore, to state such claims, Plaintiffs would need to amend their complaint. Thus, if after consideration of the arguments of the parties the Court deems it necessary for

Plaintiffs to amend any of the other counts of the SAC, Plaintiffs respectfully request the opportunity likewise to amend these counts.  If it is not necessary to amend any other claims, the Plaintiffs will withdraw these claims to avoid any further delay in the proceedings.

## III.   THE COMPLAINT IS SUFFICIENT IN ALL OTHER RESPECTS

Towards the end of RJR's brief are several pro forma arguments, each of which clearly fails under *Diageo* or other jurisprudence, and all of which are raised simply to preserve the issues for future discussion.

### A.   Plaintiffs Adequately Plead RICO Claims.

#### 1.   *Extraterritoriality.*

Despite *Diageo's* clear analysis, RJR argues that RICO is impermissibly applied extraterritorially in this action.

*Diageo* identified three possible tests for extraterritorial application of RICO: the "conduct" test, the "effects" test, and the "precious resources" test.  531 F. Supp. 2d at 422 n.17.  Using the "conduct" test, this Court determined that RICO's territorial requirements were satisfied.  *Diageo*, 531 F. Supp. 2d at 421.  That analysis governs here.  Management and control of the money-laundering enterprise occurred in the U.S.  (SAC ¶¶ 51, 55, 72, 79, 94-99, 114, 120-26, 129-30, 133, 135, 203.)  RJR communicated and otherwise acted in furtherance of the enterprise while in the U.S.  (SAC ¶¶ 51, 55, 63, 72, 79, 94-99, 114, 120-26, 129-30, 133, 135, 159(k), 203, 214.)  The money-laundering chain begins with the sales of drugs and the flow of drug money in and from the U.S.  (SAC ¶¶ 30-44.)  These are all material acts which, as discussed at length elsewhere in this brief, caused Plaintiffs' injuries.[28]

---

[28] Defendants' reliance on *Norex Petroleum Ltd. v. Access Indus. Inc.*, 540 F. Supp. 2d 438 (S.D.N.Y. 2007) is misplaced.  *Norex* involved a RICO mail fraud scheme to take over Russian

The same result occurs under the "effects" test.  Many of the effects of RJR's money-laundering operations are described at SAC ¶¶ 131-35.  They include the flourishing in America of the narcotics trade, which is largely dependent upon the money-laundering system; the resources that federal, state, and local governments must commit to combat drug and money laundering; the support of terrorism, which requires money laundering to fund its operations; and the damage to America's financial system caused by the infusion of concealed drug money.[29]

### 2.  Corporations Can Be Part of an Association-in-Fact Enterprise.

On the basis of a very narrow statutory interpretation, RJR argues that only individuals, and not corporations, can be part of an association-in-fact enterprise.  RJR admits that the Second Circuit rejected this interpretation of RICO in *United States v. Huber*, 603 F.2d 387 (2d Cir. 1979), and that the argument has been raised here simply "to preserve the issue for further review."  (D. Br. 42 n.12.)  The argument fails for the reasons set forth in *Huber*, which binds this Court.

---

oil companies.  No money-laundering predicate acts were alleged.  Central to the court's conclusion that the "conduct" test did not support application of RICO was its finding that "[t]he conduct alleged to have taken place in the United States was preparatory or peripheral to the alleged scheme at best."  By contrast, RJR's U.S. conduct was extensive and central to the money-laundering scheme.  *Norex* recognized that the Second Circuit holds the "conduct" test to be satisfied if the fraudulent scheme is "masterminded and implemented" in the U.S.  *Norex*, 540 F. Supp. 2d at 443, citing *SEC v. Berger*, 322 F.3d 187 (2d Cir. 2003).

[29] RJR argues that, under *Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004), the domestic effects of money laundering must "give rise to" Plaintiffs' claims.  *Empagran* is not comparable to this case.  *Empagran* was decided under, and confined to, the Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a.  The opinion explicitly restricted the ruling to cases in which "the conduct's domestic effects did not help to bring about that foreign injury."  542 U.S. at 175.  The FTAIA applies to antitrust laws; it does not apply to RICO.  Rather than place similar restrictions on RICO, Congress did the reverse, expanding RICO's reach to international money-laundering enterprises through the Patriot Act.  In any event, as discussed at length at §§ II., RJR's illegal conduct in the United States was the direct cause of Plaintiffs' injuries in Europe.

### 3.    Plaintiffs Are RICO "Persons" and Have Sustained RICO Injuries.

RJR argues that sovereign governments are not "persons" under RICO, and that injuries to sovereign interests are not injuries to "business or property" under RICO.  RJR admits that this Court addressed—and rejected—these arguments in detail in *EC I*.  (D. Br. 42 n.13.)  The arguments are candidly raised here simply to preserve the issues for further review.  *Id.*  Until then, the arguments should be rejected—again—for the reasons set forth in *EC I*.

