UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


THE EUROPEAN COMMUNITY, *et al.*,

          Plaintiffs,

against-                                 CASE NO:  CV-02-5771
                                              (NGG)(VVP)

RJR NABISCO, INC., *et al.*,

          Defendants.


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' JOINT SUPPLEMENTAL MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(B)(1) AND 12(B)(6)**


Date of Service:  December 20, 2010

KRUPNICK, CAMPBELL, MALONE,
BUSER, SLAMA, HANCOCK,
LIBERMAN & McKEE, P.A.

Kevin A. Malone, Esquire
kmalone@krupnicklaw.com
Carlos A. Acevedo  (CA-6427)
cacevedo@krupnicklaw.com
12 Southeast Seventh Street, Suite 801
Fort Lauderdale, Florida  33301
954-763-8181 telephone
954-763-8292 facsimile

SPEISER, KRAUSE, NOLAN &
GRANITO

John J. Halloran, Jr. (JH-2515)
JJH@ny.speiserkrause.com
Two Grand Central Tower
140 East 45th Street
New York, NY 10017
212-661-0011 telephone
212-953-6483 facsimile


ATTORNEYS FOR PLAINTIFFS

**TABLE OF CONTENTS**

I.  PLAINTIFFS' RICO CLAIMS ARE BASED ON U.S. CONDUCT BY U.S. DEFENDANTS, AND ARE NOT EXTRATERRITORIAL ............................................. 1

    A.  The *Morrison* and *Norex* Decisions ................................................. 1

    B.  Plaintiffs Should Be Granted Leave to Amend ........................................ 5

    C.  Plaintiffs Should Be Allowed to Conduct Limited Discovery ............................... 7

II.  THIS COURT POSSESSES DIVERSITY JURISDICTION ............................................. 9

    A.  Diversity Jurisdiction Exists Under the Alienage Diversity Statute ....................... 9

    B.  Diversity Jurisdiction Exists Under 28 U.S.C. § 1332(a)(4) ............................... 10

        1.  The EC Is Itself a "Foreign State" Under the FSIA ................................... 11

            (a.)  The EC Is a "Foreign State" Under *Samantar*. ............................... 11

            (b.)  The U.S. State Department Has Provided an Official Opinion Letter Stating That European Treaty-Based Entities Are "Foreign States" Under the FSIA ................................................. 15

            (c.)  This District Has Held That the EU Is a "Foreign State" Under the FSIA ................................................. 16

        2.  The EC Is an "Agency or Instrumentality" of Foreign States ................. 18

            (a.)  The EC Meets the Tripartite Test for Agency or Instrumentality. 18

            (b.)  The FSIA Covers Entities Formed By Multiple Foreign States ... 19

            (c.)  The International Organizations Immunity Act Is Not Applicable ................................................. 20

    C.  The Court Must Resolve the Diversity Jurisdiction Question ............................... 23

III.  PLAINTIFFS HAVE NOT WAIVED FEDERAL COMMON-LAW CLAIMS ............. 24

CONCLUSION ................................................................. 25

CERTIFICATE OF SERVICE ................................................. 26

# TABLE OF AUTHORITIES

**Cases**

Anza v. Ideal Steel Supply Corp.,
    126 S. Ct. 1991 (2006) ........................................................................................ 3

Arbaugh v. Y & H Corp.,
    546 U.S. 500 (2006) ........................................................................................ 24

Ayyash v. Bank Al-Madina,
    2006 WL 587342 (S.D.N.Y. 2006) ................................................................... 8

Beebe v. Housatonic Railroad Co., Inc.,
    2005 WL 1173974 (N.D.N.Y. 2005) ............................................................... 8

Boyle v. United States,
    129 S. Ct. 2237 (2009) ................................................................................... 18

Broadbent v. Org. of Am. States,
    481 F. Supp. 907 (D.D.C. 1978), aff'd, 628 F.2d 27 (D.C. Cir. 1980) ...................... 22, 23

Commercial Cleaning Servs., LLC v. Colin Serv. Sys., Inc.,
    271 F.3d 374 (2d Cir. 2001) ............................................................................ 3

El-Hadad v. United Arab Emirates,
    496 F.3d 658 (D.C. Cir. 2007) ........................................................................ 23

European Community v. Japan Tobacco, Inc.,
    186 F. Supp. 2d 231 (E.D.N.Y. 2002) ............................................................ 10

European Community v. RJR Nabisco, Inc.,
    01 Civ. 5188 (NGG/VVP) .............................................................................. 10

European Community v. RJR Nabisco, Inc.,
    150 F. Supp. 2d 456 (E.D.N.Y. 2001) ....................................................... 10, 24

European Community v. RJR Nabisco, Inc.,
    355 F.3d 123 (2d Cir. 2004) ........................................................................... 11

European Community v. RJR Nabisco, Inc., et al.,
    00 Civ. 6617 (NGG/VVP) ............................................................. 9, 10, 23, 24

Gardiner Stone Hunter Int'l v. Iberia Lineas Aereas de Espana,
    896 F. Supp. 125 (S.D.N.Y. 1995) ................................................................. 16

Granville Gold Trust-Switzerland v. Commissione Del Fullimento/Inter Change Bank,
    924 F. Supp. 397 (E.D.N.Y. 1996), aff'd, 111 F.3d 123 (2d Cir. 1997).......................... 19

H.J., Inc. v. Northwestern Bell Tel. Co.,
    492 U.S. 229 (1989)................................................................................................ 2

Hilton v. Guyot,
    159 U.S. 113 (1895)............................................................................................ 14

In re EAL Corp. v. European Org. for the Safety of Air Navigation,
    1994 U.S. Dist. LEXIS 20528 (D. Del. 1994) ............................................... 16, 17, 20, 22

In re Methionine Antitrust Litig.,
    MDL No. 00-1311 CRB (N.D. Cal. June 17, 2002) .................................................. 14

In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,
    2010 U.S. Dist. LEXIS 89275 (E.D.N.Y. 2010)..................................................... 14

In re Rubber Chems. Antitrust Litig.,
    486 F. Supp. 2d 1078 (N.D. Cal. 2007) ............................................................... 14

In re Vitamins Antitrust Litig.,
    2002 U.S. Dist. LEXIS 25815 (D.D.C. Dec. 18, 2002).................................... 14

Int'l Ass'n of Machinists & Aerospace Workers v. OPEC,
    477 F. Supp. 553 (C.D. Cal. 1979) aff'd, 649 F.2d 1354 (9th Cir. 1981) ...................... 22

JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.,
    536 U.S. 88 (2002)................................................................................................ 14

Koehler v. Bank of Berm. (N.Y.) Ltd.,
    229 F.3d 187 (2d Cir. 2000) (Sotomayor, J., dissenting from denial of rehearing in banc)
    .................................................................................................................... 14

Le Donne v. Gulf Air, Inc.,
    700 F. Supp. 1400 (E.D. Va. 1988) ............................................................... 20

Matimak Trading Co. v. Khalily,
    118 F.3d 76 (2d Cir. 1997),................................................................................. 14

Morgan v. Council of Europe, et al.,
    02-CV-0891 (CBA), 02-CV-1471 (CBA) (E.D.N.Y. Dec. 31, 2002), appeal dismissed,
    Order (2d Cir. June 3, 2004) .................................................................... 16, 17, 22

Morgan v. United States, European Union, et al.,
    04-CV-0672 (CBA) (E.D.N.Y. Feb. 26, 2004), appeal dismissed, Order (2d Cir. Aug. 3,
    2004) ................................................................................................ 17, 22

Morrison v. Nat'l Australia Bank Ltd.,
　　130 S. Ct. 2869 (2010) ................................................................. passim

Norex Petroleum Ltd. v. Access Indus., Inc.,
　　540 F. Supp. 2d 438 (S.D.N.Y. 2007) .......................................... 2, 3

Norex Petroleum Ltd. v. Access Indus., Inc.,
　　622 F.3d 148 (2d Cir. 2010) ......................................................... passim

Okoro v. Bohman,
　　164 F.3d 1059 (7th Cir. 1999) ..................................................... 24

