UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
The EUROPEAN COMMUNITY, *acting on its own behalf and on behalf of the Member States it has power to represent, and the* REPUBLIC OF AUSTRIA, KINGDOM OF BELGIUM, REPUBLIC OF BULGARIA, REPUBLIC OF CYPRUS, CZECH REPUBLIC, KINGDOM OF DENMARK, REPUBLIC OF ESTONIA, REPUBLIC OF FINLAND, FRENCH REPUBLIC, FEDERAL REPUBLIC OF GERMANY, HELLENIC REPUBLIC, REPUBLIC OF HUNGARY, REPUBLIC OF IRELAND, ITALIAN REPUBLIC, REPUBLIC OF LATVIA, REPUBLIC OF LITHUANIA, GRAND DUCHY OF LUXEMBOURG, REPUBLIC OF MALTA, KINGDOM OF THE NETHERLANDS, REPUBLIC OF POLAND, PORTUGUESE REPUBLIC, ROMANIA, SLOVAK REPUBLIC, REPUBLIC OF SLOVENIA, KINGDOM OF SPAIN, and KINGDOM OF SWEDEN, *individually*,

           Plaintiffs,

   -against-

RJR NABISCO, INC., R.J. REYNOLDS TOBACCO COMPANY, RJR ACQUISITION CORP., f/k/a NABISCO GROUP HOLDINGS CORP., RJR NABISCO HOLDINGS CORP., R.J. REYNOLDS TOBACCO HOLDINGS, INC., R.J. REYNOLDS GLOBAL PRODUCTS, INC., REYNOLDS AMERICAN INC., and R.J. REYNOLDS TOBACCO COMPANY,

           Defendants.
------------------------------------------------------------X

**MEMORANDUM & ORDER**

**02-CV-5771 (NGG) (VVP)**

IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAR 08 2011 ★

BROOKLYN OFFICE

NICHOLAS G. GARAUFIS, United States District Judge.

    The European Community and twenty-six European countries (the "Member States"), captioned above (collectively, "Plaintiffs"), bring this action against various corporate entities of American cigarette manufacturer R.J. Reynolds (collectively, "Defendants") for five violations

1

of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and for nine common-law torts in relation to Defendants' sales practices respecting their cigarettes. (2d Am. Compl. (Docket Entry # 73).) Defendants move to dismiss Plaintiffs' Second Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Defs.' Mot. (Docket Entry # 83).) As set forth below, the court grants Defendants' motion to dismiss in part and reserves decision on the remainder of Defendants' motion pending a response from Plaintiffs' counsel as to whether the European Community will proceed in this action.

## I. BACKGROUND

### A. Procedural History

Defendants' motion is the latest chapter in what is now a decade of litigation between the parties. On November 3, 2000, the European Community filed a complaint against all of the current Defendants, and others, generally alleging that Defendants engaged in a practice of smuggling and money laundering in relation to their cigarettes, in violation of RICO. (Compl., European Community v. RJR Nabisco, Inc., No. 00-cv-6617 (NGG) (VVP) (E.D.N.Y. Nov. 3, 2000) (Docket Entry # 110).) On July 16, 2001, the court dismissed the European Community's RICO claims and then dismissed the remainder of the action for lack of subject matter jurisdiction. European Community v. RJR Nabisco, Inc. (EC I), 150 F. Supp. 2d 456, 500-502 (E.D.N.Y. 2001).

On August 6, 2001, the European Community filed another complaint in this court, adding ten European countries as plaintiffs,[1] against substantially the same defendants. (Compl., European Community v. RJR Nabisco, Inc., No. 01-cv-5188 (NGG) (VVP) (Aug. 6, 2001) (Docket Entry # 1).) On the defendants' motion to dismiss, the court again dismissed the

---

[1] Those countries included the Kingdom of Belgium, the Republic of Finland, the French Republic, the Hellenic Republic, the Federal Republic of Germany, the Italian Republic, the Grand Duchy of Luxembourg, the Kingdom of the Netherlands, the Portuguese Republic, and the Kingdom of Spain, all members of the European Community.

2

plaintiffs' complaint. European Community v. Japan Tobacco, Inc. (EC II), 186 F. Supp. 2d 231, 233 (E.D.N.Y. 2002).

