UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

The EUROPEAN COMMUNITY, *acting on its own behalf and on behalf of the Member States it has power to represent, and the* REPUBLIC OF AUSTRIA, KINGDOM OF BELGIUM, REPUBLIC OF BULGARIA, REPUBLIC OF CYPRUS, CZECH REPUBLIC, KINGDOM OF DENMARK, REPUBLIC OF ESTONIA, REPUBLIC OF FINLAND, FRENCH REPUBLIC, FEDERAL REPUBLIC OF GERMANY, HELLENIC REPUBLIC, REPUBLIC OF HUNGARY, REPUBLIC OF IRELAND, ITALIAN REPUBLIC, REPUBLIC OF LATVIA, REPUBLIC OF LITHUANIA, GRAND DUCHY OF LUXEMBOURG, REPUBLIC OF MALTA, KINGDOM OF THE NETHERLANDS, REPUBLIC OF POLAND, PORTUGUESE REPUBLIC, ROMANIA, SLOVAK REPUBLIC, REPUBLIC OF SLOVENIA, KINGDOM OF SPAIN, and KINGDOM OF SWEDEN, *individually,*

                          Plaintiffs,

         -against-

RJR NABISCO, INC., R.J. REYNOLDS TOBACCO COMPANY, RJR ACQUISITION CORP., f/k/a NABISCO GROUP HOLDINGS CORP., RJR NABISCO HOLDINGS CORP., R.J. REYNOLDS TOBACCO HOLDINGS, INC., R.J. REYNOLDS GLOBAL PRODUCTS, INC., REYNOLDS AMERICAN INC., and R.J. REYNOLDS TOBACCO COMPANY,

                          Defendants.

-------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**02-CV-5771 (NGG) (VVP)**

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y.

★ MAY 13 2011 ★

**BROOKLYN OFFICE**

NICHOLAS G. GARAUFIS, United States District Judge.

On March 8, 2011, the court granted in part Defendants' motion to dismiss Plaintiffs'

claims arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"),

18 U.S.C. § 1962, Plaintiffs' sole federal claims. (Mem. & Order (Docket Entry # 102).) The

court reserved decision on the remainder of Defendants' motion to dismiss. (Id. at 15.)  For the reasons set forth below, the court dismisses the remainder of this action for lack of subject matter jurisdiction.

## I.     BACKGROUND

### A.     Procedural History

While the court assumes the parties' familiarity with the background of the case and its procedural history, as described in detail in the March 8, 2011 opinion (Mem. & Order at 2-4), it is important to highlight a few aspects of the litigation thus far.  Plaintiffs' Second Amended Complaint (the "Complaint"), the operative complaint in the litigation, brought claims against Defendants under several provisions of RICO and for nine common-law torts in relation to Defendants' sales practices regarding their cigarettes.  (2d Am. Compl. (Docket Entry # 73).) Defendants then moved to dismiss Plaintiffs' Complaint on several grounds, including the argument that Plaintiffs' RICO claims were impermissibly extraterritorial.  (Defs.' Mem. (Docket Entry # 84) at 38-41.)  While a decision on Defendants' motion was pending, the Supreme Court decided Morrison v. National Australia Bank Ltd., 130 S. Ct. 2869 (2010), which bars the extraterritorial application of federal statutes that are silent on or unclear concerning extraterritoriality.  Soon afterwards, the Second Circuit applied Morrison to civil RICO claims and concluded that the RICO statute is silent on extraterritorial application.  Norex Petroleum Ltd. v. Access Indus., Inc. (Norex II), No. 07-cv-4553, 2010 WL 3749281, at *2 (2d Cir. Sept. 28, 2010), amended by 2010 WL 4968961 (2d Cir. Dec. 8, 2010).  In light of these cases, the court requested oral argument.  (Docket Entry Oct. 21, 2010.)

At oral argument, Defendants raised the possibility that if the court dismissed Plaintiffs' RICO claims, it would lack subject matter jurisdiction over the remainder of the action because

Plaintiff European Community (the "European Community") is not a "foreign state" under the diversity statute, 28 U.S.C. § 1332(a)(4).  (Oral Arg. Tr. (Docket Entry # 91) at 7:25-9:10.)  Defendants noted, however, that the potential defect in subject matter jurisdiction could be cured if the European Community voluntarily withdrew from the lawsuit.  (Id. at 9:7-10.)  Plaintiffs disagreed with Defendants' contention that the European Community is not a "foreign state" under the diversity statute (id. at 19:25-20:4) but Plaintiffs' counsel stated that if it he were required to discuss dismissal with the European Community, he would do so (id. at 57:8-12).  The parties then submitted supplemental briefing on the issues raised at oral argument.  (Defs.' Suppl. Mem. (Docket Entry # 95); Pls.' Suppl. Opp'n (Docket Entry # 97); Defs.' Suppl. Reply (Docket Entry # 99).)

On March 8, 2011, the court dismissed Plaintiffs' RICO claims, their only federal claims.  (Mem. & Order at 15.)  Given the court's concerns over the subject matter jurisdiction issue, the court also directed Plaintiffs to inform it within thirty days whether the European Community intended to remain in the instant suit.  (Id.)  The court reserved decision on the remainder of Defendants' motion to dismiss.  (Id.)  On April 5, 2011, Plaintiffs filed a letter with the court stating that the European Community intended to remain as a party plaintiff.  (Docket Entry # 105.)  The court now considers the remainder of Defendants' motion to dismiss.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) allows defendants to challenge the court's subject matter jurisdiction by means of a motion to dismiss.  In reviewing a motion to dismiss under Rule 12(b)(1), courts must "accept as true all material factual allegations in the complaint," Shipping Fin. Serv. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998) (citation omitted), but refrain from "drawing from the pleadings inferences favorable to the party asserting

3

[jurisdiction]," APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003) (citation omitted). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).

## III.   DISCUSSION

It is axiomatic that federal courts are powerless to act unless they have subject matter jurisdiction over the cause of action. Because a federal claim no longer exists in this case, the only remaining jurisdictional hook for Plaintiffs' lawsuit is diversity jurisdiction. See 28 U.S.C. § 1332; Trans Union LLC v. Lindor, 393 F. App'x 786, 789-90 (2d Cir. 2010) (directing courts to address the issue of diversity jurisdiction after dismissing all federal claims).

### A.   Changes to the European Community

Regarding the European Community, great changes have been wrought to its status during the lengthy course of this litigation. The European Community was originally established in 1993 by the Maastricht Treaty, reforming its predecessor, the European Economic Community. See Treaty on European Union, art. G, Feb. 7, 1992, 1992 O.J. (C 191) 1 [hereinafter "Maastricht Treaty"]. In 2009, seven years after Plaintiffs filed their Original Complaint (see Compl. (Docket Entry #1)), the Lisbon Treaty incorporated the European Community, along with other European bodies, into the European Union. See Treaty of Lisbon Amending the Treaty on European Union and the Treaty Establishing the European Communities, Dec. 13, 2007, 2007 O.J. (C 306) 1 [hereinafter "Lisbon Treaty"]. The European Community thus ceases to function as an independent entity. Brian F. Havel & Gabriel S. Sanchez, Restoring Global Aviation's *"Cosmopolitan Mentalité"*, 29 B.U. Int'l L.J. 1, 3 n.2 (2011) ("While some scholars have labored in the past to keep the European Union conceptually separate from the European Community, with the former referring to a geographic and political

4

territory and the latter designating a source of law and policy, the [Treaty of Lisbon] abolished this distinction by giving single legal personality to the EU." (internal citations omitted)).

