**11-2475-cv**
**European Community v. RJR Nabisco**

|   |   |
|---|---|
| 1 | **UNITED STATES COURT OF APPEALS** |
| 2 | **FOR THE SECOND CIRCUIT** |
| 3 | |
| 4 | August Term, 2011 |
| 5 | |
| 6 | (Argued: February 24, 2012       Decided: April 23, 2014 |
| 7 | |
| 8 | Corrected: April 29, 2014) |
| 9 | |
| 10 | Docket No. 11-2475-cv |
| 11 | |
| 12 | |
| 13 | - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X |
| 14 | |
| 15 | |
| 16 | EUROPEAN COMMUNITY, acting on its own behalf and on behalf of the Member States |
| 17 | it has power to represent, KINGDOM OF BELGIUM, REPUBLIC OF FINLAND, |
| 18 | FRENCH REPUBLIC, HELLENIC REPUBLIC, FEDERAL REPUBLIC OF |
| 19 | GERMANY, ITALIAN REPUBLIC, GRAND DUCHY OF LUXEMBOURG, |
| 20 | KINGDOM OF THE NETHERLANDS, PORTUGUESE REPUBLIC, KINGDOM OF |
| 21 | SPAIN, Individually, KINGDOM OF DENMARK, CZECH REPUBLIC, REPUBLIC OF |
| 22 | LITHUANIA, REPUBLIC OF SLOVENIA, REPUBLIC OF MALTA, REPUBLIC OF |
| 23 | HUNGARY, REPUBLIC OF IRELAND, REPUBLIC OF ESTONIA, REPUBLIC OF |
| 24 | BULGARIA, REPUBLIC OF LATVIA, REPUBLIC OF POLAND, REPUBLIC OF |
| 25 | AUSTRIA, KINGDOM OF SWEDEN, REPUBLIC OF CYPRUS, SLOVAK |
| 26 | REPUBLIC, and ROMANIA, |
| 27 | *Plaintiff - Appellants*, |
| 28 | |
| 29 | v. |
| 30 | |
| 31 | RJR NABISCO, INC., R.J. REYNOLDS TOBACCO COMPANY, R.J. REYNOLDS |
| 32 | TOBACCO INTERNATIONAL, INC., RJR ACQUISITION CORP., f/k/a NABISCO |
| 33 | GROUP HOLDINGS CORP., RJR NABISCO HOLDINGS CORP., R.J. REYNOLDS |
| 34 | TOBACCO HOLDINGS, INC., NABISCO GROUP HOLDINGS CORP., R.J. |
| 35 | REYNOLDS GLOBAL PRODUCTS, INC., REYNOLDS AMERICAN INC., R.J. |
| 36 | REYNOLDS TOBACCO COMPANY, a North Carolina Corporation, |
| 37 | *Defendant - Appellees*. |
| 38 | |
| 39 | - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X |

1

CERTIFIED COPY ISSUED ON 04/29/2014

**11-2475-cv**
**European Community v. RJR Nabisco**

1   Before:   LEVAL, SACK, HALL, *Circuit Judges*.
2
3        Plaintiffs appeal from a judgment of the United States District Court for the Eastern
4   District of New York (Garaufis, *J.*) dismissing their complaint. The district court dismissed
5   the claims under the federal RICO statute, 18 U.S.C. § 1961 *et seq.*, because it concluded
6   that RICO does not apply to enterprises outside the United States. The state law claims
7   were dismissed on the ground that they were not within the diversity jurisdiction of the
8   federal courts. 28 U.S.C. § 1332. The Court of Appeals (Leval, *J.*) concludes that the RICO
9   claims are within the scope of the statute and that the state law claims are within federal
10  diversity jurisdiction. Accordingly, the judgment of the district court is **VACATED**, and
11  the case is **REMANDED**.
12
13                                  JOHN J. HALLORAN, JR., Speiser, Krause,
14                                  Nolan & Granito, New York, N.Y. (Kevin A.
15                                  Malone, Carlos A. Acevedo, Krupnick Campbell
16                                  Malone Buser Slama Hancock Liberman &
17                                  McKee, P.A., Fort Lauderdale, Fla., *on the*
18                                  *brief*), *for Plaintiff-Appellants*.
19
20                                  GREGORY G. KATSAS, Jones Day,
21                                  Washington, D.C. (David M. Cooper, Mark R.
22                                  Seiden, Jones Day, New York, N.Y., *on the*
23                                  *brief*), *for Defendant-Appellees*.
24
25                                  LEWIS S. YELIN, Attorney, Appellate Staff,
26                                  Civil Division, Department of Justice,
27                                  Washington, D.C. (Harold Hongju Koh, Legal
28                                  Advisor, Department of State, Washington,
29                                  D.C.; Tony West, Assistant Attorney General,
30                                  Civil Division, Department of Justice,
31                                  Washington, D.C.; Loretta E. Lynch, United
32                                  States Attorney for the Eastern District of New
33                                  York, New York, N.Y., Douglas N. Letter,
34                                  Attorney, Appellate Staff, Civil Division,
35                                  Department of Justice, Washington, D.C., *on the*
36                                  *brief*), *for Amicus Curiae United States of*
37                                  *America in support of neither party*.
38
39

**11-2475-cv**
**European Community v. RJR Nabisco**

1     Leval, *Circuit Judge*:

2

3         This is the latest installment in litigation brought by the European Community and

4     twenty-six of its member states[1] (collectively "Plaintiffs") against RJR Nabisco, Inc., and

5     related entities (collectively "RJR").[2] Plaintiffs appeal from the dismissal of their Second

6     Amended Complaint (the "Complaint") by the United States District Court for the Eastern

7     District of New York (Garaufis, *J.*). The principal issues they raise are (1) whether their

8     claims under the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18

9     U.S.C. § 1961 *et seq.*, are impermissibly extraterritorial, and (2) whether the European

10     Community qualifies as an organ of a foreign state for purposes of diversity jurisdiction

11     under 28 U.S.C. §§ 1332, 1603. The Complaint alleges that RJR directed, managed, and

12     controlled a global money-laundering scheme with organized crime groups in violation of

13     the RICO statute, laundered money through New York-based financial institutions and

14     repatriated the profits of the scheme to the United States, and committed various common

---

[1] The member state plaintiffs are: the Kingdom of Belgium, the Republic of Finland, the French Republic, the Hellenic Republic, the Federal Republic of Germany, the Italian Republic, the Grand Duchy of Luxembourg, the Kingdom of the Netherlands, the Portuguese Republic, the Kingdom of Spain, the Kingdom of Denmark, the Czech Republic, the Republic of Lithuania, the Republic of Slovenia, the Republic of Malta, the Republic of Hungary, the Republic of Ireland, the Republic of Estonia, the Republic of Bulgaria, the Republic of Latvia, the Republic of Poland, the Republic of Austria, the Kingdom of Sweden, the Republic of Cyprus, the Slovak Republic, and Romania.

[2] The procedural history of this litigation was summarized by the district court. *See European Cmty. v. RJR Nabisco, Inc.*, No. 02-CV-5771, 2011 WL 843957, at *1-2 (E.D.N.Y. Mar. 8, 2011).