### B.    The EC's Claims Are Not Barred by Issue Preclusion

RJR contends that the EC's RICO and common law claims are barred by claim preclusion (res judicata) and issue preclusion (collateral estoppel).  (D. Br. 48-49.)  The arguments fail.  As RJR admits, both res judicata and collateral estoppel require "adjudication on the merits" (*id.* at 48) or "final determination on the merits" (*id.* at 49).  *EC I* was not an "adjudication on the merits" or a "final determination on the merits" of either the EC's RICO claims or the EC's state common law claims.  Those claims therefore are not barred by res judicata or collateral estoppel.

Defendants' argument in regard to the EC's RICO claims is moot, because in the SAC, the European Community has not asserted any RICO claims; rather, those claims are specifically limited to the Member States.  The common law claims, Counts VI through XIV apply to both the European Community and the Member States.  Since the European Community has raised no RICO claims, the issue is moot.

Noticeably absent from Defendants' motion is any separate discussion of the EC's state common law claims.  Those claims were not encompassed within this Court's ruling of RICO standing under 1964(c). Instead those claims were dismissed based upon the trial court's finding that it lacked supplemental jurisdiction "over the Plaintiff's state law claims because complete

diversity is lacking." *EC I*, 150 F.Supp. at 501-02.  A dismissal for lack of jurisdiction is not a

dismissal on the merits.  On this matter, one need go no further than Rule 41(b) of the Federal

Rules of Procedure, which states in pertinent part that "a dismissal under this subdivision (b) and

any dismissal not under this rule—except one for lack of jurisdiction, improper venue, or failure

to join a party under Rule 19—operates as an adjudication on the merits" (emphasis added).  *See*

*also Mann v. Merrill Lynch, Pierce, Fenner, & Smith*, 488 F.2d 75, 76 (5th Cir. 1973) ("A

dismissal for lack of jurisdiction is not a dismissal on the merits that makes the action res

judicata."). Therefore, the EC's state law claims in the instant case, in which diversity

jurisdiction exists, are not barred by either res judicata or collateral estoppel.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss should be denied.

KRUPNICK, CAMPBELL, MALONE,
BUSER, SLAMA, HANCOCK,
LIBERMAN & McKEE, P.A.


By: _____

Kevin A. Malone, Esquire
kmalone@krupnicklaw.com
Carlos A. Acevedo  (CA-6427)
cacevedo@krupnicklaw.com
12 Southeast Seventh Street, Suite 801
Fort Lauderdale, Florida  33301
954-763-8181 telephone
954-763-8292 facsimile

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Plaintiffs'

Memorandum of Law in Opposition to Defendants' Joint Memorandum of Law in Support of

Motion to Dismiss the SAC Pursuant to Federal Rule of Civil Procedure 12(B)(1) and 12(B)(6)

was sent electronically and by Federal Express delivery service on April 1, 2010, on the

following:

*Co-counsel for Plaintiffs:*

John J. Halloran, Jr., Esquire
JJH@ny.speiserkrause.com
Frank H. Granito, III, Esquire
F3G@ny.speiserkrause.com
Kenneth P. Nolan, Esquire
KPN@ny.speiserkrause.com
Speiser, Krause, Nolan & Granito
Two Grand Central Tower
140 East 45th Street
New York, NY 10017
212-661-0011 telephone
212-953-6483 facsimile

John K. Weston , Esquire
jweston@sackslaw.net
Andrew B. Sacks, Esquire
asacks@sackslaw.net
Stuart H. Smith, Esquire
nolaw2@aol.com
Sacks & Weston
114 Old York Road
Jenkintown, Pennsylvania  19046
800-578-5300 telephone
215-925-8200 telephone
215-925-0508 facsimile

Edward F. Farrell, Esquire
efarrell@teleline.es
Villanueva 31
1° Izda.
28001 Madrid, Spain
011-3491-575-0370 telephone
011-3491-431-1153 facsimile

*Counsel for:*
*R.J. Reynolds Tobacco Company, RJR Acquisition Corp.,*
*(f/k/a Nabisco Group Holdings Corp.), RJR Nabisco Holdings Corp., R.J. Reynolds Tobacco*
*Holdings, Inc., (f/k/a RJR Nabisco, Inc.), and R.J. Reynolds Tobacco International, Inc.:*

> Mark R. Seiden, Esquire
> mrseiden@jonesday.com
> Phineas E. Leahey, Esquire
> peleahey@jonesday.com
> Leslie B. Dubeck, Esquire
> lbdubeck@jonesday.com
> Jones Day
> 222 East 41st Street
> New York, NY 10017-6702
> 212-326-3451 direct
> 212-326-3939 telephone
> 212-755-7306 facsimile
>
> Gregory G. Katsas, Esquire
> ggkatsas@jonesday.com
> Jones Day
> 51 Louisiana Avenue, Northwest
> Washington, DC 20001
> 202-879-3463 telephone
> 202-626-1700 facsimile