Patrickson v. Dole Food Co.,
　　251 F.3d 795 (9th Cir. 2001), aff'd, 538 U.S. 468 (2003) ............... 22

Prewitt Enters. v. OPEC,
　　353 F.3d 916 (11th Cir. 2003) ..................................................... 23

Public Citizen, Inc. v. Mineta,
　　340 F.3d 39 (2d Cir. 2003) .......................................................... 20

Reves v. Ernst & Young,
　　507 U.S. 170 (1993) .................................................................... 2, 3

Rotella v. Wood,
　　528 U.S. 549 (2000) .................................................................... 2

Ruhrgas AG v. Marathon Oil Co.,
　　526 U.S. 574 (1999) .................................................................... 24

S & S Mach. Co. v. Masinexportimport,
　　706 F.2d 411 (2d Cir. 1983) ........................................................ 19

Samantar v. Yousuf,
　　130 S. Ct. 2278 (2010) ................................................................ 11, 13

Sinochem Int'l v. Malaysian Int'l Shipping Corp.,
　　549 U.S. 422 (2007) .................................................................... 24

St. Pierre v. Dyer,
　　208 F.3d 394 (2d Cir. 2000) ........................................................ 24

Tetra Finance (HK), Ltd. v. Shaheen,
　　584 F. Supp. 847 (S.D.N.Y. 1984) ............................................... 14

United States v. Gonzales,
　　520 U.S. 1 (1997) ....................................................................... 18

**Statutes**

1 U.S.C. § 1 ................................................................................................................ 19

15 U.S.C. § 78a ...................................................................................................... 1, 2

18 U.S.C. § 1961(3) ................................................................................................... 4

18 U.S.C. § 1962 ....................................................................................................... 4

18 U.S.C. § 1962(b) .................................................................................................. 4

18 U.S.C. § 1964 ....................................................................................................... 4

18 U.S.C. § 1964(c) ............................................................................................. 4, 24

18 U.S.C. §§ 1961–1968 ................................................................................... passim

22 U.S.C. § 288a ................................................................................................ 20, 21

22 U.S.C. § 288f-5 ............................................................................................. 21, 22

22 U.S.C. § 288h ................................................................................................ 20, 21

28 U.S.C. § 1332(a)(2) ............................................................................................. 9

28 U.S.C. § 1332(a)(4) .......................................................................... 9, 10, 11, 13

28 U.S.C. § 1602 ............................................................................................. passim

28 U.S.C. § 1603(a) ..................................................................................... 11, 17, 18

28 U.S.C. § 1603(b) ........................................................................................... 17, 18

28 U.S.C. § 1603(b)(1) ........................................................................................... 19

28 U.S.C. § 1603(b)(2) ........................................................................................... 19

28 U.S.C. § 1604 ..................................................................................................... 22

**Treaties and Related Authorities**

Treaty Establishing the European Community
>(Consolidated version, as amended by the Treaty of Amsterdam), OJ C 340, 10.11.1997, p. 173....................................................................................................................... 11, 12

Treaty on European Union
>(Consolidated version, as amended by the Lisbon Treaty) OJ C 115/01 of 9.05.2008, p. 13.................................................................................................................... 9, 11, 12

Treaty on the Functioning of the European Union
>(Consolidated version, as amended by the Lisbon Treaty), OJ C 115/01 of 9.05.2008, p. 47.................................................................................................................... 9, 11, 12

Protocol on the Statute of the European System of Central Banks and of the European Central Bank,
>Protocol 4 to the Treaty on European Union and Treaty on the Functioning of the European Union, formerly Protocol 18 to the Treaty Establishing the European Community, OJ C 83/230 of 30.3.2010 ............................................................ 21

**Other Authorities**

Exec. Order  No. 12,651,
>53 Fed. Reg. 35,287 (Sept. 13, 1988) ............................................................... 21

Exec. Order No. 11,689,
>37 Fed. Reg. 25,987 (Dec. 7, 1972) ................................................................. 15

Exec. Order No. 13,307,
>68 Fed. Reg. 33,338 (June 3, 2003) ................................................................. 22

H. Steiner, D. Vagts, H.H. Koh, Transnational Legal Problems, Materials and Text
>(4th ed. 1994) .................................................................................................. 15

Markup Before the Committee on International Relations on H.R. 3656
>(Mar. 20, 2002), at 41, Serial No. 107-68 (GAO 2002) .................................... 22

Note of the Council of the European Union,
>Doc. No. 15231/02 ADD 1 (5 Dec. 2002) ..................................... 13, 15, 16, 17

Office of Legal Adviser, U.S. Department of State,
>Digest of United States Practice in International Law, 467-469 (2002).......................... 13

**Rules**

FED. R. CIV. P.  41(b) ................................................................................................. 23

Pursuant to the Court's direction on October 26, 2010, Plaintiffs respectfully submit this Supplemental Memorandum in further opposition to Defendants' motion to dismiss.[1]

## I.   PLAINTIFFS' RICO CLAIMS ARE BASED ON U.S. CONDUCT BY U.S. DEFENDANTS, AND ARE NOT EXTRATERRITORIAL

### A.   The Morrison and Norex Decisions

The Supreme Court's decision in Morrison v. National Australia Bank Ltd., 130 S. Ct. 2869 (2010), as interpreted by Norex Petroleum Ltd. v. Access Indus., Inc., et al., 622 F.3d 148 (2d Cir. 2010), demonstrates why the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 (RICO) applies to this case.

The test employed by the Supreme Court in Morrison was whether the "relationship" at issue in the lawsuit "was the 'focus' of congressional concern" in the statute under which the plaintiff was suing.  Morrison, 130 S. Ct. at 2884.  Defendants agree.  (D. Supp. Mem. 2.) Morrison involved the Securities Exchange Act of 1934, 15 U.S.C. § 78a, whose  focus is "the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States."  Morrison, 130 S. Ct. at 2888.  Thus, the Exchange Act's extraterritorial effect may be analyzed by asking one question: Were the stocks in question listed on an American exchange or bought or sold in the United States?[2]  Because the answer in Morrison was "no," the Exchange Act  did not apply.

---

[1] The abbreviations and citation forms adopted in Plaintiffs' Memorandum of Law dated April 1, 2010, are continued herein.  Defendants' Joint Supplemental Memorandum dated November 22, 2010, is cited herein as "D. Supp. Mem."  Plaintiffs' April 1, 2010, opposition memorandum is cited as "P. Opp.," Second Amended Complaint as "SAC."

[2] Notably, Morrison did not eliminate application of the Exchange Act to purchases of stocks listed on an American exchange by non-U.S. citizens, even though in such cases the losses suffered would occur outside the United States.

To determine a statute's focus under <u>Morrison</u>, one must look to the statute itself.  The focus of the Exchange Act  is the location where stocks are sold.  In contrast to the Exchange Act, RICO focuses on the Defendants' conduct.  Primarily a criminal statute, RICO is intended to deter and punish criminal conduct.  Section 1962(c), which makes it illegal "to conduct or participate, directly or indirectly, in the conduct of [a RICO] enterprise's affairs" through a pattern of racketeering activity, uses the word "conduct" twice.  <u>Reves v. Ernst & Young</u>, 507 U.S. 170, 177 (1993).

While Reynolds American focuses on the place of <u>injury</u> (D. Supp. Mem. 6), Congress' objective in RICO was to "encourag[e] civil litigation to supplement Government efforts to deter and penalize the . . . prohibited <u>practices</u>." <u>Rotella v. Wood</u>, 528 U.S. 549, 557 (2000) (emphasis added).  "The object of civil RICO is thus not merely to compensate victims but to turn them into prosecutors, 'private attorneys general,' dedicated to eliminating racketeering <u>activity</u>." <u>Id</u>. (footnote omitted and emphasis added); <u>accord</u> <u>H.J., Inc. v. Northwestern Bell Tel. Co.</u>, 492 U.S. 229, 248 (1989) (in passing RICO, Congress "had organized crime as its focus").