Plaintiffs took a two-pronged approach to that decision: they filed yet another complaint—the Original Complaint in this action (Compl. (Docket Entry # 1))—and appealed the court's decision in EC II to the United States Court of Appeals for the Second Circuit (Pls.' Notice of Appeal, European Community v. RJR Nabisco, Inc., No. 01-cv-5188 (NGG) (VVP) (E.D.N.Y. Mar. 25, 2002) (Docket Entry # 84)). On appeal, the Second Circuit affirmed this court's decision in EC II against all of the defendants except Japan Tobacco, Inc., and its subsidiaries and affiliates. European Community v. RJR Nabisco, Inc. (EC III), 355 F.3d 123, 127 (2d Cir. 2004).[2]

Following EC III, the parties stipulated to Plaintiffs filing an amended complaint in the instant action while the court stayed the proceedings so Plaintiffs could petition for a writ of certiorari to the Supreme Court of the United States. (See Docket Entry ## 41, 47.) On May 2, 2005, the Supreme Court granted certiorari and summarily vacated and remanded EC III in light of the Court's ruling in Pasquantino v. United States, 544 U.S. 349 (2005), decided the same term. European Community v. RJR Nabisco, Inc., 544 U.S. 1012, 1012 (2005). On remand, the Second Circuit concluded that Pasquantino did not change its analysis in EC III, and reinstated its decision. European Community v. RJR Nabisco, Inc. (EC IV), 424 F.3d 175, 182-83 (2d Cir. 2005). Plaintiffs again petitioned the Supreme Court for a writ of certiorari, but the Court denied the petition on January 9, 2006. European Community v. RJR Nabisco, Inc., 546 U.S. 1092 (2006).

---

[2] The Second Circuit vacated this court's decision in EC II with respect to Japan Tobacco, Inc. because, at the time of this court's decision in EC II, "Japan Tobacco had not yet been served in the action and had not appeared or joined the motion to dismiss." EC III, 355 F.3d at 139.

3

From 2006 to 2007, Plaintiffs engaged in settlement discussions with Japan Tobacco. (See Mem. & Order (Docket Entry # 72) at 2.) No parties had any contact with the court until March 2009, when Plaintiffs moved to file a Second Amended Complaint—their fifth in nine years—to add new defendants, new European nation-plaintiffs, and new factual allegations that had apparently developed since their last filing. (See id.) The court granted Plaintiffs' motion, and Plaintiffs filed their Second Amended Complaint. (2d Am. Compl.) On April 30, 2010, Defendants filed their fully briefed motion to dismiss the Second Amended Complaint. (Defs.' Mot. (Docket Entry # 83); Defs.' Mem. (Docket Entry # 84); Pls.' Opp'n (Docket Entry # 87); Defs.' Reply (Docket Entry # 88).)

Since Defendants have filed their motion, the Supreme Court decided Morrison v. National Australia Bank Ltd., 130 S. Ct. 2869 (2010), which prohibits the extraterritorial application of federal statutes that are silent on or unclear concerning extraterritoriality. Applying Morrison, the Second Circuit concluded that RICO is silent on extraterritorial application. Norex Petroleum Ltd. v. Access Indus., Inc. (Norex II), No. 07-cv-4553, 2010 WL 3749281, at *2 (2d Cir. Sept. 28, 2010), amended by 2010 WL 4968961 (2d Cir. Dec. 8, 2010). The court then ordered the parties to address the application of Morrison and Norex II to Plaintiffs' RICO claims at oral argument. (Docket Entry, Oct. 21, 2010.) After hearing oral argument from the parties, the court ordered supplemental briefing on the issue. (Docket Entry, Oct. 26, 2010; see also Defs.' Suppl. Mem. (Docket Entry # 95); Pls.' Suppl. Opp'n (Docket Entry # 97); Defs.' Suppl. Reply (Docket Entry # 99).) The court now considers Defendants' motion and the parties' supplemental briefs.

### B.     Plaintiffs' Second Amended Complaint

Plaintiffs' Second Amended Complaint—a structureless morass of allegations, devoid of any sequential description of events—generally asserts that Defendants engaged in a global money-laundering scheme. (2d Am. Compl. ¶¶ 1-5.) Plaintiffs allege a representative scheme as follows: First, Colombian and Russian criminal organizations smuggle cocaine and heroin, respectively, into Europe, where they generate large cash proceeds, in Euros, from drug sales. (Id. ¶¶ 31-32.) Those criminal organizations then trade those Euros, located in Europe, for local currency in the criminal organizations' home countries, through a European black market "money broker." (Id. ¶¶ 37-38.) Next, illicit cigarette importers purchase those Euros from the money broker at a discount to the prevailing exchange rate. (Id. ¶ 39.) Those importers then use the Euros to purchase Defendants' cigarettes from U.S. and European wholesalers. (Id.) The wholesalers then purchase cigarettes from Defendants, and ship the cigarettes to the importers. (Id.)