Despite changes to the status of a party during litigation, the court must address the issue of diversity jurisdiction at the time of the filing of the complaint. Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 830 (1989) ("The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed."). It follows, then, that a change in a party's status during litigation cannot confer diversity jurisdiction on the court if it was lacking at the time the complaint was filed. See Adrian Family Partners I, L.P. v. ExxonMobil Corp., 79 F. App'x 489, 492 (2d Cir. 2003) (citing Anderson v. Watts, 138 U.S. 694, 702-03 (1891)) (concluding that the changed status in a party's residence during litigation cannot confer diversity jurisdiction on the court). This also applies in the corporate context: post-litigation changes to an entity's structure will not confer jurisdiction on the federal court where it was lacking at the time of filing. See Dole Food Co. v. Patrickson, 538 U.S. 468, 478 (2003) ("We think the plain text of [28 U.S.C. § 1603], because it is expressed in the present tense, requires that instrumentality status be determined at the time suit is filed."); Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567, 579-80 (2004) (holding that changes in the composition of a partnership during litigation did not confer jurisdiction on the lower courts). Therefore, although the European Community, as an entity, has since been subsumed into the European Union, the court must address whether the European *Community* met the strictures of the diversity statute at the time the Original Complaint was filed: October 30, 2002.

### B.      Diversity Jurisdiction

The relevant provision of the diversity statute provides that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or

value of $75,000, exclusive of interest and costs, and is between . . . (4) a foreign state, defined in section 1603 (a) of this title, as plaintiff and citizens of a State or of different States." 28 U.S.C. § 1332(a).  Section 1603(a) of title 28 of the United States code, part of the Foreign Sovereign Immunities Act ("FSIA"), defines a "foreign state" as "includ[ing] a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)."[1]  Therefore, a "foreign state" under § 1332(a)(4) includes only a "foreign state," a "political subdivision of a foreign state," or an "agency or instrumentality of a foreign state." See Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek, 600 F.3d 171, 175 (2d Cir. 2010).

       1.    Recognition by the U.S. Department of State

In making their arguments, both parties rely on Matimak Trading Co. v. Khalily, 118 F.3d 76 (2d Cir. 1997) for the proposition that an entity is a "foreign state" only if it is recognized as a "foreign state" by the United States government.  (Defs.' Suppl. Mem. at 12; Pls.' Suppl. Opp'n at 14; Defs.' Reply at 6-7.)  Indeed, this was the central thesis in Matimak: "deference [to the Executive] is consistent with (1) the purposes of alienage jurisdiction and (2) the well-established analysis for defining a 'foreign state' in related jurisdictional statutes and constitutional provisions." 118 F.3d at 82-83.  Or, in more pithy terms, a "state" isn't a "state" unless the President calls it a "state."  Under this rubric, the Matimak court concluded that "citizens" of Hong Kong were not entitled to alienage jurisdiction under any provision of 28 U.S.C. § 1332 because Hong Kong itself was not a "state," recognized as such by the United States government, and because Hong Kong citizens' ties to the United Kingdom were "too attenuated" to be ascribed. Matimak, 118 F.3d at 86.

---

[1] The definition of an "agency or instrumentality of a foreign state as defined in subsection (b)" is discussed at Part III.B.4, infra.

6

The Supreme Court's decision in <u>JPMorgan Chase Bank v. Traffic Stream (BVI)</u> <u>Infrastructure Ltd.</u>, 536 U.S. 88, 92 (2002), however, narrowly abrogated <u>Matimak</u>. There, the Court concluded that even though the British Virgin Islands was not a governmentally recognized "state," its citizens were subject to alienage jurisdiction in diversity actions because those citizens' ties could be ascribed to the United Kingdom. <u>Id.</u> In doing so, the Court explicitly reserved opinion on whether "a foreign state must be diplomatically recognized by our own Government to qualify as such under the jurisdictional statute." <u>Id.</u>

Recently, in <u>Samantar v. Yousuf</u>, 130 S. Ct. 2278, 2286 (2010), the Court appears to have cast doubt on the requirement for diplomatic recognition of a "foreign state" under the FSIA. In <u>Samantar</u>, the Court noted that the State Department itself "sought and supported the elimination of its role with respect to claims against foreign states and their agencies or instrumentalities. . . . [but] understood the [FSIA] to leave intact the Department's role in official immunity cases." 130 S. Ct. at 2291 n.19 (citing Hearings on H.R. 11315 before the Subcommittee on Administrative Law and Governmental Relations of the House of Representatives Committee on the Judiciary, 94th Cong., 2d Sess., 34 (1976) (testimony of Monroe Leigh, Legal Adviser, Dept. of State) ("[I]t is our judgment . . . that the advantages of having a judicial determination greatly outweigh the advantage of being able to intervene in a lawsuit")). The Court did not, however, explicitly overrule <u>Matimak</u>, nor did it address the diplomatic recognition requirement in the context of alienage jurisdiction. Rather, it simply addressed whether the FSIA or common law principles of immunity applied to foreign officials apart from foreign states. <u>Id.</u> at 2282. Therefore, although <u>Matimak</u> is still technically controlling, because the current state of the law appears to be in flux, the court will address whether the European Community is a "foreign state" under the theories laid out in both <u>Matimak</u> and <u>Samantar</u>.

7

2.     A "Foreign State"

       a.     The <u>Matimak</u> Factors

In <u>Matimak</u>, the Second Circuit concluded that Hong Kong was not a "foreign state" for

purposes of alienage jurisdiction under § 1332(a)(4).  118 F.3d at 79-82.  There, the court

determined that the evidence "in the aggregate" compelled the conclusion that "the United States

did not recognize Hong Kong as a sovereign and independent international entity."  <u>Id.</u> at 82.

The court distinguished between "de jure" and "de facto" recognition by the Executive.  <u>See id.</u>

at 80 ("The parties here agree that the United States has not formally recognized Hong Kong as a

foreign state. . . . however, Matimak contends that Hong Kong has received 'de facto'

recognition as a foreign state by the United States . . . ."); <u>see also</u> <u>Abu-Zeineh v. Fed. Labs.,</u>

<u>Inc.</u>, 975 F. Supp. 774, 776 (W.D. Pa. 1994) ("De jure recognition is formal recognition . . . .

[while] de facto recognition . . . can be accorded a foreign state based upon an objective

examination of the relations between the recognized entity and the recognizing state.").