**11-2475-cv**
**European Community v. RJR Nabisco**

1    law torts in violation of New York state law. The district court dismissed the RICO claims

2    because it concluded that RICO has no extraterritorial application. The court dismissed the

3    state law claims because it determined that the European Community did not qualify as an

4    organ of a foreign state under 28 U.S.C. §§ 1332, 1603 so that its participation in the suit

5    destroyed complete diversity, and thus deprived the court of jurisdiction over the state law

6    claims.

7         We conclude that the district court erred in dismissing the federal and state law

8    claims. We disagree with the district court's conclusion that RICO cannot apply to a

9    foreign enterprise or to extraterritorial conduct. Recognizing that there is a presumption

10    against extraterritorial application of a U.S. statute unless Congress has clearly indicated

11    that the statute applies extraterritorially, *see Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct.

12    2869 (2010), we conclude that, with respect to a number of offenses that constitute

13    predicates for RICO liability and are alleged in this case, Congress has clearly manifested

14    an intent that they apply extraterritorially. As to the other alleged offenses, the Complaint

15    alleges sufficiently important domestic activity to come within RICO's coverage.

16         We believe that the district court also erred in ruling that the European

17    Community's participation as a plaintiff in this lawsuit destroyed complete diversity. The

18    European Community is an "agency or instrumentality of a foreign state" as that term is

19    defined in 28 U.S.C. § 1603(b). It therefore qualifies as a "foreign state" for purposes of 28

4

**11-2475-cv**
**European Community v. RJR Nabisco**

1    U.S.C. § 1332(a)(4), and its suit against "citizens of a State or of different States" comes

2    within the diversity jurisdiction.

3                                         **BACKGROUND**

4            According to the Complaint, the scheme alleged to violate RICO involves a

5    multi-step process beginning with the smuggling of illegal narcotics into Europe by

6    Colombian and Russian criminal organizations. The drugs are sold, producing revenue in

7    euros, which the criminal organizations "launder" by using money brokers in Europe to

8    exchange the euros for the domestic currency of the criminal organizations' home

9    countries. The money brokers then sell the euros to cigarette importers at a discounted rate.

10   The cigarette importers use these euros to purchase RJR's cigarettes from wholesalers or

11   "cut-outs." The wholesalers then purchase the cigarettes from RJR and ship the cigarettes

12   to the importers who purchased them. And the money brokers use the funds derived from

13   the cigarette importers to continue the laundering cycle.

14           The Complaint alleges that RJR directed and controlled this money-laundering

15   scheme, utilizing other companies to handle and sell their products. It alleges that RJR

16   gave special handling instructions "intended to conceal the true purchaser of the

17   cigarettes." Complaint ¶ 58. The Complaint also alleges that RJR's executives and

18   employees would travel from the United States to Europe, the Caribbean, and Central

19   America in order to further these money-laundering arrangements; that they shipped

20   cigarettes through Panama in order to use Panama's secrecy laws to shield the transactions

**11-2475-cv**
**European Community v. RJR Nabisco**

1    from government scrutiny; that RJR's employees would take monthly trips from the

2    United States to Colombia through Venezuela, bribe border guards in order to enter

3    Colombia illegally, receive payments for cigarettes, travel back to Venezuela, and wire the

4    funds to RJR's accounts in the United States; that RJR employees traveled extensively

5    from the United States to Europe and South America to supervise the money-laundering

6    scheme and to entertain the criminal customers; that RJR communicated internally and

7    with its coconspirators by means of U.S. interstate and international mail and wires; that

8    RJR's employees filed large volumes of fraudulent documents with the U.S. Customs

9    Service and the Bureau of Alcohol, Tobacco and Firearms to further their scheme; that RJR

10   received the profits of its money-laundering schemes in the United States; and that RJR

11   acquired Brown & Williamson Tobacco "for the purpose of expanding upon their illegal

12   cigarette sales and money-laundering activities," *id.* ¶¶ 100-103.

13        The Complaint asserts that in the course of executing this scheme RJR committed

14   various predicate racketeering acts in violation of RICO, including mail fraud, wire fraud,

15   money laundering, violations of the Travel Act, 18 U.S.C. § 1952, and providing material

16   support to foreign terrorist organizations. In addition the Complaint asserts that RJR

17   committed New York common law torts of fraud, public nuisance, unjust enrichment,

18   negligence, negligent misrepresentation, conversion, and money had and received.

19        Defendants moved to dismiss both the RICO and state law claims. In its first

20   decision, the district court dismissed the RICO claims on the ground that RICO has no

6

11-2475-cv
European Community v. RJR Nabisco

1   application to activity outside the territory of the United States and cannot apply to a

2   foreign enterprise. *European Cmty. v. RJR Nabisco, Inc. (European Cmty. I)*, No.

3   02-CV-5771, 2011 WL 843957, at *4-5, *7 (E.D.N.Y. Mar. 8, 2011). The court concluded,

4   citing *Morrison*, that the "focus" of the RICO statute is the enterprise, *see* 18 U.S.C.

5   §§ 1961(4), 1962(a)-(c), and that the enterprise alleged in the Complaint, which consisted

6   largely of a loose association of Colombian and Russian drug-dealing organizations and

7   European money brokers whose activity was directed outside the United States, could not

8   be considered domestic. Because the enterprise was foreign, the district court concluded,

9   under *Morrison*'s presumption that United States statutes do not apply extraterritorially

10  absent a clear indication of congressional intent, that the Complaint failed to state an

11  actionable violation of RICO. The court thus dismissed the RICO claims under Federal

12  Rule of Civil Procedure 12(b)(6).

13       As for the state law claims alleged to come within the federal courts' diversity

14  jurisdiction, the district court observed that the necessary *complete* diversity might be

15  destroyed if the European Community remained a plaintiff. *European Cmty. I*, 2011 WL

16  843957, at *8. The court allowed Plaintiffs' counsel time to determine whether the

17  European Community intended to remain a party to the suit. *Id.*

18       Once advised that the European Community would remain a party, the court ruled

19  that the state law claims did not come within the diversity jurisdiction of the federal courts.

20  It held that the European Community was not a "foreign state," as used in 28 U.S.C.

7

**11-2475-cv**
**European Community v. RJR Nabisco**

1  § 1332, with the consequence that the European Community's continued participation in

2  the suit together with various foreign nation plaintiffs destroyed complete diversity and

3  deprived the court of jurisdiction. *European Cmty. v. RJR Nabisco, Inc. (European Cmty.*

4  *II)*, 814 F. Supp. 2d 189, 208 (E.D.N.Y. 2011). The court declined to exercise supplemental

5  jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(c) because it had

6  dismissed all the federal law claims. *Id.*

7  **DISCUSSION**

8      Plaintiffs contend on appeal that the district court erred in concluding that the

9  Complaint failed to allege federal law claims, and that the district court erred in finding

10  absence of diversity jurisdiction for the state law claims. We agree with both contentions.

11  **I.      RICO Claims**

12      We turn first to the dismissal of the RICO claims. We review a district court's

13  dismissal under Rule 12(b)(6) *de novo. Connecticut v. Duncan*, 612 F.3d 107, 112 (2d Cir.

14  2010).

15  **A.      The Extraterritoriality of RICO**

16      The district court concluded that the Complaint failed to state actionable RICO

17  claims because the alleged enterprise was located and directed outside the United States.