Defendants have taken the illogical leap of arguing that just because the <u>Norex</u> defendants <u>argued</u> that a domestic application of § 1964(c) requires a domestic injury, either the district court or the appellate court agreed with them.  Neither court reached such a  conclusion.  The district court held only that the conduct and effects tests were not met by the specific facts of that case.  The district court noted that only seven of the 35 defendants were U.S. persons or entities, that those U.S. defendants were largely vestigial to the scheme, and that the primary object of the scheme was "the theft of Plaintiff's interests in Russian oil companies." <u>Norex Petroleum Ltd. v. Access Indus., Inc.</u>, 540 F. Supp. 2d 438, 444 (S.D.N.Y. 2007).  In <u>Norex</u>, the

district court pointed out that "[t]he conduct alleged to have taken place in the United States was preparatory or peripheral to the alleged scheme at best." Id. at 444.

Here, in contrast, all of the Defendants are U.S. Defendants.  Essentially all of the conduct committed by these Defendants was committed by them in the United States.[3]  The purpose of Reynolds American's scheme was to make money in the United States by laundering drug money in the United States.  Reynolds American's conduct in the United States was to "direct[], manage[], and control" the scheme (SAC ¶ 1)–precisely the sort of conduct against which RICO is directed.  See Reves, 507 U.S. at 177 (RICO section 1962(c) is directed against persons who "lead, run, manage, or direct" criminal enterprises).

The Second Circuit in Norex nowhere held that domestic injury was required for such conduct to be actionable under RICO.  Indeed, as the appellate court observed, "simply alleging that some domestic conduct occurred cannot support a claim of domestic application."  Norex, 622 F.3d at 152.  This indicated that, at some point, the level of domestic conduct becomes sufficient for RICO to apply.

In other words, unlike the bright-line rule on extraterritoriality in Morrison (sales of stocks in the U.S.), the Second Circuit has made it clear that much as there is a "continuum" of RICO causation ranging from Anza v. Ideal Steel Supply Corp., 126 S. Ct. 1991 (2006), to Commercial Cleaning Services, LLC v. Colin Service Systems, Inc., 271 F.3d 374, (2d Cir. 2001), there is a continuum of conduct which will determine RICO application.  Unfortunately, the current paucity of rulings following Norex provides little or no guidance as to when RICO cannot be applied.  However, where, as here, the defendants are all U.S. persons and virtually

---

[3] E.g., see SAC ¶¶ 2, 8-26, 46, 51, 62, 71, 72, 100-108, 133-135.

100 percent of their conduct occurred in the United States, the matter falls squarely within RICO's ambit.

18 U.S.C. §§ 1962 and 1964 support this conclusion.  First, Congress passed RICO with the intent that it be used to punish wrongdoers.  Section 1964(c) provides, in pertinent part, that "any person injured in his business or property by reason of a violation of section 1962" may sue.  "Any person" does not mean any U.S. citizen or person injured in the United States, but includes also a foreign person.  See 18 U.S.C. § 1961(3) (defining "person" as "any individual or entity capable of holding a legal or beneficial interest in property").  Consequently,  if there is adequate U.S. conduct to trigger § 1962's operative provisions, the location of injury is immaterial.

In addition to the management, direction, and control discussed above, one further course of conduct compels RICO's application to this case.  Section 1962(b) prohibits taking an interest in or control of an enterprise through a pattern of racketeering activity.  An entire section of the Second Amended Complaint (¶¶ 100-117) and an entire count (count II) are devoted to Reynolds American's acquisition of Brown & Williamson to expand and continue the racketeering enterprise.  This was a U.S. acquisition.

This fact pattern is critically important.  The RJR Defendants for many years were engaged in extensive money-laundering activities through the sale of "traditional RJR brands." (See SAC §§ VII and VIII.)  However, in 1999, RJR sold its "international operations" along with almost all of its duty-free operations.  As a result, Reynolds American needed new brands and new products for the international market and "duty-free outlets" with which it could regain its position of primacy in the money-laundering/illicit cigarette business that had generated hundreds of millions of dollars in profits annually.  Reynolds American thus acquired the Brown

4

& Williamson operations and brands, primarily as a means by which it could return to its highly profitable business of selling cigarettes to money launderers and drug smugglers.  (See SAC § IX.)  This domestic acquisition was central to the Reynolds American money-laundering scheme.

**B.    Plaintiffs Should Be Granted Leave to Amend**

This Court should deny the Defendants' motion to dismiss the complaint as pled. However, if the Court should conclude otherwise, at a minimum, the Plaintiffs should be given leave to amend the complaint to clarify and enhance the allegations of domestic conduct.

The Second Amended Complaint was filed on November 23, 2009, before the decisions in Morrison or Norex.  When filed, it clearly met both the "conduct" and "effects" tests.

If necessary, Plaintiffs can amend the complaint to comply with Norex by showing the overwhelming predominance of U.S. conduct by these Defendants.  Examples of such allegations which could be made include the following:

(1.)  *Brown & Williamson Acquisition.*  Although the Plaintiffs have already pled that Reynolds American acquired Brown & Williamson for the purpose of expanding its money-laundering scheme, more details could be supplied to show the acquisition's U.S. nexus. Plaintiffs could set forth the exact way in which the Brown & Williamson acquisition has been used to expand and expedite the money-laundering scheme (e.g., using specific brands and selling them to specific money-laundering clients) and cite specific instances in which Defendants have utilized the Brown & Williamson brands for sales to known money launderers.

(2.)  *UETA.*  The Second Amended Complaint alleges that one of the Defendants' primary customers in this money-laundering scheme is a company known as UETA.  The complaint can be substantially enhanced to detail the U.S. nexus of the UETA component of Reynolds American's scheme, including that:  (a.) UETA is based in Hollywood, Florida.  (b.)

UETA is a direct customer of Reynolds American and orders cigarettes directly from Reynolds American.  (c.) Reynolds American has full knowledge of UETA's operations, including where and to whom it sells its cigarettes.  (d.) UETA sells enormous volumes of cigarettes into illegal markets and, in particular, to money launderers.  The proceeds that Reynolds American receives from UETA are often proceeds of unlawful activities.  Reynolds American knows this.  (e.) Virtually all the transactions between UETA and Reynolds American occur in the United States.  (f.) As a part of its scheme, UETA orders enormous volumes of cigarettes ostensibly for its "duty-free shops," when, in fact, a large percentage of the cigarettes are not sold legally through duty-free shops, but rather are sold into illegal channels.  In closely monitoring the activities of this very large customer, Reynolds American is fully aware that UETA purchases far more cigarettes as "duty free" than it actually sells legally through that channel.  As such, Reynolds American knows, or at a minimum should know, that a large percentage of the cigarettes it sells to UETA are moved into illegal channels.  (g.) UETA purchases enormous volumes of cigarettes from the Reynolds American Defendants for delivery to warehouses in Laredo, Texas (and also other locations in the United States).  However, in fact, the cigarettes are destined for countries other than the United States or Mexico.  The only reason to receive and sell cigarettes in this way is to conceal their true destination and the true customers.  The Reynolds American Defendants are well aware of this.

(3.) *Giovannex*.  In the Second Amended Complaint, the Plaintiffs have alleged that one of the Defendants' primary customers is a company known as Giovannex.  While Giovannex is incorporated in Panama, the Second Amended Complaint should be clarified to establish the U.S. nexus to the scheme, including:  (a.) Giovannex had been a major customer of Brown & Williamson for many years before it was acquired by Reynolds American Inc.  (b.) After the

merger, Reynolds American embraced Giovannex as a customer and made sales to Giovannex in a way that allowed Giovannex to pay for cigarettes with narcotics proceeds.  (c.) Giovannex pays for a large portion of its cigarette acquisitions with drug proceeds.  (d.) Since the acquisition of Brown & Williamson, Reynolds American has continued to make shipments directly to Giovannex from the United States[4] and has received narcotics proceeds in payment in the United States.