As for *Defendants'* involvement in this scheme—beyond their selling of cigarettes to U.S. and European wholesalers—Plaintiffs allege that Defendants "utilized certain companies" to handle the illicit transactions, who "maintained lists of 'direct customers of RJR' which included special handling instructions for shipments for [customers that] Defendants knew were involved in criminal activities." (Id. ¶ 58.) Plaintiffs further allege that Defendants traveled around the world "for the purpose of meeting and negotiating business agreements with individuals who [Defendants] knew, or should have known, were involved in the laundering of narcotics proceeds." (Id. ¶ 63; see also id. ¶¶ 84, 115.)

Plaintiffs also allege some variations on this representative scheme. In some instances, the illicit cigarette importers are the same Colombian and Russian criminal organizations

5

engaged in drug trafficking. (Id. ¶ 39.) In others, the money brokers themselves purchase cigarettes from wholesalers. (Id. ¶ 59.) In another, Defendants initially ship their cigarettes into Panama to "use the secrecy laws of the Republic of Panama" to shield the transactions. (Id. ¶¶ 66, 104-108.) Plaintiffs also allege that Defendants purchased former British tobacco manufacturer, Brown & Williamson, for the purpose of expanding these schemes in Europe. (Id. ¶¶ 100-103.)

In one scheme, Defendants' employees allegedly traveled to Venezuela, snuck across the border to Colombia, sold cigarettes to Colombian criminal organizations for cash, snuck back across the Venezuelan border, and wired the cash proceeds to Defendants from Venezuela. (Id. ¶ 72.) Sometimes these employees would receive payments in Brady Bonds,[3] rather than cash, which they would sell for U.S. dollars back in Venezuela. (Id. ¶ 74.)

In another scheme—completely devoid of any connection to Europe—a non-party corporation with the same address as one of the Defendants sold cigarettes in Iraq, via territories controlled by the Kurdistan Workers' Party, a designated terrorist organization. (Id. ¶¶ 77, 80.) Plaintiffs argue that this somehow harmed the European Community's interests. (Id.)

Lastly, Plaintiffs assert that, "[o]n many occasions over the past decade," Defendants lied to them regarding the exportation of their cigarettes. (Id. ¶¶ 85-87.) First, Plaintiffs allege that Defendants lied to them about markings on their cigarettes that supposedly enabled Defendants to identify illicit cigarette purchasers. (Id. ¶ 86.) And second, Plaintiffs complain that Defendants undervalued the cost of their cigarettes when importing them into Europe. (Id. ¶¶ 87-89.)

---

[3] Brady Bonds are tradeable securities issued by the United States and "backed by United States Treasury zero coupon bonds, which act as collateral or as a guarantee and give investors greater security." Comment, Jessica W. Miller, Solving the Latin America Sovereign Debt Crisis, 22 U. Pa. J. Int'l Econ. L. 677, 687 (2001).

Plaintiffs finish their Second Amended Complaint by listing seven "interests" the United States and this district have in Defendants' alleged conduct (id. ¶¶ 133(a)-(g)); thirty-six "injuries" suffered by Plaintiffs (id. ¶¶ 146(a)-(jj)); twenty-nine requests for relief (id. ¶¶153(a)-(o); 155(a)-(n)); and fourteen legal claims against Defendants (id. ¶¶ 157-257).

## II. DISCUSSION

### A. Extraterritoriality of Plaintiffs' RICO Claims

Defendants argue that, following Morrison and Norex II, Plaintiffs' RICO claims are impermissibly extraterritorial, and must be dismissed under Federal Rule of Civil Procedure 12(b)(6). (Defs.' Suppl. Mem. at 1-9.) Rule 12(b)(6) allows for dismissal of a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In evaluating a motion to dismiss under Rule 12(b)(6), a court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co., 517 F.3d 104, 115 (2d Cir. 2008) (citation omitted). If the claim at issue does not state a "legally cognizable right of action," the court must dismiss that claim. Bell Atl. Corp. v. Twombly, 555 U.S. 544, 555 (2007). As discussed below, the court agrees that Plaintiffs' claims are impermissibly extraterritorial and must be dismissed under Rule 12(b)(6).