An entity has received formal, de jure recognition of statehood if "the foreign state was

recognized by the United States as 'a free and independent sovereign.'"  <u>Matimak</u>, 118 F.3d at

80 (quoting <u>Iran Handicraft & Carpet Exp. Ctr. v. Marjan Int'l Corp.</u>, 655 F. Supp. 1275, 1278

(S.D.N.Y. 1987)).  To that effect, the State Department periodically publishes a list of

"Independent States in the World."  Courts have looked to this list for similar guidance.  <u>E.g.</u>,

<u>United States v. Hasan</u>, 747 F. Supp. 2d 599, 633-34 (E.D. Va. 2010) (examining list to

determining whether international law applied to accused Somalian pirate); <u>Doe v. Roman</u>

<u>Catholic Diocese of Galveston-Houston</u>, 408 F. Supp. 2d 272, 281 n.2 (S.D. Tex. 2005)

(consulting the list to determine whether the Holy See or Vatican City was the proper entity

entitled to immunity).  Analogously, some courts have looked to similar "fact sheets" to

determine whether the United States has designated an entity as a foreign terrorist organization.

8

E.g., Matar v. Dichter, 563 F.3d 9, 11 n.1 (2d Cir. 2009) (looking at the Foreign Terrorist

Organizations Fact Sheet to determine that Hamas is a terrorist organization); Hor v. Gonzales,

421 F.3d 497, 499 (7th Cir. 2005) (looking at the same sheet for the proposition that the Algerian

Groupe Islamique Armé is a foreign terrorist organization). Here, the State Department's

"Independent States of the World" list dated November 13, 2002 does not list the European

Community as an independent state. U.S. Dep't of State, Bureau of Intelligence and Research,

"Independent States in the World" (Nov. 13, 2002) (on file with Office of the Geographer and

Global Issues). The European Community was therefore not afforded de jure recognition by the

United States as a "free and independent sovereign" at the time of the Original Complaint.

Nonetheless, Plaintiffs appear to argue that the European Community was afforded de

facto recognition of sovereignty by the Executive. (Pls.' Suppl. Opp'n at 13-14.) In Matimak,

the court gave close scrutiny to federal policy acts and State Department communiqués in

determining that Hong Kong did not receive de facto recognition as a sovereign country. 118

F.3d at 81-82. Specifically, the court noted that the United States Hong-Kong Policy Act

> provides that Hong Kong "will continue to enjoy a high degree of autonomy on
> all matters other than defense and foreign affairs," and emphasizes that only "with
> respect to economic and trade matters" shall the United States "continue to treat
> Hong Kong as a territory which is fully autonomous from the United Kingdom."

Id. at 82 (quoting 22 U.S.C. §§ 5701(1)(B), 5713(3) (West Supp. 1996)) (internal citations

omitted). This, the court concluded, made "clear [that] the United States' dealings with Hong

Kong . . . did not regard Hong Kong as an independent sovereign entity." Id. The court also

gave credence to a State Department letter, stating that "[t]he State Department no longer urges

treatment of Hong Kong as a de facto foreign state and withdraws any reliance on this

contention." Id. (alteration in original).

Case 1:02-cv-05771-NGG-VVP   Document 107   Filed 05/13/11   Page 10 of 31 PageID #: 2614

In support of their contention that the European Community has de facto recognition as a "foreign state" in the United States, Plaintiffs principally provide two pieces of evidence: a November 26, 2002 letter from the State Department to the European Police Office ("Europol") and a 1972 Executive Order. (See Pls.' Suppl. Opp'n at 13-14; Halloran Decl. Ex. 3, Letter from U.S. Dep't of State to Europol (Nov. 26, 2002) (Docket Entry # 98-3) [hereinafter "Letter"].) The State Department letter does not discuss whether the State Department considered the European Community as a "de facto foreign state." Cf. Matimak, 118 F.3d at 82. Rather, the substance of the Letter simply analyzes several federal cases on the issue of whether Europol would be entitled to immunity under the FSIA for torts committed in its information-sharing agreement with the United States.[2] Letter at 6-8. Even then, the Letter adds a caveat that "while we are happy to discuss in general how our courts have addressed several issues which could be relevant . . . you should be aware that the courts are legally authorized to make these determinations and only they could make a binding decision regarding Europol." Id. at 6.

As for the Executive Order referenced by Plaintiffs, Executive Order 11,689 signed by President Richard M. Nixon, it similarly does not address whether the United States gave de facto recognition of sovereignty to the European Community. Exec. Order No. 11,689, 37 Fed. Reg. 25,987 (Dec. 5, 1972). Rather, pursuant to 22 U.S.C. § 288h, it simply extends "the same privileges and immunities . . . enjoyed by diplomatic missions accredited to the United States" to the Mission of the Commission of the European Communities to the United States. Id. But the extension of diplomatic privileges to an entity does not afford that entity a de facto recognition of its sovereignty. Congress has authorized the President to grant diplomatic immunity to numerous entities, none of which could possibly be construed as sovereignty entities in their own right. See, e.g., 22 U.S.C. §§ 288f-2 (African Union Mission), 288f-3 (International Committee

---

[2] Further, what relationship Europol had to the European Community, if any, remains unclear.

of the Red Cross), 288j (International Development Law Institute).  This evidence, in the

aggregate, strongly suggests that the United States did not recognize the European Community as

an independent sovereign nation, de jure or de facto.  The European Community is therefore not

a "foreign state" under the principles laid out in <u>Matimak</u>.

b.     The <u>Samantar</u> Analysis

In <u>Samantar</u>, the Supreme Court concluded that the term "foreign state" in the FSIA

generally "indicates a body politic that governs a particular territory."  130 S. Ct. at 2286.  In

interpreting the FSIA, the Court focused on the Act's "codification of international law at the

time of [its] enactment" and found it useful to "examine the relevant common law and

international practice when interpreting [the FSIA]."  <u>Id.</u> at 2289.  For written authority of "the

relevant common law and international practice," the Court looked to the Restatement (Second)

of Foreign Relations Law of the United States.  <u>Id.</u> at 2286.

Section 4 of the Restatement defines "state" as "an entity that has a defined territory and

population under the control of a government and that engages in foreign relations."

Restatement (Second) of Foreign Relations Law of the United States ("Restatement") § 4; <u>see</u>

<u>also</u> Samantar, 130 S. Ct. at 2286 (adopting the same definition).  Comment c to § 4 specifically

contemplates unions between several states.  In that instance, the union is a "state" if "none of

them retains an independent capacity to engage in foreign relations and to assume separate

responsibility for its acts."  Restatement § 4, cmt. c.