18  The court's analysis was based on the Supreme Court's ruling in *Morrison* that the

19  presumption against extraterritorial application of U.S. statutes bars such application

20  absent a clear manifestation of congressional intent. *European Cmty. I*, 2011 WL 843957,

8

**11-2475-cv**
**European Community v. RJR Nabisco**

1   at *4. The district court concluded that RICO is silent as to whether Congress intended it to

2   apply to conduct outside the United States, and that "this silence prohibits any

3   extraterritorial application of RICO." *Id.* The district court believed this conclusion was

4   compelled by our holding in *Norex Petroleum Ltd. v. Access Industries, Inc.*, 631 F.3d 29,

5   32 (2d Cir. 2010). We disagree in several respects with the district court's analysis,

6   including its understanding of the *Norex* precedent.

7         The RICO statute incorporates by reference numerous specifically identified federal

8   criminal statutes, as well as a number of generically described state criminal offenses

9   (known in RICO jurisprudence as "predicates"). 18 U.S.C. § 1961(1). It adds new criminal

10  and civil consequences to the predicate offenses in certain circumstances ─ generally

11  speaking, when those offenses are committed in a pattern (consisting of two or more

12  instances) in the context of "any enterprise which is engaged in, or the activities of which

13  affect, interstate or foreign commerce." 18 U.S.C. § 1962; *see also id.* § 1964.

14        Litigants, including Plaintiffs in this case, have argued that this just-quoted

15  provision of the statute, which makes RICO applicable to enterprises whose activities

16  affect foreign commerce, sufficiently indicates congressional intent that RICO should

17  apply extraterritorially. In *Norex* we rejected that argument, noting the Supreme Court's

18  admonishment in *Morrison* that the mere fact of a statute's generic reference to "interstate

19  or foreign commerce," identifying the source of Congress's authority to regulate, would

20  not qualify as a manifestation of congressional intent that the statute apply

9

**11-2475-cv**
**European Community v. RJR Nabisco**

1    extraterritorially. *Norex*, 631 F.3d at 33 (internal quotation mark omitted). The argument

2    we rejected in *Norex* was to the effect that all claims under RICO may apply to foreign

3    conduct because all RICO claims require proof of an enterprise whose activities affect

4    interstate or foreign commerce. *Id.* We viewed this argument as plainly foreclosed by

5    *Morrison*.

6            We rejected also a similarly ambitious argument to the effect that Congress's

7    adoption of some RICO predicate statutes with extraterritorial reach indicated a

8    congressional intent that RICO have extraterritorial reach for all its predicates. *See id.* In so

9    holding, we refused to equate the extraterritoriality of certain RICO predicates with the

10   extraterritoriality of RICO as a whole. *See id.* ("*Morrison* similarly forecloses Norex's

11   argument that because a number of RICO's predicate acts possess an extraterritorial reach,

12   RICO itself possesses an extraterritorial reach.").

13           The district court here construed our rejection in *Norex* of arguments that RICO

14   applies extraterritorially *in all of its applications* as a ruling that RICO can never have

15   extraterritorial reach in *any* of its applications. *See European Cmty. I*, 2011 WL 843957, at

16   *4. This was a misreading of *Norex*. We now confront an argument about the

17   extraterritorial reach of RICO that was not considered in *Norex*, or in other rulings called to

18   our attention. Congress manifested an unmistakable intent that certain of the federal

19   statutes adopted as predicates for RICO liability apply to extraterritorial conduct. This

**11-2475-cv**
**European Community v. RJR Nabisco**

1    appeal requires us to consider whether and how RICO may apply extraterritorially in the

2    context of claims predicated on such statutes.

3        We conclude that RICO applies extraterritorially if, and only if, liability or guilt

4    could attach to extraterritorial conduct under the relevant RICO predicate. Thus, when a

5    RICO claim depends on violations of a predicate statute that manifests an unmistakable

6    congressional intent to apply extraterritorially, RICO will apply to extraterritorial conduct,

7    too, but only to the extent that the predicate would. Conversely, when a RICO claim

8    depends on violations of a predicate statute that does not overcome *Morrison*'s

9    presumption against extraterritoriality, RICO will not apply extraterritorially either.

10       Our conclusion is compelled primarily by the text of RICO. Section 1961(1), which

11   defines "racketeering activity" for purposes of RICO, incorporates by reference various

12   federal criminal statutes, which serve as predicates for RICO liability. Some of these

13   statutes unambiguously and necessarily involve extraterritorial conduct. They can apply

14   only to conduct outside the United States. As examples, § 2332 of Title 18 criminalizes

15   killing, and attempting to kill, "a national of the United States, *while such national is*

16   *outside the United States*." 18 U.S.C. § 2332(a) (emphasis added). Section 2423(c)

17   criminalizes "[e]ngaging in illicit sexual conduct *in foreign places*." *Id.* § 2423(c)

18   (emphasis added). As the conduct which violates these two statutes can occur only outside

19   the United States, Congress unmistakably intended that they apply extraterritorially. By

20   explicitly incorporating these statutes by reference as RICO predicate offenses, Congress

11-2475-cv
**European Community v. RJR Nabisco**

1    also unmistakably intended RICO to apply extraterritorially when § 2332 or § 2423(c)

2    form the basis for RICO liability. Indeed, it is hard to imagine why Congress would

3    incorporate these statutes as RICO predicates if RICO could *never* have extraterritorial

4    application.

5         Other statutes that serve as RICO predicates clearly state that they apply to both

6    domestic and extraterritorial conduct. For example, § 1203(b), which criminalizes hostage

7    taking, explicitly applies to conduct that "occurred outside the United States" if the

8    offender or the hostage is a U.S. national, the offender is found in the United States, or the

9    conduct sought to coerce the government of the United States; sections 351(i) and 1751(k)

10   expressly provide "extraterritorial jurisdiction" for their criminalization of assassination,

11   kidnapping, or assault of various U.S. government officials; a provision of § 1512

12   criminalizes extraterritorial tampering with witnesses, victims, or informants; and

13   § 2332b(e) expressly asserts "extraterritorial Federal jurisdiction" as to its criminalization

14   of various "conduct transcending national boundaries"[3] including attempts, threats, or

15   conspiracies to kill persons within the United States or damage property within the United

16   States. Here too, Congress has not only incorporated into RICO statutes that overcome the

---

[3]  "[C]onduct transcending national boundaries" is defined as "conduct occurring outside of the United States in addition to the conduct occurring in the United States." 18 U.S.C. § 2332b(g)(1).

11-2475-cv
**European Community v. RJR Nabisco**

1    presumption against extraterritoriality, it has also provided detailed instructions for when

2    certain extraterritorial conduct should be actionable.

3        By incorporating these statutes into RICO as predicate racketeering acts, Congress

4    has clearly communicated its intention that RICO apply to extraterritorial conduct to the

5    extent that extraterritorial violations of those statutes serve as the basis for RICO liability.

6    Thus, a RICO complaint predicating the defendants' liability on their having engaged in a

7    pattern of attempting, while "outside the United States," to kill the plaintiff, "a national of

8    the United States," as prohibited by 18 U.S.C. § 2332(b), would state an actionable

9    violation of RICO notwithstanding the extraterritorial conduct because RICO incorporates

10   Congress's express statement that § 2332(b) applies to whomever "*outside the United*

11   *States* attempts to kill . . . a national of the United States." *Id.* (emphasis added). When, and

12   to the extent that, a RICO charge is based on an incorporated predicate that manifests

13   Congress's clear intention to apply extraterritorially, the presumption against

14   extraterritorial application of U.S. statutes is overcome. The district court was mistaken in

15   interpreting our *Norex* decision as holding that RICO can *never* apply extraterritorially.