(4.)  *Fanchini and Dozortsev.*  This prong of the conspiracy, centered in the Eastern District of New York, was not previously pled (see P. Opp. 1 n.2.) but, if allowed to amend, the Plaintiffs will allege the U.S. nexus of this portion of the Reynolds American scheme.  The facts include the following:  (a.) Fanchini and Dozortsev ran a massive narcotics-smuggling/cigarette-sales/money-laundering scheme from the Eastern District of New York.  (b.) One of the primary mechanisms used by Fanchini and Dozortsev to launder their narcotics proceeds was the sale of cigarettes in the European Union.  (c.) A significant percentage of the cigarettes bought by Fanchini and Dozortsev for this money-laundering scheme were Reynolds American brands. (d.) This narcotics-smuggling/money-laundering scheme had a major impact in the Eastern District of New York where it was conducted.

## C.    Plaintiffs Should Be Allowed to Conduct Limited Discovery

If the Court permits amendment of the complaint, Plaintiffs should be afforded limited discovery in regard to the Defendants' U.S. conduct.

In Norex, the Second Circuit ruled that "[t]he slim contacts with the United States alleged by Norex" were "insufficient to support extraterritorial application of the RICO statute."  Norex, 622 F.3d at 152.  This Court must therefore weigh the amount of conduct which has occurred in

_____

[4] An example of records showing Reynolds American's shipments from the United States to

the United States to determine where on the continuum this level of conduct falls. That analysis is similar to resolving a *forum non conveniens* or personal jurisdiction motion; i.e., the court must determine whether there is sufficient U.S. conduct to allow the claims to go forward.

Federal courts in this Circuit have allowed limited discovery as to a *forum non conveniens* and personal jurisdiction motion so that the court can have the appropriate evidence before it. See, e.g., Beebe v. Housatonic Railroad Co., Inc., 2005 WL 1173974, *3 (N.D.N.Y. 2005) (plaintiff allowed limited discovery on *forum non conveniens* issues); Ayyash v. Bank Al-Madina, 2006 WL 587342, *8 (S.D.N.Y. 2006) (plaintiff allowed limited jurisdictional discovery which was also relevant to the *forum non conveniens* analysis because it would "aid the Court in determining the extent to which events and evidence in the United States are implicated"). Accordingly, the Plaintiffs should be allowed to conduct limited discovery to establish the U.S. aspects of the Defendants' scheme.

Extensive discovery will not be required. Discovery as to the four aspects of the scheme described above should be sufficient. For example, depositions of the Reynolds American executives responsible for the sales to UETA, Giovannex, and Fanchini/Dozortsev, along with sales records and payment records of those accounts should be sufficient to show the U.S. nexus of this scheme.

As the Defendants have candidly admitted, the analysis of the application of RICO is not going to have any real impact on this case. The Defendants have acknowledged that either with or without the European Union as a Plaintiff this Court will have diversity jurisdiction over the common-law claims and, therefore, this case will move forward. In any event, as set forth below, this Court clearly possesses diversity jurisdiction.

---

Giovannex after the acquisition is submitted herewith. (See Halloran Decl. Ex. 1.)

## II.     THIS COURT POSSESSES DIVERSITY JURISDICTION

Reynolds American argues that complete diversity does not exist and the state common-law claims should therefore be dismissed.  (D. Supp. Mem. 9-21.)  This argument is without foundation.  This Court can and should resolve the issue of diversity jurisdiction based on the alienage diversity statute, 28 U.S.C. § 1332(a)(2), and this Court's prior ruling that the European Community ("EC")[5] is an "alien" for that purpose.  If, however, diversity were not established under 28 U.S.C. § 1332(a)(2), diversity exists on the alternative ground that the EC is a "foreign state" or "agency or instrumentality of a foreign state" under 28 U.S.C. § 1332(a)(4).

### A.     Diversity Jurisdiction Exists Under the Alienage Diversity Statute

Defendants assert that complete diversity is lacking "because none of the Plaintiffs is a 'citizen' or 'subject' of a foreign state."  (D. Supp. Mem. 11 n.5.)  Reynolds American argued the exact opposite position in 2001.  Under this Court's prior ruling, the EC is a "citizen or subject" of a foreign state for purposes of the alienage diversity statute (28 U.S.C. § 1332(a)(2)) and, on this basis, there is complete diversity of jurisdiction.

In its first action before this Court, the EC named RJR and other parties (including a foreign entity, Japan Tobacco, Inc.) as party defendants.  See European Community v. RJR Nabisco, Inc., et al., 00 Civ. 6617 (NGG/VVP) (EC I).  In EC I, there was only one plaintiff, the EC itself (the Member States were not party plaintiffs).  On its motion to dismiss, RJR argued

---

[5] The Lisbon Treaty, which entered into force on December 1, 2009, consolidates the former European Community (EC) and the European Union (EU) into one single legal entity.  The EU succeeds and replaces the EC, and assumes all of its competences.  See Treaty on European Union (TEU), Article 1(3).  The TEU and the Treaty on the Functioning of the European Union (TFEU) are publicly available.  See Consolidated Versions of the Treaty on European Union and the Treaty on the Functioning of the European Union, 53 Official Journal of the European Union C 83/1, C 83/16 (30 Mar. 2010) (available at: http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:C:2010:083:FULL:EN:PDF) (last accessed Dec. 17, 2010).  Accordingly, "EC" and "EU" are used interchangeably herein.

that complete diversity was lacking because aliens were on both sides of the matter.  (See RJR

Mem. Law at 84, Doc. No. 201, Mar. 26, 2001; Halloran Decl. Ex. 2.)

On July 16, 2001, this Court granted RJR's motion to dismiss in EC I.  This Court agreed

with RJR that because there were "aliens" on both sides of the litigation, complete diversity was

lacking.  Specifically, this Court ruled:

> There is no diversity jurisdiction over Plaintiff's state law claims because
> complete diversity between the parties is lacking.  The Second Circuit has long
> recognized the explicit and unequivocal rule requiring complete diversity, and
> dismisses actions when aliens are on both sides of a matter.

150 F. Supp. 2d 456, 502 (E.D.N.Y. 2001) (citations and quotations omitted). This holding was

later reaffirmed.  See EC I, slip op. at 2 (E.D.N.Y.  Oct. 23, 2001) ("aliens appeared on both

sides of the litigation, thus destroying diversity jurisdiction").[6]

This Court's ruling in EC I controls.  There is complete diversity because Plaintiffs are

exclusively foreign parties/states (the EC and Member States), and Defendants are exclusively

U.S. citizens (Reynolds).

**B.      Diversity Jurisdiction Exists Under 28 U.S.C. § 1332(a)(4)**

Alternatively, the EC is a "foreign state" or an "an agency or instrumentality of a foreign

state" for purposes of diversity jurisdiction under 28 U.S.C. § 1332(a)(4).[7]

---

[6] Subsequent to dismissal in EC I, the EC and Member States commenced a new action against
Reynolds which did not include Japan Tobacco, Inc. as a defendant.  European Community v.
RJR Nabisco, Inc., 01 Civ. 5188 (NGG/VVP) (EC II).  Complete diversity clearly existed.
Nonetheless, Reynolds  challenged the existence of diversity jurisdiction.  (See EC II, Reynolds
Mem. of Law at 21-24, Doc. No. 41, Dec. 17, 2001.)  The EC argued that diversity jurisdiction
existed.  (EC II, Pls.' Mem. of Law in Opp'n to Motion to Dismiss at 34-40, Doc. No. 47, Dec.
18, 2001.)  In deciding the motion to dismiss in EC II, this Court allowed plaintiffs to replead
their common-law claims (necessarily rejecting Reynold's argument that there was a lack of
diversity jurisdiction).  See EC II, 186 F. Supp. 2d 231, 245 (E.D.N.Y. 2002) ("Plaintiffs' RICO
and common law claims predicated on Defendants' money laundering transactions are
DISMISSED without prejudice to replead").  On appeal, the Second Circuit affirmed this Court's

1.      **The EC Is Itself a "Foreign State" Under the FSIA**

Because the EC is a "foreign state" under FISA, this Court possesses complete diversity of jurisdiction.