#### 1. Extraterritoriality of RICO

In measuring the territorial reach of a federal statute, Morrison commands that "when a statute gives no clear indication of an extraterritorial application, it has none." 130 S. Ct. at 2878. In Norex II, Second Circuit concluded that its prior precedent "holds that RICO is silent as to any extraterritorial application." 2010 WL 4968691, at *3 (citing N. S. Fin. Corp. v. Al-Turki, 100 F.3d 1046, 1051 (2d Cir. 1996)). Therefore, in light of Morrison, this silence prohibits any extraterritorial application of RICO. Id. at *3.

2.  The Focus of RICO

In determining whether a claim seeks an extraterritorial application of a federal statute, the court must look to the "focus" of that statute. See Morrison, 130 S. Ct. at 2883-84. This focus is not necessarily the "bad act," or the *actus reus*, prohibited by the statute. Id. at 2881. Rather, it is "the object[] of the statute's solicitude," the activities "the statute seeks to regulate [and] parties or prospective parties to those [activities] that the statute seeks protect." Id. (internal citations and quotation marks omitted).

In Morrison, for example, the Court engaged in a thorough analysis of § 10(b) of the Securities Exchange Act to determine its "focus." Id. at 2884. Section 10(b) makes it illegal for "any person . . . to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance." See id. at 2881 (quoting 15 U.S.C. § 78j(b)). Looking at the operative section of the statute, the Supreme Court noted that § 10(b) focused "not upon the place where the deception originated, but upon purchases and sales of securities." Id. The Court concluded that "[t]hose purchase-and-sale transactions are the objects of the statute's solicitude. It is those transactions that the statute seeks to regulate; it is parties or prospective parties to those transactions that the statute seeks protect." Id. (internal citations and quotation marks omitted). Accordingly, the Court determined that § 10(b) was limited in scope "to purchases and sales of securities *in the United States*." Id. (emphasis added). Because the sales of securities at issue in Morrison occurred outside the United States, the Court rejected the plaintiffs' argument that it merely sought enforcement of a domestic claim even though the deceptive conduct occurred in Florida. Id. at 2885-85.

While the Second Circuit has not addressed the "focus" of RICO, the statutory analysis in Morrison proves illuminating. The RICO statute contains four operative subsections.

8

Subsection (a) makes it "unlawful for any person who has received any income derived . . . from a pattern of racketeering activity . . . to use or invest . . . any part of such income [in] any enterprise." 18 U.S.C. § 1962(a). Subsection (b) prohibits "any person through a pattern of racketeering activity . . . to acquire or maintain . . . any interest in or control of any enterprise." Id. § 1962(b). Subsection (c) forbids "any person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity." Id. § 1962(c). Lastly, subsection (d) outlaws conspiring "to violate any of the provisions of subsection (a), (b), or (c) of this section." Id. § 1962(d).

Each of the three primary subsections—(a), (b), and (c)—contains three elements: the "person," the "enterprise," and the "pattern of racketeering activity." See St. Germain v. Howard, 556 F.3d 261, 263 (5th Cir. 2009) ("Claims under RICO, 18 U.S.C. § 1962, have three common elements: (1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise.") (citation omitted). With respect to these elements, the statute does not punish the predicate acts of racketeering activity—indeed, each predicate act is, itself, a separate crime—but only racketeering activity in connection with an "enterprise." See United States v. Neapolitan, 791 F.2d 489, 500 (7th Cir. 1986) ("The central role of the concept of enterprise under RICO cannot be overstated."); Randy D. Gordon, Crimes That Count Twice: A Reexamination of RICO's Nexus Requirements Under 18 U.S.C. §§ 1962(c) and 1964(c), 32 Vt. L. Rev. 171, 172 (2007) ("[E]ven a pervasive pattern of racketeering acts (also referred to as 'predicate' acts in cases and commentary) will not sustain a RICO claim if it is not tied to a RICO 'enterprise.'"); cf. Morrison, 130 S. Ct. at 2884 ("Section 10(b) does not punish deceptive conduct, but only deceptive conduct 'in connection with the purchase or sale of any security registered on a

national securities exchange or any security not so registered.'" (quoting 15 U.S.C. § 78j(b))). RICO, therefore, seeks to regulate "enterprises" by protecting them from being victimized by or conducted through racketeering activity. See Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 164 (2001) (concluding that the purpose of RICO is "both protect[ing] a legitimate 'enterprise' from those who would use unlawful acts to victimize it [and] protect[ing] the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which 'unlawful activity is committed'" (citing United States v. Turkette, 452 U.S. 576, 591 (1981) and Nat'l Org. for Women, Inc. v. Scheidler, 510 U.S. 249, 259 (1994))). Even the name of the statute suggests that it places its focus on the "enterprise"— RICO is, after all, the Racketeer Influenced and Corrupt *Organizations* Act. See 18 U.S.C. § 1961, Short Title (emphasis added). Accordingly, it is the "enterprise" that is the object of the statute's solicitude, and the "focus" of the statute. See Morrison, 130 S. Ct. at 2884.