In contrast, § 5 of the Restatement defines "international organizations."  There, an entity

is an "international organization" if it is "(a) is created by an international agreement as defined

in § 115 and (b) has a membership consisting primarily of states as defined in § 4."  Section 115

defines "international agreement" as "an agreement between states or international organizations

by which there is manifested an intention to create, change or define relationships under

11

international law." Restatement § 115(a).  Comment b to § 5 further contemplates when "[a]
state may delegate a measure of power for certain purposes to an international organization.  This
does not necessarily involve loss of status as a state under international law, even though the
organization may exercise functions which the states themselves cease to exercise."  As an
example of an "international organization," comment b gives the European Economic
Community, the predecessor entity to the European Community.  Restatement § 5, cmt. b; see
also Lisbon Treaty, 2007 O.J. (C 306) 1; Havel & Sanchez, supra, at 3 n.2 (2011) (describing the
European Community as a "source of law and policy" rather than a "geographic and political
territory").

       This framework strongly suggests that the European Community was an "international
organization" as opposed to a state.  While it is true that the European Community was "an entity
that has a defined territory and population," i.e., the territory and population of its member states,
it is less clear whether it exercised the control of government over those territories, particularly
in the foreign relations arena.  Despite its existence, the establishment of the European
Community did nothing to abrogate the powers of international sovereignty of its member states.
During the European Community's existence, member states were still able, independent of their
inclusion in the European Community, to receive ambassadors, sign treaties, and wage war.  See
generally Note, A Community Within the Community: Prospects for Foreign Policy Integration
in the European Community, 103 Harv. L. Rev. 1066, 1066 (1990) (discussing the powers of
foreign relations of member states, and noting that "Member States have largely prevented the
Community from displacing national control over foreign relations").  Comment c to § 4 of the
Restatement is instructive in this regard: the union of multiple states is a state itself only if none

of the states "retains an independent capacity to engage in foreign relations and to assume separate responsibility for its acts." Restatement § 4, cmt. c.

The definition of "international organization," however, is a much better fit for the European Community.  First, the European Community was created by an international agreement: the Maastricht Treaty.  That Treaty, undoubtedly, was "between states" and "manifested an intention to create, change [and] define [the] relationships" between the member states.  See Maastricht Treaty, 1992 O.J. (C 191) 1 (discussing this intention in the preamble).  And second, the European Community's membership consisted entirely of states—all but one of the Member States joined as Plaintiffs in this action.[3]  In addition, there is the inescapable fact that comment b to § 5 lists the European Community's predecessor entity, the European Economic Community, as an "international organization" even though it performs many of the governmental functions of a state "which the states themselves cease to exercise."  See Restatement § 5, cmt. b.  Under the Restatement, therefore, the European Community is more properly construed as a "international organization" than a "state."

Plaintiffs point to two of this court's previous decisions, Morgan v. Council of Europe (Morgan I), 02-cv-891 (CBA) (LB) (E.D.N.Y. Jan. 3, 2003) (Docket Entry # 18), and Morgan v. United States (Morgan II), 04-cv-672 (CBA) (LB) (E.D.N.Y. Feb. 26, 2004) (Docket Entry # 4).  In those cases, the plaintiff, a pro se litigant, filed claims against various international entities, including the Republic of Finland, the Council of Europe, the European Union, and the United Nations, regarding his alleged mistreatment at the hands of Finnish officials.  (See, e.g., Compl., Morgan v. Council of Europe, 02-cv-891 (E.D.N.Y. Mar. 5, 2002) (Docket Entry # 1).)  In Morgan I, the court adopted the Magistrate Judge's report and recommendation ("R&R") that the

---

[3] The United Kingdom, a Member State of the European Community, is not a party plaintiff.  See Maastricht Treaty, 1992 O.J. (C 191) 1.

plaintiff's claims should be dismissed. Morgan I at 1. Among several reasons given for

recommending the dismissal of the plaintiff's claims, the Magistrate Judge's R&R's concluded

that "[t]he Republic of Finland and the Council of Europe are foreign states, 28 U.S.C. § 1603(a)

and (b), and are therefore entitled to immunity from the jurisdiction of the courts of the United

States." Aside from this single sentence, however, the R&R did not engage in any further

analysis of the issue. In Morgan II, a suit against the United States, the Republic of Finland, the

Council of Europe, the European Union, and the United Nations, the court stated, again in a

single sentence, "the defendants named herein are immune from suit for the reasons set forth in

the Court's prior orders." Morgan II at 3.

To the extent the instant suit can be analogized to those decisions, the court does not find

them persuasive. First, both Morgan I and Morgan II were decided prior to 2010, without the

benefit of the Supreme Court's analysis in Samantar. Second, although the relevant portion of

the diversity statute incorporates the FSIA, Morgan I and II both dealt with the issue of immunity

rather than diversity jurisdiction. And third, the brief analyses in Morgan I and II did not engage

the statutory text as fully as is necessary in the instant case. Therefore, Plaintiffs' reference to

Morgan I and II do not convince the court that the European Community is a foreign state under

the FSIA.

### 3.   A "Political Subdivision of a Foreign State"

Although the European Community is not a "state" for purposes of the diversity statute,

the court may nonetheless obtain subject matter jurisdiction if the European Community can be

construed as "a political subdivision of a foreign state or an agency or instrumentality of a

foreign state." 28 U.S.C. § 1603. Like "foreign state," however, "political subdivision" seems to

inaccurately describe the European Community's relationship with the member states. "The

term 'political subdivisions' includes all governmental units beneath the central government,

14

including local governments," as well as departments or ministries of a state's government. Garb v. Republic of Poland, 440 F.3d 579, 596 n.21 (2d Cir. 2006). The plain meaning of this definition appears to exclude supranational, treaty-based organizations. Here, the European Community was not a governmental unit beneath a state's central government, nor can it be construed as a department or ministry of a state's government. Rather, as described in Garb v. Republic of Poland, the most salient examples of "political subdivisions" from FSIA jurisprudence are culture, trade, and financial organizations controlled by a single state's government. 440 F.3d at 592 n.21 (giving, as examples of "political subdivisions," the Cuban Ministry of Foreign Trade, the Russian Ministry of Culture, the Yemeni Ministry of Supply & Trade, and an Italian public-financial entity). The European Community was not an analogous entity when this action was filed.

4. An "Agency or Instrumentality of a Foreign State"

To recap, 28 U.S.C. § 1603(a) defines a "foreign state" as "includ[ing] a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)." Subsection (b) defines an "agency or instrumentality of a foreign state" as

> any entity—(1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332 (c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).

a. A "Separate Legal Person"

The statute's "personhood" requirement "is intended to include a corporation, association, foundation, or any other entity which, under the law of the foreign state where it was created, can sue or be sued in its own name." Samantar, 130 S. Ct. at 2287 n.9. The court must

15

consider the "instrumentality status" of the disputed entity at the time the original complaint was filed in October 2002. See Dole Food, 538 U.S. at 478 ("We think the plain text of [§ 1603], because it is expressed in the present tense, requires that instrumentality status be determined at the time suit is filed."). Because the Amsterdam Treaty, the law in force when the European Community filed its Original Complaint in 2002, provided for the European Community's separate, legal personhood, the European Community is a separate legal person for the purposes of the FSIA. See Treaty of Amsterdam Amending the Treaty on European Union, The Treaties Establishing the European Communities And Related Acts art. 281, Nov. 10, 1997, 1997 O.J. (C 340) 3 [hereinafter "Treaty of Amsterdam"] ("The Community shall have legal personality."); see also Rafael Leal-Arcas, EU Legal Personality in Foreign Policy?, 24 B.U. Int'l L.J. 165, 197 (2006) (comparing the legal personality of the European Community to that of the European Union).