16       Applying its perception of our holding in *Norex*, the district court approached the

17   question whether a RICO claim can apply to extraterritorial conduct by determining that

18   the "focus" of RICO is the criminal enterprise and that any application of RICO is therefore

19   impermissibly extraterritorial when the alleged enterprise is foreign. Because the district

20   court viewed the enterprise alleged in the Complaint as consisting primarily of a loose

**11-2475-cv**
**European Community v. RJR Nabisco**

1    association of foreign criminal organizations whose policies and activities were directed

2    from outside the United States, it concluded that the enterprise was foreign. It accordingly

3    held that the presumption against extraterritorial application of U.S. statutes barred

4    application of RICO to the facts alleged in the Complaint. In our view, the court erred in

5    that analysis for two principal reasons.

6          First, the district court's approach necessarily disregards the textual distinctions in

7    the statutes incorporated by reference as RICO predicates. For example, the money

8    laundering statute explicitly applies to extraterritorial conduct "if (1) the conduct is by a

9    United States citizen . . . and (2) the transaction or series of related transactions involves

10    funds or monetary instruments of a value exceeding $10,000." 18 U.S.C. § 1956(f). The

11    district court's reading of RICO would preclude extraterritorial applications of RICO

12    where they are explicitly permitted under the money laundering statute. By contrast, some

13    RICO predicates do not mention any extraterritorial application, *see, e.g.*, 18 U.S.C. § 1511

14    (criminalizing the obstruction of state or local law enforcement), while others clearly apply

15    to extraterritorial conduct, but under different circumstances than the money laundering

16    statute, *see, e.g.*, *id.* § 1203(b) (criminalizing a subset of extraterritorial hostage-taking).

17    The district court would presumably have RICO apply extraterritorially in the same

18    manner when claims are brought under these different predicates, effectively erasing

19    carefully crafted congressional distinctions.

14

**11-2475-cv**
**European Community v. RJR Nabisco**

1    Nothing in RICO requires or even suggests such an erasure of statutory distinctions.

2    Rather, RICO prohibits, roughly speaking, investing in, acquiring control of, working for,

3    or associating with an "enterprise" if the defendant's conduct involves (in a variety of

4    potential fashions) a "pattern of racketeering activity." 18 U.S.C. §§ 1962(c), 1964(c).

5    RICO does not qualify the geographic scope of the enterprise.[4] Nor does RICO contain

6    any other language that would suggest its extraterritorial application differs from that

7    specified in its various predicates. Without any congressional instruction to the contrary,

8    we see no reason to adopt a construction of RICO that would permit a defendant associated

9    with a foreign enterprise to escape liability for conduct that indisputably violates a RICO

10    predicate, but that could impose liability on a defendant associated with a domestic

11    enterprise for extraterritorial conduct that does not fall within the geographic scope of the

12    relevant predicate.

13    Second, the district court's requirement that the defendant be, loosely speaking,

14    associated with a domestic enterprise in order to sustain RICO liability seems to us

15    illogical. Under that standard, if an enterprise formed in another nation sent emissaries to

16    the United States to engage in domestic murders, kidnappings, and violations of the various

17    RICO predicate statutes, its participants would be immune from RICO liability merely

18    because the crimes committed in the United States were done in conjunction with a foreign

---

[4] RICO does, however, limit its application to conduct associated with enterprises "engaged in, or the activities of which affect interstate or foreign commerce." 18 U.S.C. § 1962.

15

**11-2475-cv**
**European Community v. RJR Nabisco**

1    enterprise. Surely the presumption against extraterritorial application of United States laws

2    does not command giving foreigners carte blanche to violate the laws of the United States

3    in the United States. *Cf. United States v. Parness*, 503 F.2d 430, 438-39 (2d Cir. 1974)

4    (noting that a conclusion that RICO requires both a domestic enterprise and a domestic

5    pattern of racketeering activity would "permit those whose actions ravage the American

6    economy to escape prosecution simply by investing the proceeds of their ill-gotten gains in

7    a foreign enterprise").

8            The district court's standard has the additional, undesirable effect of complicating

9    the question of what conduct exposes a party to liability in the United States. Under the

10   substantive criminal law, conduct may be sufficiently extraterritorial to provide a party

11   with peace of mind that it is not subject to U.S. law. Under the district court's reasoning,

12   however, if the party acts in concert with a "domestic enterprise," it may nevertheless face

13   stiff penalties under RICO. An important value of the presumption against

14   extraterritoriality is predictability. An interpretation of RICO that depends on the location

15   of the enterprise would undermine, rather than promote, that value.

16           We think it far more reasonable to make the extraterritorial application of RICO

17   coextensive with the extraterritorial application of the relevant predicate statutes. This

18   interpretation at once recognizes that "RICO is silent as to any extraterritorial application"

19   and thus has no extraterritorial application independent of its predicate statutes. *See Norex*,

20   631 F.3d at 33 (quoting *N. S. Fin. Corp. v. Al-Turki*, 100 F.3d 1046, 1051 (2d Cir. 1996)).

**11-2475-cv**
**European Community v. RJR Nabisco**

1   At the same time, it gives full effect to the unmistakable instructions Congress provided in

2   the various statutes incorporated by reference into RICO. This approach has the benefit of

3   simplifying the question of what conduct is actionable in the United States and permitting

4   courts to consistently analyze that question regardless of whether they are presented with a

5   RICO claim or a claim under the relevant predicate. It also avoids incongruous results,

6   such as insulating purely domestic conduct from liability simply because the defendant has

7   acted in concert with a foreign enterprise.[5]

8   **B.    The Conduct Alleged in the Complaint**

9        The Complaint in our case alleges a pattern of racketeering activity based on

10   predicates that include (1) money laundering, 18 U.S.C. §§ 1956-57, (2) providing material

11   support to foreign terrorist organizations, 18 U.S.C. § 2339B, (3) mail fraud, 18 U.S.C.

12   § 1341, (4) wire fraud, 18 U.S.C. § 1343, and (5) violations of the Travel Act, 18 U.S.C.

13   § 1952. Applying *Morrison*'s presumption against extraterritoriality to these predicate

14   statutes, we conclude first that the money laundering and material support of terrorism

15   statutes both apply extraterritorially under specified circumstances, including those

16   circumstances alleged in the Complaint. Second, we conclude that the wire fraud and

---

[5]  Our rejection of the district court's conclusion — that RICO has an exclusive focus on the location of the enterprise, which alone determines whether a particular application is impermissibly extraterritorial — accords with the Ninth Circuit's ruling in *United States v. Chao Fan Xu*, 706 F.3d 965, 977 (9th Cir. 2013), although on different reasoning.

11-2475-cv
**European Community v. RJR Nabisco**

1    money fraud statutes, as well as the Travel Act, do not overcome *Morrison*'s presumption

2    against extraterritoriality. Nevertheless, because Plaintiffs have alleged that all elements of

3    the wire fraud, money fraud, and Travel Act violations were completed in the United States

4    or while crossing U.S. borders, we conclude that the Complaint states domestic RICO

5    claims based on violations of those predicates.