(a.)      **The EC Is a "Foreign State" Under <u>Samantar</u>.**

The FSIA does not define "foreign state."  In 2010, however, the Supreme Court, in addressing the scope of FSIA, defined "foreign state" as follows:  "The term 'foreign state' on its face indicates a body politic that governs a particular territory."  <u>Samantar v. Yousuf</u>, 130 S. Ct. 2278, 2286 (2010).[8]  The EU meets the definition of "foreign state" under <u>Samantar</u>.

The EU is a body politic that governs the territory of the EU, which is composed of the territory of its constituent Member States.[9]  It is a treaty-based organization that today consists of 27 Member States.  The EU has two founding treaties:  the Treaty on European Union and the Treaty on the Functioning of the European Union.[10]  The EU, like the EC before it, itself has

---

decision to allow Plaintiffs to replead the common-law and RICO claims in a separate action. <u>See</u> <u>European Community v. RJR Nabisco, Inc.</u>, 355 F.3d 123, 139 (2d Cir. 2004).

[7] Under 28 U.S.C. § 1332(a)(4), "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between— . . . (4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States." Under 28 U.S.C. § 1603(a), a provision of the Foreign Sovereign Immunities Act (FSIA), a "foreign state" is defined as including "a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)."

[8] Reynolds American overlooks the Supreme Court's controlling definition of the term "foreign state" in <u>Samantar</u>.  Its reliance upon secondary authorities, such as the Restatement and pre-<u>Samantar</u> case law (D. Supp. Mem. 12-14), is misplaced.

[9] <u>See</u> Article 52 TEU; Article 355 TFEU (ex-Article 299 TEC).

[10] <u>See</u> Consolidated Versions of the Treaty on European Union (TEU) and the Treaty on the Functioning of the European Union (TFEU), <u>see</u> n.5, <u>supra</u>.  The TFEU is the successor treaty to the Treaty Establishing the European Community (TEC).  A consolidated version of the TEC, which was in force at the time of the commencement of this action, may be found at <u>http://eur-lex.europa.eu/en/treaties/dat/11997D/htm/11997D.html</u>  (last accessed Dec. 17, 2010).

11

legal personality.[11]  EU citizenship is conferred on all nationals of the Member States of the EU.[12]

The EU's institutional balance is marked by a triangular structure involving three main institutions:  the European Parliament (which directly represents the EU's citizens and is democratically elected by them);[13] the Council (which represents the individual Member States);[14] and the European Commission (the EU's executive arm, which represents and upholds the interests of the EU as a whole).[15]  The Council and the Parliament adopt legislation which is applicable throughout the EU.  The EU has its own judicial system with the European Court of Justice as its highest court.[16]

The EU has a vast array of competences for a large number of matters which are set forth by treaty.[17] The EU issues its own currency, the euro.  The EU engages in foreign relations and

---

[11] See Article 47 TEU states categorically that "[t]he Union shall have legal personality."  (ex-Article 281 TEC).  See also Article 335 TFEU ("the Union shall enjoy the most extensive legal capacity accorded to legal persons under national law in each of its Member States; it may in particular, acquire or dispose of movable and immovable property and be a party to legal proceedings") (ex-Article 282 TEC).

[12] See Article 20(1) TFEU ("Citizenship of the Union is hereby established.  Every person holding the nationality of a Member State shall be a citizen of the Union.  Citizenship of the Union shall be additional to and not replace national citizenship") (ex-Article 17 TEC).

[13] Responsibilities of the European Parliament, see Article 14 TEU.

[14] Responsibilities of the Council, see Article 16 TEU.

[15] Responsibilities of the European Commission, see Article 17 TEU.

[16] Responsibilities of the Court of Justice of the European Union, see Article 19 TEU.

[17] According to Article 3(1) TFEU, the EU has exclusive competence to legislate and adopt legally binding acts in the following areas:  (a) customs union; (b) the establishing of the competition rules necessary for the functioning of the internal market; (c) monetary policy for the Member States whose currency is the euro; (d) the conservation of marine biological resources under the common fisheries policy; and (e) common commercial policy.  According to Article 4(2) TFEU, there also exist a range of areas with regard to which the EU shares competence with the Member States, including:  (a) internal market; (b) social policy in defined areas; (c) economic, social, and territorial cohesion; (d) agriculture and fisheries, excluding the conservation of marine biological resources; (e) environment; (f) consumer protection; (g)

has entered into many treaties and international agreements.[18]   Accordingly, the EU clearly

meets the definition of "foreign state" as that term is defined by Samantar and used in 28 U.S.C.

§ 1332(a)(4).

Reynolds American argues that the EU is not itself a "foreign state" under the FSIA

because the State Department's "Fact Sheet" does not "recognize" the EU as an 'independent

state.'" (D. Supp. Mem. at 13) (citation omitted).  This argument is ill-founded.

**First**, Samantar defines "foreign state" under the FSIA.  That definition–which Reynolds

American never mentions–does not include any "recognition" requirement.  Samantar is

controlling; not a "Fact Sheet" which does not even define "foreign state" under the FSIA.

**Second**, the State Department has found European, treaty-based entities to be "foreign

states" under the FSIA, without suggesting that its "recognition" of the entity as an "independent

state" was a relevant consideration.  See Letter of U.S. State Department to Europol, dated

November 26, 2002 ("Opinion Letter").[19]

**Third**, diplomatic recognition is not a prerequisite for invoking diversity jurisdiction

according to the Executive Branch.  As Judge (now Justice) Sotomayor observed:

> This Court, in Matimak, attempted to shift responsibility for the disturbing
> consequences of its reasoning to the Executive Branch.  Because the Department
> of State maintains that British Overseas Territories are not independent "states,"

---

transport; (h) trans-European networks; (i) energy; (j) areas of freedom, security and justice; and
(k) common safety concerns in defined public health matters.

[18] A full list of agreements entered into by the EC or EU may be found at Commission's Treaty
Office Database: http://ec.europa.eu/world/agreements/searchByOrganization.do?id=4&letter=E
(last accessed Dec. 17, 2010).

[19] The U.S. State Department Opinion Letter was published by the EU.  See Note of the Council
of the European Union, Doc. No. 15231/02 ADD 1 (Consolidated version of Exchange of Letters
related to the Supplemental Agreement), at 6-8 (Brussels, 5 Dec. 2002). (See Halloran Decl. Ex.
3.)  The Opinion Letter was also published by the U.S. State Department.  See Office of Legal
Adviser, U.S. Department of State, Digest of United States Practice in International Law, 467-
469 (2002).  (See Halloran Decl. Ex. 4.)

the Matimak court reasoned that it was forced to conclude that Bermuda corporations were stateless.  The Executive Branch, however, has urged us *not* to use the definition of "statehood" taken from the context of diplomatic recognition as a basis for denying British Overseas Territories the benefit of federal alienage jurisdiction.

Koehler v. Bank of Berm. (N.Y.) Ltd., 229 F.3d 187, 189 (2d Cir. 2000) (Sotomayor, J.,

dissenting from denial of rehearing *in banc*) (citations omitted) (emphasis added).[20]  See also

Tetra Finance (HK), Ltd. v. Shaheen, 584 F. Supp. 847, 848 (S.D.N.Y. 1984) (diversity should

not turn on formal recognition).

      **Fourth**, U.S. courts consistently treat the EC as a foreign state for purposes of

"international comity," which is "the recognition one nation allows within its territory to the

legislative, executive or judicial acts of another nation."  Hilton v. Guyot, 159 U.S. 113, 174

(1895).  See, e.g., In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 2010

U.S. Dist. LEXIS 89275, at *18 (E.D.N.Y. 2010) ("the policies underlying international comity

apply with equal force to a supranational body like the EU" even though it is not a "nation"); In

re Rubber Chems. Antitrust Litig., 486 F. Supp. 2d 1078, 1082 (N.D. Cal. 2007) (EU should be

afforded comity); In re Vitamins Antitrust Litig., 2002 U.S. Dist. LEXIS 25815, at *33 (D.D.C.