### 3. Location of a RICO Enterprise

Because the "focus" of RICO is the "enterprise," a RICO "enterprise" must be a "domestic enterprise." Cf. id. at 2884 ("And it is in our view only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies."). While there are no cases suggesting how a court may determine the geographic location of a RICO enterprise, other cases have analogously discussed how to determine the geographic location of a corporation. In Hertz Corp. v. Friend, 130 S. Ct. 1181 (2010), for example, the Supreme Court adopted the "nerve center test" as the vehicle of choice in determining a corporation's "principal place of business." In Hertz, the Supreme Court interpreted the diversity jurisdiction statute to "conclude that [a corporation's] 'principal place of business' is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities. It is the place that Courts of Appeals have called the corporation's

'nerve center.'" 130 S. Ct. at 1192 (citing <u>Scot Typewriter Co. v. Underwood Corp.</u>, 170 F. Supp. 862, 865 (S.D.N.Y. 1959)).

The nerve center test "identif[ies] the place where overall corporate policy originates or the nerve center from which it radiates out to its constituent parts and from which its officers direct, control and coordinate all activities without regard to locale, in the furtherance of the corporate objectives." <u>Royal Indem. Co. v. Wyckoff Heights Hosp.</u>, 953 F. Supp. 460, 462-63 (E.D.N.Y. 1996) (internal punctuation and citations omitted) (citing <u>Scot Typewriter</u>, 170 F. Supp. at 865). In instances where the corporation at issue may not have a single center of corporate policy, <u>Hertz</u> consoles the lower courts that "there will be hard cases," such as when enterprises "may divide their command and coordinating functions among officers who work at several different locations." 130 S. Ct. at 1194. Even then, the Court encourages using the nerve center test, as it "points courts in a single direction. . . . [where they] do not have to try to weigh corporate functions, assets, or revenues different in kind, one from the other." <u>Id.</u> Relative to other tests that attempt to define corporate location, the nerve center test "provides a sensible test that is relatively easier to apply, not a test that will, in all instances, automatically generate a result." <u>Id.</u>

RICO enterprises, however, may not have a single center of corporate policy. Although the "nerve center test" compels the court to determine a principal, i.e., single place of business for a corporation, though there may be many, the test is still instructive in determining the geographic location of "enterprise." The nerve center test's focus on the "brains," that is, where the corporation's decision are made, as opposed to the "brawn," that is, how the corporation acts, shows the Supreme Court's conception of the corporation's geographic location and where it

makes its decisions as twinned. Thus, although an enterprise may very well possess several "nerve centers," it is the "brains" not the "brawn" that dictate where the enterprise is located.

Indeed, the divide-and-command coordination structure mentioned in Hertz is the same type of organization contemplated by the Court in Boyle in regard to RICO enterprises. There, the court admitted that a RICO enterprise

> need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times.

Boyle v. United States, 129 S. Ct. 2237, 2245 (2009). Nonetheless, a RICO enterprise must have some semblance of "interpersonal relationships and a common interest," id. at 2244, and must "must function as a continuing unit," id. at 2245. Applying the nerve center test here, to determine an "enterprise's" location, similarly avoids the "weigh[ing of] corporate functions, assets, or revenues different in kind, one from the other." Hertz, 130 S. Ct. at 1194. An analysis of the territoriality of an "enterprise" in a RICO complaint, therefore, should focus on the decisions effectuating the relationships and common interest of its members, and how those decisions are made.

### 4. Territoriality of Plaintiffs' RICO Claims

The enterprise alleged in Plaintiffs' Complaint comprises of Defendants, "associated distributers, shippers, currency dealers, wholesalers, money brokers, and other participants." (2d Am. Compl. ¶ 158.) Plaintiffs assert that Defendants participated in the management of the enterprise through a pattern of racketeering activity, (Id. ¶ 171), and conspired with the other entities involved in the enterprise to violate RICO (id. ¶¶ 174-80). The Member States allege that they were harmed as a result of this conduct. (Id. ¶¶ 164-65; 169, 173, 180.)