> b. An "Organ of a Foreign State or Political Subdivision Thereof"
>> i. Singular or Plural?

Because the European Community arises out of an agreement among multiple states, the court must discern whether this clause of the FSIA is couched in the plural as well as the singular, that is, whether the FSIA applies only to "organs of a foreign state" or an "organ of foreign states." Put another way, whether the European Community can be an "organ of *a* foreign state" if it consisted of more than one foreign state. This occupies a central dispute in the parties' briefs. (Defs.' Suppl. Mem. at 15; Pls.' Suppl. Opp'n at 19.) And the great weight of authority suggests the answer is "yes."

As a general matter of statutory interpretation, "unless the context indicates otherwise[,] words importing the singular include and apply to several persons, parties, or things." 1 U.S.C. § 1. "'Context' here means the text of the Act of Congress surrounding the word at issue, or the

16

texts of other related congressional Acts . . . ." Rowland v. Calif. Men's Colony, Unit II Men's Advisory Council, 506 U.S. 194, 199 (1993). Therefore, unless the text of the act at issue suggests that its terms should be couched in the singular, the court will equate singular articles to their plural equivalents. See Public Citizen, Inc. v. Mineta, 340 F.3d 39, 54 (2d Cir. 2003) (equating "a tire" under the TREAD Act to "tires").

In this vein, a number of courts have concluded that the term "a foreign state" under the FSIA also includes "foreign states" in the context of "share pooling": whether multiple foreign states who separately own shares in an entity may pool those shares to demonstrate that the entity is majority-owned by "a foreign state" for the purpose of asserting immunity under the FSIA. See 28 U.S.C. § 1603(b)(2) ("An 'agency or instrumentality of a foreign state' means any entity . . . a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof . . . .").

The leading case on the issue, LeDonne v. Gulf Air, Inc., 700 F. Supp. 1400, 1406 (E.D. Va. 1988), discussed whether Gulf Air, Inc., a corporation created by treaty among the Emirate of Abu Dhabi, the State of Bahrain, the State of Qatar and the Sultanate of Oman, fell under the FSIA even though Gulf Air was "owned equally by four foreign states, not one [of] which has a majority of [] shares." The court explicitly rejected this argument as an "unnecessary literalism that runs counter to [the FISA's] purpose and ignores the well-established international practice of states acting jointly through treaty-created entities for public or sovereign purposes." Id.

The Fifth Circuit has adopted the position advanced in LeDonne. In Linton v. Airbus Industrie, 30 F.3d 592 (5th Cir. 1994), that court considered whether Germany's interest in Airbus could be pooled with other foreign countries' to show that Airbus was majority-owned by "a foreign state," and therefore immune to suit under the FSIA. While the court dismissed the

17

appeal on procedural grounds, it explicitly rejected the district court's "comment[] that 'pooling' appears to be foreclosed by the use of the state ('singular') in the FSIA . . . [and] should be examined in light of the rules of statutory construction and in light of the cases in which the pooling issue has been considered." Id. at 598 n.29. The Linton court then noted a number of opinions to have considered the issue, all of which rejected the singularity theory in favor of pooling. Id. (collecting cases).

Similarly, in In re EAL Corp., No. 93-cv- 578 (SLR), 1994 WL 828320 (D. Del. Aug. 3, 1994), the court addressed whether the European Organisation for the Safety of Air Navigation ("Eurocontrol"), the entity responsible for air traffic control in Europe and created by the International Convention Relating to Cooperation for the Safety of Air Navigation, qualified as the agency or instrumentality of "a foreign state" under the FSIA. The court concluded that, although Eurocontrol was the child of fifteen different European nations, its responsibilities regarding a primarily sovereign activity—regulating air space—"would be frustrated if Eurocontrol were not accorded the status of an 'agency or instrumentality of a foreign state.'" Id. at *5.

The court agrees with this line of reasoning that an entity established by multiple foreign states can, in principle, be an "organ of a foreign state" under the FSIA. This parallels a plain reading of the statute under venerable principles of statutory interpretation that include the plural with the singular. See 1 U.S.C. § 1; In re Aircrash Disaster Near Roselawn, Ind. on Oct. 31, 1994, 909 F. Supp. 1083, 1093 (N.D. Ill. 1995) ("[W]e find that 1 U.S.C. § 1 permits reading § 1603(b)(2) as referring to majority ownership by 'foreign states' rather than simply 'a foreign state.' Moreover, we find that the wooden reading urged by the plaintiffs would most assuredly frustrate the FSIA's objective of providing a comprehensive jurisdictional scheme in cases

18

involving foreign states." (internal quotation marks omitted)).  Therefore, although the European

Community was established by multiple foreign states, this does not automatically disqualify it

from being characterized as "an organ of a foreign state" under § 1603(b).

        ii.  The Character of the European Community as an "Organ of a
            Foreign State"

In determining whether an entity is the "organ of a foreign state," the Second Circuit has

counseled district courts to apply the Filler factors.  See In re Terrorist Attacks on Sept. 11, 2011,

538 F.3d 71, 85 (2008) (citing Filler v. Hanvit Bank, 378 F.3d 213, 217 (2d Cir. 2009)),

abrogated on other grounds by Samantar, 130 S. Ct. at 2278.  The Filler factors ask the court to

weigh:

> (1) [W]hether the foreign state created the entity for a national purpose;
> (2) whether the foreign state actively supervises the entity; (3) whether the foreign
> state requires the hiring of public employees and pays their salaries; (4) whether
> the entity holds exclusive rights to some right in the [foreign] country; and
> (5) how the entity is treated under foreign state law.

Filler, 378 F.3d at 217.  "Filler invites district courts to engage in a balancing process, without

particular emphasis on any given factor and without requiring that every factor weigh in favor of,

or against, the entity . . . ."  Terrorist Attacks, 538 F.3d at 85 (quoting Murphy v. Korea Asset

Mgmt. Corp., 421 F. Supp. 2d 627, 641 (S.D.N.Y. 2005)).

National purpose.  Under Filler, the "national purpose" factor asks whether the entity

"was created for a quintessential government purpose," such as the preservation of countries'

financial industries.  Murphy, 421 F. Supp. 2d at 642.  In fact, this was precisely the purpose of

the Member States in creating the European Community: to "establish[] a common market and

an economic and monetary union . . . to promote throughout the Community a harmonious,

balanced and sustainable development of economic activities, . . . and economic and social

19

cohesion and solidarity among Member States." Treaty of Amsterdam art. 2, 1997 O.J. (C 340) 3.