6    **1.    Allegations of Money Laundering and Material Support of**
7    **Terrorism**

8         The money laundering predicates apply extraterritorially "if (1) the conduct is by a

9    United States citizen . . . and (2) the transaction or series of related transactions involves

10   funds or monetary instruments of a value exceeding $10,000." 18 U.S.C. § 1956(f).

11   Section 1956(f) expressly states that "[t]here is extraterritorial jurisdiction over the conduct

12   prohibited by this section." Section 1957 similarly criminalizes knowingly engaging "in a

13   monetary transaction in criminally derived property of a value greater than $10,000 . . .

14   derived from specified unlawful activity," *id.* § 1957(a), if the offense "*takes place outside*

15   *the United States* . . . , but the defendant is a United States person,"[6] *id.* § 1957(d)

---

[6]     In defining the offense of money laundering, § 1956 also states that money laundering includes transporting "a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States." 18 U.S.C. § 1956(a)(2). This however is irrelevant to our inquiry. The quoted passage necessarily involves crossing the United States border. Regulation of conduct in crossing the United States borders is not regulation of extraterritorial conduct. The presumption against extraterritorial application of United States statutes does not apply to statutes that regulate entering and exiting the United States.

18

11-2475-cv
**European Community v. RJR Nabisco**

1   (emphasis added). The predicate act criminalizing material support for terrorism similarly

2   states that it applies extraterritorially. It covers "knowingly provid[ing] material support or

3   resources to a foreign terrorist organization," *id.* § 2339B(a)(1), and adds that "[t]here is

4   extraterritorial Federal jurisdiction over an offense under this section," *id.* § 2339B(d)(2).

5        The claims of the Complaint asserting RICO liability for a pattern of violations of

6   these predicates meet the statutory requirements for extraterritorial application of RICO.

7   The district court erred in dismissing, as impermissibly extraterritorial, the RICO claims

8   based on these predicates.[7]

9        **2.    Allegations of Mail Fraud, Wire Fraud, and Travel Act**
10              **Violations**

11       Whether Congress manifested an intent that the wire fraud statute, 18 U.S.C.

12   § 1343,[8] or the Travel Act, 18 U.S.C. § 1952,[9] applies extraterritorially presents a more

---

[7] It might be argued that Congress's clear statement in the predicate statute that *it* applies extraterritorially does not constitute a congressional statement that a RICO charge predicated on that statute applies extraterritorially. This overlooks the fact that the predicate statutes are incorporated by reference into the RICO statute and are a part of it.

[8] The wire fraud statute, 18 U.S.C. § 1343, provides that:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned . . . .

[9] The Travel Act, 18 U.S.C. § 1952, provides, in pertinent part, as follows:
(a) Whoever travels in interstate or foreign commerce or uses the mail or any

**11-2475-cv**
**European Community v. RJR Nabisco**

1    complicated question. The argument in favor of extraterritoriality depends on their

2    references to foreign commerce. The wire fraud statute applies to the transmission of

3    communications by "wire, radio, or television . . . in interstate or foreign commerce" in the

4    execution of a scheme to defraud. *Id.* § 1343. The Travel Act applies to "travel[] in

5    interstate or foreign commerce or use[] [of] the mail or any facility in interstate or foreign

6    commerce" with intent to further unlawful activity. *Id.* § 1952(a). In *Morrison*, the

7    Supreme Court observed that a "general reference to foreign commerce . . . does not defeat

8    the presumption against extraterritoriality." *Morrison*, 130 S. Ct. at 2882. This admonition

9    appears to bar reading these statutes literally to cover wholly foreign travel or

10   communication. We conclude that the references to foreign commerce in these statutes,

11   deriving from the Commerce Clause's specification of Congress's authority to regulate, do

12   not indicate a congressional intent that the statutes apply extraterritorially.[10]

---

facility in interstate or foreign commerce, with intent to--
(1) distribute the proceeds of any unlawful activity; or
(2) commit any crime of violence to further any unlawful activity; or
(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
and thereafter performs or attempts to perform--
(A) an act described in paragraph (1) or (3) . . . or
(B) an act described in paragraph (2) . . . shall be fined . . . , imprisoned . . . , or both.
(b) As used in this section (i) "unlawful activity" means . . . any act . . . indictable under . . . section 1956 or 1957 [the money-laundering statute].

[10] In *Pasquantino v. United States*, 544 U.S. 349, 371-72 (2005), the Supreme

**11-2475-cv**
**European Community v. RJR Nabisco**

1    The mail fraud statute presents an easier case.[11]  There, unlike in the Travel Act and

2    wire fraud statute, Congress included no reference to transnational application whatsoever.

3    *See generally* 18 U.S.C. § 1341. Accordingly, we see no basis for finding a manifestation

4    of congressional intent that the mail fraud statute apply extraterritorially.

5        Applying these principles to the Complaint, we conclude that it alleges sufficient

6    domestic conduct for the claims involving mail fraud, wire fraud, and Travel Act violations

7    to sustain the application of RICO, notwithstanding that these predicates do not apply

8    extraterritorially.[12]

---

Court suggested, in dictum, that, because "the wire fraud statute punishes frauds executed
in interstate or foreign commerce" it "is surely not a statute in which Congress had only
domestic concerns in mind." *Id.* (internal citations and quotation marks omitted). Because
that statement is dictum, and because *Morrison* explicitly rejects the reasoning on which it
relies, we do not read *Pasquantino* to require us to construe the "foreign commerce"
language of the wire fraud statute as rebutting the presumption against extraterritoriality.

[11]  The mail fraud statute, 18 U.S.C. § 1341, provides that:
Whoever, having devised or intending to devise any scheme or artifice to
defraud, or for obtaining money or property by means of false or fraudulent
pretenses, representations, or promises, . . . for the purpose of executing such
scheme or artifice or attempting so to do, places in any post office or
authorized depository for mail matter, any matter or thing whatever to be
sent or delivered by the Postal Service, or deposits or causes to be deposited
any matter or thing whatever to be sent or delivered by any private or
commercial interstate carrier . . . shall be fined under this title or imprisoned
. . . .

[12]  As noted above, the allegations based on the money-laundering predicate and the
predicate covering material support for terrorist activities state an actionable claim
notwithstanding their non-domestic elements, because Congress manifested its intention
that those predicates apply extraterritorially as RICO violations.

21

11-2475-cv
European Community v. RJR Nabisco

1       The Complaint alleges that RJR essentially orchestrated a global money laundering

2   scheme from the United States by sending employees and communications abroad. It

3   claims that RJR "communicated . . . with [its] coconspirators on virtually a daily basis by

4   means of U.S. interstate and international wires as a means of obtaining orders for

5   cigarettes, arranging for the sale and shipment of cigarettes, and arranging for and

6   receiving payment for the cigarettes in question." Complaint ¶ 94. The Complaint also

7   states that RJR and its coconspirators "utilized the interstate and international mail and

8   wires, and other means of communication, to prepare and transmit documents that

9   intentionally misstated the purchases of the cigarettes in question so as to mislead the

10   authorities within the United States, the European Community, and the Member States."