Dec. 18, 2002) ("the concerns of the EC should be addressed out of respect for the EC as a

foreign sovereign"); In re Methionine Antitrust Litig., MDL No. 00-1311 CRB, slip op. at 13

(N.D. Cal. June 17, 2002) (EU, as a "foreign government," is protected by international comity).

(See Halloran Decl. Ex. 5.)

---

[20] Judge (now Justice) Sotomayor's dissent was later vindicated.  The holdings in Matimak Trading Co. v. Khalily, 118 F.3d 76 (2d Cir. 1997), and its progeny were unanimously repudiated in JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd., 536 U.S. 88, 91 (2002) (the Second Circuit's decision on appeal in JPMorgan Chase Bank, which was reversed, had relied upon Matimak).  Reynolds' extensive reliance on Matimak is inexplicable.  (See D. Supp. Mem. 12-13.)

**Fifth**, the United States has accorded diplomatic recognition to the EU for many years. See, e.g., Exec. Order No. 11,689, 37 Fed. Reg. 25,987 (Dec. 7, 1972) (confirming diplomatic privileges and immunities for the EU).[21]  Thus, even if U.S. recognition were relevant in defining a "foreign state" under the FSIA, that condition has been met.

> **(b.)   The U.S. State Department's Opinion Letter To The EU States That European Treaty-Based Entities Are "Foreign States" Under the FSIA.**

The U.S. State Department has provided an official Opinion Letter to the European Union stating that European, treaty-based organizations established by the Member States qualify as "foreign states" under the FSIA.  (See Halloran Decl. Ex. 3 at 6-8; Ex. 4.)

The EU and the United States entered into an agreement to cooperate on matters within the purview of the European Police Office ("Europol").  See Agreement Between the United States of America and the European Police Office, Dec. 6, 2001.  Subsequently, the EU (acting through Europol) and United States negotiated a Supplemental Agreement to address the exchange of personal data of natural persons.  As part of that negotiation, the EU requested an opinion from the U.S. State Department concerning Europol's status under the FSIA.

The State Department, in an official letter to the EU, confirmed that Europol, as a "European treaty-based organization" formed by a group of Member States, "whose officials perform functions typically performed by national governmental agencies," qualifies as a "foreign state" under the terms of the FSIA.  (See Halloran Decl. Ex. 3 at 7 citing In re EAL Corp. v. European Org. for the Safety of Air Navigation, 1994 U.S. Dist. LEXIS 20528 (D. Del.

---

[21] See also H. Steiner, D. Vagts, H.H. Koh, Transnational Legal Problems, Materials and Text at 1104 (4th ed. 1994) ("By 1992, 150 countries including the United States had established diplomatic relations with the Community").

1994) ("Eurocontrol"); Gardiner Stone Hunter Int'l v. Iberia Lineas Aereas de Espana, 896 F. Supp. 125, 131 n.6 (S.D.N.Y. 1995).)

The State Department's Opinion Letter reflects settled law.  In Eurocontrol, plaintiffs sued Eurocontrol, "an entity created under the International Convention Relating to Cooperation for the Safety of Air Navigation, 1960" whose contracting members were European states.  Id. at *10.  Eurocontrol claimed immunity as a foreign state under the FSIA, and plaintiffs argued that Eurocontrol was actually an international organization of multiple states.  Id. at *12.  The District Court rejected that argument as "unpersuasive" and contrary to case law.  Id.  The Court determined that "Eurocontrol is charged with the regulation and governance of aviation and air traffic in its Member States"  and concluded that "Eurocontrol is a 'foreign state' under the FSIA."  Id. at *14-15.

The Opinion Letter and Eurocontrol convincingly demonstrate that the EC should be deemed a "foreign state" under the FSIA.  Just as Europol and Eurocontrol were created by treaties among Member States of the EC, the EC itself was created by treaty among the Member States of the EC.  Just as Europol and Eurocontrol perform government functions, the EC performs government functions in myriad areas.  Accordingly, the EC should be accorded the same status as Eurocontrol and Europol, and this Court should confirm that the EC is a "foreign state" under the FSIA.

### (c.)    This District Has Held That the EU Is a "Foreign State"

The Eastern District of New York has held that the European Union, and other European, treaty-based organizations, are "foreign states" under the FSIA.  See Morgan v. Council of Europe, et al., 02-CV-0891 (CBA), 02-CV-1471 (CBA) (E.D.N.Y. Dec. 31, 2002) (adopting Report and Recommendation of Bloom, M.J. ("R&R") finding that the Council of Europe is a

16

"foreign state" under the FSIA), appeal dismissed, Order (2d Cir. June 3, 2004) ("Morgan I")
(see Halloran Decl. Ex. 6); Morgan v. United States, European Union, et al., 04-CV-0672
(CBA), at 3 & n.1 (E.D.N.Y. Feb. 26, 2004) ("European Union" is "immune from suit" on the
same basis as the Council of Europe), appeal dismissed, Order (2d Cir. Aug. 3, 2004) ("Morgan
II").  (See Halloran Decl. Ex. 7.)

In Morgan I, plaintiff Michael Morgan sued the Council of Europe seeking damages for
alleged injuries sustained while he was incarcerated in a Finnish prison for two years.  The
Council of Europe moved to dismiss the complaint on the ground that it was immune from suit
under the FSIA as a foreign state.  See Morgan I, R&R at 3.  Magistrate Judge Bloom considered
the treaty among states under which the Council of Europe was established and determined that
the Council of Europe is a "foreign state" under the FSIA (28 U.S.C. § 1603 (a) and (b)).  See
Morgan I, R&R at 5 (citation omitted).)  Judge Amon adopted the R&R and the appeal was
dismissed.  See Morgan I, supra.

In Morgan II, Morgan brought a similar suit against the European Union and others.
Judge Amon dismissed the claim against the EU, holding that it was "immune from suit" on the
same basis as the Council of Europe.  See Morgan II, supra.

Morgan I and Morgan II should be accorded respectful consideration by this Court.  They
are recent opinions within this District which squarely decide the precise issue presented for
decision, namely, whether European, treaty-based entities, including the EU itself, are deemed
"foreign states" under the FSIA.   The R&R of Magistrate Judge Bloom (which was decisive in
Morgan I and  Morgan II) was decided on full briefing by the Council of Europe, well-reasoned,
and consistent with both settled law (i.e., Eurocontrol) and the Opinion Letter of the U.S. State
Department.  Morgan I and Morgan II are part of the uniform body of authorities holding that

European, treaty-based entities—i.e., the EU, Eurocontrol, Europol, and the Council of Europe—

are "foreign states" under the FSIA.

### 2.      The EC Is an "Agency or Instrumentality" of Foreign States

Alternatively, the EC is an "agency or instrumentality of a foreign state" and, on that

basis, complete diversity exists.  In the FSIA, Congress included within the category "foreign

state" agencies, instrumentalities, and political subdivisions of foreign states.  See 28 U.S.C. §

1603(a).[22]

### (a.)      The EC Meets the Tripartite Test for Agency or Instrumentality

Congress intended the terms "agency" and "instrumentality" to cover a broad range of

entities as demonstrated by the broad statutory definition of "foreign state" which "includes"

agencies and instrumentalities of "any" form.  28 U.S.C. §§ 1603(a)-(b).[23] See Granville Gold

---

[22] "Foreign state" includes "a political subdivision of a foreign state or an agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a).  Congress has defined the term "agency or instrumentality" as follows:

An "agency or instrumentality of a foreign state" means any entity –

(1)  which is a separate legal person, corporate or otherwise, and

(2)  which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3)  which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title nor created under the laws of any third country."

28 U.S.C. § 1603(b).

[23] Congress defines "foreign state" as a term that "*includes*" political subdivisions, agencies, and instrumentalities.  28 U.S.C. § 1603(a) (emphasis added).  This use of the term "includes" (rather than "means") evidences Congress' clear intent to set forth a broad, non-exhaustive list of covered entities.  See Boyle v. United States, 129 S. Ct. 2237, 2243 & n.2 (2009).  Additionally, "foreign state" includes "*any* entity" meeting the criteria of "agency or instrumentality of a foreign state."  28 U.S.C. § 1603(b) (emphasis added).  This use of the term "any" "ensures that the definition has a wide reach."  Boyle, 129 S. Ct. at 2243.  Accord United States v. Gonzales, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind'") (citation omitted).