Plaintiffs' accusations concerning the operation of the enterprise can be characterized as encompassing a series of steps governed by "interpersonal relationships." See Boyle, 129 S. Ct. at 2245. As discussed above, those steps are the "drug smuggling step" performed by the Colombian and Russian mob (2d Am. Compl. ¶¶ 31-32); the "currency swap step" between those mob organizations and European money brokers (id. ¶¶ 37-38); the "currency purchase step" between the money brokers and cigarette importers (id. ¶ 39); the "cigarette purchase step" performed by importers and wholesalers (id.); and the "cigarette shipping step" performed by wholesalers and Defendants (id.).

Nothing in Plaintiffs' Complaint even remotely suggests that Defendants had any hand in the planning, decisions, or "overall corporate policy" of the drug smuggling, currency swap, or currency purchase steps. In fact, the Complaint very clearly and repeatedly articulates that the "overall corporate policy" regarding these steps originates with organized criminal organizations in Europe and South America. (E.g., id. ¶¶ 32 (alleging that drugs are sold into Europe via the orders of criminal organizations in Europe and the Middle East); 37 (claiming that European money brokers have "developed methods to bypass the banking systems"); 38-41 (describing South American criminal organizations as "negotiating" contracts with money brokers and "contacting" individuals in Europe).)

Regarding the cigarette purchase and cigarette shipping step, Plaintiffs allege that Defendants "utilized certain companies to handle and sell their products [that Defendants] knew were involved in criminal activities," (id. ¶ 58), and that Defendants "negotiate[ed] business agreements with individuals who [Defendants] knew, or should have known, were involved in the laundering of narcotics proceeds" (id. ¶ 63). Yet Plaintiffs do not allege how Defendants' involvement in these activities demonstrated how Defendants organized, orchestrated, planned,

13

or even participated in the remaining criminal steps. Indeed, the Complaint, when read as a whole, strongly suggests the money laundering cycle was directed by South American and European criminal organizations. It is those organizations that began the money laundering process by smuggling drugs; those organizations that swapped currency with money brokers in Europe; and those organizations that controlled the cigarette importers, and thereby completed the money laundering cycle. Defendants' appear to be nothing more than sellers of fungible goods in a complex series of transactions directed by South American and Russian gangs. If there was an "overall corporate policy" of the money laundering enterprise alleged in the Complaint, it issued from those criminal organizations located in South America and Russia—not Defendants in the United States. Because Plaintiffs RICO claims, Counts I through V, are extraterritorial, they do not state a "legally cognizable right of action," and the court must dismiss them under Federal Rule of Civil Procedure 12(b)(6). See Bell Atl. Corp. v. Twombly, 555 U.S. 544, 555 (2007).

**B.     Subject Matter Jurisdiction over Plaintiffs' Remaining Common Law Claims**

Aside from their RICO claims, Plaintiffs only remaining claims are predicated on state-law causes of action. As such, the court must assess whether it has subject matter jurisdiction, particularly diversity jurisdiction, over the remainder of this case. See Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001). To do so would require the court to address whether the European Community may bring claims on diversity grounds. If the European Community were not present, however, the court would undoubtedly possess subject matter jurisdiction over the remaining state law claims because the Member States are "foreign states" as contemplated by the diversity statute. See 28 U.S.C. § 1332(a)(4).

This very issue was raised at oral argument on October 26, 2010. (Oral Arg. Tr. (Docket Entry # 91) at 8-9.) There, the court expressed its concern about ruling on an issue of such solemnity unless it was absolutely necessary. (Id. at 12.) Both sides conceded that the potential jurisdictional defect could be circumvented if the European Community voluntarily withdrew from the action. (Id. at 9, 15.) Plaintiffs' counsel stated that he would be amenable to withdrawing the European Community from suit, if the court dismissed Plaintiffs' RICO claims, after consulting with his clients. (Id. at 15, 56.) Accordingly, the court reserves decision on Defendants' motion regarding the state-law causes of action to allow Plaintiffs' counsel time to inform the court whether the European Community intends to remain in this suit.

## III. CONCLUSION

Defendants' Motion to Dismiss is GRANTED in part. The court directs Plaintiffs' counsel to inform the court within thirty days of this Memorandum and Order as to whether Plaintiff European Community intends to remain in this suit. The court reserves decision on the remainder of Defendants' motion pending Plaintiffs' counsel's response.

SO ORDERED.

Dated: Brooklyn, New York  
      March 7, 2011

s/Nicholas Garaufis,  
NICHOLAS G. GARAUFIS  
United States District Judge