   *Supervision.* The "supervision" factor looks to whether the foreign states regulate the entity or direct the entity's appointments or official acts. See Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co., 476 F.3d 140, 143 (2d Cir. 2007) (concluding that the Republic of Korea supervised Financial Supervisory Service of the Republic of Korea because it appointed its governor and auditor, controlled its actions through another agency, and regulated its inspection fees); Murphy, 421 F. Supp. 2d at 643 (concluding the same in regards to the Korea Asset Management Corporation because the Republic of Korea had the power to appoint its auditor, through which it exercised control over its decision making); U.S. Fidelity & Guar. Co. v. Braspetro Oil Services Co., No. 97-cv-6124 (JGK), 1999 WL 307666 (S.D.N.Y. May 17, 1999) (concluding that the defendant was an organ of Brazil where the President of Brazil appointed its directors, approved its charter, and could inspect its financial reports).

   To determine whether the Member States "actively supervised" the European Community, it is important to engage in a brief review of the Community's composition. Prior to the Lisbon Treaty in 2009, the European Community consisted of five basic institutions: the Council of the European Communities (the "Council"), the European Parliament (the "Parliament"), the Commission of the European Communities (the "Commission"), the Court of Justice of the European Communities (the "Court of Justice"), and the European Court of Auditors (the "Court of Auditors").[4] Amsterdam Treaty, art. 7. The Council was a legislative body consisting of one representative from each Member State. Id., art. 203. The Parliament, also a legislative body, consisted of representatives directly elected by the citizens of the Member States. Id., art. 190(1). The Commission served the European Community's executive

---

[4] Some of these bodies still exist as part of the framework of the European Union. See Lisbon Treaty.

function, consisting of a "cabinet" of individuals from each Member State, and a President nominated by the Council and approved by Parliament. Id., art. 214. The Court of Justice consisted of twenty-seven judges, again, one from each Member State, nominated by that State and confirmed by the other States. See id., art. 221 (establishing a court of fifteen judges); Treaty of Nice Amending the Treaty on European Union, the Treaties Establishing the European Communities and Certain Related Acts [hereinafter "Nice Treaty"], art. 2 ¶ 27, Mar. 10, 2001, 2001 O.J. (C 80) 1 (amending the Amsterdam Treaty and establishing the one-judge-per-Member-State rule). The Court of Auditors similarly consisted of twenty-seven members, one from each state, appointed by the Council. Amsterdam Treaty, art. 247; Nice Treaty, art. 2 ¶ 36.

This structure demonstrates that the Member States did not actively supervise the European Community as a whole. While it is true that the Member States individually nominated representatives to serve as Commission officials, judges on the Court of Justice, and auditors on the Court of Auditors, this power was not unlimited: the other Member States needed to consent to the appointment. See Amsterdam Treaty, arts. 214, 221, 247. In other instances, the Member States had absolutely no control over the appointment of officials. Representatives of Parliament were elected by direct elections of the Member States' citizenry, not appointed by the Member States' governments. Id., art. 190(1). And the President was elected by Council members, not appointed by the Member States, individually or collectively. Id., art. 214. Indeed, the only Community institution that gave the Member States an unfettered appointment right was the Council, which consisted of the Member States themselves. Id., art. 203. This is unlike the "supervision" of the appointment process in other cases where the foreign state or an executive of a foreign state wielded an unchecked appointment power. See Peninsula Asset

Mgmt., 476 F.3d at 140; Murphy, 421 F. Supp. 2d at 643; Braspetro Oil Services Co., 1999 WL
307666, at *9.

      Further, aside from the Council, each one of the European Community's public
institutions was independent of control by the Member States, individually or collectively.
Although the Member States nominated representatives to the Commission, the Amsterdam
Treaty specifically established that

> [t]he Members of the Commission shall, in the general interest of the Community,
> be completely independent in the performance of their duties. In the performance
> of these duties, they shall neither seek nor take instructions from any government
> or from any other body. They shall refrain from any action incompatible with
> their duties. Each Member State undertakes to respect this principle and not to
> seek to influence the Members of the Commission in the performance of their
> tasks.

Amsterdam Treaty, art. 213(2). The Amsterdam Treaty similarly makes independent the judges
and auditors of the Courts of Justice and Auditors. See id. arts. 222 ("The Judges and
Advocates-General shall be chosen from persons whose independence is beyond doubt . . . .");
248 ("The Court of Auditors and the national audit bodies of the Member States shall cooperate
in a spirit of trust while maintaining their independence."). Nor, by virtue of the representatives'
direct election, could the Member States control Parliament. Indeed, the only institution
susceptible to any control by the Member States was the Council. Id., art. 203. This, however, is
not enough to conclude that the Member States controlled the European Community any more
than, say, U.S. states control the workings of the federal government. See Ernest A. Young,
Protecting Member State Autonomy in the European Union: Some Cautionary Tales from
American Federalism, 77 N.Y.U. L. Rev. 1612, 1696 (2002) (stating that just as "the State of
Texas has no more influence at the Federal Communications Commission, for example, than
does AT&T (and in fact, probably less)," the Member States lack power to control regulatory

activity in the European Community).  Consequently, the Member States do not meet the "supervision" factor under Filler.

*Hiring of public employees and payment of their salaries.*  Filler does not provide any guidance as to how the court should determine whether the employees of the putative "organ" are "public employees."  Rather, Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect, 89 F.3d 650 (9th Cir. 1996), was the first case to rely on the "public employee" analysis in the FSIA context.  There, the court tersely concluded that the employees of a Mexican oil refinery were "public employees" because they were "subject to the rights and obligations of public servants."  Id. at 654.  Implicit in Corporacion Mexicana's conclusion that the employees of the oil refinery were "public employees" was the recognition that it was the law of the foreign state—there, Mexico—that determined whether the employees held "the rights and obligations of public servants."  See id.; Glencore, Ltd. v. Chase Manhattan Bank, N.A., No. 92-cv-6214 (JFK), 1998 WL 74294, at *3 (S.D.N.Y. Feb. 20, 1998) (concluding that employees of Indian bank were public employees where Supreme Court of India concluded that they were public employees).