11   *Id.* ¶ 95. The Complaint alleges that "the U.S. mails and wires are used by [RJR] to bill and

12   pay for the cigarettes, to confirm billing and payment for the cigarettes, to account for the

13   payment of the cigarettes to [RJR] and [its] subsidiaries, and to maintain an accounting of

14   the proceeds received by [RJR] from the sale of the cigarettes, with said proceeds

15   ultimately being returned to [RJR] in the United States." *Id.* ¶ 96. The Complaint

16   furthermore alleges:

17                   [T]he employees, executives, and managers of [RJR] often
18                   traveled extensively, both to supervise the schemes and also to
19                   entertain [RJR's] criminal customers. RJR executives traveled
20                   from the United States to Europe and South America to meet
21                   with, entertain, and maintain relations with RJR's criminal
22                   customers. RJR executives and managers who engaged in such

**11-2475-cv**
**European Community v. RJR Nabisco**

1                    travel and entertainment often received large travel and
2                    entertainment budgets from [RJR].
3
4     *Id.* ¶ 84.

5          Beyond these allegations that the Defendants managed their global money

6     laundering schemes from the United States through foreign travel and communications, the

7     Complaint also claims that the schemes themselves were directed at the United States and

8     had substantial domestic effects. The Complaint alleges that RJR repatriated the profits of

9     its unlawful activity into the United States through money laundering and other acts of

10    concealment. The money laundering involved in one portion of the scheme ─ that

11    comprising Russian organized crime and the Bank of New York─ was largely centered in

12    and operated from Queens, New York, where tens of millions of dollars were allegedly

13    laundered. Defendants allegedly filed large volumes of false documents with the United

14    States Customs Service and the Bureau of Alcohol, Tobacco and Firearms in order to

15    deceive these agencies and permit the unlawful activity to continue. Finally, the Complaint

16    alleges that the money laundering scheme it describes is intertwined with organized crime

17    and narcotics trafficking in New York City, that much of the money laundering through

18    cigarette sales occurs in New York City, and that millions of dollars' worth of real estate

19    have been purchased within New York in conjunction with the scheme.

20         We need not now decide precisely how to draw the line between domestic and

21    extraterritorial applications of the wire fraud statute, mail fraud statute, and Travel Act,

**11-2475-cv**
**European Community v. RJR Nabisco**

1  because wherever that line should be drawn, the conduct alleged here clearly states a

2  domestic cause of action. The complaint alleges that defendants hatched schemes to

3  defraud in the United States, and that they used the U.S. mails and wires in furtherance of

4  those schemes and with the intent to do so. Defendants are also alleged to have traveled

5  from and to the United States in furtherance of their schemes. In other words, plaintiffs

6  have alleged conduct in the United States that satisfies every essential element of the mail

7  fraud, wire fraud, and Travel Act claims.   If domestic conduct satisfies every essential

8  element to prove a violation of a United States statute that does not apply extraterritorially,

9  that statute is violated even if some further conduct contributing to the violation occurred

10  outside the United States.[13]

11      We note that, as we are reviewing a dismissal based solely on the contents of the

12  Complaint, our conclusion is based entirely on the Complaint, which we find sufficient to

13  state an actionable claim. Plaintiffs' ability to prevail will depend, in part, on their ability to

14  present evidence showing that the alleged statutory violation was domestic. Should the

15  pattern of conduct of certain Defendants or certain schemes prove to be extraterritorial, the

16  district court may need to narrow the scope of this action accordingly, through either

17  motions for (partial) summary judgment or through carefully tailored jury instructions.

---

[13] We need not decide whether domestic conduct satisfying fewer than all of the statute's essential elements could constitute a violation of such a statute.

24

11-2475-cv
European Community v. RJR Nabisco

1    **II.      Diversity Jurisdiction and State Law Claims**

2          Next, we turn to the district court's dismissal of Plaintiffs' state law claims. We

3    review a district court's legal conclusions dismissing state law claims for lack of subject

4    matter jurisdiction *de novo. Capital Ventures Int'l v. Republic of Argentina*, 552 F.3d 289,

5    293 (2d Cir. 2009).

6          Federal courts are powerless to adjudicate a suit unless they have subject matter

7    jurisdiction over the action. The district court determined that it lacked subject matter

8    jurisdiction over Plaintiffs' state law claims under the diversity jurisdiction statute, 28

9    U.S.C. § 1332. Section 1332 requires complete diversity between opposing parties. *See,*

10   *e.g.*, *Hallingby v. Hallingby*, 574 F.3d 51, 56 (2d Cir. 2009); *Strawbridge v. Curtiss*, 7 U.S.

11   (3 Cranch) 267, 267 (1806). If the European Community is not diverse from RJR, its

12   continued participation in this lawsuit would destroy complete diversity and deprive the

13   federal court of jurisdiction.[14]

14         Section 1332(a)(4) grants the federal courts jurisdiction over suits where the amount

15   in controversy exceeds $75,000 and the suit is between "a foreign state . . . as plaintiff and

---

[14] Since this lawsuit was filed, the European Community has been incorporated into the European Union. Despite this change, the European Community remains the relevant entity, as the court's subject matter jurisdiction and a party's instrumentality status for purposes of § 1603 are both determined at the time when the complaint is filed. *See Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989) (subject matter jurisdiction); *Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003) (instrumentality status).

11-2475-cv
**European Community v. RJR Nabisco**

1    citizens of a State." 28 U.S.C. § 1332(a)(4). A "foreign state" is defined for purposes of

2    § 1332(a)(4) by § 1603, which is part of the Foreign Sovereign Immunities Act ("FSIA").

3    This latter section provides:

4           (a) A "foreign state" . . . includes a political subdivision of a foreign state or
5           an agency or instrumentality of a foreign state as defined in subsection (b).
6           (b) An "agency or instrumentality of a foreign state" means any entity--
7                  (1) which is a separate legal person, corporate or otherwise, and
8                  (2) which is an organ of a foreign state or political subdivision thereof
9           . . .
10                 and
11                 (3) which is neither a citizen of a State of the United States . . . nor
12          created under the laws of any third country.

13

14   *Id.* § 1603.

15          The European Community is therefore a "foreign state" for purposes of § 1332(a)(4)

16   if it is an "agency or instrumentality of a foreign state." Whether it is an agency or

17   instrumentality of a foreign state, in turn, depends on whether it conforms to the definition

18   in subsection (b). There is no doubt that the European Community satisfies the first and

19   third elements of the definition of "agency or instrumentality" provided in § 1603(b).[15] It

---

[15] The European Community has independent legal status. Consolidated Version of the Treaty Establishing the European Community, art. 281, Oct. 11, 1997, O.J. (C340) 293 (1997) [hereinafter EC Treaty] ("The Community shall have legal personality."). The European Community was not created under the laws of a non-member state. *See* EC Treaty, art. 313; *see also In re Air Crash Disaster Near Roselawn, Ind.*, 96 F.3d 932, 938 (7th Cir. 1996) ("The FSIA requires that the [entity] not be created under the laws of a third country, that is, a nation not a member of the multinational joint venture.").

11-2475-cv
**European Community v. RJR Nabisco**

1   is clear also that the European Community is not a political subdivision of a foreign state.

2   The question is whether the European Community is "an organ of a foreign state." *Id.*

3       For the reasons discussed below, we conclude that the European Community is an

4   organ of a foreign state, and thus an agency or instrumentality of a foreign state. As a result,

5   the continued participation of the European Community in this suit does not destroy

6   complete diversity.