Trust-Switzerland v. Commissione Del Fullimento/Inter Change Bank, 924 F. Supp. 397, 405 (E.D.N.Y. 1996) ("The legislative history of the FSIA is clear that the term 'agency or instrumentality' should be interpreted broadly"), aff'd, 111 F.3d 123 (2d Cir. 1997); see S & S Mach. Co. v. Masinexportimport, 706 F.2d 411, 414 (2d Cir. 1983) (same).

The EC meets each of the three criteria for an "agency or instrumentality of a foreign state." 28 U.S.C. § 1603(b).  The EC is a "separate legal person, corporate or otherwise" (28 U.S.C. § 1603(b)(1));  Reynolds American does not challenge the EC's status as a separate legal person.  The EC "is an organ of a foreign state" (28 U.S.C. § 1603(b)(2)); Reynolds American does not contest that the EC is an "organ" and, indeed, concedes that the EC is an agency or instrumentality of "its twenty-seven Member States collectively."  (See D. Supp. Mem. 15.) Reynolds American merely contests the EC's status as an organ of "a" foreign state (an argument that is refuted below).  The EC is not "a citizen of a State of the United States" and was not "created under the laws of any third country" outside of its Member States; Reynolds American does not argue otherwise.

**(b.)   The FSIA Covers Entities Formed By Multiple Foreign States**

While acknowledging that the EC is an agency or instrumentality of "its twenty-seven Member States collectively"  (see D. Supp. Mem. 15),  Reynolds American argues that section 1603(b)(2) defines an "agency or instrumentality" as "an organ of *a* foreign state" (emphasis added) and the EC is not an agency or instrumentality of a single foreign state.  (See D. Supp. Mem. 15.)  This "textual" argument is flatly incorrect.

By federal law, in construing U.S. statutes, "words importing the singular include and apply to several persons, parties or things."  See 1 U.S.C. § 1.  It is an "elementary rule of statutory construction that the singular . . . includes the plural."  Public Citizen, Inc. v. Mineta,

340 F.3d 39, 54 (2d Cir. 2003).  The singular article  ("a foreign state") should therefore be construed to include the plural ("foreign states").

The courts have rejected the argument that the FSIA should be construed to limit its coverage to agencies or instrumentalities formed or owned by a single foreign state.  In Eurocontrol, for example, plaintiffs argued "that an international association is not an 'agency or instrumentality of a foreign state' if it is not majority-owned by a single foreign nation."  See Eurocontrol, 1994 U.S. Dist. LEXIS 20528 at *12.  The court rejected this argument and held that Eurocontrol, which was formed by multiple Member States by treaty, is a foreign state under the FSIA.  Id. at *15.  Accord Le Donne v. Gulf Air, Inc., 700 F.  Supp. 1400, 1406 (E.D. Va. 1988) ("[i]f the policies that animate the FSIA are to be given their full range, it must, therefore, apply to treaty-created instrumentalities jointly owned by foreign states").  (See also Halloran Decl. Ex. 3 at 7 (Europol, an entity "established by treaty between a group of foreign governments rather than by a single foreign government," qualifies as a "foreign state").)

### (c.)    The International Organizations Immunity Act Is Not Applicable

Reynolds American argues that the International Organizations Immunity Act, 22 U.S.C. § 288a, et seq. ("IOIA") and its "limited" protections exclusively govern the EC.  (See D. Supp. Mem. 6-18.)  This novel argument is meritless.

*First*, the courts, given a choice to apply either the FSIA or IOIA to a European, treaty-based organization, have held that FSIA—not IOIA—applies to define the organization's rights and obligations.  See, e.g., Eurocontrol, 1994 U.S. Dist. LEXIS 20528 at *7 (FSIA, not IOIA, is "dispositive").

*Second*, Reynolds American has misread 22 U.S.C. § 288h.  It argues that: "[i]n 1972, the IOIA was amended to address specifically the European Communities, the predecessor entity

to the EC" (22 U.S.C. § 288h), and "this amendment extended only limited privileges" to the EC

delegation.  (D. Supp. Mem. 6-17.)  In fact, however, "[22 U.S.C. § 288h] was *not* enacted as

part of . . . . the International Organizations Immunities Act."  22 U.S.C. § 288h at 575 (West

2004) (emphasis added).  The key premise of Reynolds' IOIA argument is simply incorrect.

The statutory enactment was not designed to "limit" the privileges, immunities, and

exemptions available to the EC.  It was enacted prior to the FSIA, to provide clarity to the

protections available to the EC delegation in the United States.  22 U.S.C. § 288h  was amended

in 1987 and President Reagan confirmed:  "This order is not intended to abridge in any respect

privileges, exemptions or immunities that the Delegation of the Commission of the European

Communities may have acquired or may acquire by international agreements or by

Congressional action."  See Exec. Order  No. 12,651, 53 Fed. Reg. 35,287 (Sept. 13, 1988).   The

United States thereby expressly confirmed that the protections accorded to the EC delegation

under 22 U.S.C. § 288h were not "limited" (as argued by Reynolds).

***Third***, Reynolds American argues that Congress, in amending IOIA to protect the

European Central Bank ("ECB") (22 U.S.C. § 288f-5), intended for IOIA to exclusively govern

the EC.  (See D. Supp. Mem. 18.)  Reynolds overlooks the history and background applicable to

22 U.S.C. § 288f-5.

The ECB was organized as a corporation, with prescribed capitalization, and the national

central banks of the Member States—not the Member States themselves—are the sole

subscribers to and holders of the ECB's capital.  See Article 28, Protocol on the Statute of the

European System of Central Banks and of the European Central Bank (Official Journal C 83/230

of 30.3.2010.)

On May 30, 2001, the legal landscape dramatically changed when the Ninth Circuit ruled that "tiered" corporations—corporations owned by agencies or instrumentalities of foreign states, such as the ECB—were not subject to the FSIA.  See Patrickson v. Dole Food Co., 251 F.3d 795 (9th Cir. 2001), aff'd, 538 U.S. 468 (2003).

During the appellate process in Patrickson, Congress confirmed that FSIA protections should be available to the ECB, which was understood by Congress to be a tiered, multinational entity.  See Markup Before the Committee on International Relations on H.R. 3656 (Mar. 20, 2002), at 41, Serial No. 107-68 (GAO 2002) (the "ECB is an independent legal entity owned by the central banks of the EU member states" and the bill was designed "to provide the European Central Bank (ECB) the same immunity from judicial process that we routinely provide to foreign central banks under the Foreign [Sovereign] Immunities Act (FSIA)").  The bill was signed into law on November 5, 2002.  See Pub. L. No. 107-278, § 1.

Thus, 22 U.S.C. § 288f-5 addressed  a narrow problem posing potential concern to the ECB as a tiered, multinational corporate entity.  It was not an expression of broad legislative policy to exclude the EC from the coverage of the FSIA.  Indeed, the United States has confirmed that 22 U.S.C. § 288f-5 is designed to supplement, not preempt, the privileges, immunities, and exemptions acquired, or to be acquired, by the ECB pursuant to other agreements or laws.  See Exec. Order No. 13,307, 68 Fed. Reg. 33,338 (June 3, 2003).[24]

---

[24] Reynolds American argues that no court has applied the FSIA to international organizations. (See D. Supp. Mem. 15.)  This is contrary to law.  See, e.g., Eurocontrol, at *7 (FSIA, not IOIA, is dispositive); Morgan I, supra (Council of Europe); Morgan II, supra (European Union); see also Opinion Letter, supra (Europol).  The cases upon which Reynolds relies (D. Supp. Mem. 15-16) either support the application of  the FSIA to an international organization, have been abrogated, or are inapposite.  See Int'l Ass'n of Machinists & Aerospace Workers v. OPEC, 477 F. Supp. 553, 569 (C.D. Cal. 1979) ("defendants are entitled to immunity under 28 U.S.C. § 1604" of the FSIA), aff'd on other grounds, 649 F.2d 1354 (9th Cir. 1981);  Broadbent v. Org. of Am. States, 481 F. Supp. 907, 908 (D.D.C. 1978), aff'd, 628 F.2d 27 (D.C. Cir. 1980), abrogated

Accordingly, the EC is an agency or instrumentality of a foreign state under the FSIA, and that status confers complete diversity of jurisdiction in this case. [25]

**C.      The Court Must Resolve the Diversity Jurisdiction Question**

Defendants suggest that the Court may avoid resolving the diversity issue by simply dismissing the EC from the case on other grounds.  That suggestion is misguided.  The proffered theories do not support elimination of the EC from this case.