The European Court of Justice has long held that "public service" means "a series of posts which involve direct or indirect participation in the exercise of powers conferred by public law and duties designed to safeguard the general interests of the state or of other public authorities."  See Case 149/79, Comm'n of the European Cmtys. v. Kingdom of Belgium, 1980 E.C.R. 3881, ¶ 10; see also Case C-4/91, Bleis v. Ministère de l'Education Nationale, 1991 E.C.R. 5627, ¶ 6 ("[E]mployment in the public service . . . must be understood as meaning a series of posts which involve direct or indirect participation in the exercise of powers conferred by public law and duties designed to safeguard the general interests of the State or of other public authorities . . . .").  Under this rubric, it may initially seem that the employees of the

23

European Community, i.e., its President, cabinet members, auditors, judges, members of Parliament, and Council representatives, are "public employees." Each occupies a post which involves the exercise of the powers conferred on them by the various treaties regulating the European Community. See, e.g., Amsterdam Treaty, arts. 190, 203, 214. And each position is designed to further "the general interests" of the European Community. See, e.g., id., arts. 213(2), 234, 247(4). But the "public employee" question under Filler asks whether the individuals were public employees of the *foreign states*, not the *entity*. Indeed, the cases to substantively address the "public employee" inquiry under Filler determined that the employees in question were public employees of the foreign state at issue, not the alleged organ. See Glencore, 1998 WL 74294, at *3 (concluding that Indian bank employees were "public employees" under the FSIA where Supreme Court of India determined they were specifically employees of the Republic of India); Vivas v. Boeing Co., Nos. 06-cv-3566, 06-cv-3567, 06-cv-3568, 06-cv-6807, 07-cv-0683, 2007 WL 2409742, at *5 (N.D. Ill. Aug. 21, 2007) (concluding that state-operated-airline pilots were public employees because they were required to be members of the Peruvian Air Force and were paid by the state treasury).

Here, although the employees of the European Community may have met the definition of "public employees" of the Community itself, they were not public employees of the Member States. Indeed, the "powers conferred by public law" given to these employees was not the public law of the Member States but the public law of the European Community; the legislators, judges, and executives of the European Community held no power to legislate, judge, or execute the laws of their home countries. Further, the powers vested in these employees were intended to be exercised so as to "safeguard the general interests" of the European Community, not the employees' home countries. As discussed above, the Amsterdam Treaty specifically called for

24

these officers' independence—independence from their home countries' governments. See
Amsterdam Treaty, arts. 213, 222, 248. In addition, it appears that although the Member States
paid into the European Community's general fund, it was the Community itself that paid—and
set—its employees' salaries. See id. arts. 210, 247(8); see also Vivas, 2007 WL 2409742, at *5
(entity was an organ of the foreign state where employees were paid directly from the state
treasury). Consequently, the employees of the European Community were not public employees
of the Member States under Filler.

   *Exclusive Rights.* Filler also asks whether the putative organ possesses "exclusive rights
to some right in the [foreign] country." 378 F.3d at 217. Other courts examining the "exclusive
rights" factor have given it broad meaning. Terrorist Attacks, 538 F.3d at 86 (Saudi High
Commission for Relief to Bosnia and Herzegovina held an "exclusive right" where it was the
"sole authority" to collect and distribute charity in Bosnia); Peninsula Asset Mgmt., 476 F.3d at
143 (Financial Supervisory Service of the Republic of Korea held an "exclusive right" where it
was had the sole authority to receive monthly business reports from the entities it oversaw);
Kelly v. Syria Shell Petroleum Development B.V., 213 F.3d 841, 848 (5th Cir. 2000) (Al Furat
Petroleum Company had "the exclusive right to explore and develop Syria's identified petroleum
reserves, which are the property of the Syrian government.").

   The Amsterdam Treaty obliquely refers to the European Community's "exclusive rights":

   > In areas which do not fall within its exclusive competence, the Community shall
   > take action, in accordance with the principle of subsidiarity, only if and insofar as
   > the objectives of the proposed action cannot be sufficiently achieved by the
   > Member States and can therefore, by reason of the scale or effects of the proposed
   > action, be better achieved by the Community.

Amsterdam Treaty, art. 5. Precisely what this means, or how the European Community's
"exclusive competences" interacted with the "principle of subsidiarity," has long been unclear.
See George A. Bermann, Taking Subsidiarity Seriously: Federalism in the European Community

& The United States, 94 Colum. L. Rev. 331, 348-66 (1994) (discussing the "exclusive right"

versus "subsidiarity" conflict in the context of principles of federalism). Nonetheless, it appears

that—at the time Plaintiffs filed their Complaint—the European Community possessed two

"exclusive rights" in regard to the Member States. One, as set forth in Article 106(1) of the

Amsterdam Treaty, the European Central Bank had "the exclusive right to authorise the issue of

banknotes within the Community."[5] And two, Article 133(1) calls for a "common commercial

policy . . . based on uniform principles, particularly in regard to changes in tariff rates, the

conclusion of tariff and trade agreements, the achievement of uniformity in measures of

liberalisation, export policy and measures to protect trade such as those to be taken in the event

of dumping or subsidies." The European Court of Justice has concluded that this language

means that the "[European] Community has exclusive competence, pursuant to Article 113 of the

[Amsterdam] Treaty, to conclude the Multilateral Agreements on Trade in Goods." See Opinion

1/94, Competence of the Community to Conclude International Agreements Concerning Services

& the Protection Of Intellectual Property - Article 228(6) of the EC Treaty, 1994 E.C.R. I-5267,

¶ 34. Therefore, the European Community possessed some "exclusive rights" relative to the

Member States under Filler.

    *Treatment Under Foreign State Law.* The court also considers how the entity is treated

under the law of the foreign states; specifically, whether the entity is considered an "organ" of

the government by the foreign states. See Peninsula Asset Mgmt., 476 F.3d at 143 (concluding

---

[5] It is true that, despite this provision, the United Kingdom, Denmark, and Sweden continued to issue their own currency. Both the United Kingdom and Denmark "opted-out" of their inclusion in the "Eurozone." Maastricht Treaty, Protocol on Denmark; id., Protocol on Certain Provisions Relating to the United Kingdom of Great Britain and Northern Ireland. And Sweden, while having no similar opt-out provision, rejected the Euro by plebiscite. See Sweden Says No to Euro, BBC News (Sept. 15, 2003), http://news.bbc.co.uk/2/hi/europe/
3108292.stm. Nonetheless, the "exclusive right" inquiry under Filler asks whether the putative organ has a *legal* rather than a *de facto* exclusive right. See Bd. of Regents of Univ. of Tex. Sys. v. Nippon Tel. & Tel. Corp., 478 F.3d 274, 280 (5th Cir. 2007) (concluding that putative organ of Japan did not hold exclusive rights to telephone service in Japan where it possessed a de facto monopoly it inherited from its government-controlled predecessor and was tasked with increasing telephone service competition).

that Korean entity met "foreign state law" factor where Korean government informed the State

Department and the court that it considered the entity an "organ" of the government); Nippon

Tel. & Tel., 478 F.3d at 280 (concluding that Japanese entity did not meet "foreign state law"

factor where it was not considered an organ of Japan under Japanese law); Ocean Line Holdings,

578 F. Supp. 2d at 625 (concluding that entity, a subsidiary to a private corporation, was not an

organ of China even though it was considered an "Enterprise Owned by the Whole People"

under Chinese law).  The court cannot find, nor do the parties cite to any law of any Member

State that construed the European Community as an "organ" of the Member States, individually

or collectively.  If anything, secondary authorities strongly suggest that the European

Community was "a truly supranational body with a reasonably autonomous institutional

existence of its own" rather than "an intergovernmental body, requiring the consent of each

Member State before common action can be taken."  See Young, supra, at 162 n.32 (quoting

Peter L. Lindseth, Democratic Legitimacy and the Administrative Character of

Supranationalism: The Example of the European Community, 99 Colum. L. Rev. 628, 652

(1999)).  And much unlike an "organ" of the Member States, the European Community

"impinged upon"—rather than advanced—"the autonomy of individual member states."  See

Jacqueline Bhabha, Belonging In Europe: Citizenship and Post-national Rights, 11 Int'l Soc. Sci.