7       **A.    Definitions**

8       The FSIA does not include a definition of the term "organ." A number of

9   dictionaries we have consulted include definitions of "organ" that are altogether

10   compatible with the European Community in its relationship to the states that formed it.

11   *See Organ Definition*, Oxford English Dictionary, http://www.oed.com/view/Entry/

12   132421 (last visited July 10, 2013) ("A means of action or operation, an instrument; (now)

13   *esp*. a person, body of people, or thing by which some purpose is carried out or some

14   function is performed."); American Heritage Dictionary 875 (2d College ed. 1982) ("An

15   organization that performs certain specified functions: The FBI is an organ of the Justice

16   Department."); Merriam-Webster's Third New International Dictionary of the English

17   Language 1589 (1976) ("an instrumentality exercising some function or accomplishing

18   some end"). RJR in rebuttal points to definitions that characterize an organ as subordinate

19   to a larger entity, arguing that this is not the case with the European Community's

20   relationship to its member nations. But the fact that the word is sometimes used to refer to

**11-2475-cv**
**European Community v. RJR Nabisco**

1   a smaller part of a larger whole does not mean that the word can serve only in that fashion.

2   The European Community was formed by its member nations to serve on their collective

3   behalf as a body exercising governmental functions over their collective territories. We see

4   no reason why it is not properly described as an organ of each nation.

5       In *Filler v. Hanvitt Bank*, 378 F.3d 213, 217 (2d Cir. 2004), this court set forth five

6   factors to guide a court in determining whether a party is an "organ" under the FSIA. The

7   factors are:

8       (1) whether the foreign state created the entity for a national purpose; (2)
9       whether the foreign state actively supervises the entity; (3) whether the
10      foreign state requires the hiring of public employees and pays their salaries;
11      (4) whether the entity holds exclusive rights to some right in the [foreign]
12      country; and (5) how the entity is treated under foreign state law.
13
14  *Id.* (quoting *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 846-47 (5th Cir.

15  2000)) (alteration in original). We have stated that these factors invite a balancing process,

16  and that an entity can be an organ even if not all of the factors are satisfied. *See In re*

17  *Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 85 (2d Cir. 2008), *abrogated on other*

18  *grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010). The European Community satisfies

19  four of these factors and, very likely, also the fifth: it was created by the European nations

20  for national purposes; it is supervised by the foreign countries; it has public employees

21  whose salaries are paid, at least indirectly, by the member nations, which continue to bear

22  collectively the expenses of operation; it holds exclusive rights in the foreign countries;

28

**11-2475-cv**
**European Community v. RJR Nabisco**

1   and the foreign countries treat it as a government entity under their laws. We discuss each

2   of these factors briefly below.

3                 **1.      National Purpose**

4          It seems beyond doubt that the member states that founded the European

5   Community did so for a "national purpose." *Filler*, 378 F.3d at 217. Their purpose was to

6   establish governmental control on a collective basis over various national functions

7   previously performed by each of the member states on an individual basis, such as by

8   establishing a common market and a monetary union, and by coordinating economic

9   activities throughout the community. EC Treaty, arts. 1-4. The management of a common

10  currency and the maintenance of economic stability are quintessential national purposes.

11                 **2.      Supervision**

12         We have said that a foreign state actively supervises an organ when it appoints the

13  organ's key officials and regulates some of the activities the organ can undertake. *See, e.g.*,

14  *Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co.*, 476 F.3d 140, 143 (2d Cir.

15  2007). Member states exercise supervisory responsibility over the European Community

16  by appointing representatives to serve on the Council of Ministers, which is the European

17  Community's "primary policy-making and legislative body." *See* Stephen Breyer,

18  *Changing Relationships Among European Constitutional Courts*, 21 Cardozo L. Rev.

19  1045, 1046 (2000). Each member of the Council is the appointed representative of one

20  member state (although the individual representative will change depending on the subject

**11-2475-cv**
**European Community v. RJR Nabisco**

1  matter to be discussed by the Council). *Id.* Additionally, each member state selects

2  commissioners to serve on the European Commission, which administers the

3  Community's various departments. *Id.* at 1046-47.

4       It is true that these entities are just two of the five basic institutions of the European

5  Community. However, this factor does not require the foreign state to micro-manage every

6  aspect of the organ's activities. The Council of Ministers is the European Community's

7  primary policy-making and legislative body. Therefore, the member states' supervision of

8  this entity enables the member states to supervise the most significant policy decisions

9  made by the European Community.

10       **3.    Public Employees**

11       The third factor asks "whether the foreign state requires the hiring of public

12  employees and pays their salaries." *Filler*, 378 F.3d at 217. The EC Treaty, enacted by the

13  member states, requires the creation of particular positions, which are to be filled by public

14  officials. *See European Cmty. II*, 814 F. Supp. 2d at 205. Service as a European

15  Community official satisfies the European Court of Justice's definition of "public service"

16  because such officials exercise "powers conferred by public law and duties designed to

17  safeguard the general interests of the state or of other public authorities." *Id.* (quoting Case

18  149/79, *Comm'n of the European Cmtys. v. Kingdom of Belgium*, 1980 E.C.R. 3881, ¶10).

19  The member states indirectly pay the salaries of the public employees. In 2000, for

20  example, they contributed 78.4% of the European Community's budget, 5.5% of which

11-2475-cv
European Community v. RJR Nabisco

1   goes to administrative expenses, which include salaries and pensions. *See* European

2   Commission, EU Budget 2008 Financial Report, 82, 88 (2009).

3         RJR argues that the European Community does not satisfy this factor because its

4   employees are not public employees *of the member states*. *See, e.g.*, *Patrickson v. Dole*

5   *Food Co.*, 251 F.3d 795, 808 (9th Cir. 2001), *aff'd by* 538 U.S. 468 (2003). This fact seems

6   to us of small importance at best. Given that the European Community exercises

7   governmental functions delegated to it by the member states, and does so through public

8   employees whose pay is financed largely by the member states, it seems to make little or no

9   difference for the question whether the European Community serves as an organ of its

10  member states that its employees are not employees directly of the member states.

11  Nevertheless, as noted above, our precedent makes clear that the five *Filler* factors are

12  merely issues to be considered in the decision, and there is no requirement that all five be

13  satisfied to support the conclusion that an entity is an organ of a foreign state. We would

14  reach the same conclusion even if precedent compelled us to decide that the European

15  Community fails to satisfy this factor. *See Peninsula Asset Mgmt.*, 476 F.3d at 143

16  (concluding the entity was an "organ" despite the fact that it failed to satisfy the public

17  employee factor).

18              **4.    Exclusive Rights**

19         Fourth, we consider "whether the entity holds exclusive rights to some right in the

20  foreign country." *Filler*, 378 F.3d at 217 (alteration omitted). This factor has been given a

31

**11-2475-cv**
**European Community v. RJR Nabisco**

1   broad meaning. *See, e.g.*, *Terrorist Attacks*, 538 F.3d at 86 (an entity satisfied this factor

2   when it held "the 'sole authority' to collect and distribute charity to Bosnia"); *Peninsula*

3   *Asset Mgmt.*, 476 F.3d at 143 (entity "has the exclusive right to receive monthly business

4   reports from the solvent financial institutions it oversees"). The European Community

5   holds the exclusive right to exercise a number of significant governmental powers, which

6   include the right to "authori[z]e the issue of banknotes within the Community" and "to

7   conclude the Multilateral Agreements on Trade in Goods." *European Cmty.*, 814 F. Supp.