*First*, neither the Revenue Rule nor the Penal Law Rule bars the EC's money-laundering claims**.**  The application of both rules to this case has been exhaustively briefed already, and is not a proper subject for the limited purposes of this supplemental briefing.[26]  Plaintiffs have already shown that their present claims are unaffected by either the Revenue or the Penal Law Rule.  (P. Opp. 14-31.)

*Second*, the EC's claims are not barred by issue preclusion—another matter that has already been briefed.  (See P. Opp. 49-50.)  EC I, which dismissed the EC's claims on the basis of lack of jurisdiction, was not an adjudication on the merits, as FRCP 41(b) expressly makes clear.  "[A] dismissal for lack of subject matter jurisdiction is not an adjudication of the merits,

---

in El-Hadad v. United Arab Emirates, 496 F.3d 658, 667 (D.C. Cir. 2007) ("we rejected Broadbent's per se rule").  Prewitt Enters. v. OPEC, 353 F.3d 916, 922 (11th Cir. 2003), provides no guidance because the parties stipulated that *neither* the FSIA nor IOIA provided a basis to serve OPEC.

[25] The foregoing clearly establishes diversity jurisdiction in this case.  If, however, the Court were to reach a different conclusion, Plaintiffs respectfully request the opportunity to amend the complaint to address the Court's decision.

[26] The supplemental briefing was ordered at the October 26, 2010, oral argument.  The Court directed the parties to address application of Morrison and Norex, supra, and the diversity issue. (See Hr'g. Tr. 20, 41, 54-56, Oct. 26, 2010)  The Court expressed its desire for brevity (Id. at  55 (THE COURT:  ". . . For me there's a premium on conciseness").)  Most particularly the Court did ***not*** request additional briefing on matters already briefed.

and hence has no *res judicata* effect."  St. Pierre v. Dyer, 208 F.3d 394, 400 (2d Cir. 2000).  The cases Defendants cite are not to the contrary.[27]

Even if EC I could have preclusive effect, the Court there determined—at most—that the EC suffered no budgetary loss due to tobacco smuggling for purposes of 1964(c) because that loss was borne by the Member States.[28]  The Court in EC I did not address the common-law equitable claims raised in this action, particularly the EC's request for injunctive relief to stop Defendants' money laundering.  The injuries supporting injunctive relief, such as damage to public morals and safety and damage to the EC's financial infrastructure and operation of the European marketplace,[29] were not addressed in EC I.  The EC therefore retains viable claims not precluded by any prior decision.

***Finally***, the diversity jurisdictional issue must be addressed before the Court may consider merits issues.  Sinochem Int'l v. Malaysian Int'l Shipping Corp., 549 U.S. 422, 431 (2007).  In light of Arbaugh v. Y & H Corp., 546 U.S. 500 (2006), the sufficiency of the EC's injuries and application of Revenue/Penal Law Rules are clearly not jurisdictional matters.

## III.  PLAINTIFFS HAVE NOT WAIVED FEDERAL COMMON-LAW CLAIMS

Defendants err in stating that Plaintiffs' counsel agreed to New York common law as the only body of common law which may be available to the Court.  (See D. Supp. Mem. 9.)   The choice of law issue was raised by this Court in the hearing of October 26, 2010, as matter of choice of law "[a]mong the States."  (Hr'g. Tr. 45:5-19, Oct. 26, 2010; see Halloran Decl. Ex. 8.)

---

[27] Both Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574 (1999)  and Okoro v. Bohman, 164 F.3d 1059 (7th Cir. 1999) confined their *dicta* limiting the preclusive effect of jurisdictional determinations to jurisdictional issues.  "[A] jurisdictional dismissal precludes only the relitigation of the ground of that dismissal."  Okoro at 164 F.3d 1063.

[28] European Community v. RJR Nabisco, Inc., 150 F. Supp. 2d 456, 501 (E.D.N.Y. 2001).

[29] See SAC ¶ 201.

24

The Court's order to brief this issue is devoid of any instruction to brief issues of federal common law.  Plaintiffs' counsel never agreed to any waiver of federal common law.  Furthermore, the applicability of federal common law has no bearing on the issues ordered briefed by the Court.  The Defendants' argument on this matter should be rejected.

## CONCLUSION

For the reasons stated above, the Court should find that RICO applies to this action and that diversity jurisdiction exists.

KRUPNICK, CAMPBELL, MALONE,
BUSER, SLAMA, HANCOCK,
LIBERMAN & McKEE, P.A.


By  /s/_____

Kevin A. Malone, Esquire
kmalone@krupnicklaw.com
Carlos A. Acevedo  (CA-6427)
cacevedo@krupnicklaw.com
12 Southeast Seventh Street, Suite 801
Fort Lauderdale, Florida  33301
954-763-8181 telephone
954-763-8292 facsimile


SPEISER, KRAUSE, NOLAN & GRANITO

John J. Halloran, Jr. (JH-2515)
JJH@ny.speiserkrause.com
Two Grand Central Tower
140 East 45th Street
New York, NY 10017
212-661-0011 telephone
212-953-6483 facsimile


ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of Plaintiffs' Memorandum of Law in Opposition to Defendants' Joint Supplemental Memorandum of Law in Support of Motion to Dismiss the Second Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(B)(1) and 12(B)(6) and the Declaration of John J. Halloran, Jr., were served on December 20, 2010, on the following:

*Co-counsel for Plaintiffs:*

John J. Halloran, Jr., Esquire
JJH@ny.speiserkrause.com
Frank H. Granito, III, Esquire
F3G@ny.speiserkrause.com
Kenneth P. Nolan, Esquire
KPN@ny.speiserkrause.com
Speiser, Krause, Nolan & Granito
Two Grand Central Tower
140 East 45th Street
New York, NY 10017
800-683-8302 telephone
212-661-0011 telephone
212-953-6483 facsimile

John K. Weston , Esquire
jweston@sackslaw.net
Andrew B. Sacks, Esquire
asacks@sackslaw.net
Stuart H. Smith, Esquire
nolaw2@aol.com
Sacks & Weston
114 Old York Road
Jenkintown, Pennsylvania  19046
800-578-5300 telephone
215-925-8200 telephone
215-925-0508 facsimile

Edward F. Farrell, Esquire
efarrell@teleline.es
Villanueva 31
1º Izda.
28001 Madrid, Spain
011-3491-575-0370 telephone
011-3491-431-1153 facsimile

*Counsel for:*
*R.J. Reynolds Tobacco Company,*
*RJR Acquisition Corp.,*
*(f/k/a Nabisco Group Holdings Corp.),*
*RJR Nabisco Holdings Corp.,*
*R.J. Reynolds Tobacco Holdings, Inc.,*
*(f/k/a RJR Nabisco, Inc.), and*
*R.J. Reynolds Tobacco International, Inc.:*

Mark R. Seiden, Esquire
mrseiden@jonesday.com
Phineas E. Leahey, Esquire
peleahey@jonesday.com
Leslie B. Dubeck, Esquire
lbdubeck@jonesday.com
Jones Day
222 East 41st Street
New York, NY 10017-6702
212-326-3451 direct
212-326-3939 telephone
212-755-7306 facsimile

Gregory G. Katsas, Esquire
ggkatsas@jonesday.com
Jones Day
51 Louisiana Avenue, Northwest
Washington, DC 20001
202-879-3463 telephone
202-626-1700 facsimile