J. 11 (1999).  This concept of a supranational, autonomous, and independent entity "ha[d] been

most visibly championed by the constitutional courts of certain member states of the Community

and their friends."  Larry Catá Backer, The Extra-National State: American Confederate

Federalism and the European Union, 7 Colum. J. Eur. L. 173, 194 (2001).  As one example, the

Constitutional Court of Spain specifically disclaimed "ownership" over the European

Community.  See id. at 205-06 (quoting Treaty on European Union, Case No. 1236/92, Spanish

27

Constitutional Court (Plenary Session) (July 1, 1992)); see also id. at 204-05 (citing similar examples from the constitutional courts of Germany, Italy, and, to some degree, the United Kingdom). Therefore, the Member States did not consider the European Community to be their "organ."

    *Weighing the Filler factors.* As discussed above, the European Community was certainty created for a "national purpose" and did possess some, albeit limited, exclusive rights. Nonetheless, the Member States did not actively supervise the European Community, did not require the hiring of employees that could be deemed public employees of the Member States, and rejected notions of the European Community as an "organ" of themselves under their own laws. These factors all point to the inescapable conclusion that the European Community really is a supranational body, truly independent of the governments of the Member States. It was not a subsidiary of the Member States, nor was it controlled by them in any meaningful fashion. Weighing these factors qualitatively and quantitatively, the court concludes that the European Community is not an "organ or instrumentality" of the Member States.

        c.    "Not Created Under the Laws of Any Third Country"

    Because the European Community existed by virtue of the establishing treaties signed by the Member States, the issue arises as to whether the European Community was "created under the laws of a third country." 28 U.S.C. § 1603(b). Where multinational, treaty-based organizations are concerned, courts have concluded that the entity at issue is not created under the laws of a third country if "the instrumentality is created or established . . . under the laws of the owner nations, [as opposed to] under the laws of any other, third countries." See, e.g., LeDonne, 700 F. Supp. at 1406; see also Gardner Stone Hunter, 896 F. Supp. at 131 n.7; Sequa Corp. v. Aetna Cas. & Sur. Co., No. 89-cv-234 (JRR), 1990 WL 212756, at *5 (D. Del. Jan. 18, 1990) (concluding that court lacked subject matter jurisdiction over entity where entity, created

by multinational treaty, was partially established by Bahrain, which had no ownership interest in entity). Here, the only countries' laws establishing the European Community are those of its Member States. See Maastricht Treaty. Therefore, the European Community was not created under the laws of a third country under 28 U.S.C. § 1603(b).

Consequently, the European Community is neither a "foreign state," a "political subdivision of a foreign state," nor an "agency or instrumentality of a foreign state" as required under 28 U.S.C. § 1332(a)(4). The court therefore lacks subject matter jurisdiction over the instant action. See 28 U.S.C. § 1332(a).

     **C.**     **Supplemental Jurisdiction**

The court further declines to exercise supplemental jurisdiction over Plaintiffs' action. "Supplemental jurisdiction allows federal courts to hear and decide state-law claims along with federal-law claims when they 'are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.'" Wis. Dep't of Corrs. v. Schacht, 524 U.S. 381, 387 (1998) (quoting 28 U.S.C. § 1367(a)). This exercise is discretionary. Id. Where "the district court has dismissed all claims over which it has original jurisdiction," the supplemental jurisdiction statute counsels the court to decline jurisdiction. 28 U.S.C. § 1367(c)(3); see also Cataldi v. United Water N.Y., 363 F. App'x 769, 769 (2d Cir. 2010) (affirming order of district court declining to exercise supplemental jurisdiction where court dismissed plaintiff's federal claims and lacked diversity jurisdiction over the remainder). Here, the court dismissed Plaintiffs' only federal claims in its March 8, 2011 opinion; only Plaintiffs' state law claims remain. (See Mem. & Order.) As discussed above, the court lacks subject matter jurisdiction over Plaintiffs' lawsuit. Therefore, as counseled by 28 U.S.C. § 1367(c)(3), the court will decline to exercise supplemental jurisdiction over the remainder of Plaintiffs' case.

### D.   Plaintiffs' Request to Amend Their Complaint

Plaintiffs have also requested leave to amend their Second Amended Complaint. (Pls.'
Opp'n at 33 n.24.)  Notwithstanding that this would be Plaintiffs' *sixth* complaint in the decade
of litigation between the parties, the court denies Plaintiffs leave to amend. "Although Rule
15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given
when justice so requires,' it is within the sound discretion of the district court to grant or deny
leave to amend." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007). "A
district court has discretion to deny leave for good reason, including futility, bad faith, undue
delay, or undue prejudice to the opposing party." Id.  Here, Plaintiffs requested leave to amend
in the event the court concluded that their federal claims were impermissibly extraterritorial.
(Pls.' Opp'n at 33 n.24.)  Plaintiffs suggested that they possessed additional facts that could have
aided the court's determination that the enterprise alleged in the Complaint was a domestic
enterprise. (Id.)  Plaintiffs complain that they did not include such allegations in their Second
Amended Complaint because "this Court had repeatedly requested brevity in the pleadings."
(Pls.' Mot. for Reconsideration (Docket Entry # 103) at 5.)[6]

But brevity and sufficiency are not mutually exclusive.  Nothing prevented Plaintiffs
from including in their Complaint the facts most salient to tie Plaintiffs' alleged harms to
Defendants' conduct, or to prove that Defendants' were involved in an illegal, domestic
enterprise. Rather than doing that, Plaintiffs spent the vast majority of their 143-page, 273-
paragraph alleging facts and harms that, even taken at face value, had absolutely nothing to do
with Defendants.  The court commented on the Complaint's disorganization in its previous
opinion. (Mem. & Order at 5.)  Surely Plaintiffs had the wherewithal and the opportunity to file

---

[6] The court strains to take this excuse seriously given that Plaintiffs' Complaint measures 143 pages and 273
paragraphs.

a reasonably concise and legally sufficient complaint, as the court expected them to do the previous *five times*. The court will not now grant Plaintiffs leave to amend their Complaint.

## IV.   CONCLUSION

Defendants' Motion to Dismiss is GRANTED in part. Plaintiffs' request for leave to amend their Complaint is DENIED. The action is DISMISSED for lack of subject matter jurisdiction.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
     May 12, 2011

NICHOLAS G. GARAUFIS
United States District Judge

31