8   2d at 206-07.

9               **5.     Foreign State Law**

10           Finally, the fifth factor asks "how the entity is treated under foreign state law."

11   *Filler*, 378 F.3d at 217. In *Peninsula Asset Management*, this factor was satisfied when the

12   "Korean government informed the State Department and the district court that it treats [the

13   entity] as a government entity." *Peninsula Asset Mgmt.*, 476 F.3d at 143. Neither party

14   cites to European law that clearly addresses this question. The member states that are

15   parties to this suit have identified the European Community as an organ. Plaintiffs

16   informed the district court in their briefing that they consider the European Community to

17   be a governmental entity, and the United States Department of State has advised that it

18   accepts this representation. *See* Brief for the United States as Amicus Curiae at 29.

19   Therefore, in a manner similar to the one employed in *Peninsula Asset Management*, the

20   European Community appears to satisfy this factor. Furthermore, the fact that the member

32

**11-2475-cv**
**European Community v. RJR Nabisco**

1   states have ceded portions of their governmental authority to the European Community to

2   be exercised by it in their stead and on their collective behalf seems to confirm its status as

3   an organ and agency of the member states.

4        RJR argues that none of the member states has treated the European Community as

5   its "organ," rather than as a supranational body of the member states. This argument,

6   however, depends on the proposition that a governmental entity created by a collectivity of

7   governments to exercise certain powers in their stead and on their behalf cannot be at once

8   a supranational entity and an organ or agency of the actors that created it. It appears to us

9   that both descriptions are accurate, and the fact that the European Community functions as

10  a supranational governmental entity does not negate its also being an organ and agency of

11  its member states, which continue to exist as sovereign nations, notwithstanding having

12  delegated some of their governmental powers to the supranational agency they created.

13  **B.    Multi-National Entities**

14       RJR argues that the text and legislative history of the FSIA, along with the common

15  law at the time of the FSIA's enactment, demonstrate that an "organ" of a foreign state

16  cannot include an international organization created by multiple states. We disagree.

17       First, we turn to the text of § 1603. The fact that § 1603(b)(2) uses the term "organ

18  of *a* foreign state" in the singular does not necessarily negate application to the European

19  Community, which serves numerous foreign states. 28 U.S.C. § 1603(b)(2) (emphasis

20  added). There is no logic to the proposition that an entity that serves as an organ of one

33

11-2475-cv
**European Community v. RJR Nabisco**

1    foreign state cannot also serve as the organ of another. The Dictionary Act furthermore

2    states that "[i]n determining the meaning of any Act of Congress, unless the context

3    indicates otherwise[,] words importing the singular include and apply to several persons,

4    parties, or things." 1 U.S.C. § 1. Context "means the text of the Act of Congress

5    surrounding the word at issue, or the texts of other related congressional Acts." *Rowland v.*

6    *Cal. Men's Colony*, 506 U.S. 194, 199 (1993). The context here gives no indication that the

7    phrase "a foreign state" must be interpreted to exclude an organ that serves as an agency of

8    several states. Our interpretation finds support in the law of other circuits dealing with the

9    pooling of shares to determine the status of commercial entities. *See In re Air Crash*

10   *Disaster Near Roselawn, Ind.*, 96 F.3d 932, 938-39 (7th Cir. 1996) (holding that an entity

11   created by multiple governments is an "agency or instrumentality" under the FSIA);

12   *Mangattu v. M/V IBN Hayyan*, 35 F.3d 205, 208 (5th Cir. 1994) (same); *Linton v. Airbus*

13   *Indus.*, 30 F.3d 592, 598 n.29 (5th Cir. 1994) (collecting cases). In these "share pooling"

14   cases, courts have repeatedly held that corporations owned by several foreign states are

15   covered by the FSIA, even though the statute uses the singular.

16        RJR argues that because some dictionaries define "organ" as a smaller unit of a

17   larger entity, an "organ" cannot be a larger international organization created by multiple

18   foreign states. *See* Merriam-Webster's Collegiate Dictionary 819 (10th ed. 1997) (giving

19   as a definition of "organ": "a subordinate group or organization that performs specialized

20   functions"). This argument is not persuasive for at least two reasons: First, while some

34

11-2475-cv
European Community v. RJR Nabisco

1    dictionary definitions treat an organ as smaller than, or subordinate to, the entity for which

2    it functions as an organ, other dictionary definitions do not include any specification that

3    the entity serving as an organ must be smaller or subordinate, but focus rather on the

4    organ's performance of a service. *See* definitions provided *supra*. Second, even if we

5    accept an implicit connotation of subordinate status, that is not necessarily inconsistent

6    with treating the European Community as an organ of the nations that created it. While the

7    member states ceded to the European Community primacy as to certain specified

8    governmental functions, they retained the vast majority of governmental control. Each

9    member state continued to exist as a sovereign state, notwithstanding having voluntarily

10   ceded portions of its authority to the European Community, and, through the Treaty of

11   Lisbon, the member states dissolved the European Community and incorporated it into the

12   European Union. Thus, in certain senses, the European Community exercised its powers by

13   the sufferance of the member states, and was both subordinate to and smaller than the

14   aggregate of the nation states that created it.

15          RJR advances a number of additional strained arguments to the effect that an

16   international organization should not be considered an agency or instrumentality, none of

17   which are convincing.[16]

---

[16]  RJR also cites, in support of its position, the enactment of separate statutes, 22
U.S.C. §§ 288-288*l*, which provide certain immunities to certain international
organizations, but which do not grant co-extensive immunities to all international
organizations as the FSIA provides to foreign states. RJR argues that this separate statutory

**11-2475-cv**
**European Community v. RJR Nabisco**

1         *                    *                    *

2    We are satisfied that the European Community meets at least four, and possibly all

3   five of the *Filler* factors, and therefore qualifies as an organ and agency of a foreign state

4   under § 1332(a)(4). The suit accordingly comes within the diversity jurisdiction, as

5   specified in 28 U.S.C. § 1332.[17]

6                                **CONCLUSION**

7    The judgment of the district court dismissing the action is VACATED, and the case

8   REMANDED for further proceedings.

---

framework for analyzing the immunities of international organizations suggests that Congress did not contemplate that such organizations would fall within the definition of "foreign state" under the FSIA. It suffices to say that Congress's belief that certain international organizations were not organs of foreign states under the FSIA cannot be read to imply that Congress believed none could be organs of foreign states. Nothing in the statutes cited by RJR suggests that international organizations that do qualify as organs of a foreign state cannot, by virtue of their status as international organizations, be treated as foreign states under the FSIA.

[17] Plaintiffs also contend that the district court erred by dismissing their federal common law nuisance claim without discussion. Although the Complaint does not specify whether Plaintiffs' public nuisance claim was brought under federal or state law, it appears that Plaintiffs stipulated that all of their common law claims were to be decided under New York law. Therefore, we have considered the dismissal of Plaintiffs' public nuisance claim along with Plaintiffs' other state law claims.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

36